09:05:00   1                    UNITED STATES DISTRICT COURT

           2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

           3

           4    KELLY BUTLER,                    .
                                                 .
           5         PLAINTIFF,                  . NO. 11-CV-2313-L
                                                 .
           6              V.                     . DECEMBER 4, 2013
                                                 .
           7    HOMESERVICES LENDING LLC,        . JURY TRIAL - DAY 2
                                                 .
           8         DEFENDANT.                  . SAN DIEGO, CALIFORNIA
                . . . . . . . . . . . . . . . . . ..

           9

09:05:00  10

          11              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                                  (PARTIAL TRANSCRIPT)
          12            BEFORE THE HONORABLE M. JAMES LORENZ
                             UNITED STATES DISTRICT JUDGE
          13
                APPEARANCES:
          14
                FOR THE PLAINTIFF:      TEEPLE HALL LLP
          15                            BY: GREGORY M. GARRISON
                                            GRANT G. TEEPLE
          16                            9255 TOWNE CENTER DRIVE
                                        SUITE 500
          17                            SAN DIEGO, CALIFORNIA  92121

          18    FOR THE DEFENDANT:      SHEPPARD MULLIN RICHTER & HAMPTON LLC
                                        BY: THOMAS R. KAUFMAN
          19                                PAUL BERKOWITZ
                                        1901 AVENUE OF THE STARS
          20                            SUITE 1600
                                        LOS ANGELES, CALIFORNIA  90067
          21

          22    COURT REPORTER:         JULIET Y. EICHENLAUB, RPR, CSR
                                        USDC CLERK'S OFFICE
          23                            880 FRONT STREET, ROOM 4290
                                        SAN DIEGO, CALIFORNIA  92101
          24                            JULIET_EICHENLAUB@CASD.USCOURTS.GOV

          25
                REPORTED BY STENOTYPE, TRANSCRIBED BY COMPUTER

                                                                          1

1                              <u>INDEX</u>

2    EXAMINATION

3    WITNESS NAME                    DIRECT  CROSS  REDIRECT  RECROSS

4       KELLY BUTLER .................... 10      40     71        74

5       MICHAEL YIP ..................... 76      108    112

6       DANNY VALENTINI.................. 114     188    198       200

7       MARK BUCHANAN ................... 161     177    185       187

8
     EXHIBIT     DESCRIPTION                                    EVIDENCE
9
     11          E-MAIL FROM ROBIN LEONARD .................... 98
10
     12          E-MAIL ....................................... 145
11
     18          E-MAIL FROM DANNY VALENTINI .................. 156
12
     123         EXCERPT FROM THE PHONE RECORDS ............... 65
13
     104         MS. BUTLER'S W-2.............................. 68
14
     16          E-MAIL ....................................... 148
15
     108         DOHERTY EMPLOYEE HANDBOOK ................. 22
16
     3           CELL PHONE RECORDS............................ 29
17
     4           HMA WORKFLOW CHART............................ 33
18
     7           ELECTRONIC TIME CARD ......................... 34
19
     106         HANDBOOK ACKNOWLEDGEMENT...................... 47
20
     8           LETTER FROM LAURA DAWSON.....................146
21
     9           E-MAIL ....................................... 153
22
     5           E-MAIL FROM DANNY VALENTINI .................. 155
23

24

25

2

09:05:00  1        SAN DIEGO, CALIFORNIA, DECEMBER 4, 2013

        2            (PARTIAL TRANSCRIPT.)

        3        THE COURT:  GOOD MORNING.

        4        MR. GARRISON:  GOOD MORNING, YOUR HONOR.  WE HAVE TWO

        5    ISSUES WE WANT TO RAISE WITH THE COURT TO GET SOME

        6    INSTRUCTION ON BRIEFLY BEFORE TRIAL.  YESTERDAY, MR.

        7    KAUFMAN RAISED THAT OUR FIRM REPRESENTED MANY OF THESE

        8    WITNESSES IN OTHER CASES WHICH I THINK HE HAS A RIGHT TO

        9    DO TO SHOW BIAS IF HE WANTS TO DO THAT.  THAT BRINGS THE

       10    ISSUE THAT IF HE OPENS THAT DOOR I INTEND TO PUT IN FRONT

       11    OF THE JURY THAT THEY SUED BECAUSE THEY WEREN'T PAID

       12    OVERTIME AND THAT THE COMPANY PAID THEM WHEN THEY SUED.  I

       13    THINK THAT'S -- IT WILL BE BROUGHT IN.  IN THE EVENT THE

       14    COURT IS NOT GOING TO ALLOW ME TO DO THAT, I WOULD ASK

09:05:33 15    THAT HE NOT BE ALLOWED TO SAY AND INSINUATE THAT OUR FIRM

       16    SUED HIS CLIENT AND THAT THERE'S SOME NEFARIOUS MEANING TO

       17    THAT WITHOUT THE JURY KNOWING EXACTLY WHY THEY SUED WHICH

       18    WAS FOR OVER SOMETIME AND THAT THEY WERE PAID WHEN THEY

       19    SUED.

       20        MR. KAUFMAN:  JUST THE DISTINCTION I SEE HERE IS WE

       21    WANTED TO PUT IN EVIDENCE THAT THEY ALL HIRED THESE

       22    LAWYERS AND ALL BROUGHT LAWSUITS TO SHOW BIAS.  IF THEY

       23    WANT TO SAY THAT THEY SUED FOR OVERTIME, I DON'T HAVE A

       24    PROBLEM WITH THAT.  I DO HAVE A PROBLEM WITH GETTING INTO

       25    WHAT THE RESULT WAS OF THOSE CASES AND THE CONFIDENTIAL

09:06:07   1     SETTLEMENTS ON THE BASIS THAT IT'S USING THE FACT OF

          2     SETTLEMENT TO PROVE --

          3         THE COURT:  I AGREE.  I AGREE.  I'LL ALLOW YOU TO ASK

          4     SOMEBODY WHICH WHETHER IT HAD TO DO WITH WAGES, BUT I

          5     DON'T WANT TO GO INTO THE DETAILS OR --

          6         MR. GARRISON:  YOUR HONOR, CAN I THEN ASK JUST THIS

          7     -- BECAUSE I DON'T THINK IT'S FAIR AND THIS IS WHY I'M

          8     ASKING -- CAN I JUST SAY, WAS THE COURT RESOLVED TO YOUR

          9     SATISFACTION?  YOU CAN'T MAKE IT LOOK LIKE I'M FILING

        10     FRIVOLOUS LAWSUITS.

        11         THE COURT:  THAT'S FINE.  I THINK YOU CAN JUST

        12     INDICATE WAS IT RESOLVED TO YOUR SATISFACTION.  WELL, LET

        13     ME THINK FOR A MINUTE.  LET ME THINK.

        14         MR. KAUFMAN:  WHILE YOU'RE THINKING, WE'RE NOT GOING

09:06:51  15     TO SAY ANYTHING TO SUGGEST THAT THE LAWSUITS WERE

        16     NECESSARILY FRIVOLOUS OR THAT THE LAWSUITS WERE THROWN OUT

        17     OF COURT AND THAT THEY LOST.  ALL THAT MATTERS IS THAT

        18     WE'RE JUST TRYING TO SHOW THESE ARE NOT INNOCENT THIRD

        19     PARTIES WHO ARE JUST COMING FORWARD.  THESE ARE ALL PEOPLE

        20     WHO ALL USE THIS COUNSEL AND ALL SUED, AND HE'S FREE TO

        21     SAY WHAT THE CASE WAS ABOUT.  LET'S JUST LEAVE IT AT THAT.

        22         THE COURT:  I DON'T THINK IT SERVES A PURPOSE TO SAY

        23     IT WAS RESOLVED TO THEIR SATISFACTION.  I THINK IT BEST TO

        24     JUST SAY IT WAS RESOLVED, PERIOD.  I'LL ALLOW THAT.  I

        25     THINK ONE WAY OR THE OTHER IS NOT IMPORTANT.  THE FACT IS

09:07:29   1      IT WAS RESOLVED, AND IT WAS OVER WAGES, AND IT WAS

          2      RESOLVED.

          3          MR. GARRISON:  OKAY. I WILL DO THAT.  THE NEXT ISSUE

          4      IS, JUDGE, AND THIS IS SOMETHING THAT WAS ON A MOTION IN

          5      LIMINE, AND I JUST WANT TO GET SOME INSTRUCTION FROM YOU

          6      AS TO HOW TO OBJECT AND PROTECT MY RECORD.  I UNDERSTAND

          7      YOUR RULINGS.  THERE ARE EQUITABLE DEFENSES IN MY MIND

          8      THAT ARE BEING RAISED HERE.  THEY'RE TRYING TO SAY THAT

          9      SHE HAD TO DO CERTAIN THINGS, AND IF SHE HAD DONE THEM,

        10      THEY WOULD HAVE PAID HER.  I THINK THAT'S IMPROPER IN THE

        11      CASES WE CITED IN OUR MOTION IN LIMINE.  I KNOW THE COURT

        12      DISAGREES, BUT IN YOUR RULING, WHAT I THINK YOU SAID WAS

        13      THAT THIS IS RELEVANT BECAUSE IT GOES TOWARDS KNOWLEDGE.

        14      IF IT SHOWS THAT THEY COULDN'T HAVE KNOWN --

09:08:08  15          THE COURT:  RIGHT.

        16          MR. GARRISON:  THAT IS NOT THE WAY THE CASE IS BEING

        17      PRESENTED, AND I DON'T THINK IT'S THE WAY THE DEFENSE IS

        18      GOING TO CROSS-EXAMINE THE WITNESSES.  MY ONLY POINT IS TO

        19      PROTECT MY RECORD, UNLESS YOU GIVE ME A STANDING

        20      OBJECTION, I THINK I HAVE TO OBJECT AND SAY, OBJECTION,

        21      IMPROPER ARGUMENT OR MISSTATEMENT OF LAW OR SOMETHING.

        22          THE COURT:  I DON'T BEGRUDGE YOU OBJECTING TO ONE OF

        23      MY RULINGS.  I FEEL THAT THEY DO HAVE THE RIGHT TO RAISE

        24      THIS FOR THAT ISSUE OF KNOWLEDGE.  FROM THE STANDPOINT OF

        25      -- I MEAN, JURY INSTRUCTIONS WILL PLAY A FAIR ROLE IN THIS

09:08:47  1   AT SOME POINT, AND SO I DON'T BELIEVE THAT THIS COURT CAN

2   PRECLUDE DEFENSES ANY MORE THAN YOUR THEORIES, YOU KNOW,

3   AT THIS STAGE, UNLESS THERE'S SOME SPECIFIC CASE LAW THAT

4   IS SO SPECIFIC AND ON POINT.  IF YOU CAN ENTER SOMETHING

5   FOR ANOTHER PURPOSE, YOU KNOW, I THINK THAT'S POSSIBLE;

6   AND THE FACT IS YOU MAY NOT BE LOOKING AT IT FROM THAT

7   STANDPOINT, BUT THE DEFENSE MAY BE LOOKING AT IT FROM A

8   DIFFERENT STANDPOINT.  BUT THAT BEING SAID, I HAVE NO

9   PROBLEM IF YOU OBJECT; AND FOR THE RECORD, IF YOU WANT TO

10  PUT ON THE RECORD NOW A STANDING OBJECTION WHERE YOU DON'T

11  HAVE TO STAND UP AND OBJECT, THAT'S FINE TOO.

12       MR. GARRISON:  THAT'S WHAT I WOULD PREFER BECAUSE

13  BASICALLY YOU'VE BEEN VERY COURTEOUS, AND WE GET ALONG

14  FINE, BUT I HAVE AN OBLIGATION TO PROTECT MY CLIENT'S

09:09:43 15  RIGHTS.

16       THE COURT:  I KNOW.  LISTEN, YOU GOT TO DO WHAT YOU

17  GOT TO DO, AND I DON'T BEGRUDGE ANYBODY OBJECTING,

18  APPEALING OR WHATEVER IT IS.  WE JUST DO WHAT WE NEED TO

19  DO AND WHAT WE THINK IS RIGHT.  WE MAY BE WRONG.

20       MR. GARRISON:  JUDGE, YOU SPENT A LOT OF TIME.  THIS

21  IS NOT SOMETHING YOU DIDN'T CONSIDER, AND I KNOW THAT.  I

22  THINK WE CAN DEAL WITH IT IN JURY INSTRUCTIONS.  BUT I'D

23  LIKE TO MAKE THE STANDING OBJECTION THAT ANY ARGUMENT THAT

24  RESTS ON EQUITABLE DEFENSE -- IN OTHER WORDS, IF KELLY HAD

25  DONE "X," SHE WOULD HAVE GOT PAID -- I BELIEVE IS IMPROPER

09:10:15  1    UNDER THE CASE LAW THAT WE CITED.

       2        THE COURT:  ALL RIGHT.  YOU CAN HAVE THAT STANDING

       3    OBJECTION, FOR THE RECORD.

       4        MR. GARRISON:  I APPRECIATE THAT.

       5        MR. TEEPLE:  YOUR HONOR, MAY I JUST WHINE ONE MOMENT?

       6    AND I'LL BE BRIEF.  I HAVE NO DIFFICULTY WITH MR. KAUFMAN

       7    TALKING ABOUT THE LITIGATION, THE FACT THAT THEY BROUGHT

       8    SUITS AND THE FACT THEY EVEN USED THE SAME LAWYER.  I

       9    THINK IT'S PREJUDICIAL TO MS. BUTLER TO SAY IT'S THESE

      10    LAWYERS AND THIS TEEPLE HALL FIRM, WHICH IS WHAT HE SAID,

      11    IT MAKES IT SEEM AS THOUGH, IT IMPUGNS US IN A WAY.

      12        THE COURT:  YEAH, I DON'T THINK THERE'S A NEED TO

      13    RAISE THAT AGAIN, THAT THEY'RE THE LAWYERS.  I AGREE WITH

      14    THAT.

09:10:51 15        MR. KAUFMAN:  JUST SO I'M CLEAR, FOR THE RECORD, I

      16    HAVE NEVER IMPUGNED THEM, AND IN FACT, I SAID I LIKE THEM

      17    IN MY OPENING STATEMENT.

      18        THE COURT:  THE WAY YOU DID IT, IN MY OPINION, DID

      19    NOT IMPUGN THEM.  BUT YOU DID RAISE IT AND THAT PROBABLY

      20    WAS CLOSE, AND I DON'T THINK IT'S NECESSARY TO DO THAT

      21    AGAIN.

      22        MR. KAUFMAN:  I'M SORRY.  ONE LAST THING I WANT TO

      23    SAY ABOUT IT.  IT'S RELEVANT.  THE WAY THESE LAWSUITS

      24    STARTED WAS MR. BUCHANAN FILED THE FIRST LAWSUIT, AND ALL

      25    THE PEOPLE HE KNEW SUED WITH HIM TOGETHER USING THE SAME

09:11:21    1    LAWYERS.  THEN SUBSEQUENTLY, FURTHER PEOPLE SUED AFTER

            2    THEY WERE TERMINATED OR THEY LEFT THE COMPANY AND BROUGHT

            3    IN THE SAME LAWYERS.  SO I WON'T MENTION TEEPLE HALL

            4    AGAIN, BUT I THINK THERE IS SOME RELEVANCE TO THE FACT

            5    THAT THESE WITNESSES ARE ALL SORT OF IN CAHOOTS

            6    TOGETHER.

            7         THE COURT:  YOU MAY BE ABLE -- WELL, I DON'T THINK

            8    THAT'S REALLY RELEVANT.  THE PROBLEM IS IT DOES GET INTO

            9    OR IMPLY THAT THE LAWYERS ARE IN CAHOOTS TOO, AND THEY

           10    COULD HAVE GONE TO ANY LAWYERS.  SO I THINK YOU MADE YOUR

           11    POINT ORIGINALLY.  I DON'T THINK THERE'S ANY NEED TO GO

           12    INTO THAT.

           13         MR. KAUFMAN:  OKAY.  THANK YOU, YOUR HONOR.

           14         THE COURT:  ALL RIGHT.  BRING IN THE JURY.

09:12:19   15         MR. TEEPLE:  SHOULD I HAVE MS. BUTLER TAKE THE STAND

           16    NOW?

           17         THE COURT:  SURE.  ABOUT HOW LONG WILL MS. BUTLER BE?

           18         MR. TEEPLE:  I WOULD BE SURPRISED IF IT'S A HALF

           19    HOUR.

           20         MR. GARRISON:  WE STILL THINK THE CASE WILL BE DONE

           21    THURSDAY AFTERNOON?

           22         THE COURT:  SURE.

           23         MR. GARRISON:  NO GUARANTEE.

           24         THE COURT:  WELL, ONE THING ABOUT IT, IF IT FLOPS

           25    OVER INTO FRIDAY MORNING OR SOMETHING AS LONG AS THE JURY

```
09:12:39    1           CAN GET OUT ON FRIDAY, THEY CAN COME IN AND DELIBERATE ON

            2           MONDAY.  I HAVE A CALENDAR ON MONDAY BUT A JURY CAN

            3           DELIBERATE.

            4               (JURY PRESENT.)

            5               THE COURT:  GOOD MORNING, EVERYONE.  I HOPE YOU HAD A

            6           GOOD EVENING.  READY TO ROLL.

            7               THE CLERK:  JUST REMINDING YOU, YOU'RE STILL UNDER

            8           OATH.

            9               THE WITNESS:  YES, THANK YOU.

           10               THE COURT:  ALL RIGHT.  ARE WE READY TO PROCEED?

           11               MR. TEEPLE:  THANK YOU, YOUR HONOR.  YES, WE ARE.

           12               THE COURT:  OKAY.

           13                       DIRECT EXAMINATION

           14       BY MR. TEEPLE:

09:14:08   15       Q.  GOOD MORNING, MS. BUTLER?

           16       A.  GOOD MORNING.

           17       Q.  HOW ARE YOU TODAY?

           18       A.  GOOD.  THANK YOU.

           19       Q.  ARE YOU A LITTLE LESS NERVOUS NOW THAT YOU'VE DONE THIS A

           20       LITTLE FOR A WHILE?

           21       A.  A LITTLE.

           22       Q.  WHAT I WANT TO FINISH TOPIC-WISE WITH YOU NOW IS GIVING THE

           23       JURY A GOOD SENSE OF WHAT YOU DO OR WHAT YOU DID WHILE YOU WERE

           24       WITH HSL FROM 2008 TO 2010, AND A DISTINCTION THAT'S BEEN MADE

           25       BY COUNSEL IN OPENING STATEMENT AND BY US ABOUT TWO IMPORTANT
```

09:14:37    1    PARTS OF YOUR JOB.  ONE WAS WHAT I CALL THE LIFE OF THE LOAN.

            2    FROM THE APPLICATION, YOU DISCUSSED IT YESTERDAY, TO GETTING IT

            3    TO UNDERWRITING AND FINALLY GETTING IT FUNDED THROUGH THE

            4    ESCROW PEOPLE AND SIGNED OFF, AND THEY GET THEIR HOMES, WE'LL

            5    CALL THAT THE LIFE OF A LOAN.  NOW, JUST FOR THAT ACTIVITY,

            6    JUST FOR AN APPLICATION ALL THE WAY THROUGH FUNDING, WHAT'S THE

            7    QUICKEST IN HOURS YOU THINK THAT CAN BE ACHIEVED?  THESE ARE

            8    AVERAGES.

            9    A.   THE QUICKEST COULD BE ANYWHERE FROM TWO TO THREE HOURS.

           10    Q.   OKAY.  AND WHAT'S THE LONGEST IT COULD TAKE A LOAN, A

           11    NIGHTMARE LOAN?

           12    A.   A NIGHTMARE LOAN, 12 TO 15 HOURS.

           13    Q.   IS AN AVERAGE IN THERE AROUND EIGHT OR TEN HOURS FOR A

           14    LOAN?

09:15:28   15    A.   YES.

           16    Q.   SO IF MR. KAUFMAN BRINGS IN AN EXPERT TO SAY THAT YOU

           17    SHOULD BE ABLE TO GET YOUR LOANS DONE WITHIN 40 HOURS A WEEK,

           18    WOULD THAT BE RIGHT OR WRONG?

           19    A.   THAT WOULD BE CORRECT.

           20    Q.   YOU COULD GET ALL THE LOAN WORK DONE IN UNDER 40 HOURS A

           21    WEEK, CAN'T YOU, ON AVERAGE?

           22    A.   ON AVERAGE, YES, SOMETIMES, YES.

           23    Q.   SOMETIMES YOU HAVE HOW MANY LOANS PENDING AT ONE TIME?

           24    A.   IT COULD VARY.  THERE COULD BE ANYWHERE FROM INTAKE OF A

           25    LOAN ONE TO TWO A WEEK OR THREE A WEEK ANYWHERE TO HAVING 30 IN

09:16:03   1   THE PIPELINE.  SO IT DEPENDS ON THE WEEK.

  2   Q.  EVER TAKEN MORE THAN THREE A WEEK?

  3   A.  SOMETIMES, YES.

  4   Q.  WHAT'S THE MOST YOU TOOK IN A WEEK THAT YOU RECALL?

  5   A.  THERE COULD BE SIX TO TEN NEW LOANS IN A WEEK.

  6   Q.  SO WE DON'T DISPUTE THE FACT AS TO JUST DOING THE LIFE OF

  7   THE LOAN WORK THAT COULD EASILY BE DONE IN 40 HOURS OR LESS,

  8   RIGHT?

  9   A.  YES.

 10   Q.  IS LESS MORE ACCURATE THAN 40?

 11   A.  I WOULD SAY 40 IS A GOOD AVERAGE.  IT COULD BE LESS SOME

 12   WEEKS.

 13   Q.  40 FOR FOUR LOANS?

 14   A.  YES.

09:16:35  15   Q.  YOU HAVE ONE LOAN IN A WEEK, YOU STILL HAVE SOME IN THE

 16   PIPELINE, RIGHT?

 17   A.  YES.

 18   Q.  LET'S TALK ABOUT ALL THE OTHER STUFF NOW.  LET'S FORGET

 19   ABOUT LIFE OF A LOAN.  WE DID SOME OF THAT YESTERDAY.  YOU

 20   TALKED ABOUT ALL THE STUFF THAT CAME UNDER THE HEADING OF

 21   MARKETING THAT KEPT YOUR RELATIONSHIP GOOD WITH REAL ESTATE

 22   AGENTS.  DO YOU RECALL THAT?

 23   A.  YES.

 24   Q.  THE MENTORING PROGRAM?

 25   A.  YES.

09:16:57   1   Q.   WHAT ELSE WOULD YOU DO IN A DAY THAT ISN'T LIFE OF LOAN?

           2   A.   OKAY.   I CAN EXPLAIN IT TO YOU.   IT MIGHT TAKE A FEW

           3   MINUTES.   TYPICALLY, MY DAY STARTED WHEN WE STARTED IN WITH

           4   HOMESERVICES LENDING IN 2008, OUR FULFILLMENT SITE WHERE THEY

           5   DID THE UNDERWRITING AND THINGS LIKE THAT WE TALKED ABOUT

           6   YESTERDAY.

           7   Q.   COULD YOU JUST SLOW DOWN A LITTLE BIT?

           8   A.   SURE.   THE FULFILLMENT SITE WAS LOCATED IN MINNEAPOLIS.   SO

           9   THEY WERE TWO HOURS AHEAD OF US.   SO TYPICALLY, WHEN I CAME IN

          10   THE OFFICE WAS BETWEEN 7:00 AND 7:30 BECAUSE IT WOULD BE

          11   CONSISTENT WITH THEIR WORK HOURS.   SO THEY MAYBE CAME IN

          12   ANYWHERE FROM 9:00, 8:30 TO 9:00 IN THE MORNING.   SO THE REASON

          13   FOR COMING IN SO EARLY WAS TO BE ABLE TO GET FIRST IN LINE FOR

          14   ANY DISCUSSIONS WITH UNDERWRITERS, WITH FUNDERS, WITH

09:17:51  15   PROCESSORS AT THAT FULFILLMENT SITE.   SO IT'S NORMAL,

          16   FIRST-IN-FIRST-OUT, YOU WOULD BE ABLE TO HAVE CONVERSATIONS

          17   WITH THEM BEFORE YOUR DAY REALLY GOT STARTED.   THAT MAY TAKE A

          18   COUPLE HOURS, YOU KNOW, WORKING THROUGH PROBLEMS WITH THEM.

          19   Q.   I'M GOING TO INTERRUPT YOU AND PICK ON YOU A LITTLE HERE.

          20   NOW UNDERWRITERS, THAT HAS TO DO WITH LIFE OF THE LOAN,

          21   RIGHT?

          22   A.   YES.

          23   Q.   I DON'T WANT TO TALK ABOUT LIFE OF THE LOAN, HOW LONG THAT

          24   TAKES.   LIST FOR ME THE TYPES OF THINGS LIKE THE MENTORING AND

          25   THINGS THAT DIDN'T HAVE TO DO WITH TAKING CARE OF A LOAN.

09:18:26  1    A.   OKAY.   WHEN I GET IN THE OFFICE, THE REAL ESTATE AGENTS

2    WOULD TYPICALLY COME IN AT 9:00 IN THE MORNING, APPROXIMATELY

3    THAT TIME, AND WE WOULD BE OPEN FOR BUSINESS, AND MY DAY WOULD

4    CONSIST OF FOLLOWING UP ON E-MAILS WHEN I GOT IN IN THE

5    MORNING, RETURNING PHONE CALLS, RETRIEVING VOICE MAILS THAT

6    WERE LEFT, TALKING WITH REAL ESTATE AGENTS.   YOU KNOW, THAT

7    WOULD VARY IN TIME.   THERE WERE REALLY A LOT OF REAL ESTATE

8    AGENTS IN THE OFFICE, AND THEY WOULD COME IN AND MAYBE TALK

9    ABOUT A PHONE CALL FROM THE NIGHT BEFORE.   WE ALSO HAD ANOTHER

10   PLATFORM WE WERE WORKING ON CALLED AN E-PLATFORM.   THAT WAS

11   KIND OF COOL.   IT WAS ANOTHER OPPORTUNITY FOR US TO ENGAGE IN

12   BUSINESSES WITH REAL ESTATE AGENTS NOT ONLY IN OUR OFFICE BUT

13   OTHER PRUDENTIAL LOCATIONS.

14   Q.   COULD YOU DESCRIBE PLEASE WHAT THE E-PLATFORM -- I'M GOING

09:19:19  15   SLOW TO LET THE COURT REPORTER CATCH UP -- WHAT THE E-PLATFORM

16   IS?   SLOW DOWN JUST A LITTLE, PLEASE.

17   A.   OKAY.   THE E-PLATFORM WAS A MARKETING TOOL THAT WAS

18   DEVELOPED BY PRUDENTIAL, CALIFORNIA REALTY, AND I'LL TELL YOU

19   THEY HAD TWO OFFICES WITHIN THE HSL SYSTEM THAT WERE

20   RESPONSIBLE FOR ASSISTING THIS E-PLATFORM.   ONE OF THE OFFICES

21   WAS MY OFFICE WITH MY TEAM MEMBER, HMC, JIM OLMSTED.   THE OTHER

22   WAS AN OFFICE IN SAN DIEGO.

23        I'LL EXPLAIN HOW THE E-PLATFORM WORKS.   WITHIN

24   PRUDENTIAL, WHICH THEY SOLD REAL ESTATE, IF YOU WERE A

25   BORROWER, ANY ONE OF YOU, AND YOU WERE LOOKING FOR A HOME, AND

13

09:20:06   1    YOU WENT ONLINE AND SAW A PICTURE OF A HOUSE IN THE AREA YOU

           2    WERE LOOKING AT, YOU COULD ACTUALLY LOG ONTO THE WEB SITE AND

           3    WANT TO SEE THE HOME, BUT THEY WOULD REQUIRE THAT YOU PUT IN

           4    CERTAIN INFORMATION TO BE ABLE TO VIEW MORE DETAILS ABOUT THE

           5    HOME.  SO THEY WOULD CAPTURE YOUR POSSIBLE PHONE NUMBER, YOUR

           6    E-MAIL ADDRESS.

           7              AUTOMATICALLY, THAT WAS SENT TO THE MANAGER OF THE

           8    E-PLATFORM, AND THEN HE WOULD ASSIGN IT TO A REAL ESTATE AGENT

           9    WHO WOULD THEN CONTACT YOU.  ONCE THE REAL ESTATE AGENT

          10    CONTACTED YOU, AND YOU WERE INTERESTED, HE WOULD FORWARD YOUR

          11    INFORMATION TO US, AND THEN WE WOULD HAVE THE OPPORTUNITY TO

          12    SPEAK TO YOU ABOUT FINANCING.

          13    Q.  IS IT FAIR TO SAY THAT YOU TALKED TO LOTS OF PEOPLE ABOUT

          14    LOANS WHO NEVER ACTUALLY EVEN FILLED OUT AN APPLICATION?

09:20:56  15    A.  YES.

          16    Q.  IS THERE ANY KIND OF RATIO OF NUMBER OF LEADS I TALKED TO

          17    VERSUS HOW MANY ACTUALLY YOU GET A LOAN OUT OF THAT YOU COULD

          18    ESTIMATE FOR THE JURY?

          19    A.  IT COULD BE ANYWHERE FROM -- IF YOU TOOK A NUMBER, TEN,

          20    THERE MAY BE SEVEN THAT NEVER WENT ANYWHERE AND MAYBE THREE

          21    LOANS OR TWO LOANS THAT WENT FORWARD.  SO 80 PERCENT, NO.  20

          22    PERCENT, YES.

          23    Q.  SO YOU'RE SPENDING TIME SPEAKING WITH THESE PEOPLE ABOUT

          24    THEIR HOUSES AND THEIR DREAMS AND HOW MUCH MONEY THEY HAVE.

          25    DESCRIBE FOR THE JURY WHAT THOSE CONVERSATIONS WOULD BE LIKE.

09:21:34   1   A.   ABSOLUTELY.  I WANT TO LET YOU KNOW, ALSO, THAT JUST

           2   BECAUSE IT DIDN'T GO FORWARD IT DIDN'T MEAN THAT WE DIDN'T

           3   SPEND THE TIME WITH YOU BECAUSE MAYBE THE LOANS THAT DIDN'T

           4   CLOSE, AND MAYBE YOU DIDN'T QUALIFY, BUT WE WOULD ASSIST YOU IN

           5   GETTING QUALIFIED TO PURCHASE IN THE FUTURE.  WE WOULD GO

           6   THROUGH WHAT YOU WOULD NEED POSSIBLY.  IF YOU'RE, LET'S SAY,

           7   FOR EXAMPLE, HAD A CREDIT ISSUE, WE WOULD ASSIST YOU IN GETTING

           8   YOUR CREDIT CLEANED UP SO YOU COULD BE A BUYER.  SO WE DIDN'T

           9   AUTOMATICALLY DISCARD THE PEOPLE JUST BECAUSE THEY DIDN'T

          10   QUALIFY.  IT WAS A POTENTIAL FUTURE RELATIONSHIP.

          11   Q.   SO DURING YOUR WORKDAY, WOULD YOU RETURN CALLS?

          12   A.   YES.

          13   Q.   WOULD YOU GET THROUGH ALL YOUR E-MAILS?  CALL IT, CLEARING

          14   YOUR E-MAIL.

09:22:20  15   A.   CLEARING MY E-MAIL, FOR THE MOST PART, YES.

          16   Q.   HOW LONG WOULD THAT TAKE EACH DAY, CLEARING YOUR E-MAILS?

          17   A.   DEPENDS ON THE AMOUNT OF E-MAILS.  E-MAILS COULD BE

          18   ANYWHERE FROM 50 A DAY TO 300.  SO IT REALLY VARIED, AND IT

          19   DEPENDED ON THE COMPLEXITY.  IF THERE WERE AN E-MAIL TO

          20   PRINTOUT, A COMPLETE FILE, THE BORROWER SENT EVERYTHING IN,

          21   THAT MAY TAKE LONGER THAN, YOU KNOW, THANK YOU, YOUR LOAN

          22   CLOSED, YOU KNOW, HAVE A NICE DAY.  SO IT VARIED FROM DAY TO

          23   DAY.

          24   Q.   LET'S SAY YOU'RE SITTING IN YOUR OFFICE CLEARING YOUR

          25   E-MAILS.  WOULD IT TAKE YOU LONGER IF YOU WERE INTERRUPTED?

09:22:56   1   A.   YES.

          2   Q.   WHY IS THAT?

          3   A.   BECAUSE IF YOU LOSE YOUR TRAIN OF THOUGHT OR YOU'RE HALFWAY

          4   THROUGH AN E-MAIL, AND YOU HAVE A HALF-HOUR, 45-MINUTE

          5   CONVERSATION WITH SOMEONE AND THEN GO BACK, E-MAILS START TO

          6   ACCUMULATE AGAIN.

          7   Q.   HOW OFTEN -- WAS IT COMMON FOR YOU TO BE INTERRUPTED?

          8   A.   ALL DAY LONG.

          9   Q.   WHY IS THAT?

         10   A.   BECAUSE WE WERE IN AN OFFICE THAT HAD ONE HUNDRED REAL

         11   ESTATE AGENT, AND WE HAD AN OPEN-DOOR POLICY.  SO IF SOMEONE

         12   WANTED TO COME IN AND TALK WITH YOU, WE WOULD SURELY INVITE

         13   THAT.

         14   Q.   HOW LATE COULD YOU WORK IN THE OFFICE AT NIGHT?

09:23:35  15   A.   IN THE OFFICE, OUR LAPTOP SHUT OFF AT 1:00 EVERY NIGHT.  SO

         16   THAT WAS SORT OF THE DEADLINE TO BE DONE FOR THE DAY.

         17   Q.   WAS IT FREQUENT FOR YOU TO STAY THERE PAST 5:00?

         18   A.   YES.

         19   Q.   HOW OFTEN WOULD YOU STAY THERE TILL 10:00?

         20   A.   ON A WEEKLY, MAYBE ONE NIGHT A WEEK.  SOMETIMES IT WOULD BE

         21   SOONER.  SOMETIMES IT WOULD BE UNTIL 10:00.

         22   Q.   IS THERE ANYTHING YOU WOULD DO EACH NIGHT BEFORE YOU LEFT

         23   TO PREPARE FOR THE NEXT DAY?

         24   A.   YES.  EVERY NIGHT I MADE AN ACTION PLAN OF THE DUTIES I HAD

         25   TO DO FOR THE NEXT DAY.  IT MAY BE FOLLOWING UP WITH A BORROWER

16

09:24:18   1   WHO HADN'T RETURNED MY PHONE CALL, OR I ASKED FOR CERTAIN

           2   DOCUMENTATION AND HADN'T RECEIVED IT.  SO I WOULD MAKE A LIST

           3   TO DO THE NEXT DAY OF EVERYTHING THAT MAYBE CARRIED OVER OR I

           4   NEED TO FOLLOW UP ON.

           5   Q.  NOW, MR. KAUFMAN STOOD UP AND SAID THAT THE FIRST HE EVER

           6   HEARD OF ANYTHING THAT WAS NOT LIFE OF THE LOAN RELATED WAS, I

           7   GUESS, IN GREG'S OPENING STATEMENT.  YOU HAD YOUR DEPOSITION

           8   TAKEN IN THIS MATTER?

           9   A.  YES.

          10   Q.  DID YOU READ YOUR DEPOSITION AGAIN LAST NIGHT?

          11   A.  YES.

          12   Q.  DID HE EVER ASK YOU ABOUT ANYTHING BESIDES LIFE OF A LOAN

          13   STUFF?

          14   A.  NO.

09:25:01  15   Q.  MR. KAUFMAN ALSO MENTIONED SOMETHING IN OPENING STATEMENT

          16   ABOUT SOMETHING ABOUT YOU TAKING TIME OFF TO BE SICK.  DID YOU

          17   EVER MISS ANY TIME FOR EXTENDED ILLNESS?

          18   A.  NO.

          19   Q.  WELL, WAS THERE EVER A TIME WHEN YOU WERE ILL?

          20   A.  YES, AND I STILL WENT TO WORK.

          21   Q.  WELL, TELL US ABOUT THAT.  WHEN WAS IT?

          22   A.  IT WAS IN THE BEGINNING OF 2010.  I WASN'T FEELING WELL.  I

          23   WENT TO THE EMERGENCY ROOM AND WENT BACK TO WORK THE NEXT

          24   MORNING.

          25   Q.  MAY I ASK WHAT WAS WRONG?

09:25:34   1   A.   I THINK THAT I WAS JUST HAVING SOME STOMACH ISSUES, AND I

2   WASN'T FEELING WELL, AND IT CONCERNED ME TO THE POINT WHERE I

3   DID GO TO THE EMERGENCY ROOM.

4   Q.   TELL ME ABOUT YOUR VACATION AND HOLIDAYS.  WERE YOU EVER

5   OUT OF THE OFFICE FOR TEN DAYS?

6   A.   I DON'T THINK TEN DAYS, NO.

7   Q.   WHAT'S THE LONGEST YOU RECALL EVER HAVING BEEN OUT OF THE

8   OFFICE?

9   A.   OUT OF THE OFFICE, IT MAY HAVE BEEN THREE OR FOUR DAYS AT A

10   TIME.

11   Q.   DID YOU WORK ON THOSE DAYS, EVER?

12   A.   YES.

13   Q.   WOULD YOU PUT IN TIME FOR THOSE DAYS?

14   A.   YES.

09:26:10   15   Q.   DID YOU GO TO THE RED SOX OPENER EVERY YEAR?

16   A.   I WENT FOR 2008 AND 2009.

17   Q.   YOU KNOW, THEY BEAT MY CARDINALS THIS YEAR.

18   A.   YES, THEY CERTAINLY DID.

19   Q.   FEEL PRETTY GOOD ABOUT THAT, HUH?

20   A.   ABSOLUTELY.

21   Q.   DID YOU WORK WHEN YOU WENT TO BOSTON?

22   A.   I DID.

23   Q.   HOW COULD THAT WORK?  HOW COULD YOU WORK WHEN YOU WERE

24   THERE?

25   A.   EVERY TIME I LEFT THE OFFICE I TOOK MY LAPTOP WITH ME, AND

09:26:42   1   IT WASN'T EXCLUDED FROM THESE TRIPS.   I ALWAYS HAD MY LAPTOP

2   WITH ME WHEN I WENT TO BOSTON.   IT ACTUALLY WORKED OUT, TO BE

3   HONEST WITH YOU, A LOT BETTER BECAUSE I WAS THREE HOURS AHEAD

4   AND COULD GET A JUMP START ON MY DAY AND GET MY WHOLE DAY SET

5   UP, WORK.   JIM WOULD COME IN THE OFFICE, ALREADY BE IN CONTACT

6   WITH HIM.   HE WOULD KNOW EVERYTHING I DID.   I WOULD GO TO THE

7   GAME, GO BACK TO MY HOTEL, FINISH UP WITH ANY E-MAILS, PHONE

8   CALLS, ANYTHING LIKE THAT.

9   Q.   DID YOU ACCOMMODATE YOUR FLIGHTS FOR WORK AT ALL?

10   A.   YES, I DID.

11   Q.   EXPLAIN THAT TO THE JURY.

12   A.   IT WAS GREAT.   THERE WAS A RED EYE OUT OF L.A.X. THAT USED

13   TO BE AT 10:30 AT NIGHT, AND THERE WAS A 6:30 FLIGHT COMING

14   BACK FROM BOSTON.   SO ON THE FLIGHT GOING TO BOSTON, I WOULD

09:27:26   15   GET IN AT 6:00 A.M.   I COULD TAKE A SHOWER, GET STARTED WITH

16   WORK, GET MY DAY GOING.   AND THEN THE NEXT MORNING, I WOULD

17   TAKE THE 6:30, OR WHEN I CAME BACK, TAKE THE 6:30 FLIGHT BACK,

18   AND I WOULD BE BACK BY 11:00 IN THE MORNING OR 11:30.

19   Q.   DURING THIS TIME PERIOD -- LET ME ASK YOU.   ARE YOU MARRIED

20   NOW?

21   A.   NO.

22   Q.   WERE YOU MARRIED THEN?

23   A.   NO.

24   Q.   DO YOU HAVE ANY KIDS?

25   A.   NO.

09:27:52   1    Q.   WERE YOU A MEMBER OF ANY CLUBS?

           2    A.   I BELONG TO 24 HOUR FITNESS.

           3    Q.   ARE YOU A GOLFER?

           4    A.   NO.

           5    Q.   WERE YOU INVOLVED IN ANY ACTIVITIES, SOCIALLY OR

           6    PERSONALLY, THAT WOULD REGULARLY TAKE OVER AN HOUR OR TWO A

           7    WEEK?

           8    A.   NO.

           9    Q.   WHAT TOOK UP MOST OF THE TIME FOR YOU FROM 2008 TO 2010

          10    OTHER THAN SLEEPING?

          11    A.   IN 2008 AND 2010, I MEAN, WITH THE WAY THAT THE MARKET WAS

          12    GOING AND EVERYONE, YOU KNOW -- AND WE TALKED ABOUT IT

          13    YESTERDAY -- LOSING THEIR JOBS, ALL I DID IS I THREW MYSELF

          14    INTO MY WORK.  I WANTED TO KEEP MY JOB.  I WANTED TO BE GOOD AT

09:28:38  15    WHAT I WAS DOING.  I WANTED TO MAKE SURE THAT EVERYONE IN

          16    THESE, YOU KNOW, THE UNCERTAIN TIMES, AND ALL THE FEAR THAT WAS

          17    BEING PROJECTED THROUGH THE BANKS CLOSING, AND THERE BEING NO

          18    MORE LOANS, I WANTED TO MAKE SURE THE CLIENTS WERE COMFORTABLE,

          19    AND I DEDICATED MYSELF TO MY JOB DURING THAT PERIOD.

          20    Q.   DID YOU HEAR MR. OLMSTED TESTIFY THAT HE WAS THERE 60 TO 65

          21    HOURS ON AVERAGE A WEEK?

          22    A.   YES.

          23    Q.   WERE YOU THERE WHEN HE WAS THERE?

          24    A.   YES.

          25    Q.   WERE YOU THERE BEFORE HIM?

```
09:29:06   1    A.   SOMETIMES.

           2    Q.   WERE YOU THERE AFTER HIM?

           3    A.   SOMETIMES.

           4    Q.   DID HE DO ANY OF THE LIFE OF THE LOAN STUFF, OR WAS THAT

           5    ALL WITH YOU?

           6    A.   THE LIFE OF THE LOAN BASICALLY WAS ME.  HE WOULD DO THE UP

           7    FRONT STUFF AND TAKE THE LOAN APPLICATION AND COMPLETE THE

           8    PACKAGE, AND THEN HAND IT OVER TO ME.  SO YES, HE WAS INVOLVED,

           9    BUT NOT THROUGH THE ENTIRE PROCESS.

          10    Q.   SO IN ADDITION TO THE THINGS YOU TWO WERE DOING AS A TEAM,

          11    YOU HAD THE EXTRA TASK OF SEEING THE LOANS THROUGH; IS THAT

          12    FAIR TO SAY?

          13              MR. KAUFMAN:  OBJECTION.  LEADING.

          14              THE COURT:  SUSTAINED.

09:29:41  15              MR. TEEPLE:  WITHDRAWN.

          16    BY MR. TEEPLE:

          17    Q.   WERE THERE THINGS YOU DID THAT MR. OLMSTED DIDN'T?

          18    A.   I PROCESSED THE LOAN.

          19    Q.   THANK YOU.  LET'S TALK ABOUT HOLIDAYS.  IN FACT, LET ME DO

          20    THAT DIFFERENTLY.  DO WE HAVE EXHIBIT 108?  THIS IS DEFENSE

          21    EXHIBIT.

          22              MR. TEEPLE:  ANY OBJECTION TO 108?

          23              MR. KAUFMAN:  NO.

          24              MR. TEEPLE:  OKAY.  I'D LIKE TO DISPLAY 108, YOUR

          25    HONOR.
```

```
09:30:37    1                  THE COURT:  IS THAT IN EVIDENCE?

            2                  MR. TEEPLE:  I'M MOVING IT INTO EVIDENCE NOW.

            3                  THE COURT:  NO OBJECTION.

            4                  MR. KAUFMAN:  NO OBJECTION.

            5                  THE COURT:  BE IN.

            6                  (EXHIBIT 108 ADMITTED.)

            7     BY MR. TEEPLE:

            8     Q.  DO YOU HAVE A SCREEN IN FRONT OF YOU THERE?

            9     A.  I HAVE IT.

           10     Q.  WHAT IS EXHIBIT 108?

           11     A.  IT'S THE DOHERTY EMPLOYEE HANDBOOK.

           12     Q.  COULD YOU GO TO PAGE FOUR PLEASE?  ON THE BOTTOM, THERE'S A

           13     BATES STAMP THAT SAYS A BUNCH OF ZEROS AND A FOUR.  CAN YOU

           14     ZOOM INTO THE HOLIDAY PAY?  A LITTLE TIGHTER PLEASE.  NOW ON

09:31:15   15     YOUR TIME CARD WE HEARD THAT YOU PUT IN ON CHRISTMAS AND OTHER

           16     HOLIDAYS THE FACT THAT YOU WORKED.  NOW IS THIS YOUR EMPLOYEE

           17     HANDBOOK?  IS THIS THE EMPLOYEE HANDBOOK THAT YOU RECALL?

           18     A.  YES.

           19     Q.  AND AT ONE POINT TOO THERE, DO YOU SEE IT SAYS THAT HSL IS

           20     GOING TO PAY FOR THANKSGIVING, CHRISTMAS DAY, NEW YEAR'S DAY,

           21     HOLIDAYS; DO YOU SEE THAT?

           22     A.  YES.

           23     Q.  IS IT YOUR UNDERSTANDING YOU GOT PAID WHETHER YOU WORK THAT

           24     DAY OR NOT?

           25     A.  YES.
```

09:31:50   1    Q.  BY PUTTING WORK ON THAT DAY, LET'S SAY CHRISTMAS, ON YOUR

           2    TIME CARD, YOU DIDN'T GET EXTRA MONEY, DID YOU?

           3    A.  NO.

           4    Q.  DID YOU WORK SOMETIMES ON THOSE DAYS, ON ANY OF THOSE

           5    HOLIDAYS?

           6    A.  YES.

           7    Q.  SO EVEN THOUGH YOU WERE BEING PAID, AND YOU DIDN'T HAVE TO

           8    WORK, YOU WOULD WORK ON SOME OF THOSE DAYS?

           9    A.  YES.

          10    Q.  WE'LL GET YOUR PHONE RECORDS OUT AND TALK ABOUT THAT AGAIN

          11    IN A MOMENT.  LET'S STAY ON THAT EXHIBIT.  BEFORE I TURN TO THE

          12    PORTION OF THAT EXHIBIT, I WANT TO DISCUSS WITH YOU -- LET'S

          13    TALK ABOUT YOUR TIME CARDS.  NOW, WHEN YOU FIRST STARTED, DID

          14    SOMEBODY TELL YOU HOW TO FILL TIME CARDS OUT?

09:32:36  15    A.  I BELIEVE SO, YES.

          16    Q.  WELL, YOU DID IT.  YOU LEARNED IT SOMEWHERE, RIGHT?

          17    A.  YES.

          18    Q.  AND IN YOUR FIRST WEEK, YOU PUT IN 40 HOURS OF OVERTIME, IS

          19    THAT RIGHT, YOUR FIRST TWO-WEEK PERIOD?

          20    A.  THE FIRST PERIOD THAT I ACTUALLY ENTERED MY TIME, YES.

          21    Q.  WHAT HAPPENED AFTER YOU DID THAT?

          22    A.  I RECEIVED AN E-MAIL FROM MICHAEL YIP.

          23    Q.  HOW DID YOU FEEL WHEN YOU GOT THAT E-MAIL?

          24    A.  WHEN I RECEIVED THAT E-MAIL, I WAS FEARFUL.  I WAS IN A NEW

          25    COMPANY WITH NEW BOSSES WITH NEW -- JUST A NEW COMPANY IN

09:33:23   1    GENERAL.  I WAS IN THE SAME LOCATION BUT A NEW BOSS.

2    Q.  AND DID MR. YIP AND YOU HAVE AN OPPORTUNITY TO DISCUSS THAT

3    E-MAIL, THE PHONE CALL?

4    A.  AFTER I THOUGHT ABOUT THE E-MAIL AND READ THE E-MAIL, I

5    CALLED MICHAEL YIP, YES.

6    Q.  ALL RIGHT.  AND YOU HEARD MR. OLMSTED TALK ABOUT A PHONE

7    CALL YESTERDAY WHERE HE SAT ACROSS FROM YOU.  IS THAT THE SAME

8    PHONE CALL THAT HE OVERHEARD YOUR SIDE OF?

9    A.  I WOULD IMAGINE SO, YES.

10   Q.  AT THE END OF THAT PHONE CALL, WHAT CONCLUSIONS HAD YOU

11   DRAWN ABOUT PUTTING IN OVERTIME?

12   A.  AFTER THE PHONE CALL WITH MICHAEL YIP, IT WAS MADE CLEAR TO

13   ME THAT BY PUTTING IN OVERTIME THAT I WOULD POTENTIALLY LOSE MY

14   JOB.

09:34:12   15   Q.  DO YOU REMEMBER HIS EXACT WORDS IN THAT PHONE CALL?

16   A.  NO.  THAT PHONE CALL WAS ALMOST SIX YEARS AGO.

17   Q.  BUT THAT WAS HIS MESSAGE THAT YOU TOOK AWAY?

18   A.  YES, THAT I WOULD LOSE MY JOB IF I CONTINUED TO RECORD

19   OVERTIME.

20   Q.  WELL, WHY DID YOU PUT IN JUST 40 HOURS A WEEK THEN.  ON

21   EVERY SINGLE TIME CARD THAT WE'RE GOING TO SHOW THE JURY FROM

22   THAT TIME ON IT JUST SAYS 9:00 TO 5:00, 9:00 TO 5:00, 9:00 TO

23   5:00; THAT ISN'T ACCURATE, IS IT?

24   A.  NO, IT'S NOT ACCURATE.

25   Q.  WHY DID YOU DO IT?

09:34:41  1    A.   BECAUSE THE POLICY THAT THEY HAD PUT IN PLACE WAS

2    IMPOSSIBLE TO FOLLOW.

3    Q.   ANY OTHER REASON?

4    A.   I WAS FEARFUL OF LOSING MY JOB.

5    Q.   FROM YOUR CONVERSATION WITH MR. YIP?

6    A.   FROM, YES.

7    Q.   LET'S LOOK AT PAGE FIVE, THE VERY NEXT PAGE OF YOUR

8    EMPLOYEE HANDBOOK.   SCROLL DOWN TO WHERE WE HAVE THE

9    UNDERLINING.   CLARIFICATION OF OVERTIME PAY.   LET'S LOOK AT THE

10    UNDERLINED PART.   "ANY OR ALL OVERTIME MUST BE APPROVED

11    BEFOREHAND BY THE SUPERVISOR AND INITIALED ON EMPLOYEE'S TIME

12    CARD BEFORE EMPLOYEE BEGINS TO WORK ANY ADDITIONAL TIME."   DID

13    YOU UNDERSTAND THAT WAS THE POLICY?

14    A.   YES.

09:35:28  15    Q.   WHERE DID YOUR TIME CARD LIVE?

16    A.   IT WAS AN ELECTRONIC TIME CARD.

17    Q.   HOW COULD SOMEONE, IF YOU KNOW, INITIAL IT?

18    A.   I DON'T THINK THAT THEY COULD.   IT WAS IMPOSSIBLE.

19    Q.   NOW, LET'S SAY IT'S FRIDAY NIGHT.   IT'S 6:00.   YOU EVER GET

20    A CALL FROM ANY OF THE REALTORS YOU WORKED WITH SAYING, HEY, WE

21    JUST SIGNED A CONTRACT, WE WANT TO FILL OUT LOAN PAPERS?

22    A.   ABSOLUTELY.

23    Q.   WHAT WAS EXPECTED OF YOU FRIDAY NIGHT AT 6:00 WHEN THAT

24    HAPPENED?

25    A.   I'LL EXPLAIN.   IF A REALTOR CALLED AND SAID THEY HAD

09:36:07   1   SOMEONE IN THEIR CAR COMING IN TO WRITE A CONTRACT, COULD WE

2   PLEASE TALK TO THE PEOPLE OR PEOPLE THEY'RE BRINGING IN, THE

3   EXPECTATION WAS THAT WE WOULD STAY AND TALK TO THEIR BORROWERS

4   AND GET THEM PRE-APPROVED OR PRE-QUALIFIED.

5   Q.   WELL, DID YOU EVER TELL THEM, YOU KNOW, I'M SORRY, IT'S

6   6:00, I GOT TO CALL A GUY ALL THE WAY DOWN IN SAN DIEGO AND

7   HOPE I GET AHOLD OF HIM AND FIND MY TIME CARD AND GET HIS

8   INITIALS FIRST?

9   A.   NEVER.

10   Q.   WAS THAT REALISTIC?

11   A.   NOT REALISTIC.

12   Q.   THAT'S WHAT YOU MEAN BY "IMPOSSIBLE" TO FOLLOW THIS

13   POLICY?

14   A.   YES.

09:36:44   15   Q.   YOU DIDN'T HAVE A SUPERVISOR ON SITE TO GO TO, DID YOU?

16   A.   NO.

17   Q.   NOT IN THE SAME BUILDING OR THE SAME OFFICE, DID YOU?

18   A.   NO.

19   Q.   HOW FAR AWAY WERE THEY?

20   A.   IN SAN DIEGO, APPROXIMATELY 50 MILES AWAY.

21   Q.   LET'S JUST TALK A LITTLE BIT ABOUT YOUR COMMUNICATION WITH

22   YOUR SUPERVISOR.  WE KNOW WE HAVE YOUR CELL RECORDS.  OTHER

23   THAN THE CELL RECORDS, HOW ELSE WOULD YOU COMMUNICATE WITH

24   THEM?

25   A.   I WOULD ALWAYS COMMUNICATE WITH THEM THROUGH MY OFFICE LAND

09:37:11   1   LINE WHICH WAS AT MY DESK AND THROUGH E-MAIL.

2   Q.   ALL RIGHT.   AND ON AVERAGE, HOW MANY E-MAILS DO YOU THINK

3   YOU WERE SENDING TO MR. YIP OR MR. VALENTINI, WHO ARE IN SAN

4   DIEGO, EACH DAY?

5   A.   ON AN AVERAGE, IT COULD BE FIVE E-MAILS A DAY, SOME DAYS

6   MORE, SOME DAYS LESS.

7   Q.   OKAY.   BUT ON AVERAGE, IT WOULD BE FIVE.   SO OVER A COUPLE

8   YEARS.   OKAY.   SO DO YOU HAVE THOSE E-MAILS?

9   A.   NO.

10   Q.   WHY NOT?

11   A.   I WAS TOLD THEY WERE DESTROYED WHEN I LEFT THE COMPANY.

12   THEY WERE COMPANY PROPERTY.

13   Q.   WHY DIDN'T YOU TAKE THEM WITH YOU?

14   A.   THEY WERE COMPANY PROPERTY.

09:37:49   15   Q.   THEY WOULDN'T LET YOU TAKE THEM?

16   A.   NO.

17   Q.   IN THIS LITIGATION, HAVE YOU SEEN HSL'S COPIES OF ALL THOSE

18   E-MAILS?

19   A.   NO.

20   Q.   HAVE YOU LOOKED FOR THEM?

21   A.   I SEEN A FEW E-MAILS.   IT'S NOWHERE NEAR THE AMOUNT THAT I

22   WOULD HAVE PRODUCED.

23   Q.   LET'S DO SOME EXHIBIT WORK.   MAY I APPROACH YOUR HONOR?

24            THE COURT:   YES.

25   BY MR. TEEPLE:

```
09:38:16   1    Q.   THANK YOU.  WE'RE JUST GOING TO GET THE BIG FAT ONES.  WE

           2    WON'T LOOK AT ALL OF THEM.  HERE THEY ARE, WITH THE YELLOW

           3    STICKIES ON THEM.  IF YOU WOULD LOOK AT EXHIBIT NUMBER ONE

           4    PLEASE AND -- OH, I'M GOING TO SKIP TO NUMBER TWO.  CAN YOU

           5    LOOK AT EXHIBIT NUMBER THREE, PLEASE, FOR ME?

           6              MR. KAUFMAN:  NOT TWO?

           7              MR. TEEPLE:  IT'S GOING TO BE THREE.  I APOLOGIZE.

           8    LET ME KNOW WHEN YOU HAVE THAT IN FRONT OF YOU, MA'AM.  DO YOU

           9    HAVE EXHIBIT THREE IN FRONT OF YOU?  EXHIBIT THREE IS LIKE

          10    PHONE BOOK. I'M HOLDING UP MY EXHIBIT FOR THE JURY.  SO THEY

          11    CAN SEE.

          12    BY MR. TEEPLE:

          13    Q.   THIS IS ALL OF EXHIBIT THREE, RIGHT?

          14    A.   YES.

09:39:31  15    Q.   WHAT IS EXHIBIT THREE?

          16    A.   THESE ARE MY CELL PHONE RECORDS.

          17              MR. TEEPLE: I MOVE IN EXHIBIT THREE, YOUR HONOR.

          18              THE COURT:  ANY OBJECTION?

          19              MR. KAUFMAN:  NO OBJECTION.

          20              THE COURT:  BE ENTERED.

          21              (EXHIBIT 3 ADMITTED.)

          22    BY MR. TEEPLE:

          23    Q.   CAN WE PUT UP PAGE ONE AND GO AHEAD AND ZOOM IN ON THE

          24    HIGHLIGHTED PART THERE.  THESE ARE YOUR PERSONAL CELL PHONE

          25    RECORDS FROM THE PERIOD THAT'S AT DISPUTE IN THIS CASE; IS THAT
```

09:39:58   1   FAIR TO SAY?

           2   A.   YES.

           3   Q.   DID YOU REVIEW THESE PHONE RECORDS?

           4   A.   I DID.

           5   Q.   DID YOU GO THROUGH AND CIRCLE ALL THE TIMES THAT YOU

           6   CONTACTED EITHER MR. VALENTINI IN SAN DIEGO OR MR. YIP?

           7   A.   AMONG THE HMC'S, YES.

           8   Q.   OKAY.  VERY FINE.  AND HOW MANY TIMES DID YOU HAVE EITHER A

           9   TEXT OR TELEPHONE CALL WITH MR. VALENTINI?

          10   A.   I THINK -- BEFORE MY WORK TIME AND AFTER?

          11   Q.   I APOLOGIZE.  BEFORE 9:00 AND AFTER 5:00, HOW MANY CALLS

          12   ARE THERE WITH MR. VALENTINI?

          13   A.   I THINK THERE IS APPROXIMATELY 900.

          14   Q.   AND HOW MANY CALLS OR TEXTS WERE THERE WITH MR. YIP WHO IS

09:40:41  15   ALSO IN SAN DIEGO?

          16   A.   I BELIEVE THERE WAS APPROXIMATELY 250.

          17   Q.   ALL BEFORE 9:00 OR AFTER 5:00?

          18   A.   YES.

          19   Q.   ARE YOU PERSONAL FRIENDS WITH MR. VALENTINI?

          20   A.   NO.

          21   Q.   DID YOU VISIT HIS HOME?

          22   A.   NO.

          23   Q.   DID YOU HAVE A REASON TO CALL HIM OTHER THAN WORK?

          24   A.   NO.

          25   Q.   ARE THESE ALL WORK CALLS IN YOUR VIEW?

09:41:13   1    A.   YES.

           2    Q.   NOW, WHERE WERE YOU AT WHEN YOU WERE MAKING THESE WORK

           3    CALLS AFTER 5:00 AND BEFORE 9:00?

           4    A.   I COULD BE IN THE OFFICE, OR I COULD BE AT HOME WORKING.

           5    Q.   WE'LL GO THROUGH IT.   SOME OF THEM ARE 5:00 IN THE MORNING,

           6    RIGHT?

           7    A.   I WAS PROBABLY AT HOME.

           8             THE COURT:   EXCUSE ME, COUNSEL, I JUST MISSED OVER

           9    WHAT TIME FRAME WAS THAT 900 AND 250.   YOU SAID IT.

          10             MR. TEEPLE:   THESE RECORDS ARE JUST DURING THE

          11    EMPLOYMENT TIME, FROM THE FIRST DAY OF HER EMPLOYMENT THROUGH

          12    THE END.   SO THAT IS JANUARY '08 THROUGH AUGUST OF 2010.

          13             THE COURT:   ALL RIGHT.   THANK YOU.

          14    BY MR. TEEPLE:

09:41:51  15    Q.   DID I SAY THAT DIRECTLY, MA'AM?

          16    A.   YOU DID.

          17    Q.   THESE ARE ALL JUST BEFORE 9:00 A.M. OR AFTER 5:00 P.M.

          18    YOU'RE NOT COUNTING ANYTHING WHERE YOU ARE CALLING THEM DURING

          19    THE DAY ON YOUR CELL PHONE, FAIR TO SAY?

          20    A.   THAT'S FAIR.

          21    Q.   NOW, COUNSEL MENTIONED THAT IF YOU LOOKED AT THESE CALLS

          22    FOR ANY DAY BEFORE 9:00 OR AFTER 5:00, THE AVERAGE, MEANING

          23    THERE'S GOING TO BE SOME LONGER OR SOME SHORTER, IS SIX

          24    MINUTES.   ALL RIGHT.   LET'S ASSUME THAT'S RIGHT FOR A MINUTE.

          25    IF IT'S 6:00 P.M., WHERE ARE YOU MOST LIKELY AT?

09:42:26  1   A.   IN MY OFFICE.

2   Q.   AND IF YOU'RE TALKING WITH MR. VALENTINI OR MR. YIP AT 6:00

3   P.M., WHAT'S IN FRONT OF YOU ON YOUR DESK?

4   A.   MOST LIKELY AN OPEN FILE.

5   Q.   WHY ARE YOU MOST LIKELY CALLING HIM OR IS HE CALLING YOU?

6   A.   IF I WAS CALLING HIM, TO ASK FOR HELP ON A SPECIFIC

7   SITUATION WITH A FILE.   IF HE WAS CALLING ME, IT WAS TO RETURN

8   MY CALL TO ADDRESS THE ISSUE WITH THE FILE.

9   Q.   I GOT THE IMPRESSION FROM MR. KAUFMAN THAT YOU HAVE THE

10   PHONE CALL, AND YOU HANG UP, AND IT'S ALL OVER THERE.   WOULD

11   THAT BE ACCURATE?

12   A.   IF I LEFT HIM A VOICE MAIL, I WOULD BE ALSO LEAVING A VOICE

13   MAIL FOR HIM TO CALL ME BACK, I'M HERE, CALL ME BACK, PLEASE

14   CALL ME.

09:43:11  15   Q.   LET'S TALK ABOUT THE TIME YOU ACTUALLY DID SPEAK WITH HIM.

16   A.   YES.

17   Q.   IS IT HIM ASKING YOU TO DO SOMETHING OR YOU ARE ASKING HIM

18   WHAT TO DO ON THE FILE?

19   A.   YES.

20   Q.   AND THEN YOU HANG UP, AND THEN WHAT DO YOU DO?

21   A.   I WORK ON THE FILE.

22   Q.   SO THIS ISN'T JUST ONLY PHONE WORK.   IT'S PHONE WORK IN

23   CONNECTION WITH A TASK THAT YOU'RE WORKING ON; IS THAT MOST

24   COMMON?

25   A.   THAT'S ACCURATE.

09:43:32  1    Q.  IS IT FAIR TO SAY THAT THE PHONE CALLS ARE JUST EVIDENCE OF

          2    THE FACT THAT YOU'RE THERE DOING ALL THESE OTHER THINGS?

          3    A.  YES.

          4    Q.  YOU'RE NOT TELLING THE JURY THAT -- THAT'S FINE.  I THINK I

          5    MADE MY POINT.  LET'S LOOK AT EXHIBIT 4, AND IT'S IN A

          6    DIFFERENT NOTEBOOK, AND I'LL COME UP AND HAND IT TO YOU.  DO

          7    YOU HAVE ANY OBJECTION TO EXHIBIT FOUR, SIR?

          8              MR. KAUFMAN:  I DO NOT.

          9              THE COURT:  OKAY.  I MOVE IN EXHIBIT FOUR, YOUR

         10    HONOR.

         11              THE COURT:  ALL RIGHT.  BE ENTERED.

         12              (EXHIBIT 4 ADMITTED.)

         13    BY MR. TEEPLE:

         14    Q.  WHAT IS EXHIBIT FOUR?  YOU CAN SEE IT ON YOUR SCREEN.  WHAT

09:44:20 15    IS IT?

         16    A.  IT'S AN HMA, HOME MORTGAGE ASSISTANT, WORK FLOW BASICS.  SO

         17    IT'S BASICALLY A CHART OF THE DUTIES OF AN HMA.

         18    Q.  NOW, BRIEFLY, TO YOURSELF, START AT THE TOP AND START

         19    SCROLLING DOWN.  WE COVERED A LOT HERE.  I DON'T WANT TO GO

         20    THROUGH THE WHOLE TWO-PAGE LIST AND TALK ABOUT THE THINGS WE

         21    ALREADY TALKED ABOUT, BUT IS THERE ANYTHING ON THIS LIST THAT

         22    WE HAVEN'T ALREADY TALKED ABOUT IN SOME FORM OR ANOTHER?  GO

         23    AHEAD AND READ IT TO YOURSELF AND JUST LET US KNOW.

         24              AND UZIEL, CAN YOU SLOWLY SCROLL DOWN SO THE JURY CAN

         25    SEE ALL THIS.  OF COURSE, ALL THIS ADMITTED EVIDENCE COMES BACK

09:45:11   1    INTO THE JURY ROOM.   IS THERE ANYTHING ON THAT LIST WE HAVEN'T

           2    TALKED ABOUT IN SOME FORM OR ANOTHER?

           3    A.   I DON'T THINK SO.

           4    Q.   ALL THAT HAS TO DO WITH PUSHING A LOAN THROUGH?

           5    A.   WITH THE LIFE OF THE LOAN.

           6    Q.   THAT'S ABOUT THE LIFE OF THE LOAN MOSTLY?

           7    A.   YES.

           8    Q.   LET'S LOOK AT EXHIBIT SEVEN PLEASE.

           9           MR. TEEPLE:   ANY OBJECTION?

          10           MR. KAUFMAN:   NO.

          11           MR. TEEPLE:   WE MOVE IN EXHIBIT SEVEN, YOUR HONOR.

          12           THE COURT:   BE ENTERED.

          13           (EXHIBIT 7 ADMITTED.)

          14    BY MR. TEEPLE:

09:46:28  15    Q.   I KNOW THIS IS SIDEWAYS.   I DON'T KNOW IF YOU CAN READ IT.

          16    WHAT IS EXHIBIT SEVEN, MA'AM?   DO YOU RECOGNIZE IT EVEN THOUGH

          17    IT'S BEING MANIPULATED?

          18    A.   YES.   IT LOOKS LIKE AN ELECTRONIC TIME CARD.

          19    Q.   NOW, THIS IS THE FIRST PAGE OF EXHIBIT SEVEN.   IS THAT YOUR

          20    HANDWRITING AT THE TOP THERE THAT SAYS, PAID, 40 HOURS,

          21    REGULAR?

          22    A.   NO, IT'S NOT.

          23    Q.   DO YOU KNOW WHOSE IT IS?

          24    A.   NO, I DON'T.

          25    Q.   FOR THIS TIME PERIOD OF 1-14-08, IT LOOKS LIKE THERE MAY

09:47:02   1   HAVE BEEN AN INITIAL PAY PERIOD WHERE YOU DIDN'T ENTER A TIME

2   CARD; IS THAT FAIR TO SAY?

3   A.   YES.

4   Q.   SO SOMEBODY DID THAT FOR YOU, JUST PUT IN THAT -- ANYBODY

5   ASK YOU IF YOU WORKED 40 HOURS THAT WEEK?

6   A.   NO.

7   Q.   AND YOU DON'T KNOW WHO WROTE THAT?

8   A.   I DON'T.

9   Q.   THEY JUST PRESUMED THAT'S WHAT IT WAS I GUESS.  WELL, WHO'S

10   TO SAY?

11           MR. KAUFMAN:  CALLS FOR SPECULATION.

12           MR. TEEPLE:  AGREED.  WITHDRAWN, YOUR HONOR.  NEXT

13   PAGE.  PLEASE PROCEED.  THAT'S ANOTHER BLANK PAGE.

14   BY MR. TEEPLE:

09:47:42  15   Q.   DO YOU RECOGNIZE PAGE THREE OF EXHIBIT SEVEN?

16   A.   YES.

17   Q.   WHAT IS THAT?

18   A.   THAT IS THE ELECTRONIC TIME CARD THAT I FIRST ENTERED MY

19   HOURS THAT I WORKED.

20   Q.   SO THIS IS FOR A TWO-WEEK TIME PERIOD, FAIR TO SAY?

21   A.   YES.

22   Q.   AND DO YOU SEE OVERTIME IN THERE, THE COLUMN?

23   A.   YES, I DO.

24   Q.   HOW MUCH WAS THAT?

25   A.   41.5 HOURS.

34

09:48:07  1    Q.  DID YOU EVER PUT OVERTIME ON A TIME CARD EVER AGAIN?

2    A.  NO, I DID NOT.

3    Q.  GO TO THE NEXT PAGE PLEASE.  LET'S STOP THERE.  WE HAVE THE

4    NEXT PAY PERIOD HERE.  9:00 TO 5:00.

5    A.  YES.

6    Q.  AND WE TALKED ABOUT ALREADY WHY YOU PUT IN 9:00 TO 5:00.

7    IS THERE ANY OTHER REASON WE HAVEN'T TALKED ABOUT?

8    A.  NO.

9    Q.  NOW, YOU ARE AN HMA.  WHAT DOES THAT STAND FOR?

10    A.  HOME MORTGAGE ASSISTANT OR HOME MORTGAGE ASSOCIATE.

11    Q.  YOU'RE NOT A PURE LOAN PROCESSOR, ARE YOU?

12    A.  I AM NOT.

13    Q.  YOU ARE AN HMA.  YOU WOULD DO SOME PROCESSING, WE TALKED

14    THAT, THE LIFE OF A LOAN; IS THAT FAIR TO SAY?

09:49:14 15    A.  YES.

16    Q.  YOU WORKED FOR WHAT I CALL BROKERS, MORTGAGE BROKERS, AND

17    WHAT THEY CALL HMC'S.  HOW MANY BROKERS OR HMC'S DID YOU WORK

18    FOR, DID YOU SERVICE?  MR. OLMSTED WAS ONE, RIGHT?

19    A.  MR. OLMSTED THROUGH 2008 -- SORRY, LET ME CORRECT THAT --

20    THROUGH THE ENTIRE PERIOD BUT JUST SPECIFICALLY FOR HIM IN

21    2008.

22    Q.  AND AT ANY TIME DID YOU EVER WORK FOR MORE THAN JUST ONE

23    HMC?

24    A.  YES.

25    Q.  WHAT IS THE MOST THAT YOU RECALL EVER HAVING WORKED FOR?

09:49:44    1    A.   THERE WERE THREE AT A TIME.

            2    Q.   THREE AT A TIME?

            3    A.   YES.

            4    Q.   IN ADDITION TO SITTING WITH MR. OLMSTED ACROSS HIS DESK

            5    EVERY DAY WHEN HE'S THERE, YOUR THERE, YOU'VE GOT TWO OTHER

            6    HMC'S OUT THERE IN THE WORLD THAT YOU ARE HANDLING WHATEVER

            7    THEY NEED ON AN HMA LEVEL; IS THAT FAIR TO SAY?

            8    A.   YES.

            9    Q.   WERE THEY LOCATED IN THE SAME OFFICE AS YOU?

           10    A.   NO.

           11    Q.   WHERE WERE THEY LOCATED?

           12    A.   ONE OF THE OTHER HMC'S WAS LOCATED IN MONARCH BEACH WHICH

           13    IS SOUTH ORANGE COUNTY, AND THAT'S A COUPLE MILES AWAY FROM MY

           14    OFFICE.  THE OTHER HMC AT THE TIME WAS LOCATED -- SHE HAD DUEL

09:50:21   15    OFFICES.  ONE IN SAN CLEMENTE, ONE IN MISSION VIEJO.  AND THE

           16    OTHER HMC I WORKED FOR HAD DUEL OFFICES AS WELL.  SHE WORKED

           17    OUT OF THE DESIGN CENTER WHICH WAS ALSO LOCATED IN LAGUNA

           18    NIGUEL AND THE SAN CLEMENTE OFFICE AS WELL.

           19    Q.   HOW WOULD YOU COMMUNICATE WITH THE OTHER HMC'S?

           20    A.   PRETTY MUCH LIKE I DID WITH DANNY VALENTINI.  IT WOULD BE

           21    E-MAILS AND PHONE CALLS FIRST.  CELL PHONE, TEXT MESSAGES, AS

           22    KIND OF A BACKUP IF I WASN'T HEARING BACK FROM THEM OR I KNOW

           23    THEY WERE OUT IN THE FIELD AND HAD THEIR CELL PHONES WITH THEM.

           24    IF I TEXT THEM, THEY WOULD AUTOMATICALLY SEE MY NUMBER AND

           25    HOPEFULLY RESPOND.  THEY WOULD COME INTO MY OFFICE ON A VERY

09:51:08   1   FREQUENT BASIS BRINGING FILES, BRINGING FILES IN, WANTING TO

2   SIT DOWN, GO THROUGH THE FILE, WHICH I THOUGHT WAS GREAT

3   INSTEAD OF JUST THROWING IT AT ME.  SO THAT TOOK SOME TIME.

4   Q.  SO WHAT WOULD BE THE BEST WAY FOR US TO KNOW WHEN AND HOW

5   YOU WERE COMMUNICATING WITH THEM?  WOULD IT BE YOUR CELL

6   RECORDS OR E-MAIL RECORDS?

7   A.  FIRST, IT WOULD BE MY E-MAIL RECORDS.

8   Q.  DO YOU HAVE ANY OF THOSE E-MAILS?

9   A.  I DO NOT.

10   Q.  WHY NOT?

11   A.  THEY WERE DESTROYED.

12   Q.  BY YOU?

13   A.  NO.

14   Q.  BY WHO?

09:51:41   15   A.  BY HSL.

16   Q.  COMING DOWN THE HOME STRETCH HERE, YOUR HONOR.  ONE MOMENT.

17   YOU KNOW EVERYBODY HAS TALKED ABOUT IT, BUT I DON'T THINK WE

18   TALKED IT WITH YOU.  HOW WERE YOU PAID?

19   A.  I WAS PAID BY HSL AS AN HOURLY EMPLOYEE.

20   Q.  HOW MUCH AN HOUR?

21   A.  $23.08.

22   Q.  HOW ELSE WERE YOU PAID?

23   A.  I WAS ALSO PAID BY MY HMC'S AS A SPLIT ON THEIR

24   COMMISSION.

25   Q.  YOU GOT A PART OF THEIR COMMISSION?  THEY GAVE IT UP SO YOU

09:52:28   1   COULD HAVE IT, RIGHT?

2   A.   YES.

3   Q.   BUT IT CAME THROUGH ON AN HSL CHECK, RIGHT?

4   A.   IT WAS PART OF MY PAYCHECK ISSUED BY HSL, YES.

5   Q.   IF YOU DIDN'T GET IT, IT WENT BACK TO THE HMC, RIGHT?

6   A.   YES.

7   Q.   YOU KNOW, WE'VE BEEN TALKING ABOUT AVERAGES.  I JUST WANT

8   TO MAKE SURE THE JURY UNDERSTANDS.  WAS THERE EVER A TIME WHEN

9   YOU WORKED LESS THAN 60 HOURS IN A WEEK?

10   A.   TYPICALLY, NO.

11   Q.   WELL, TYPICALLY, JUST AN AVERAGE.  AN AVERAGE IS MADE UP OF

12   HIGHS AND LOWS.  WHAT'S THE SHORTEST WEEK YOU RECALL WORKING?

13   A.   THE SHORTEST WEEK COULD BE A NORMAL WEEK, 40 HOURS.

14   Q.   WHAT'S THE LONGEST WEEK YOU EVER WORKED?

09:53:27   15   A.   THE LONGEST WEEK COULD BE, I MEAN, IT COULD BE A LOT MORE.

16   IT COULD BE 80 HOURS A WEEK.

17   Q.   WHEN WOULD THOSE WEEKS -- STRIKE THAT.  WHAT WOULD CAUSE

18   YOU TO WORK 80 HOURS A WEEK?

19   A.   IF THERE WERE A CERTAIN NUMBER OF LOANS THAT CAME IN THAT

20   NEEDED ATTENTION, IF WE WERE WORKING ON A MARKETING PROJECT.  I

21   THINK THEY SAID IN OPENING, IN YOUR OPENING YOU HEARD THEM TALK

22   ABOUT MARKETING BLITZ' THINGS LIKE THAT, TRYING TO GET THE

23   AGENTS REALLY PUMPED UP TO GO OUT AND GET MORE BUSINESS.  WE

24   WOULD ASSIST IN THAT.  THAT MAY BE A TYPICAL WEEK WHERE I WOULD

25   SPEND MORE TIME IN THE OFFICE.

09:54:12   1   Q.   ONE MOMENT.   WHY DID YOU LEAVE?

          2   A.   I LEFT HSL, AND IT TOOK A WHILE BECAUSE I HAD BEEN THERE

          3   FOR SO LONG.

          4            THE COURT:   EXCUSE ME, WE GOT A DIALOGUE GOING HERE.

          5   I THINK IT'S A VERY CLEAR QUESTION.   I THINK SHE CAN JUST

          6   ANSWER IT.   OTHERWISE, WE'LL BE HERE ALL DAY.

          7   BY MR. TEEPLE:

          8   Q.   IN A COUPLE OF WORDS, WHY DID YOU LEAVE HSL?

          9   A.   I HAD ENOUGH.

         10   Q.   WERE YOU BURNED OUT?

         11   A.   I WAS BURNED OUT.

         12            MR. TEEPLE: NOTHING FURTHER, YOUR HONOR.

         13            THE COURT:   ALL RIGHT.

         14                           CROSS-EXAMINATION

09:55:02  15   BY MR. KAUFMAN:

         16   Q.   GOOD MORNING, MS. BUTLER.

         17   A.   GOOD MORNING.

         18   Q.   BEFORE I GET INTO MY PREPARED EXAMINATION, I JUST WANT TO

         19   CLARIFY SOMETHING YOU SAID UP FRONT.   WAS I CORRECT IN HEARING

         20   YOU SAYING THAT THE TIME YOU ACTUALLY SPENT WORKING ON LOAN

         21   FILES YOU COULD DO THAT IN UNDER 40 HOURS A WEEK?

         22   A.   SOMETIMES, YES.

         23   Q.   SOMETIMES, OR TYPICALLY, YOUR TYPICAL WEEK, YOU COULD DO

         24   THE WORK ON YOUR LOAN FILES YOU HAD IN UNDER 40 HOURS A WEEK?

         25   A.   DEPENDING ON THE AMOUNT OF FILES, YES.

09:55:35  1    Q.  AND YOU'RE CLAIMING THAT ALL THIS OVERTIME IS GENERATED

2    BECAUSE OF THIS LARGE VOLUME OF TIME THAT YOU WERE REQUIRED TO

3    SPEND ON WHAT YOU'VE CALLED MARKETING; CORRECT?

4    A.  YES.

5    Q.  OKAY.  I WANT TO MAKE SURE I GOT THAT STRAIGHT.

6            INDULGE ME, I WANT TO GO BACK TO THE BEGINNING A

7    LITTLE BIT.  I'LL TRY NOT TO REPEAT THINGS TOO MUCH THAT WE

8    ALREADY COVERED.  WE ESTABLISHED YOU BECAME AN EMPLOYEE OF HSL

9    IN JANUARY 2008; CORRECT?

10   A.  YES.

11   Q.  AND BEFORE THAT, YOU HAD BEEN ESSENTIALLY DOING THE SAME

12   JOB BUT THROUGH OLMSTED CONSULTING FOR THE TEN YEARS BEFORE

13   THAT?

14   A.  YES.

09:56:14 15   Q.  AND FROM YOUR PERSPECTIVE AT LEAST, YOUR JOB DUTIES DIDN'T

16   REALLY CHANGE WHEN YOU WENT FROM OLMSTED TO HSL, IT WAS JUST

17   BASICALLY A CHANGE OF THE EMPLOYER?

18   A.  YES.

19   Q.  AND THERE WERE OTHER PEOPLE WITHIN THE BROAD FIRST CAPITAL

20   STRUCTURE WHO HAD SIMILAR JOBS TO YOU?

21   A.  YES.

22   Q.  AND THEY ALSO CAME OVER AT THIS SAME TIME BECAUSE HSL

23   PURCHASED OR ACQUIRED THE EMPLOYEES OF FIRST CAPITAL?

24   A.  I DON'T UNDERSTAND THE QUESTION.

25   Q.  BAD QUESTION.  MY FAULT.

09:56:51   1           THOSE OTHER EMPLOYEES OVER AT FIRST CAPITAL, THEY TOO

  2   BECAME HSL HOME MORTGAGE ASSOCIATES?

  3   A.  A LIMITED AMOUNT, YES.

  4   Q.  LIKE YOU, IT WAS JUST A CHANGE OF THE EMPLOYER; THEIR JOB

  5   DUTIES REMAINED ESSENTIALLY THE SAME?

  6   A.  I DON'T KNOW WHAT THEIR JOB DUTIES WERE.

  7   Q.  DID YOU KNOW LAURA DAWSON?

  8   A.  YES, I KNOW WHO SHE IS.

  9   Q.  WAS SHE A -- DID SHE HAVE A SIMILAR JOB TO YOU AT FIRST

10   CAPITAL BEFORE THE JANUARY 2008?

11   A.  I DIDN'T KNOW LAURA BEFORE HSL.

12   Q.  DO YOU KNOW IF SHE HAD THE SAME JOB THAT YOU HAD AT FIRST

13   CAPITAL?

14   A.  I DON'T KNOW.

09:57:38 15   Q.  DO YOU KNOW IF MS. DAWSON -- DO YOU KNOW IF SHE, AS A HOME

16   MORTGAGE ASSOCIATE, HAD THE SAME JOB DESCRIPTION AS YOU HAD AS

17   A HOME MORTGAGE ASSOCIATE?

18   A.  I BELIEVE SHE HAD THE SAME TITLE.

19   Q.  HAVE YOU EVER SEEN ANY DOCUMENT THAT LAID OUT WHAT WERE THE

20   JOB DUTIES FOR A HOME MORTGAGE ASSOCIATE?

21   A.  WE JUST LOOKED AT A DOCUMENT THAT.

22   Q.  LET'S LOOK AT THAT ONE.  I'M GOING TO GO OUT OF ORDER

23   BECAUSE I THINK THAT'S VALUABLE.  WOULD YOU GO TO EXHIBIT FOUR

24   PLEASE?  I'M GOING TO STEP BACK HERE IF THAT'S OKAY.  THIS, AS

25   YOU DESCRIBED IT, IS CALL HMA WORKFLOW BASICS.  THIS SETS FORTH

09:58:35  1  THE JOB DUTIES OF A HOME MORTGAGE ASSOCIATE; CORRECT?

2  A.  YES.

3  Q.  AND IF YOU GO DOWN, YOU'LL SEE THERE'S A SECTION THAT SAYS

4  RESPONSIBILITY.  DO YOU SEE THAT ON THE LEFT SIDE?

5  A.  YES.

6  Q.  AND LIKE THE FIRST SET OF DUTIES, IT SAYS, HMC SLASH HMA;

7  CORRECT?

8  A.  YES.

9  Q.  SO THAT IS DUTIES THAT COULD BE PERFORMED BY EITHER A HOME

10  MORTGAGE CONSULTANT OR BY YOU?

11  A.  YES.

12  Q.  GO DOWN A LITTLE FURTHER PLEASE.  NOW, THE NEXT SET OF

13  DUTIES ARE, IT JUST SAYS HMA.  SO THAT'S JOB DUTIES THAT WOULD

14  BE YOUR RESPONSIBILITY; CORRECT?

09:59:12  15  A.  YES.

16  Q.  AND THEN THERE'S SOME FURTHER DUTIES.  GO DOWN A LITTLE

17  FURTHER.  IT'S KIND OF HARD TO READ BECAUSE OF THE BLUE

18  BACKGROUND, BUT THEY DON'T MENTION HMA'S AS DOING THEM.

19  THEY'RE DONE BY SOMEONE CALLED THE DECISIONER. THOSE ARE NOT

20  JOB DUTIES OF YOURS; CORRECT?

21  A.  NO, THEY'RE NOT.

22  Q.  AND THEN GO DOWN FURTHER.  YOU'LL SEE AS YOU GO DOWN

23  THERE'S OTHER JOB DUTIES.  JUST KEEP SCROLLING DOWN.  SOME ARE

24  HMA.  SOME ARE ACTUALLY JUST HMC.  SO NOT EVERYTHING ON THIS

25  JOB DESCRIPTION IS ONE OF YOUR JOB DUTIES; CORRECT?

09:59:50   1    A.   NO, IT'S NOT.

           2    Q.   PLEASE IDENTIFY FOR ME ON THIS JOB DESCRIPTION WHERE THE

           3    MARKETING JOB DUTIES ARE.  I DON'T SEE IT.

           4         MR. TEEPLE:  OBJECTION.  LACKS FOUNDATION.

           5    ARGUMENTATIVE.

           6         MR. KAUFMAN:  I DON'T THINK IT'S ARGUMENTATIVE,

           7    YOUR HONOR.  SHE DESCRIBED IT AS A JOB DESCRIPTION.

           8         THE COURT:  YEAH, SHE DESCRIBED IT -- I THINK SHE

           9    USED THAT TERM.  I THINK IT'S FAIR.  OVERRULED.

          10    BY MR. KAUFMAN:

          11    Q.   WHERE IS IT?

          12    A.   I DON'T THINK THIS LIST IS ONE HUNDRED PERCENT ACCURATE.  I

          13    THINK THAT THE WAY THIS IS SET UP THERE'S SOME DUTIES LISTED

          14    UNDER UNDER HMA THAT WE DID NOT HAVE ACCESS TO DO.  THE HMA

10:00:36  15    PART REFERS TO KIND OF A CROSS-BREED BETWEEN SOME DUTIES THAT

          16    WERE DONE IN FULFILLMENT.  SO THERE'S SOME DUTIES LISTED UNDER

          17    HMA THAT I DID NOT HAVE ACCESS TO DO.

          18    Q.   THAT'S NOT MY QUESTION THOUGH.  YOU HAVE TESTIFIED, IF I

          19    UNDERSTAND, AT LEAST FROM YOUR COUNSEL, THAT 70 PERCENT OF YOUR

          20    JOB WAS MARKETING.  ONLY 30 PERCENT THAT COULD BE DONE IN LESS

          21    THAN 40 HOURS WAS AS THEY DESCRIBE LIFE OF A LOAN.  I'M ASKING

          22    YOU, ON THIS JOB DESCRIPTION AS YOU IDENTIFIED IT, PLEASE

          23    IDENTIFY FOR ME ONE MARKETING DUTY.

          24         MR. TEEPLE:  OBJECTION.  MISSTATES TESTIMONY.  SHE

          25    SAID THIS WAS THE LIFE OF THE LOAN NOT HER JOB DUTIES.

10:01:13  1        MR. KAUFMAN:  THAT'S NOT WHAT SHE SAID, YOUR HONOR.

         2        THE COURT:  WELL, HERE IS THE THING.  WAIT A MINUTE.

         3   IT'S VERY DIFFICULT OVER A COURSE OF TWO HOURS' WORTH OF

         4   TESTIMONY TO PICK OUT A SPECIFIC ASPECT AS TO WHAT SHE SAID OR

         5   WHAT SHE DIDN'T SAY.  IT WOULD TAKE ME TOO LONG TO GO BACK OVER

         6   THE TRANSCRIPT.  IT'S THE JURY'S DUTY.  THEY'RE TAKING NOTES.

         7   IT'S THE JURY'S DUTY TO DETERMINE THE FACTS OF THE CASE, AND

         8   I'M NOT GOING TO SUSTAIN THE OBJECTION BECAUSE I BELIEVE THERE

         9   WAS A DISCUSSION OF MARKETING, TELEPHONE MARKETING, WITH THE

        10   REALTORS OVERALL AND A FAIR AMOUNT OF TIME WENT INTO THAT

        11   HELPING CLIENT DEVELOPMENT WHICH SHE WAS TALKING TO CITIZENS

        12   WHO WERE BROUGHT IN AFTER HOURS TO TRY TO WORK THROUGH THESE

        13   LOANS.  SO I'M GOING TO ALLOW THE QUESTION.

        14        THE WITNESS:  CAN YOU REPEAT THE QUESTION?

10:02:17 15   BY MR. KAUFMAN:

        16   Q.  CAN YOU IDENTIFY FOR ME ONE MARKETING JOB DUTY, 70 PERCENT

        17   OF YOUR JOB AS YOU DESCRIBED IT, AS LISTED ON EXHIBIT FOUR?

        18   A.  CAN YOU GO BACK UP TO THE TOP OF EXHIBIT FOUR?  EVERYTHING

        19   ON HERE RELATES TO PROCESSING OF A LOAN.

        20   Q.  HAVE YOU SEEN ANY DOCUMENT EVER THAT INDICATES THAT YOU

        21   WERE HIRED IN A JOB WHERE IT WAS YOUR RESPONSIBILITY TO GO OUT

        22   AND DO SALES ACTIVITY LIKE MARKETING AS YOU'RE DESCRIBING?

        23   A.  NO.

        24   Q.  YOUR CALLS THAT YOU HAD TO DANNY VALENTINI THAT YOU SAID

        25   THAT HAPPENED AT NIGHT OR IN THE MORNING, THOSE WERE ALL CALLS

10:04:04   1   ABOUT LOAN FILES; CORRECT?

2   A.   YES.

3   Q.   NOW, I THINK THIS IS ALREADY IN THE RECORD, BUT I WANT TO

4   MAKE SURE IT'S CLEAR.   WHEN YOU WORKED UNDER MR. OLMSTED, YOU

5   WERE TREATED AS AN INDEPENDENT CONTRACTOR, NOT PAID AN HOURLY

6   WAGE; CORRECT?

7   A.   YES.

8   Q.   SO YOU HAD NO OCCASION TO ENTER IN TIME SHEETS FOR YEARS

9   WHEN YOU WORKED WITH MR. OLMSTED?

10   A.   NO, I DID NOT.

11   Q.   BUT UNDER THE ARRANGEMENT OF MR. OLMSTED, AT THE END AT

12   LEAST YOU WERE EARNING APPROXIMATELY $7,400 PER MONTH?

13   A.   I BELIEVE THAT'S WHAT WAS SAID, YES.

14   Q.   I THINK THAT TRANSLATES TO $88,800 PER YEAR.   I'M JUST

10:04:51   15   DOING MATH.   AND PART OF THE WAY THAT PAY CAME IS YOU RECEIVED

16   ESSENTIALLY TEN BASIS POINTS OF MR. OLMSTED'S LOAN PRODUCTION;

17   CORRECT?

18   A.   YES.

19   Q.   AND TEN BASIS POINTS IS ONE-TENTH OF ONE PERCENT?

20   A.   YES.

21   Q.   ALL RIGHT.   NOW, WHEN YOU CAME OVER TO HOMESERVICES

22   LENDING, YOU UNDERSTOOD YOU WERE NOW GOING TO BE AN EMPLOYEE,

23   NOT AN INDEPENDENT CONTRACTOR; CORRECT?

24   A.   YES.

25   Q.   AND YOU WERE TOLD ABOUT THIS COMPANY DOHERTY THAT WAS THE

10:05:30   1   HR PROVIDER FOR HSL; YOU WERE TOLD THAT THEY EXISTED?

2   A.   YES.

3   Q.   AND YOU WERE GIVEN HANDBOOKS TO CONFIRM YOUR UNDERSTANDING

4   OF THE NEW POLICIES THE COMPANY WOULD HAVE IN PLACE; CORRECT?

5   A.   YES.

6   Q.   AND YOU SIGNED ACKNOWLEDGEMENTS OF THOSE POLICIES THAT YOU

7   WOULD FOLLOW THEM; CORRECT?

8   A.   YES.

9   Q.   AND YOU ACTUALLY RECEIVED SOME TRAINING ON HOW TO USE

10   DOHERTY'S TIME KEEPING SYSTEM, DIDN'T YOU?

11   A.   I DON'T REMEMBER RECEIVING THE TRAINING, NO.

12   Q.   WELL, YOU SAID YOURSELF THAT SOMEBODY TOLD YOU HOW TO USE

13   THE TIME KEEPING SYSTEM; CORRECT?

14   A.   YES, BUT I DON'T REMEMBER WHO IT WAS.

10:06:29   15             MR. KAUFMAN:  DO YOU HAVE ANY OBJECTION TO US

16   ENTERING EXHIBIT 106?  IT'S THE HANDBOOK ACKNOWLEDGEMENT.

17             MR. TEEPLE:  NO OBJECTION.

18             MR. KAUFMAN:  YOUR HONOR, MAY WE PUT EXHIBIT 106 IN

19   EVIDENCE?

20             THE COURT:  ALL RIGHT.

21             (EXHIBIT 106 ADMITTED.)

22             THE COURT:  YOU WANT THAT ENTERED?

23             MR. KAUFMAN:  YES.

24             THE COURT:  OKAY.  BE ENTERED.

25   BY MR. KAUFMAN:

10:06:58  1  Q.  I REALIZE IT'S TYPED IN, BUT DO YOU RECALL THIS IS YOUR

2  ACKNOWLEDGEMENT OF THE HSL HANDBOOK THAT YOU SIGNED AT THE END

3  OF 2007?

4  A.  YES.

5  Q.  NOW, THE WAY THE DOHERTY SYSTEM WORKED WAS THAT YOU, EVERY

6  PAY PERIOD, WOULD GO IN AND YOURSELF ENTER TIME INTO THE

7  WEB-BASED SYSTEM; CORRECT?

8  A.  YES.

9  Q.  AND YOUR PRACTICE WAS TO JUST DO IT ONCE EVERY TWO WEEKS AT

10  THE END OF THE PAY PERIOD; YOU WOULD ENTER ALL YOUR TIME OR YOU

11  WOULD ENTER TIME FOR A TWO-WEEK PERIOD?

12  A.  YES.

13  Q.  AND YOU HAVE NO IDEA WHO, IF ANYBODY, LOOKED AT THIS

14  BETWEEN THE TIME YOU SENT IT INTO THE DOHERTY SYSTEM AND WHEN

10:07:46  15  YOUR PAYCHECK ARRIVED?

16  A.  I DON'T KNOW WHO, NO.

17  Q.  AND DOHERTY ALWAYS PAID YOU FOR THE TIME THAT WAS INPUTTED

18  INTO THE SYSTEM; IS THAT CORRECT?

19  A.  YES.

20  Q.  AND DIDN'T DOHERTY EXPRESSLY INSTRUCT YOU THAT IT WAS YOUR

21  RESPONSIBILITY TO ACCURATELY REPORT YOUR TIME?

22  A.  I DON'T KNOW WHO.  I DON'T THINK IT WAS DOHERTY, NO.

23  Q.  WELL, DO YOU REMEMBER I TOOK YOUR DEPOSITION IN THIS

24  CASE?

25  A.  YES.

10:08:35   1   Q.   AND IN THAT DEPOSITION, YOU AGREED YOU WOULD TELL ME THE

2   TRUTH TO THE ANSWER OF THE QUESTIONS I GAVE YOU; CORRECT?

3   A.   YES.

4   Q.   AND I SAID IF YOU DIDN'T UNDERSTAND ANY QUESTIONS YOU COULD

5   ASK ME TO CLARIFY, AND I WOULD?

6   A.   YES.

7        MR. KAUFMAN:   YOUR HONOR, I WOULD LIKE TO READ FROM

8   PAGE 46, LINES 10 TO 14.

9        THE COURT:   ALL RIGHT.

10        MR. KAUFMAN:   ANY OBJECTIONS?

11        MR. TEEPLE:   YOU CAN PROCEED QUESTION.   NO OBJECTION.

12        MR. KAUFMAN:   "QUESTION: DID YOU EVER HEAR FROM

13     ANYBODY EITHER AT HSL OR AT DOHERTY THAT IT WAS YOUR

14     RESPONSIBILITY TO ACCURATELY RECORD YOUR TIME?

10:09:13   15        ANSWER: YES.

16        QUESTION:   WHO DID YOU HEAR THAT FROM?

17        ANSWER:   WELL, IT SAYS HERE IN THE HANDBOOK THAT I

18     ACKNOWLEDGE THAT I RECEIVED."

19        YOU UNDERSTOOD IT WOULD VIOLATE COMPANY POLICY IF YOU

20   FALSIFIED YOUR TIME RECORDS?

21   A.   YES.

22   Q.   AND NOBODY EITHER AT HSL OR DOHERTY EVER TOLD YOU THAT YOU

23   SHOULD FALSELY REPORT YOUR TIME IN THE TIME KEEPING SYSTEM, DID

24   THEY?

25   A.   AT DOHERTY, NO.

10:09:45   1     Q.  DID ANYBODY AT HSL TELL YOU YOU SHOULD FALSELY REPORT YOUR

           2     TIME IN THE TIME KEEPING SYSTEM?

           3     A.  I THINK I TOLD YOU EARLIER THAT I HAD A CONVERSATION WITH

           4     MICHAEL YIP THAT SAID THAT SAID IF I REPORTED OVERTIME THAT MY

           5     JOB WOULD BE AT RISK.

           6     Q.  YOU'RE NOW SAYING YOU HAD A CONVERSATION WITH SOMEONE AT

           7     HSL WHO TOLD YOU YOUR JOB IS AT RISK IF YOU RECORD ANY

           8     OVERTIME?

           9     A.  THAT WAS THE MESSAGE THAT I GOT FROM THE CONVERSATION,

          10     YES.

          11     Q.  NOW A MESSAGE I GOT FROM THE CONVERSATION SUGGESTS TO ME

          12     THAT YOU'RE INTERPRETING.  WHAT DID MICHAEL YIP SAY THAT YOU'RE

          13     INTERPRETING IN THAT WAY?

          14     A.  I DON'T RECALL THE EXACT CONVERSATION.  I KNOW THAT THE

10:10:24  15     MESSAGE THAT I GOT AFTER THE CONVERSATION IT WAS MADE VERY

          16     CLEAR TO ME THAT OVERTIME WAS NOT WHAT HSL WANTED TO SEE.

          17     Q.  WHAT DID MICHAEL YIP SAY?

          18              MR. TEEPLE:  ASKED AND ANSWERED, YOUR HONOR.

          19              THE COURT:  WELL, IT'S CROSS-EXAMINATION.  I'LL GIVE

          20     IT ONE MORE RESPONSE.

          21              THE WITNESS:  I DON'T RECALL THE EXACT CONVERSATION.

          22     BY MR. KAUFMAN:

          23     Q.  NOW YOU SAID YOU WENT BACK AND READ THROUGH THE DEPOSITION.

          24     WHY DIDN'T YOU TELL ME AT YOUR DEPOSITION ABOUT A CONVERSATION

          25     YOU HAD WITH MANAGEMENT THAT YOU WOULD NOT BE ALLOWED TO WORK

```
10:10:59    1    OVERTIME?

            2    A.   YOU DIDN'T ASK ABOUT MICHAEL YIP.

            3    Q.   ALL RIGHT.  THAT'S YOUR POSITION.

            4            MR. TEEPLE:  OBJECTION, YOUR HONOR.

            5            THE COURT:  SUSTAINED.

            6    BY MR. KAUFMAN:

            7    Q.   YOU NEVER TOLD ANY OF YOUR SUPERVISORS AT HSL THAT YOU WERE

            8    PLACING FALSE INFORMATION INTO THE TIME KEEPING SYSTEM, DID

            9    YOU?

           10    A.   NO.

           11    Q.   WAS MICHAEL YIP YOUR SUPERVISOR?

           12    A.   MICHAEL YIP WAS THE PERSON I TALKED TO ABOUT ALL OPERATIONS

           13    OF OUR REGION.

           14    Q.   DANNY VALENTINI WAS YOUR SUPERVISOR?

10:11:32   15    A.   YES.

           16    Q.   MICHAEL YIP WAS HIS CLERICAL ASSISTANT; IS THAT CORRECT?

           17    A.   WHEN I SPOKE TO MICHAEL ABOUT THINGS GOING ON WITH THE

           18    COMPANY, IT WAS AS IF I WAS TALKING TO DANNY.  MICHAEL WAS

           19    EASIER TO GET IN TOUCH WITH.

           20    Q.   MY QUESTION, THOUGH, IS THAT YOU UNDERSTOOD THAT MICHAEL

           21    YIP WAS DANNY'S CLERICAL ASSISTANT; IS THAT CORRECT?

           22    A.   IT WAS HIS ASSISTANT, YES.

           23    Q.   SO WHEN YOU STARTED WITH HSL, YOU WERE IN LAGUNA NIGUEL.

           24    YOU ESTABLISHED THAT; CORRECT?

           25    A.   YES.
```

10:12:03  1   Q.   AND DANNY VALENTINI WAS 50 TO 100 MILES AWAY?

2   A.   IN SAN DIEGO, YES.

3   Q.   AND AS HAS BEEN A PRACTICE WHEN YOU WORKED FOR OLMSTED

4   CONSULTING, YOU CONTINUED TO GET ONE-TENTH OF ONE PERCENT OF

5   THE LOAN VOLUME ON MR. OLMSTED'S LOANS; CORRECT?

6   A.   YES.

7   Q.   BUT NOW YOU ALSO RECEIVED HOURLY PAY FOR THE HOURS YOU

8   RECORDED IN THE TIME KEEPING SYSTEM; CORRECT?

9   A.   YES.

10   Q.   NOW MR. OLMSTED, THOUGH, HE WAS NOT YOUR SUPERVISOR AS YOU

11   UNDERSTOOD IT; CORRECT?

12   A.   NO, HE WAS NOT.

13   Q.   YOU VIEWED HIM AS JUST A CO-WORKER AT HSL?

14   A.   THE PERSON I WORK -- YES.

10:12:45  15   Q.   HE'S NOT SOMEONE YOU FELT YOU HAD TO GO TO TO GET

16   PERMISSION TO WORK OVERTIME; IT WOULDN'T BE TO HIM?

17   A.   NO.

18   Q.   AND HE WASN'T RESPONSIBLE FOR TRACKING YOUR WORK HOURS?

19   A.   NO.

20   Q.   YOU UNDERSTOOD YOUR ACTUAL SUPERVISOR FOR MOST OF YOUR

21   EMPLOYMENT, TO NEAR THE VERY END, WAS DANNY VALENTINI?

22   A.   DANNY VALENTINI AND MICHAEL YIP, YES.

23   Q.   NOW LET ME GO BACK.  I THOUGHT YOU SAID TO ME YOU

24   UNDERSTOOD THAT MICHAEL YIP WAS JUST DANNY'S ASSISTANT.  DANNY

25   WAS THE MANAGER; CORRECT?

10:13:14   1    A.   DANNY WAS MY MANAGER, YES.

           2    Q.   IF YOUR MANAGER HAD A SECRETARY WHO TOOK PHONE CALLS, YOU

           3    WOULDN'T THINK THE SECRETARY WAS ALSO YOUR MANAGER, WOULD

           4    YOU?

           5    A.   NO.

           6    Q.   NOW BECAUSE DANNY WAS NOT THERE IN THE OFFICE, HE WOULD NOT

           7    BE ABLE TO PHYSICALLY OBSERVE WHAT YOU WERE DOING ON A

           8    MINUTE-BY-MINUTE BASIS, WOULD HE?

           9    A.   PHYSICALLY, NO.

          10    Q.   THE ONLY WAY HE WOULD HAVE AN IDEA OF WHAT YOU WERE DOING

          11    IS TO THE EXTENT YOU COMMUNICATED TO HIM WHAT YOU WERE DOING

          12    EITHER THROUGH E-MAIL, PHONE OR TEXT OR WHAT HAVE YOU?

          13    A.   YES.

          14    Q.   YOU NEVER DISCUSSED WITH DANNY THE SPECIFIC HOURS YOU WERE

10:13:52  15    WORKING; ISN'T THAT CORRECT?

          16    A.   THE SPECIFIC HOURS, NO.

          17    Q.   AND YOU NEVER ONCE ASKED HIM FOR PERMISSION TO WORK

          18    OVERTIME, DID YOU?

          19    A.   NOT AFTER THAT INITIAL CONVERSATION WITH MICHAEL YIP, NO.

          20    Q.   YOU NEVER EVER, EVEN THE TIME YOU WROTE DOWN 41 HOURS, YOU

          21    DIDN'T ASK FOR PERMISSION TO WORK OVERTIME?

          22    A.   NO.

          23    Q.   AND IT WASN'T SOME NEW POLICY THEY ANNOUNCED AFTER YOU PUT

          24    IN 41 HOURS; THAT HAD ALWAYS BEEN THE POLICY, WASN'T IT, THAT

          25    YOU WERE SUPPOSED TO ASK PERMISSION FIRST?

10:14:28   1   A.   THE POLICY -- I DON'T KNOW IF IT WAS ALWAYS THE POLICY FOR

2   THE ENTIRE LENGTH OF HSL'S EXISTENCE, BUT FOR MY PERIOD, YES.

3   Q.   YOU HAD NEVER EVEN DISCUSSED THE TOPIC OF OVERTIME WORK IN

4   ANY CAPACITY WITH DANNY VALENTINI, HAD YOU?

5   A.   NO.

6   Q.   OKAY.   NOW, MICHAEL MOSES BRIEFLY WAS YOUR SUPERVISOR AT

7   THE TAIL END OF YOUR EMPLOYMENT; CORRECT?

8   A.   YES.

9   Q.   AND YOU HAVE NO REASON TO BELIEVE THAT MICHAEL MOSES KNEW

10   THE HOURS YOU WERE WORKING EITHER, DO YOU?

11   A.   MICHAEL MOSES, I BELIEVE THAT, YES, HE DID KNOW THE HOURS I

12   WAS WORKING.

13   Q.   YOU BELIEVE MICHAEL MOSES KNEW THE HOURS YOU WERE WORKING

14   EVEN THOUGH YOU DIDN'T INTERACT WITH HIM IN THE WAY YOU

10:15:17   15   INTERACTED WITH MR. VALENTINI, DID YOU?

16   A.   IT WAS DIFFERENT.   MICHAEL MOSES WAS ACTUALLY IN OUR

17   OFFICE.

18   Q.   BUT MIKE MOSES ACTUALLY ONLY WORKED BETWEEN 9:00 AND 5:00

19   IN THE OFFICE; ISN'T THAT TRUE?

20   A.   I DON'T KNOW WHAT HIS EXACT SCHEDULE WAS.

21   Q.   YOU DON'T REMEMBER HIM EVER BEING THERE OUTSIDE THE HOURS

22   OF 9:00 AND 5:00, DO YOU?

23   A.   NO.

24   Q.   AND HE WOULD HAVE NO OCCASION TO OBSERVE YOUR HOURS IF HE

25   WASN'T IN THE OFFICE?

10:15:42   1    A.   I DON'T UNDERSTAND THAT QUESTION.

           2    Q.   IF MICHAEL MOSES WAS NOT IN THE OFFICE BECAUSE HE WENT HOME

           3    AT 5:00, HE WOULD HAVE NO OCCASION TO OBSERVE ANY WORK YOU DID

           4    AFTER 5:00?

           5    A.   IF I HAD E-MAILED HIM AFTER 5:00, THEN I BELIEVE HE WOULD

           6    KNOW I WAS WORKING IF I WAS ASKING HIM QUESTIONS.

           7    Q.   YOU DIDN'T ASK MICHAEL MOSES QUESTIONS ABOUT YOUR WORK

           8    BECAUSE YOU FOUND HIM TO BE SOMEONE WHO WASN'T KNOWLEDGEABLE

           9    ABOUT THE PRODUCT; ISN'T THAT CORRECT?

          10    A.   NOT THE PRODUCT NECESSARILY BUT THE HSL CULTURE AND THE HSL

          11    ENVIRONMENT.

          12    Q.   SO IT WAS NOT TYPICAL FOR YOU TO REACH OUT TO MICHAEL MOSES

          13    AND SAY ANYTHING ABOUT WORK AFTER 5:00?

          14    A.   NO, THAT'S NOT TRUE.

10:16:31  15    Q.   IT WAS TYPICAL?

          16    A.   I WOULD STILL INTERACT WITH MICHAEL MOSES VIA E-MAIL AND

          17    PHONE CALLS WHILE I WAS IN THE OFFICE.   IT WASN'T -- I DIDN'T

          18    TEXT HIM BECAUSE I PHYSICALLY SAW HIM IN THE OFFICE.

          19    Q.   BUT HE LEFT THE OFFICE AT 5:00 EVERY DAY?

          20    A.   I DON'T RECALL WHAT HIS SCHEDULE WAS.

          21    Q.   HOLD ON A SECOND.   OKAY.   YOU NEVER ASKED MICHAEL MOSES

          22    PERMISSION TO WORK OVERTIME EITHER, DID YOU?

          23    A.   NO, I DID NOT.

          24    Q.   AND YOU NEVER TOLD HIM YOU WERE FALSIFYING YOUR TIME SHEETS

          25    EITHER?

10:17:17  1    A.  NO, I DID NOT.

2    Q.  NOW YOU UNDERSTOOD THAT BOTH MR. VALENTINI AND MICHAEL

3    MOSES WHEN HE WAS THERE, THEY REPORTED UP TO AN AREA MANAGER

4    NAMED MICHAEL REZA?

5    A.  YES.

6    Q.  MR. REZA WAS ACTUALLY TWO LEVELS ABOVE YOU IN THE

7    MANAGEMENT HIERARCHY?

8    A.  YES.

9    Q.  NOW, HE WORKED PART OF HIS TIME AT THE SAME LAGUNA NIGUEL

10   FACILITY WHERE YOU WORKED, RIGHT?

11   A.  I DON'T UNDERSTAND.

12   Q.  MR. REZA, FOR PART OF YOUR EMPLOYMENT, WORKED IN THE SAME

13   BUILDING THAT YOU WORKED?

14   A.  YES.

10:17:51  15   Q.  BUT HE ALSO TYPICALLY WAS ONLY THERE BETWEEN 9:00 AND

16   5:00?

17   A.  YES.

18   Q.  AND YOU HAVE NO REASON TO BELIEVE HE KNEW THE HOURS THAT

19   YOU WERE ACTUALLY WORKING?

20   A.  I BELIEVE THAT WHEN HE CAME IN IN THE MORNING HE WOULD SEE

21   ME AT THE OFFICE, AND WHEN HE LEFT, I WAS STILL THERE.

22         MR. KAUFMAN:  YOUR HONOR, I'D LIKE TO READ FROM MS.

23   BUTLER'S DEPOSITION, PAGE 73, LINES 7 TO 15?

24         MR. TEEPLE:  NO OBJECTION.

25         THE COURT:  OKAY.

55

10:18:29    1           MR. KAUFMAN:  "QUESTION:  SO WHAT'S YOUR BASIS FOR

           2      YOUR BELIEF THAT HE KNEW THE PRECISE HOURS YOU WERE

           3      WORKING?"

           4           "HE" IS MR. REZA.

           5           "ANSWER:  I DIDN'T SAY HE KNEW THE PRECISE HOURS I

           6      WAS WORKING.

           7           QUESTION:  WELL, WHAT'S YOUR BASIS FOR, WELL, DO YOU

           8      HAVE A BASIS FOR YOUR CONTENTION THAT MR. REZA WAS AWARE

           9      OF THE NUMBER OF HOURS YOU WERE WORKING?

          10           ANSWER:  I DON'T KNOW IF HE WAS AWARE."

          11   BY MR. KAUFMAN:

          12   Q.  NOW, LET'S TALK A LITTLE BIT ABOUT YOUR TIME SHEETS.  YOU

          13   TESTIFIED ON DIRECT, IF I UNDERSTOOD RIGHT, THAT THE FIRST TWO

          14   PAY PERIODS YOU DIDN'T ENTER ANY OVERTIME, CORRECT, FIRST TWO

10:19:15   15   PAY PERIODS THAT YOU WORKED AT HSL?

          16   A.  I DON'T UNDERSTAND.

          17   Q.  YOU WERE SHOWN THESE TWO TIME SHEETS THAT LOOKED LIKE YOU

          18   HADN'T EVEN FILLED THEM OUT.  THERE WAS SOME WRITING ON IT, AND

          19   YOU SAID, I DIDN'T FILL OUT TIME SHEETS THE FIRST TWO PAY

          20   PERIODS I WAS WITH HSL?

          21   A.  YES.

          22   Q.  ISN'T IT ALSO TRUE THAT YOU DIDN'T WORK ANY OVERTIME AT ALL

          23   DURING THOSE FIRST TWO PAY PERIODS?

          24   A.  I DON'T RECALL.  WE WERE IN A TRANSITION PERIOD.

          25   Q.  WELL, DO YOU RECALL THAT I DID ASK YOU THIS ONCE BEFORE,

10:19:47   1    AND YOU SAID YOU WORKED NO OVERTIME DURING THOSE PAY PERIODS?

2    A.   I DON'T RECALL.

3         MR. KAUFMAN:   YOUR HONOR, I'D LIKE TO READ FROM PAGE

4    80, LINES FOUR TO SEVEN.

5         MR. GARRISON:   NO OBJECTION.

6         THE COURT:   OKAY.

7         MR. KAUFMAN:   "QUESTION: IN THE TWO PREVIOUS PAY

8         PERIODS HAD YOU NOT WORKED ANY OVERTIME?

9         ANSWER:   NO, WE WERE STILL TRANSITIONING OUT FROM

10        FIRST CAPITAL STILL."

11   BY MR. KAUFMAN:

12   Q.   YOU WERE PAID FOR THE 41.5 HOURS OF OVERTIME THAT YOU PUT

13   IN IN THE THIRD PAY PERIOD; CORRECT?

14   A.   YES.

10:20:25  15    Q.   AND THEN YOU RECEIVED THIS E-MAIL FROM MICHAEL YIP ABOUT

16   OVERTIME?

17   A.   YES.

18   Q.   AND MR. YIP SAID IN THE E-MAIL YOU SHOULD GET, PURSUANT TO

19   THE COMPANY POLICY, YOU WERE SUPPOSED TO GET PREAPPROVAL BEFORE

20   YOU WORKED ANY MORE OVERTIME; CORRECT?

21   A.   YES.

22   Q.   AND THERE'S NOTHING IN THE E-MAIL THAT SAID PERMISSION WILL

23   NEVER BE GRANTED?

24   A.   NOT THAT I RECALL.

25   Q.   AND OTHER HMA'S DURING THIS PERIOD WERE ENTERING OVERTIME

10:20:56    1   INTO THE SYSTEM AND GETTING PAID, WEREN'T THEY?

            2   A.  I DON'T KNOW WHAT OTHER HMA'S ENTERED INTO THEIR TIME

            3   KEEPING SYSTEM.

            4   Q.  YOU DON'T KNOW OF A SINGLE CASE WHERE SOMEBODY ASKED TO

            5   WORK OVERTIME AND WAS TOLD YOU MAY NOT WORK OVERTIME?

            6   A.  I DON'T KNOW SPECIFICALLY.

            7   Q.  DO YOU KNOW GENERALLY OF AN HMA WHO ASKED TO WORK OVERTIME

            8   AND WAS TOLD NO?

            9   A.  I DON'T KNOW.

           10   Q.  NOW, I THOUGHT BEFORE TODAY THAT YOU WERE CONTENDING THE

           11   REASON YOU WORKED ALL THIS OVERTIME WAS THAT YOU NEEDED IT TO

           12   GET YOUR FILES DONE.  DO YOU STILL THINK THAT'S THE CASE?

           13   A.  I DON'T UNDERSTAND.

           14   Q.  IS IT YOUR POSITION IN THIS CASE THAT YOU NEEDED TO WORK

10:21:48   15   ALL THIS OVERTIME BECAUSE OTHERWISE YOU COULDN'T GET THE WORK

           16   DONE ON YOUR FILES?

           17   A.  I STILL DON'T UNDERSTAND.  I'M SORRY.

           18   Q.  HOLD ON A SECOND.  LET'S PUT ASIDE THE MARKETING, THE

           19   SUPPOSED MARKETING.  LET'S CLEAR THAT OUT OF THE WAY.

           20           FOR THE WORK THAT YOU WERE DOING THAT WAS ACTUALLY ON

           21   THE LOAN FILES, IS IT YOUR POSITION IN THIS CASE THAT YOU

           22   NEEDED TO WORK ALL THE HOURS YOU DID BECAUSE OTHERWISE YOU

           23   COULDN'T GET THOSE LOAN FILES DONE?

           24   A.  I THINK I SAID EARLIER THAT THE ACTUAL PROCESSING OF THE

           25   FILES WAS A SMALLER PERCENTAGE OF MY DAY, IF THAT'S WHAT YOU'RE

10:22:45   1    ASKING ABOUT.

2    Q.  IS IT THE CASE THAT YOUR VOLUME OF LOANS WAS JUST A LITTLE

3    BIT ABOVE AVERAGE FOR CALIFORNIA HOME MORTGAGE ASSOCIATES?  DO

4    YOU KNOW ONE WAY OR THE OTHER?

5    A.  I DON'T KNOW ONE WAY OR THE OTHER.

6    Q.  AND ISN'T IT TRUE THAT YOU TYPICALLY CLOSED FEWER THAN

7    THREE LOANS A WEEK?

8    A.  SOME WEEKS WERE MORE, SOME WEEKS -- YOU CAN'T REALLY TALK

9    ABOUT A WEEKLY.  I MEAN, IF YOU BREAK IT DOWN TO WEEKLY, BUT

10    SOME ARE MORE, SOME ARE LESS.

11    Q.  THE AVERAGE OF ALL THE WEEKS?

12    A.  TWO TO THREE.

13    Q.  NOW, YOU HAD SAID THAT AT SOME POINT YOU TOOK ON ADDITIONAL

14    HOME MORTGAGE CONSULTANTS BESIDES JIM OLMSTED; CORRECT?

10:23:30   15    A.  YES.

16    Q.  IT WASN'T ACTUALLY UNTIL 2010 THAT THAT HAPPENED THOUGH; IS

17    THAT CORRECT?

18    A.  NO IN 2009.

19    Q.  WAS IT LATE 2009?

20    A.  IT COULD HAVE BEEN MID-2009.

21    Q.  AND THIS HAPPENED AT THE TIME WHERE MR. OLMSTED'S LOAN

22    VOLUME HAD DIPPED A BIT; ISN'T THAT TRUE?

23    A.  I DON'T KNOW.

24    Q.  AND EVEN IF YOU HAD TO DO 20 LOAN FILES, WHETHER IT WAS FOR

25    FOUR DIFFERENT HMC'S OR ALL FROM ONE HMC, THE AMOUNT OF WORK

10:24:00  1    YOU'D HAVE TO DO ON THE FILE WOULD BE THE SAME, WOULDN'T IT?

        2    A.   EVERY LOAN IS DIFFERENT.

        3    Q.   THAT'S TRUE, BUT IT DOESN'T MATTER IF ALL THE LOANS ARE

        4    GENERATED BY ONE HMC OR IF THE SAME LOANS WERE GENERATED BY TWO

        5    HMC'S.   THE WORK YOU HAVE TO DO IS THE SAME; CORRECT?

        6    A.   AS FAR AS THE LOAN PROCESS, YES.

        7    Q.   SO IF I WERE TO GO AND LOOK AT THE VOLUME OF THE LOANS YOU

        8    CLOSED, THAT WOULD TELL ME MORE ABOUT THE HOURS YOU WORKED ON

        9    THOSE FILES THAN KNOWING HOW MANY HMC'S YOU HAPPENED TO GET

       10    FILES FROM?

       11    A.   YES.

       12    Q.   MR. OLMSTED WAS VERY GOOD ABOUT PUTTING TOGETHER AN

       13    ORGANIZED FILE; CORRECT?

       14    A.   YES.

10:24:41 15    Q.   HE WAS NEVER IN PRESIDENT'S CLUB, TO YOUR KNOWLEDGE?

       16    A.   I DON'T KNOW.

       17    Q.   DO YOU KNOW WHETHER OTHER HMA'S WHO HANDLED AS MANY LOAN

       18    FILES AS YOU WERE ABLE TO GET THEIR JOBS DONE IN 40 HOURS A

       19    WEEK?

       20    A.   I DON'T KNOW.

       21    Q.   NOBODY EVER TOLD YOU THAT YOU HAD TO BE IN THE OFFICE AT

       22    ANY PARTICULAR HOURS; ISN'T THAT CORRECT?

       23    A.   THERE WERE NO SPECIFIED HOURS, NO.

       24    Q.   AND IF YOU HAD WANTED TO, OR HAD A REASON TO, TO LEAVE FOR

       25    AN HOUR IN THE MIDDLE OF THE DAY, THERE IS NO POLICY OR RULE

10:25:24   1    THAT SAID YOU COULDN'T DO THAT?

2    A.  NO.

3    Q.  BUT YOU BELIEVED DANNY WAS AWARE YOU WERE WORKING OVERTIME;

4    CORRECT?

5    A.  I BELIEVE SO, YES.

6    Q.  AND YOUR BASIS FOR THAT BELIEF IS THAT YOU HAD THESE

7    COMMUNICATIONS WITH MR. VALENTINI EITHER AFTER 5:00 OR BEFORE

8    9:00; CORRECT?

9    A.  YES.

10   Q.  YOU WOULD SEND HIM A TEXT MESSAGE IN THE EVENING AFTER

11   NORMAL BUSINESS HOURS, THAT HAPPENED SOMETIMES?

12   A.  TEXT MESSAGES, PHONE CALLS, E-MAILS.

13   Q.  I DIDN'T MEAN TO SAY ONLY TEXT MESSAGES.  BUT THAT IS ONE

14   OF THE THINGS YOU DID WAS TEXT MESSAGES, RIGHT?

10:25:59  15    A.  YES.

16   Q.  AND WOULD YOU AGREE THAT TEXT MESSAGES ARE USUALLY RESERVED

17   FOR SHORTS LITTLE MESSAGES THAT ONLY TAKE A FEW SECONDS TO

18   SEND?

19   A.  YES.

20   Q.  YOU ALSO HAD PHONE CALLS WITH HIM IN CERTAIN EVENINGS AFTER

21   BUSINESS HOURS; CORRECT?

22   A.  YES.

23   Q.  TO THE EXTENT YOU DID, ON YOUR CELL PHONE RECORDS WE WOULD

24   BE ABLE TO SEE THE LENGTH OF HOW LONG THOSE CALLS LASTED?

25   A.  YES.

10:26:23   1    Q.   IF IT SAID IT WAS ONLY A MINUTE, IT MAY VERY WELL HAVE BEEN

           2    YOU JUST LEFT A MESSAGE, CALL ME BACK, SOMETHING LIKE THAT?

           3    A.   IT COULD BE, YES.

           4    Q.   IT COULD BE IF HE CALLED YOU AND IT WAS A MINUTE IT WAS

           5    JUST THAT YOUR PHONE PICKED UP AND WENT TO VOICEMAIL; ISN'T

           6    THAT TRUE?

           7    A.   IT'S POSSIBLE.

           8    Q.   NOW, WHEN YOU SENT MR. VALENTINI A TEXT IN THE EVENING, THE

           9    TEXT MESSAGE WOULD NOT INDICATE WHETHER YOU WERE IN THE OFFICE

          10    OR GONE HOME, WOULD IT?

          11    A.   I DON'T KNOW WHAT THE CONTENT OF THE TEXT MESSAGE WAS.   I

          12    DON'T HAVE COPIES OF THOSE.

          13    Q.   OKAY.   BUT THE FACT THAT THEIR EXISTED A TEXT MESSAGE, THAT

          14    IN ITSELF DOESN'T SAY WHERE YOU ARE; CORRECT?

10:27:05  15    A.   IT DOESN'T SAY WHERE I AM.   IT DOESN'T MEAN I WASN'T IN THE

          16    OFFICE.

          17    Q.   I WASN'T SAYING THAT.   I'M JUST SAYING YOU CAN'T TELL FROM

          18    THE FACT THAT I SEE A PHONE RECORD THAT SAYS THERE'S A TEXT

          19    MESSAGE SENT AT 8:00 THAT YOU WERE IN THE OFFICE AT 8:00; I

          20    CAN'T TELL THAT FROM THAT, CAN I?

          21    A.   NO, YOU CAN'T TELL THAT.

          22    Q.   NOW YOU COULD GO HOME AT 5:00, HAVE DINNER, SHOWER, GO TO

          23    THE GYM, AND THEN BEFORE BED, CALL DANNY VALENTINI ABOUT SOME

          24    ISSUE FOR TOMORROW.   ISN'T THAT POSSIBLE THAT COULD HAPPEN?

          25    A.   ON AN INFREQUENT BASIS, YES.

10:27:44  1    Q.  AND IF YOU HAPPENED TO HAVE TEXTED OR CALLED DANNY FROM

2    HOME AT 8:00, HE WOULD NOT BE ABLE TO TELL WHETHER YOU WORKED

3    CONTINUOUSLY UNTIL 8:00 OR WHETHER THERE HAD BEEN SOME BREAK IN

4    THERE WHERE YOU WEREN'T WORKING AT ALL; ISN'T THAT TRUE?

5    A.  I DON'T UNDERSTAND THE QUESTION.

6    Q.  TWO SCENARIOS.  ONE SCENARIO IS I CALL AT 8:00.  I HAD BEEN

7    WORKING FROM 9:00 A.M. STRAIGHT THROUGH 8:00.  SCENARIO TWO, I

8    WENT HOME AT 5:00, STOP WORKING FOR OTHER NON-WORK RELATED

9    REASONS, AND THEN AT 8:00 THOUGHT OF SOMETHING FOR WORK AND

10    MADE A CALL.  SEE THOSE TWO SITUATIONS?

11    A.  YES.

12    Q.  THE FACT A CALL HAPPENED AT 8:00 DOESN'T TELL ME WHICH OF

13    THOSE TWO HAPPENED, DOES IT?

14    A.  NO.

10:28:35  15    Q.  I'M GOING TO HAVE AN EXPERT TO ADDRESS THIS, BUT YOU SAID

16    YOU COUNTED UP THE NUMBER OF TEXT MESSAGE AND CALLS.  DID YOU

17    YOURSELF DO ANY ANALYSIS AS TO ON AN AVERAGE DAY WHAT WAS THE

18    TOTAL LENGTH OF TIME SPENT ON PHONE CALLS BEFORE 9:00 OR AFTER

19    5:00?

20    A.  NO.

21    Q.  OKAY.  WE'LL DEAL WITH THAT LATER.  YOU DO AGREE THAT EVERY

22    YEAR YOU WENT BACK TO VISIT FAMILY IN BOSTON ABOUT APRIL OF

23    EACH YEAR?

24    A.  I DIDN'T GO TO VISIT FAMILY.  MY FAMILY LIVED THERE, AND I

25    MAY HAVE DINNER WITH THEM, BUT IT WAS SPECIFICALLY NOT TO GO;

10:29:17   1    YOU KNOW, TO GO SEE OPENING DAY OF RED SOX.

2    Q.   IF YOU LOOK AT -- CAN WE TURN TO EXHIBIT 123?   IT'S JUST AN

3    EXCERPT FROM PHONE RECORDS.

4              MR. TEEPLE:   NO OBJECTION IF IT'S A PHONE RECORD.

5              MR. KAUFMAN:   SORRY, YOUR HONOR.   I SHOULD ASK YOU.

6              THE COURT:   OKAY.

7              (EXHIBIT 123 ADMITTED.)

8    BY MR. KAUFMAN:

9    Q.   IF WE COULD TURN TO THE SECOND PAGE OF THE EXHIBIT.

10   THERE'S A CALL NUMBER 73.   COULD YOU BLOW THAT UP A BIT?   IN

11   EARLY APRIL, THERE STARTS TO BE CALLS TO THIS 508 NUMBER.   I

12   WENT TO SCHOOL IN BOSTON SO I REMEMBER THAT AS A BOSTON AREA

13   CODE.   WHAT NUMBER IS THAT?

14   A.   THAT'S MY MOTHER'S HOME PHONE NUMBER.

10:30:32   15   Q.   WOULD YOU AGREE THAT IF THERE'S A PERIOD IN APRIL FOR A

16   COUPLE DAYS WHERE THERE'S SEVERAL PHONE CALLS MADE TO THAT

17   NUMBER THAT LIKELY SIGNALS TIME YOU WERE IN MASSACHUSETTS?

18   A.   NOT NECESSARILY.

19   Q.   WHY WOULD THAT NOT BE THE CASE?

20   A.   WELL, I MEAN, I WOULD CALL MY MOM ALL THE TIME.   IS THAT

21   WHAT YOU MEAN TO CALL THAT NUMBER?

22   Q.   IF I WERE TO LOOK THROUGH THE PHONE RECORDS, WOULD I SEE

23   THROUGHOUT PHONE CALLS TO THE 508 AREA CODE?

24   A.   YES.

25   Q.   WHEN YOU DID GO BACK TO THESE RED SOX GAMES AND SUCH, THAT

64

10:31:04    1    WAS A 3,000-MILE FLIGHT TO GO OUT THERE; CORRECT?

           2    A.   ABSOLUTELY.

           3    Q.   YOU WOULDN'T FLY, GET TO THE RED SOX GAME AND GET BACK ON A

           4    PLANE THAT NIGHT AND FLY BACK, RIGHT?

           5    A.   YOU KNOW WHAT, NOT NECESSARILY THAT NIGHT.  I MEAN, IF IT

           6    WAS A GOOD GAME, YEAH.

           7    Q.   YOU HAD TO ARRANGE YOUR TO AND FROM FLIGHTS IN ADVANCE,

           8    DIDN'T YOU?

           9    A.   YES, I DID.

          10    Q.   AND YOU WOULDN'T PLAN TO GO THERE FOR JUST A DAY, DID YOU?

          11    A.   I DID NOT DURING THAT PERIOD, NO.

          12    Q.   ARE YOU CLAIMING THAT ON THE DAYS WHEN YOU WENT, YOU HAD

          13    DINNER WITH YOUR FAMILY, WENT TO THE RED SOX GAME, PRESUMABLY

          14    YOU MAY HAVE VISITED OLD FRIENDS IN BOSTON, THAT YOU WORKED A

10:31:42   15    FULL DAY IN DOING YOUR JOB DUTIES AS A HOME MORTGAGE

          16    ASSOCIATE?

          17    A.   YES.

          18    Q.   AND YOU DID DURING THOSE DAYS, YOU PUT IN THE SAME EIGHT

          19    HOURS.  DID YOU WORK EXACTLY EIGHT HOURS IN THOSE PERIODS?  DID

          20    YOU WORK MORE?  DID YOU WORK LESS?

          21    A.   AGAIN, IT WAS AN APPROXIMATE NUMBER.  IT COULD HAVE BEEN

          22    MORE.  IT COULD HAVE BEEN LESS.

          23    Q.   IT COULD HAVE BEEN LESS ON THOSE DAYS BECAUSE OF THE TIME

          24    SPENT ON YOUR ACTUAL VACATION?

          25    A.   IT WASN'T NECESSARILY A VACATION.  I WAS WORKING ALSO.  I

10:32:11   1   HAD MY LAPTOP WITH ME.

2   Q.   EVEN IF YOU BROUGHT YOUR LAPTOP WITH YOU, YOU WOULD

3   CONSIDER THAT TO BE A VACATION TIME TO GO TO BOSTON TO WATCH

4   THE RED SOX?

5   A.   I WAS WORKING.   I DIDN'T CONSIDER THAT A VACATION.

6   Q.   IF YOU ACTUALLY TOOK A VACATION DAY, AND YOU INDICATED IN

7   THE SYSTEM THAT YOU TOOK EIGHT HOURS OF VACATION.   DO YOU

8   UNDERSTAND THAT THAT WOULD BE PAID, BUT IT WOULD DRAW ON A PTO

9   BANK?

10   A.   I BELIEVE SO, YES.

11   Q.   AND IF YOU TOOK A DAY OFF AND GOT PAID FOR EIGHT HOURS, AND

12   YOU DIDN'T WORK IT, THAT'S PAY THAT SHOULD HAVE COME OUT OF

13   YOUR PTO IF THAT HAPPENED; CORRECT?

14   A.   YES.

10:33:15   15   Q.   IN YOUR CASE, YOU NEVER AT ONE TIME INPUT EVEN AN HOUR OF

16   PAID TIME OFF DURING YOUR EMPLOYMENT WITH HSL; IS THAT TRUE?

17   A.   THAT'S TRUE.

18   Q.   WHEN YOU LEFT, YOU WERE ACTUALLY PAID OUT ALL OF YOUR

19   ACCRUED VACATION PTO TIME AT THE END?

20   A.   YES, I WAS.

21   Q.   WHEN YOU GOT THAT, DID YOU GO TO HSL AND SAY, YOU KNOW,

22   THERE MAY HAVE BEEN DAYS WHERE I WORKED LESS THAN EIGHT HOURS,

23   AND I DIDN'T TAKE PTO; I WANT TO GIVE IT BACK, THIS TIME THAT I

24   SHOULDN'T HAVE GOTTEN THAT I GOT?

25   A.   NO.

10:33:49  1    Q.  NOW YOU LEFT IN AUGUST 2010; CORRECT?

       2    A.  I DID.

       3    Q.  YOU FILED THIS LAWSUIT IN JUNE OF 2011?

       4    A.  I DID.

       5    Q.  SO THERE WAS A PERIOD OF A LITTLE LESS THAN A YEAR AFTER

       6    YOU LEFT BEFORE YOU FILED THIS LAWSUIT?

       7    A.  YES.

       8    Q.  WOULD YOU EXPECT THAT HSL WOULD MAINTAIN E-MAILS OF FORMER

       9    EMPLOYEES FOREVER?  WHAT WAS YOUR EXPECTATION THERE?

      10    A.  I DIDN'T HAVE ANY EXPECTATION.  I NEVER WORKED FOR A

      11    COMPANY LIKE THIS BEFORE.

      12    Q.  IN 2009, WHICH IS A FULL YEAR YOU WORKED AT HSL, YOU EARNED

      13    ALMOST $100,000; IS THAT CORRECT?

      14    A.  I DON'T HAVE MY PAYCHECK OR MY W-2 IN FRONT OF ME.  I DON'T

10:34:47 15    KNOW.

      16              MR. KAUFMAN:  CAN WE LOOK AT EXHIBIT 104?

      17              THE COURT:  COUNSEL.  WHY DON'T WE TAKE A TEN-MINUTE

      18    RECESS?  WE'VE GONE A LITTLE OVER AN HOUR AND A HALF.  PEOPLE

      19    CAN GO TO THE RESTROOM OR WHATEVER.  TAKE ABOUT A 10, 15-MINUTE

      20    BREAK. LEAVE YOUR PADS HERE, AND MY CLERK WILL COME OUT AND GET

      21    YOU.

      22              (RECESS.)

      23              THE COURT:  OKAY.  PROCEED.

      24              MR. KAUFMAN:  CAN WE ASK THE JURORS IF THEY CAN SEE

      25    THAT?  CAN THE JURORS SEE IT?  IS IT BIG ENOUGH?

10:57:22   1          YOUR HONOR, I'D LIKE TO PUT EXHIBIT 104 INTO

           2     EVIDENCE.

           3          THE COURT:  ANY OBJECTION?

           4          MR. TEEPLE:  NO OBJECTION.

           5          THE COURT:  ALL RIGHT.  BE ENTERED.

           6          (EXHIBIT 104 ADMITTED.)

           7     BY MR. KAUFMAN:

           8     Q.  MS. BUTLER, IT APPEARS TO BE YOUR W-2 FOR THE YEARS YOU

           9     WERE AT HSL; IS THAT CORRECT?

          10     A.  YES.

          11     Q.  IN 2008, YOU EARNED $73,406 AND CHANGE?

          12     A.  YES.

          13          MR. TEEPLE:  YOUR HONOR, THE DOCUMENT IS IN EVIDENCE.

          14     IT SPEAKS FOR ITSELF.  TO ASK THE WITNESS JUST TO READ FROM

10:57:57  15     IT --

          16          THE COURT:  WELL, I WOULD ASSUME THAT YOU'RE ASKING

          17     THAT QUESTION ABOUT THE AMOUNT SO YOU CAN FOLLOW IT UP WITH

          18     SOME OTHER QUESTION.

          19          MR. KAUFMAN:  CORRECT.

          20          THE COURT:  ALL RIGHT.  THAT'S FINE FOR

          21     PRELIMINARY.

          22          MR. KAUFMAN:  CAN YOU GO TO THE SECOND PAGE PLEASE?

          23     BY MR. KAUFMAN:

          24     Q.  NOW IN 2009, IT LOOKS LIKE YOUR PAY INCREASED TO 95,903.88;

          25     CORRECT?

10:58:26  1   A.   YES.

2   Q.   AND IN 2009, DIDN'T THE FEDERAL GOVERNMENT PASS A LAW TO

3   ENCOURAGE PEOPLE TO ENGAGE IN REFINANCES OF THEIR MORTGAGES?

4            MR. TEEPLE:  OBJECTION.  FOUNDATION, SPECULATION AND

5   RELEVANCE.

6            THE COURT:  I DON'T KNOW IF IT'S RELEVANT YET UNTIL I

7   HEAR.  SUBJECT TO A MOTION TO STRIKE, I'LL ALLOW IT.  HOWEVER,

8   YOU DO NEED TO LAY A FOUNDATION?

9   BY MR. KAUFMAN:

10  Q.   YOU WORKED IN THE MORTGAGE INDUSTRY, WOULDN'T YOU AGREE?

11  A.   YES.

12  Q.   YOU HEARD OF SOMETHING CALLED HARP?

13  A.   YES.

14  Q.   AND I'M GOING SOMEWHERE WITH THIS, YOUR HONOR.  AS A RESULT

10:59:07  15  OF THAT, THERE WAS A BIG INCREASE IN THE AMOUNT OF MORTGAGE

16  REFINANCE ACTIVITY; ISN'T THAT TRUE?

17  A.   WITH HARP, YES.

18  Q.   SO THERE WAS, IF YOU HAD FEARS BECAUSE OF THE GREAT

19  RECESSION THAT YOUR JOB WAS IN JEOPARDY, WEREN'T THEY

20  ALLEVIATED BY THE FACT THAT HSL'S BUSINESS WAS DOING SO WELL IN

21  2009?

22  A.   I DON'T KNOW THAT.

23  Q.   DID YOU KNOW ANYBODY, DID YOU KNOW ANY HMA'S WHO WERE LAID

24  OFF FROM HOMESERVICES LENDING IN 2009?

25  A.   NOT PERSONALLY, NO.

10:59:39    1    Q.   DID YOU KNOW ANYBODY NON-PERSONALLY WHO WAS AN HMA AT HSL

            2    WHO WAS LAID OFF?

            3    A.   AT HSL, NO.

            4    Q.   THERE'S BEEN SOME TALK ABOUT THE FULFILLMENT CENTER BEING

            5    IN MINNESOTA?

            6    A.   YES.

            7    Q.   ISN'T IT TRUE THAT IN MAY 2008 IT WAS RELOCATED TO SAN

            8    BERNARDINO?

            9    A.   YES.

           10    Q.   SO REALLY IT WAS ONLY FOR THE FIRST FEW MONTHS THAT YOU

           11    WORKED FOR HSL THAT YOU HAD THIS ISSUE OF HAVING TO DEAL WITH

           12    MINNESOTA FOR THE FULFILLMENT CENTER; ISN'T THAT TRUE?

           13    A.   IT WAS FOR THE FIRST PART OF MY EMPLOYMENT THERE, YES.

           14    Q.   UNTIL THEY MOVED IT TO SAN BERNARDINO?

11:00:19   15    A.   YES.

           16              MR. KAUFMAN:  I HAVE NOTHING FURTHER, YOUR HONOR.

           17              THE COURT:  ALL RIGHT.

           18                                  REDIRECT

           19    BY MR. TEEPLE:

           20    Q.   EXHIBIT FOUR PLEASE.  IS THIS YOUR JOB DESCRIPTION?

           21              MR. KAUFMAN:  ASKED AND ANSWERED.

           22              THE COURT:  OVERRULED.  YOU CAN ANSWER.

           23              THE WITNESS:  NO, IT'S NOT.

           24    BY MR. TEEPLE:

           25    Q.   WHAT IS THIS?

11:00:52  1    A.   THIS PERTAINS TO THE LIFE OF A LOAN, ACTUAL PROCESSING.

2    Q.   OKAY.  JUST THE LIFE OF THE LOAN?

3    A.   YES.

4    Q.   WHEN YOU RECEIVED CALLS AT NIGHT, WERE THEY ONLY ABOUT

5    FILES YOU'RE WORKING ON?

6    A.   NO, THEY WERE NOT.

7    Q.   WHAT OTHER CALLD WERE YOU GETTING?

8    A.   I WAS GETTING CALLS FROM REAL ESTATE AGENTS AND BORROWERS

9    AS WELL.

10   Q.   ANYTHING ELSE?

11   A.   NO, THAT'S ABOUT IT.

12   Q.   CLIENTS EVER CALL YOU AT NIGHT?

13   A.   WELL, BORROWERS.  YES, CLIENTS.  YES, CLIENTS ARE

14   BORROWERS.  SAME THING.

11:01:26  15   Q.   REAL ESTATE AGENTS?  REAL ESTATE AGENTS WOULD CALL?

16   A.   YES.

17   Q.   DID YOU EVER HELP OTHER HMA'S?

18   A.   I WOULD GET OCCASIONAL CALLS FROM OTHER HMA'S IN ORANGE

19   COUNTY AND SAN DIEGO.  IF THEY NEEDED ASSISTANCE, I WAS GLAD TO

20   HELP THEM.

21   Q.   HOW MANY HMA'S WORKED IN THE OFFICE WITH YOU?

22   A.   IN THE BEGINNING, FOR THE FIRST FEW MONTHS, THERE WAS

23   ANOTHER HMA THERE, AND AFTER THAT, IT WAS JUST ME.

24   Q.   SO THERE WEREN'T HMA'S ALL OVER THE PLACE FOR YOU TO BE

25   SEEING IF THEY WERE BEING HIRED AND FIRED, WERE THERE?

11:01:59  1  A.  NO.

2  Q.  WHEN WERE YOU EXPECTED TO BE IN THE OFFICE, PHYSICALLY?

3  A.  THE EXPECTATION WAS FOR WHAT YOU WOULD CONSIDER NORMAL

4  BUSINESS HOURS, TYPICAL 9:00 TO 5:00 WORKDAY.

5  Q.  YOU WERE EXPECTED TO BE THERE WHEN THE REAL ESTATE AGENTS

6  WERE THERE?

7  A.  YES.

8  Q.  LET'S LOOK AT EXHIBIT 108.  IT'S ALREADY IN EVIDENCE, YOUR

9  HONOR.  AND AT PAGE FIVE PLEASE, 005.  RIGHT THERE.  COULD YOU

10  ZOOM IN ON THE LAST PARAGRAPH OF 2.1 PLEASE?  THAT'S A LITTLE

11  TOO TIGHT. ONE MORE. THANK YOU.  FULL-TIME EMPLOYEES -- I'M

12  READING THE LAST PARAGRAPH -- ARE GENERALLY EXPECTED TO WORK

13  8:00 A.M. TO 5:00 P.M.  WERE YOU A FULL-TIME EMPLOYEE, MA'AM?

14  A.  YES, I WAS.

11:07:56  15  Q.  DID YOU UNDERSTAND THAT WAS YOUR EXPECTATION?

16  A.  YES, I DO.

17  Q.  NOW, AFTER MR. VALENTINI, THERE WAS MR. MOSES?

18  A.  MOSES.

19  Q.  CAN YOU SPELL THAT?

20  A.  M-O-S-E-S.

21  Q.  AND HE WAS YOUR NEW SUPERVISOR?

22  A.  YES.

23  Q.  HE WORKED IN THE OFFICE WITH YOU?

24  A.  A PORTION OF THE TIME, YES.

25  Q.  WERE YOU THERE WHEN HE GOT TO WORK?

11:07:56   1    A.   I WAS ALREADY AT THE OFFICE, YES.

           2    Q.   WERE YOU THERE WHEN HE LEFT?

           3    A.   YES, I WAS.

           4    Q.   NOW IF HE ASKED YOU TO DO SOMETHING AT 5:00 P.M. OR 4:00

           5    P.M. AND THEN HE LEFT, WOULD YOU DO IT?

           6    A.   OF COURSE, I WOULD.

           7    Q.   IF IT TOOK YOU LATE INTO THE EVENING, WOULD YOU DO IT?

           8    A.   OF COURSE, I WOULD.

           9    Q.   AND THEN WOULD YOU SHOW HIM YOUR WORK ON OCCASION?

          10    A.   YES, I WOULD.

          11    Q.   WOULD THAT BE A WAY HE WOULD KNOW WHAT YOU WERE DOING AFTER

          12    5:00 P.M.?

          13              MR. KAUFMAN:   OBJECTION.   LEADING.

          14              THE COURT:   SUSTAINED.

11:07:56  15    BY MR. TEEPLE:

          16    Q.   HOW WOULD MR. MOSES KNOW THAT YOU ARE THERE AFTER 5:00 AND

          17    BEFORE 9:00 OR 8:00?

          18    A.   IF I WAS WORKING ON SOMETHING I'D DISCUSS WITH HIM, I WOULD

          19    TELL HIM IT WAS COMPLETED OR COPY HIM ON THE E-MAIL.

          20    Q.   SO THE E-MAILS ON THE WORK PRODUCT?

          21    A.   YES.

          22              MR. TEEPLE:   NOTHING FURTHER.   THANK YOU.

          23              MR. KAUFMAN:   I HAVE A VERY BRIEF RE-CROSS.

          24              THE COURT:   LAST SHOT.

          25                        RECROSS EXAMINATION

11:07:56   1    BY MR. KAUFMAN:

2    Q.   I THINK I JUST HEARD YOU SAY THAT THERE WAS AN EXPECTATION

3    FOR YOU TO BE IN THE OFFICE BETWEEN 9:00 AND 5:00; IS THAT THE

4    CASE?

5    A.   YES.

6    Q.   I'D LIKE TO READ FROM YOUR DEPOSITION PAGE 110, LINE 14 TO

7    PAGE 111, LINE 2.

8              MR. TEEPLE:  NO OBJECTION.

9              MR. KAUFMAN: "QUESTION: DID ANYONE TELL YOU YOU HAD

10        TO BE IN THE OFFICE DURING BUSINESS HOURS?

11             ANSWER:  NO.

12             QUESTION: DID ANYONE TELL YOU THAT WHILE YOU WERE IN

13        THE OFFICE PHYSICALLY IN THE BUILDING YOU COULDN'T TAKE

14        ANY BREAKS?

11:07:56  15             ANSWER: NO, NO ONE SAID I EVER COULDN'T TAKE ANY

16        BREAKS.

17             QUESTION: DID ANYONE EVER PUT ANY RESTRICTIONS ON HOW

18        YOU WOULD SPEND YOUR TIME AT WORK OTHER THAN YOU WOULD

19        HAVE TO MAKE SURE TO GET YOUR WORK DONE?

20             ANSWER:  NO.

21             QUESTION: NO, THEY DID NOT?

22             ANSWER: NO, THEY DID NOT."

23             I HAVE NO FURTHER QUESTIONS.

24             THE COURT:  ALL RIGHT.  THANK YOU.

25             THE WITNESS:  THANK YOU.

11:07:56   1          MR. GARRISON:  YOUR HONOR, MAY I CALL THE NEXT

          2     WITNESS?

          3          THE COURT:  YES.

          4          MR. GARRISON:  WE WOULD CALL MICHAEL YIP.

          5          (OATH ADMINISTERED.)

          6          THE CLERK:  PLEASE STATE AND SPELL YOUR NAME FOR THE

          7     RECORD.

          8          THE WITNESS:  YES.  IT'S MICHAEL YIP, M-I-C-H-A-E-L,

          9     Y-I-P.

         10                          DIRECT EXAMINATION

         11   BY MR. GARRISON:

         12   Q.  GOOD MORNING, MR. YIP.  MY NAME IS GREG GARRISON.  WE

         13   HAVEN'T MET.  JUST BEFORE WE STARTED, I TEND TO TALK FAST, AND

         14   THE COURT REPORTER HAS ASKED ME TO SLOW DOWN.  SO PLEASE LET ME

11:08:31  15   FINISH MY QUESTION BEFORE YOU ANSWER.

         16   A.  OKAY.

         17   Q.  COULD YOU GIVE US YOUR EDUCATIONAL BACKGROUND, SIR?

         18   A.  YES.  I GRADUATED FROM THE UNIVERSITY OF SAN DIEGO IN

         19   2002.

         20   Q.  ARE YOU CURRENTLY EMPLOYED BY HSL?

         21   A.  YES.

         22   Q.  WHEN DID YOU BEGIN TO WORK FOR THEM?

         23   A.  IN JANUARY 2008.

         24   Q.  PRIOR TO THAT, HAD YOU WORKED AT FIRST CAPITAL?

         25   A.  YES.

11:08:52  1    Q.   AND HAD YOU WORKED WITH DANNY VALENTINI AT FIRST CAPITAL?

       2    A.   YES.

       3    Q.   WHEN YOU TRANSITIONED OVER TO HSL, DID YOU CONTINUE TO WORK

       4    WITH MR. VALENTINI?

       5    A.   YES.

       6    Q.   YOU AND MR. VALENTINI WORKED IN THE SAN DIEGO HSL OFFICE;

       7    IS THAT RIGHT?

       8    A.   THAT'S CORRECT.

       9    Q.   WHERE WAS THAT LOCATED?

      10    A.   IN THE DEL MAR OFFICE.

      11    Q.   AND YOUR TYPICAL DAY WAS SPENT IN THE OFFICE; ISN'T THAT

      12    TRUE?

      13    A.   THAT'S CORRECT.

      14    Q.   AND NORMALLY, YOU WERE IN THE SAME OFFICE AS MR. VALENTINI

11:09:21 15    WHEN HE WAS PRESENT; ISN'T THAT RIGHT?

      16    A.   YES.

      17    Q.   IN OTHER WORDS, YOU SHARED A SPACE?

      18    A.   YEAH.  WE WERE TOGETHER MOST OF THE TIME.

      19    Q.   AND JUST TO DRAW A PICTURE FOR THE JURY IT WASN'T LIKE YOU

      20    WERE IN ONE OFFICE, AND HE WAS IN THE NEXT; YOU WERE IN THE

      21    SAME ROOM?

      22    A.   DANNY HAS HIS OWN OFFICE, AND I WORK IN THE OUTSIDE OF

      23    THAT, BUT IT'S IN THE SAME AREA.

      24    Q.   HE KNEW WHEN YOU WERE THERE AND WHEN YOU WEREN'T BY

      25    LOOKING?

```
11:09:46   1              MR. KAUFMAN:  OBJECTION.  CALLS FOR SPECULATION.
           2              THE COURT:  SUSTAINED.
           3    BY MR. GARRISON:
           4    Q.  SIR, IF MR. VALENTINI WAS IN HIS OFFICE, AND YOU WERE
           5    SEATED AT YOUR DESK, COULD HE SEE YOU?
           6    A.  YES, HE COULD.  BUT WE WEREN'T ALWAYS IN THE SAME OFFICE
           7    ALL THE TIME.
           8    Q.  I UNDERSTAND.  SOMETIMES MR. VALENTINI WOULD BE IN THE
           9    FIELD; CORRECT?
          10    A.  THAT'S CORRECT.
          11    Q.  BUT WHEN HE WAS PRESENT AT THE OFFICE, HE WAS RIGHT WITH
          12    YOU; ISN'T THAT FAIR?
          13    A.  YES.
          14    Q.  OKAY.  AND YOUR TITLE WAS AREA ADMINISTRATOR; IS THAT
11:10:14  15    RIGHT?
          16    A.  THAT'S CORRECT.
          17    Q.  AND YOU ALWAYS REPORTED TO MR. VALENTINI AT HSL?
          18    A.  THAT'S CORRECT.
          19    Q.  HIS TITLE WAS WHAT?
          20    A.  BRANCH MANAGER.
          21    Q.  AS THE BRANCH MANAGER, MR. VALENTINI MANAGED ALL OF THE
          22    HMC'S AND HMA'S IN SAN DIEGO AND ORANGE COUNTY; IS THAT FAIR?
          23    A.  YES.
          24    Q.  AS THE AREA ADMINISTRATOR, YOU DEALT WITH REGULATIONS AND
          25    COMPLIANCE ISSUES FOR HSL; ISN'T THAT RIGHT?
```

11:10:44   1            MR. KAUFMAN:  OBJECTION.  VAGUE.

         2            THE COURT:  SUSTAINED.  HE'LL CLARIFY.

         3    BY MR. GARRISON:

         4    Q.  HAVE YOU HEARD THE TERM "REGULATION" AT HSL?

         5    A.  YES.

         6    Q.  WHAT'S A REGULATION?

         7    A.  A REGULATION IS LIKE FOR A LAW, A REQUIREMENT THAT WE NEED

         8    TO ABIDE BY.

         9    Q.  SOME REQUIREMENT EMPLOYEES HAD TO COMPLY WITH; IS THAT

        10    RIGHT?

        11    A.  THAT'S CORRECT.

        12    Q.  YOU ALSO DEALT WITH COMPLIANCE ISSUES THAT EMPLOYEES HAD TO

        13    COMPLY WITH; TRUE?

        14    A.  I WOULD SEND REMINDERS OUT JUST SO PEOPLE COULD FOLLOW

11:11:14  15    THEM.  MORE LIKE A GUIDELINE.

        16    Q.  FAIR ENOUGH.  SO BASICALLY WHAT WOULD HAPPEN WOULD BE  --

        17    LET'S JUST GET AN AVERAGE FIRST OF ALL.  BETWEEN 2008 AND THE

        18    MIDDLE OF 2010, APPROXIMATELY HOW MANY EMPLOYEES WERE THERE

        19    THAT WORKED FOR MR. VALENTINI IN THE SAN DIEGO OR ORANGE COUNTY

        20    AREA FOR HSL?

        21    A.  ROUGHLY 25, 30.

        22    Q.  OF THOSE 20, 25, 30, HOW MANY WERE HMC'S AND HOW MANY WERE

        23    HMA'S, BEST ESTIMATE, JUST AN ESTIMATE?

        24    A.  I DON'T KNOW.  20 HMC'S AND MAYBE THE REST HMA.

        25    Q.  ABOUT TEN?

11:11:49  1   A.  YEAH, PROBABLY AROUND THERE.  MAYBE A LITTLE LESS.

2   Q.  I THINK YOU SAID EIGHT IN YOUR DEPOSITION.  IS THAT FAIR?

3   A.  YEAH.

4   Q.  SO IN EITHER EVENT, WHAT YOU WOULD DO IS YOU WOULD APPRISE

5   PEOPLE OF REGULATIONS THAT MATTER TO THEM BY E-MAIL, SENDING

6   E-MAILS; CORRECT?

7   A.  YES.

8   Q.  THAT WORKED FOR DANNY; CORRECT?

9   A.  YES, THAT'S CORRECT.

10   Q.  AND YOU WOULD ALSO APPRISE THEM OF COMPLIANCE ISSUES THAT

11   SOMEONE THOUGHT THEY HAD TO KNOW ABOUT; IS THAT TRUE?

12   A.  I WOULD SEND MORE OF THE GUIDELINES; HERE, THIS IS WHAT WE

13   NEED TO FOLLOW AND SO FORTH.

14   Q.  OKAY.  SO WHATEVER NEEDED TO BE FOLLOWED WOULD NORMALLY

11:12:23  15   COME FROM YOU TO THE EMPLOYEES, IS THAT FAIR, IN THIS TIME

16   FRAME?

17   A.  MOST OF THE TIME.  DANNY SENT SOME E-MAILS OUT REGARDING

18   THEM AS WELL.

19   Q.  YOU ALSO HELPED MR. VALENTINI IN TALKING TO HMA'S; ISN'T

20   THAT RIGHT?

21   A.  THAT'S CORRECT.

22   Q.  PEOPLE WOULD HAVE QUESTIONS; IF THEY COULDN'T GET AHOLD OF

23   DANNY, THEY WOULD CALL YOU OFTEN?

24   A.  THAT'S CORRECT.

25   Q.  THEN YOU WOULD TALK TO DANNY AND TRY TO GET AN ANSWER BACK

79

11:12:47  1    TO THE INDIVIDUAL; IS THAT FAIR?

2    A.  OR SOMETIMES DANNY WOULD END UP CALLING THEM BACK TOO.

3    Q.  EITHER WAY, YOU WOULD PUT DANNY IN TOUCH WITH THEM, OR YOU

4    MIGHT CALL BACK AND SAY, DANNY IS BUSY, BUT HERE IS WHAT YOU

5    NEED TO DO?

6    A.  YEAH.  I WOULD HELP.  IF I KNEW THE ANSWER, I WOULD HELP

7    THEM OR SEND IT BACK TO DANNY.

8    Q.  SAME THING WITH HMC'S.  I THINK I ASKED YOU ABOUT HMA'S. IF

9    SOMEONE HAD A QUESTION FOR DANNY, AND THEY COULDN'T GET AHOLD

10   OF HIM, IT WAS COMMON FOR THEM TO CALL YOU DURING THIS TIME

11   FRAME; ISN'T THAT FAIR?

12   A.  YES.

13   Q.  IN YOUR WORK AT HSL, YOU KNEW KELLY BUTLER; ISN'T THAT

14   RIGHT?

11:13:23  15   A.  YES.

16   Q.  DID YOU KNOW KELLY PRIOR TO HSL OR NO?

17   A.  NO.

18   Q.  WAS IT COMMON FOR YOU TO RECEIVE E-MAILS FROM KELLY BUTLER

19   IN YOUR WORK AT HSL BETWEEN 2008 AND 2011?

20   A.  I RECEIVED E-MAILS.  I DON'T REMEMBER EXACTLY HOW MANY, BUT

21   I RECEIVED E-MAILS FROM EVERYONE.

22   Q.  I UNDERSTAND.  BUT I'M TALKING ABOUT KELLY.  WE'RE HERE FOR

23   KELLY TODAY.  WOULD YOU SAY ON A DAILY BASIS YOU WOULD RECEIVE

24   E-MAILS FROM KELLY?

25   A.  PROBABLY.

```
11:13:57   1   Q.  AND YOU ALSO HAD TELEPHONE CONVERSATIONS WITH KELLY ON A
           2   DAILY BASIS; ISN'T THAT FAIR?
           3   A.  YES.
           4   Q.  AND SOME OF THOSE TELEPHONE CONVERSATIONS WOULD HAPPEN
           5   BEFORE 9:00 IN THE MORNING; ISN'T THAT TRUE?
           6   A.  YEAH, BUT MOST CALLS I WOULD THINK WOULD HAPPEN DURING
           7   BUSINESS HOURS.
           8   Q.  OKAY.  SO THE MAJORITY WERE DURING BUSINESS HOURS.  WERE
           9   THERE EVER TELEPHONE CONVERSATIONS WITH KELLY BEFORE 9:00 IN
          10   THE MORNING?
          11   A.  THERE PROBABLY WERE.
          12   Q.  AND THERE WAS ALSO TELEPHONE CONVERSATIONS WITH KELLY AFTER
          13   5:00 AT NIGHT; ISN'T THAT RIGHT?
          14   A.  YEAH, I THINK THERE WERE, BUT THEY WERE MORE FREQUENT
11:14:28  15   PROBABLY DURING THE BUSINESS HOURS.
          16   Q.  WHAT WAS YOUR PHONE NUMBER DURING THAT TIME FRAME?
          17   A.  MY OFFICE?
          18   Q.  YOUR CELL PHONE?
          19   A.  MY CELL PHONE IS 619-933-8010.
          20   Q.  DO YOU HAVE ANY IDEA HOW MANY TIMES BETWEEN 2008 AND THE
          21   MIDDLE OF 2010 KELLY BUTTER MAY HAVE CONTACTED YOU EITHER
          22   BEFORE 9:00 IN THE MORNING OR AFTER 5:00?
          23   A.  I DON'T REMEMBER THE SPECIFICS ON THAT.
          24   Q.  COULD YOU GIVE ME ANY ESTIMATE?
          25   A.  I DON'T REMEMBER.  I MEAN THIS IS QUITE A FEW YEARS BACK.
```

11:14:58  1   I DON'T KNOW THE AMOUNT.

2   Q.  AND THAT'S FAIR.  IF I TOLD YOU THAT HER BILLS REFLECTED

3   OVER TWO HUNDRED CONTACTS BEFORE 9:00 OR AFTER 5:00, WOULD THAT

4   SOUND UNUSUAL TO YOU?

5   A.  LIKE I SAY, I DON'T REMEMBER THE SPECIFICS ON THE NUMBER ON

6   THAT.

7   Q.  IN YOUR WORK WITH KELLY, YOU GOT TO KNOW HER WORK PRODUCT,

8   DIDN'T YOU, THE KIND OF WORK SHE PUT OUT?

9   A.  NOT NECESSARILY.

10   Q.  DID YOU HAVE ANY OPINION OF KELLY AS A WORKER?  DID YOU

11   THINK SHE WAS A BAD WORKER?

12   A.  NO, I THINK SHE WAS A GOOD WORKER.

13   Q.  DID YOU EVER WRITE HER UP OR HAVE CAUSE TO COMPLAIN ABOUT

14   HER?

11:15:33  15   A.  NO, THAT WASN'T MY RESPONSIBILITY.

16   Q.  YOU NEVER COMPLAINED TO ANYBODY ABOUT HER, DID YOU?

17   A.  I'M SORRY?

18   Q.  YOU NEVER COMPLAINED TO ANYBODY ABOUT HER?

19   A.  THAT WASN'T MY RESPONSIBILITY.

20   Q.  AND IF KELLY TESTIFIED ABOUT THE NUMBER OF OVERTIME HOURS

21   THAT SHE WORKED, YOU WOULD NOT THINK SHE WOULD LIE, WOULD

22   YOU?

23   A.  I BELIEVE PEOPLE SHOULD INPUT THE HOURS THAT THEY WORK AND

24   BE PAID FOR THOSE HOURS.

25   Q.  THAT'S INTERESTING.  YOU DIDN'T SAY THAT IN YOUR DEPO.  DID

82

11:16:00   1   YOU INPUT THE HOURS THAT YOU WORKED IN 2008?

2   A.   YEAH, I INPUTTED MY HOURS.

3   Q.   DID YOU INPUT THE HOURS THAT YOU WORKED?

4   A.   YEAH, I INPUTTED MY HOURS.

5   Q.   DID YOU INPUT YOUR OVERTIME HOURS IN 2008?

6   A.   THERE WERE PROBABLY A FEW TIMES IT WAS OVER, BUT MY MAIN

7   CONCERN IS I WANTED TO DO A GOOD JOB IN MY COMPANY AND HELP OUR

8   EMPLOYEES AND CUSTOMERS RATHER THAN WORRY ABOUT A FEW MINUTES

9   HERE AND THERE WHEN I DID WORK OVERTIME.

10   Q.   WHERE DO YOU LIVE?

11   A.   IN SAN DIEGO.

12   Q.   DID YOU STAY AT YOUR HOUSE LAST NIGHT?

13   A.   YES, I DID.

14   Q.   DID YOU MEET THESE LAWYERS YESTERDAY REGARDING THIS CASE?

11:16:40   15   A.   YES.

16   Q.   FOR HOW LONG?

17   A.   A FEW HOURS.

18   Q.   SO YOU WERE AN HOURLY EMPLOYEE WHEN YOU BEGAN TO WORK FOR

19   HSL; IS THAT TRUE?

20   A.   YES.

21   Q.   AND ISN'T IT FAIR TO SAY IN 2008 WHEN YOU BEGAN TO WORK FOR

22   HSL YOU WERE BUSY?

23   A.   YES.

24   Q.   THERE WERE NEW SYSTEMS YOU HAD TO LEARN IN ORDER TO DO YOUR

25   JOB; ISN'T THAT RIGHT?

11:17:06   1   A.   THAT'S CORRECT.

          2   Q.   AND YOU HAD TO SEND OUT REGULATIONS TO THESE 20 OR 30

          3   PEOPLE THAT WORKED FOR DANNY; IS THAT TRUE?

          4   A.   YEAH, I WOULD SEND E-MAILS OUT.

          5   Q.   AND YOU WORKED CLOSELY WITH DANNY. YOU TOLD US THAT BEFORE;

          6   CORRECT?

          7   A.   YES.

          8   Q.   ISN'T IT TRUE THAT IT WAS COMMON FOR DANNY VALENTINI TO GET

          9   CALLS FROM HMA'S AT 6:00 OR 7:00 AT NIGHT?

         10   A.   I DIDN'T KEEP TRACK OF DANNY'S TIME AND CALLS.

         11   Q.   THAT WASN'T THE QUESTION THOUGH.  IN YOUR EXPERIENCE, IN

         12   YOUR PERSONAL KNOWLEDGE, WAS IT COMMON FOR MR. VALENTINI TO GET

         13   PHONE CALLS FROM HMA'S AT 6:00 OR 7:00 AT NIGHT?

         14   A.   I DON'T KNOW.  I DON'T RECEIVE HIS CALLS AND MONITOR HIS

11:17:52  15   CALLS.

         16   Q.   YOU DIDN'T HAVE ANY IDEA ONE WAY OR THE OTHER?

         17   A.   I DON'T KNOW.

         18        MR. GARRISON:  OKAY.  I'D LIKE TO PLAY THE DEPOSITION

         19   IF I COULD, YOUR HONOR.

         20        THE COURT:  ALL RIGHT.

         21        MR. GARRISON:  IT WILL BE PAGE 102, LINE EIGHT

         22   THROUGH PAGE 102, LINE 19.

         23   BY MR. GARRISON:

         24   Q.   WHILE YOU'RE DOING THAT, YOU'RE DEPOSITION WAS TAKEN BY A

         25   LAWYER OTHER THAN ME IN 2012, IS THAT RIGHT, FEBRUARY?

84

```
11:18:50   1    A.   THAT'S CORRECT.
           2    Q.   YOU REMEMBER GOING TO AN OFFICE WHERE YOU WERE ASKED
           3    QUESTIONS AFTER BEING SWORN IN, PROMISED TO TELL THE TRUTH?
           4    A.   YES.
           5    Q.   IS IT FAIR FOR ME TO SAY THAT YOUR RECOLLECTION OF WHAT
           6    HAPPENED IN 2008 IS PROBABLY BETTER IN 2012 THAN IT WAS A YEAR
           7    LATER?
           8    A.   THAT'S CORRECT.
           9         MR. KAUFMAN:  I HAVE NO OBJECTIONS, YOUR HONOR.
          10         THE COURT:  ALL RIGHT.
          11         MR. GARRISON:  102, 19.
          12         (VIDEO PLAYED.)
          13         MR. GARRISON:  I WANTED TO PLAY THROUGH 19.  I
          14    APOLOGIZE FOR THESE TECHNICAL DIFFICULTIES, JUDGE.  I CAN READ
11:20:19  15    IT.  HE'LL GO TO THE NEXT ONE.  I'M SURE THERE WILL BE MORE.
          16         (VIDEO PLAYED.)
          17    BY MR. GARRISON:
          18    Q.   AND YOU ALSO GOT PHONE CALLS FROM HMA'S AS LATE AS 8:00 AT
          19    NIGHT; ISN'T THAT TRUE?
          20    A.   IT'S POSSIBLE, BUT MOST OF THE CALLS WERE DURING THE NORMAL
          21    BUSINESS HOURS.
          22    Q.   I'D LIKE TO READ FROM THE DEPOSITION ON PAGE 103, LINE FOUR
          23    THROUGH SEVEN.  I'LL JUST READ IT.
          24         MR. KAUFMAN:  GO AHEAD.
          25    BY MR. GARRISON:
```

11:21:12   1    Q.   "QUESTION: CERTAINLY, YOU KNOW THAT YOU WOULD GET CALLS

           2         FROM HMC'S AND JUNIORS AND HMA'S UP TO 8:00 P.M.

           3         AT NIGHT; THAT WOULD HAPPEN, WOULD IT NOT?

           4              ANSWER: SOMETIMES."

           5         IN ADDITION TO CALLS, YOU ALSO GOT E-MAILS THAT

           6    SHOWED THEY CAME IN, FROM PEOPLE, BEFORE 9:00?

           7    A.   YEAH.

           8    Q.   AND AFTER 5:00 COMMONLY AS WELL; TRUE?

           9    A.   MOSTLY DURING THE BUSINESS HOURS, BUT IT WOULD HAPPEN

          10    SOMETIMES BEFORE AND SOMETIMES AFTER.

          11    Q.   I WANT YOU TO JUST LISTEN TO MY QUESTION SO WE CAN MOVE

          12    THROUGH; OKAY?  I UNDERSTAND YOUR TESTIMONY ABOUT THE BUSINESS

          13    HOURS, BUT RIGHT NOW I'M NOT ASKING ABOUT THAT.  WAS IT COMMON

          14    FOR YOU TO GET E-MAILS FROM PEOPLE THAT MR. VALENTINI

11:21:53  15    SUPERVISED EITHER BEFORE 9:00 IN THE MORNING OR AFTER 5:00 AT

          16    NIGHT BETWEEN 2008 AND 2011?

          17    A.   I'M SURE IT HAPPENED.  I'M NOT SURE IF IT WAS COMMON.

          18    Q.   DO YOU HAVE ANY OF YOUR E-MAILS FROM 2008?

          19    A.   I DON'T THINK SO.

          20    Q.   WE ASKED FOR THOSE IN THE COURSE OF THIS CASE.  YOU STILL

          21    WORK AT HSL, DON'T YOU?

          22    A.   THAT'S CORRECT.

          23    Q.   AND YOU ALWAYS WORKED AT HSL FROM 2008, RIGHT?

          24    A.   YES.

          25    Q.   AND THERE WERE E-MAILS IN YOUR FILES FROM KELLY BUTLER;

11:22:22   1   ISN'T THAT TRUE?

2   A.   WELL, MY COMPUTER DID CRASH AT ONE POINT, AND THEY REPLACED

3   IT.   SO I DID LOSE A LOT OF INFORMATION ON THAT.

4   Q.   WHEN DID YOUR COMPUTER CASH?

5   A.   I DON'T -- I DON'T REMEMBER THE EXACT YEAR.

6   Q.   WHAT YEAR?

7   A.   I WOULD PROBABLY BE SPECULATING A LITTLE BIT.   IT WAS

8   PROBABLY 2010, -11.   I DON'T REMEMBER EXACTLY.

9   Q.   IS IT YOUR TESTIMONY THAT WHEN YOUR COMPUTER CRASHED YOU

10   HAD NO ACCESS TO ANY E-MAILS?   THEY WERE ALL GONE?

11           MR. KAUFMAN:   OBJECTION.   LACK OF FOUNDATION, YOUR

12   HONOR.

13           THE COURT:   YEAH, YOU CAN LAY A FOUNDATION.

14   BY MR. GARRISON:

11:22:56  15   Q.   IT WAS YOUR COMPUTER, TRUE, IT WAS THE ONE YOU USED AT

16   WORK?

17   A.   IT WAS A COMPUTER SUPPLIED BY HOMESERVICES LENDING.

18   Q.   SURE.   AND YOU KNEW THERE WAS INFORMATION ON THAT COMPUTER

19   PRIOR TO THE DATE OF THE CRASH; IS THAT RIGHT?

20   A.   YEAH.   THERE WAS E-MAILS ON THERE BEFORE.

21   Q.   ISN'T IT TRUE THAT HSL HAS A SYSTEM TO BACK UP THE STUFF ON

22   YOUR COMPUTER ONTO A MAIN SERVER?

23           MR. KAUFMAN:   OBJECTION.   LACK OF FOUNDATION, YOUR

24   HONOR.

25           THE COURT:   WELL, IF HE KNOWS.

11:23:25   1          THE WITNESS:  I DON'T KNOW HOW THEY DO IT, BUT I HAVE

2    MY OWN LAPTOP, BUT I'M NOT PRIVACY TO WHAT THE COMPANY DOES ON

3    THAT.

4    BY MR. GARRISON:

5    Q.  YOU'VE BEEN THERE SINCE 2008.  YOU'VE BEEN THERE FOR OVER

6    FIVE YEARS, RIGHT?

7    A.  YES.

8    Q.  AND NO ONE EVER TOLD YOU THAT THE COMPANY HAS A POLICY TO

9    BACK UP INFORMATION ON COMPUTERS; IS THAT TRUE?

10   A.  I DIDN'T PAY ATTENTION TO THAT.

11   Q.  YOU DIDN'T PAY ATTENTION TO IT.  ARE YOU SAYING NO ONE EVER

12   TOLD YOU THAT OR NOT?

13          MR. KAUFMAN:  OBJECTION.  ARGUMENTATIVE, YOUR HONOR.

14          THE COURT:  SUSTAINED.

11:23:54  15   BY MR. GARRISON:

16   Q.  ARE YOU SAYING THAT YOU HAVE NEVER HEARD THAT THE COMPANY

17   HAS A POLICY TO BACK UP THE INFORMATION ON YOUR PERSONAL

18   COMPUTER?

19   A.  I DIDN'T PAY ATTENTION TO ANYTHING LIKE THAT.  I WAS JUST

20   WORKING MY OWN COMPUTER, AND I DON'T KNOW WHAT THEY DO OR DON'T

21   ON THAT.

22   Q.  ISN'T IT FAIR TO SAY THAT IN 2008 WHILE YOU WERE EMPLOYED

23   BY HSL YOU COMMONLY WORKED MORE THAN 40 HOURS IN A WEEK?

24   A.  PROBABLY A COUPLE TIMES HERE AND THERE, BUT I DON'T

25   CONSIDER IT PROBABLY COMMON.

11:24:42   1    Q.   SIR, DID YOU REPORT ANY OVERTIME IN 2008?

2    A.   I WAS MORE CONCERNED ABOUT DOING A GOOD JOB AT MY COMPANY

3    AND HELPING SERVE THE CUSTOMER AND EMPLOYEES RATHER THAN

4    KEEPING TRACK OF OVERTIME A FEW MINUTES HERE AND THERE.

5    Q.   I HAVE NO DOUBT YOU'RE TRYING TO HELP YOUR COMPANY.   ANSWER

6    MY QUESTION.   LISTEN TO MY QUESTION.   ISN'T IT TRUE WHEN YOU

7    WORKED IN 2008 FOR HSL ON AVERAGE YOU WORKED MORE THAN 40 HOURS

8    IN A WEEK?

9    A.   IT'S PROBABLY A FEW TIMES.   I DON'T REMEMBER SPECIFICS.

10          MR. GARRISON:   PAGE 108, YOUR HONOR, I'D LIKE TO

11    PLAY, IF IT WILL WORK OR I'LL READ IT.

12          THE COURT:   WHICHEVER IS QUICKER?

13          MR. GARRISON:   I PREFER THE PLAYING IF WE CAN DO IT.

14    WHAT I'D LIKE TO DO, YOUR HONOR, IS JUST START AT PAGE 107,

11:25:39  15    LINE 20 AND GO THROUGH PAGE 108, LINE 17, AND I THINK IT WILL

16    EXPEDITE THE PROCESS.

17          MR. KAUFMAN:   107.

18          MR. GARRISON:   107, LINE 21 TO 108 LINE 16.

19          (VIDEO PLAYED.)

20          MR. GARRISON:   WHERE DID THAT STOP?   I THINK THE

21    --BEGINNING ON PAGE 108 AT LINE 11:

22          SAME WITH 2008.   WOULDN'T YOU AGREE THAT ON AVERAGE

23    YOU WORKED MORE THAN 40 HOURS A WEEK IN 2008 JUST ON AVERAGE TO

24    THE BEST OF YOUR RECOLLECTION?

25          ANSWER:   YES.

11:27:43  1          SAME IN 2010?

        2          ANSWER:  YES.

        3   BY MR. GARRISON:

        4   Q.   THERE'S BEEN TALK OF POLICIES AND PROCEDURES.  YOU

        5   UNDERSTOOD THERE WAS A COMPANY CALLED DOHERTY BETWEEN 2008 AND

        6   2011; CORRECT?

        7   A.   YES.

        8   Q.   THEY'RE STILL THE ONES THAT DO ALL THE HUMAN RESOURCES FOR

        9   HSL TODAY; IS THAT CORRECT?

       10   A.   THAT'S CORRECT.

       11   Q.   THEY DON'T HAVE AN INHOUSE PERSON THAT DOES THE HR.  IT'S

       12   THIS COMPANY IN MINNESOTA; TRUE?

       13   A.   YES.

       14   Q.   THEY DON'T HAVE ANY EMPLOYEE IN CALIFORNIA AS FAR AS YOU

11:28:14 15   KNOW; ISN'T THAT TRUE?

       16   A.   NOT THAT I'M AWARE OF.

       17   Q.   YOU NEVER MET ANYONE THAT SAID I'M FROM DOHERTY, AND I'M

       18   HERE TO HELP YOU WITH HR; IS THAT FAIR?

       19   A.   I TALKED WITH THE PEOPLE FROM DOHERTY AND MET A FEW PEOPLE

       20   WHEN THEY CAME OUT INITIALLY.

       21   Q.   I ASKED A POOR QUESTION.  ISN'T IT TRUE THERE'S NOBODY YOU

       22   EVER MET ON A DAILY BASIS WHO'S AVAILABLE TO YOU TO HANDLE HR

       23   QUESTIONS IN CALIFORNIA?

       24   A.   NOT THAT I'M AWARE OF IN CALIFORNIA.

       25   Q.   NO ONE YOU EVER MET THAT'S THERE EVERY DAY TO HELP YOU WITH

11:28:44   1    YOUR WORK HERE; TRUE?

2    A.  WE CAN ALWAYS CALL DOHERTY AT ANY TIME IF WE NEED TO.

3    Q.  I UNDERSTAND THAT.  I'M ASKING ABOUT A PHYSICAL HUMAN IN

4    CALIFORNIA THAT IS IN CALIFORNIA TO HELP YOU WITH HR AT HSL?

5    A.  NOT THAT I'M AWARE OF.

6    Q.  THERE NEVER HAS BEEN AS FAR AS YOU KNOW; IS THAT TRUE?

7    A.  THAT'S CORRECT.

8    Q.  BUT DOHERTY HAS GIVEN YOU HANDBOOKS, AND YOU'VE SEEN THOSE,

9    RIGHT?

10    A.  YES.

11    Q.  ONE OF THINGS IN THE HANDBOOK THEY HAVE YOU SIGN IS A THING

12    ACKNOWLEDGING YOU'RE GOING TO FOLLOW THE RULES; CORRECT?

13    A.  YES.

14    Q.  THEY SAY IN THE HANDBOOK THAT IF YOU FALSIFY YOUR TIME

11:29:14 15    RECORD BY NOT PUTTING EVERYTHING DOWN THAT CAN BE CONSIDERED

16    THEFT; CORRECT?

17    A.  WE'RE REQUIRED TO INPUT THE TIME ACCURATELY AND BE PAID FOR

18    THE TIME THAT WE INPUT.

19    Q.  YOU DID THAT IN 2008, DIDN'T YOU, THAT YOU'RE REQUIRED TO

20    DO IT?

21    A.  YES.

22    Q.  WHAT DID YOU WRITE ON YOUR TIME CARD IN 2008?  9:00 TO

23    5:00?

24    A.  YES.

25    Q.  IT WAS 9:00 TO 5:00, WASN'T IT?  SIR?

11:29:43   1    A.   YES.

        2    Q.   IN 2009 WHEN YOU WORKED OVERTIME, YOU ALSO WROTE 9:00 TO

        3    5:00 ON YOUR TIME CARDS, DIDN'T YOU?

        4    A.   YES.

        5    Q.   2010 WHEN YOU WORKED OVERTIME, YOU WROTE 9:00 TO 5:00 ON

        6    YOUR TIME CARDS; TRUE?

        7    A.   I THINK SO, YES.

        8    Q.   IN 2011 WHEN YOU WORKED OVERTIME, YOU WROTE 9:00 TO 5:00 ON

        9    YOUR TIME CARDS; CORRECT?

       10    A.   THERE WAS A CHANGE IN THE POLICY IN 2011.

       11    Q.   SO YOU DIDN'T WRITE 9:00 TO 5:00?

       12    A.   I MEAN, OCCASIONALLY.  IT WOULD DEPEND.  SOME DAYS IT WOULD

       13    BE 9:00 TO 5:00.  SOMETIMES IT MIGHT BE A LITTLE OVER.

       14    Q.   DID YOU CLAIM OVERTIME IN 2011?

11:30:29  15    A.   THERE WERE PROBABLY SOME TIMES.

       16    Q.   IN YOUR DEPOSITION, YOU TOLD US THE FIRST TIME THAT YOU

       17    CLAIMED OVERTIME WAS THIS YEAR WHICH WAS 2012; IS THAT A TRUE

       18    STATEMENT?

       19    A.   IT WAS PROBABLY WHEN THE CHANGE HAPPENED.  I THINK THAT WAS

       20    AT THAT TIME.

       21    Q.   HAVE YOU EVER BEEN DISCIPLINED AT ANY TIME FOR FAILING TO

       22    RECORD YOUR OVERTIME IN 2008?

       23    A.   NO, I HAVE NOT.

       24    Q.   HOW ABOUT 2009?  ANY DISCIPLINE FOR FAILING TO RECORD

       25    OVERTIME?

11:30:58   1   A.   NO.

           2   Q.   HOW ABOUT IN 2010?

           3   A.   NO.

           4   Q.   SO AFTER THIS DEPOSITION WAS TAKEN, DID ANYBODY COME TO YOU

           5   AND SAY, MR. YIP, WE UNDERSTAND YOU DIDN'T REPORT YOUR OVERTIME

           6   IN 2008; WE OWE YOU SOME MONEY; CAN YOU GIVE US AN ESTIMATE SO

           7   WE CAN PAY YOU?

           8   A.   I'M SORRY.  REPEAT THAT.

           9   Q.   DID SOMEONE COME TO YOU AFTER THIS DEPOSITION WAS GIVEN IN

          10   THIS CASE FROM YOUR COMPANY AND SAY, HEY, WE UNDERSTAND THAT

          11   YOU WORKED.  YOU DID THE WORK, BUT YOU WEREN'T PAID, AND WE

          12   WANT TO MAKE SURE YOU GET PAID; HOW MANY HOURS DID YOU WORK IN

          13   2008?  DID THAT EVER HAPPEN?

          14   A.   NO.

11:31:32  15   Q.   HOW ABOUT IN 2009, DID SOMEONE COME TO YOU AND SAY, HEY, WE

          16   UNDERSTAND IN 2009 FROM YOUR SWORN TESTIMONY THAT YOU WORKED

          17   OVERTIME, AND YOU WEREN'T PAID; HOW MUCH DO WE OWE YOU?

          18   A.   NO.

          19   Q.   SAME ANSWER FOR 2010?  NO ONE EVER PAID YOU FOR THE WORK

          20   YOU DID THAT YOU WEREN'T PAID FOR?

          21   A.   THERE WERE TIMES I WORKED PROBABLY A LITTLE BIT OF OVERTIME

          22   BUT I DON'T THINK IT WAS THAT -- IT WAS INFREQUENT REALLY.

          23   Q.   DID ANYBODY EVER VISIT YOU AND ASK YOU TO GIVE THEM

          24   INFORMATION ABOUT HOW THIS HAPPENED THAT YOU DIDN'T REPORT

          25   OVERTIME AND WHY YOU DIDN'T DO IT, ANYBODY FROM HR?

11:32:07  1  A.  NO.

2  Q.  AFTER YOUR DEPOSITION, NO ONE TALKED TO YOU ABOUT IT,

3  RIGHT?

4  A.  YEAH, NO ONE.

5  Q.  ISN'T IT TRUE THE ONLY REASON YOU STARTED REPORTING OVER

6  TIME IN 2012 WAS BECAUSE OF YOUR TESTIMONY IN THIS CASE?

7  A.  I'M NOT SURE.

8  Q.  THE REASON YOU DIDN'T REPORT THE OVERTIME IS BECAUSE YOU

9  BELIEVED DOING SO COULD AFFECT YOUR CAREER, TRUE?

10  A.  I NEVER FELT MY JOB WAS IN JEOPARDY.  I WAS NEVER TOLD THAT

11  I COULD NOT INPUT ANY OVERTIME, AND I WAS JUST MORE CONCERNED

12  AT THAT TIME ON DOING A GOOD JOB FOR MY COMPANY AND HELPING

13  SUPPORT MY CUSTOMERS AND ALSO EMPLOYEES AND NOT -- I WASN'T TOO

14  CONCERNED ABOUT EVERY LITTLE MINUTE OF OVERTIME, IF I DID HAVE

11:32:58  15  ANY.

16  Q.  DO YOU UNDERSTAND THAT AS A MATTER OF LAW IF YOU WORK MORE

17  THAN 40 HOURS IN A WEEK YOU'RE ENTITLED TO BE PAID?  DO YOU

18  UNDERSTAND THAT?

19          MR. KAUFMAN:  CALLS FOR LEGAL CONCLUSION, YOUR

20  HONOR.

21          THE COURT:  I'M SORRY.  I DIDN'T HEAR THAT.

22          MR. KAUFMAN:  I'M SORRY.  CALLS FOR LEGAL CONCLUSION.

23  HE'S ASKING HIM TO OPINE ON THE FLSA.

24          THE COURT:  SUSTAINED.

25  BY MR. GARRISON:

11:33:22    1   Q.  YOU WERE TRAINED IN THE FLSA AT DOHERTY, WEREN'T YOU?  YOU

            2   WERE TALKED TO ABOUT WAGE AND HOUR LOSS; ISN'T THAT TRUE?

            3   A.  I'M NOT FAMILIAR WITH THE FLSA.

            4   Q.  WERE YOU EVER TOLD AT ANY TIME THAT YOU WORKED AT HSL THAT

            5   AS AN EMPLOYEE YOU HAVE A RIGHT TO BE PAID IF YOU WORK MORE

            6   THAN 40 HOURS A WEEK?

            7   A.  I BELIEVE ALL EMPLOYEES SHOULD ACCURATELY INPUT THEIR TIME

            8   AND BE PAID FOR THE TIME THAT THEY WORK.

            9   Q.  THE QUESTION I'M ASKING YOU IS THIS: WERE YOU EVER INFORMED

           10   IN 2008 THAT IF YOU WORKED MORE THAN 40 HOURS A WEEK YOU HAD A

           11   RIGHT TO BE PAID FOR THE OVERTIME YOU WORKED WHETHER YOU WERE

           12   TRYING TO HELP YOUR CUSTOMERS OR FOR ANY REASON?

           13   A.  I WASN'T CONCERNED ON OVERTIME.  NO ONE EVER TOLD ME I

           14   COULD NOT INPUT OVERTIME.  I WAS JUST MORE CONCERNED WITH DOING

11:34:08   15   A GOOD JOB FOR MY COMPANY AND HELPING OUR CUSTOMERS AND

           16   EMPLOYEES.

           17   Q.  DID YOU MEET WITH LAWYERS BEFORE YOUR DEPOSITION WAS TAKEN

           18   IN 2012?

           19   A.  YES.

           20   Q.  I'D LIKE TO PLAY PAGE 101, LINE 22 THROUGH PAGE 102 LINE 4.

           21          (VIDEO PLAYED.)

           22   Q.  I'D ALSO LIKE TO READ FROM MR. YIP'S DEPOSITION.  I'LL READ

           23   THIS BECAUSE IT'S QUICKER.  PAGE 16.

           24          THE COURT:  IS THIS BASED ON A QUESTION PENDING?

           25          MR. GARRISON:  IT'S BASED ON THE LAST QUESTION.  I

11:35:37   1   CAN ASK HIM AGAIN IF YOU LIKE.  I JUST DIDN'T IMPEACH HIM WITH

2   THAT ONE.

3                 THE COURT:  THAT'S FINE.

4                 MR. GARRISON:  PAGE 16 LINE 7 THROUGH 14.  MAY I

5   READ?

6                 MR. KAUFMAN:  OH, YEAH.

7   BY MR. GARRISON:

8   Q.   "WERE YOU PAID HOURLY OR WERE YOU PAID ON A SALARY?

9                 ANSWER:  HOURLY.

10                 HAVE YOU ALWAYS BEEN PAID HOURLY?

11                 YES.

12                 YOU UNDERSTAND THAT AS AN HOURLY EMPLOYEE YOU WERE

13            ENTITLED TO BE PAID OVERTIME?

14                 ANSWER:  YES."

11:36:05  15                 THAT WAS YOUR UNDERSTANDING IN 2008, WASN'T IT?

16   A.   YES.

17   Q.   NOW, ONE OF YOUR DUTIES AT HSL WAS WHEN THERE WAS A

18   QUESTION ABOUT PAYROLL OR SOMETHING HAPPENED WITH AN EMPLOYEE

19   THAT MR. VALENTINI SUPERVISED, YOU WOULD BE CC'D ON AN E-MAIL

20   THAT WOULD BE SENT OUT FROM PAYROLL; ISN'T THAT TRUE?

21   A.   I THINK IT HAPPENED SOMETIMES.

22   Q.   WAS IT SOMETIMES OR EVERY TIME?

23   A.   I WOULDN'T KNOW IF IT WAS EVERY TIME, BUT I DO REMEMBER

24   THERE WERE TIMES THAT I WAS C C'D.

25   Q.   TAKE A LOOK AT EXHIBIT 12 IN THAT BOOK IN FRONT OF YOU AND

| | | |
|---|---|---|
| 11:36:42 | 1 | TELL ME IF YOU RECOGNIZE IT.  EXHIBIT 11. |
| | 2 | A.  I'M NOT SURE IF THIS IS THE RIGHT ONE. |
| | 3 | MR. GARRISON:  MAY I APPROACH, YOUR HONOR? |
| | 4 | THE COURT:  YES. GO AHEAD. |
| | 5 | MR. GARRISON:  THANK YOU. |
| | 6 | BY MR. GARRISON: |
| | 7 | Q.  DO YOU RECOGNIZE THAT EXHIBIT, SIR? |
| | 8 | A.  CAN YOU GIVE ME A SECOND TO LOOK OVER IT? |
| | 9 | MR. KAUFMAN:  IT'S EXHIBIT 11. WE HAVE NO OBJECTION |
| | 10 | TO IT. |
| | 11 | THE COURT:  ALL RIGHT. |
| | 12 | MR. GARRISON:  MAY I PUBLISH YOUR HONOR? |
| | 13 | THE COURT:  IT WILL BE ENTERED. |
| | 14 | (EXHIBIT 11 ADMITTED.) |
| 11:37:37 | 15 | BY MR. GARRISON: |
| | 16 | Q.  SO LET'S GO THROUGH THIS E-MAIL.  WHO IS ROBIN LEONARD?  DO |
| | 17 | YOU KNOW HER? |
| | 18 | A.  SHE WORKS AT THE DOHERTY PAYROLL. |
| | 19 | Q.  IT LOOKS LIKE ON FEBRUARY 19TH, 2008, AFTER MS. BUTLER HAD |
| | 20 | PUT HER TIME CARD IN, AN E-MAIL WAS SENT BY ROBIN REGARDING |
| | 21 | OVERTIME TO YOU AND TO DANNY VALENTINI; IS THAT RIGHT? |
| | 22 | A.  I SEE IT WAS MISSING THE TIME CARDS. |
| | 23 | Q.  DO YOU SEE WHERE IT SAYS ON THE SECOND PAGE, ALSO, THERE IS |
| | 24 | OVERTIME BEING SUBMITTED FOR KELLY BUTLER 41.5 HOURS AND |
| | 25 | CRYSTAL VIGIL, 2.51 HOURS.  I DO NEED MANAGER APPROVAL ON THESE |

11:38:38  1   BEFORE I CAN ISSUE PAYMENT.  DO YOU SEE THAT?

2   A.   YES.

3   Q.   THAT'S WHAT WOULD HAPPEN WHENEVER ANYBODY PUT IN OVERTIME

4   IS DOHERTY WOULD SEND YOU AN E-MAIL; CORRECT?

5   A.   I WASN'T RESPONSIBLE FOR APPROVING OVERTIME.

6   Q.   PLEASE ANSWER MY QUESTION.  WERE YOU CC'D ON AN E-MAIL FROM

7   DOHERTY WHEN OVERTIME WAS REQUESTED FOR AN EMPLOYEE OF MR.

8   VALENTINI?

9   A.   THERE WERE PROBABLY SOME.  I DON'T KNOW IF IT WAS ALL THE

10   E-MAILS, BUT IT WASN'T MY RESPONSIBILITY TO APPROVE THOSE.

11   Q.   OTHER THAN THIS E-MAIL, HAVE THERE BEEN ANY OTHER E-MAILS

12   WHERE DOHERTY SENT YOU SOMETHING SAYING, HEY, SOMEONE IS

13   REQUESTING OVERTIME, SHOULD WE PAY IT OR NOT, THAT YOU

14   RECOLLECT EVER?

11:39:20  15   A.   I DON'T REMEMBER.

16   Q.   NOT EVEN ONE OTHER ONE?

17   A.   I MEAN THERE COULD BE.  I JUST DON'T REMEMBER THAT.

18   Q.   WERE YOU AWARE THAT WHEN DOHERTY PULLED -- WELL, YOU NEVER

19   APPROVED OVERTIME YOURSELF?  YOU WERE NOT ASKED TO DO TIME

20   CARDS, TRUE?

21   A.   THAT'S CORRECT.

22   Q.   THAT WAS DANNY VALENTINI'S JOB; CORRECT?

23   A.   CURRENTLY HE DOES AFTER THE CHANGE HAPPENED IN 2011.

24   BEFORE THAT OR PRIOR TO 2011, I'M NOT SURE WHO ACTUALLY

25   APPROVED THAT.

11:39:52   1   Q.   COULD YOU GO TO PAGE 191 AND PLAY THE CLIP 19 THROUGH 24.

2           MR. KAUFMAN:   YOUR HONOR, JUST A NOTE FOR THIS.

3   THERE IS A DEPOSITION CORRECTION THAT WAS PUT IN A TIMELY

4   MATTER ON THE ERRATA SHEET FOR THIS.   SO IF IT IS READ, THE

5   CORRECTION SHOULD BE READ AS WELL.

6           MR. GARRISON:   I DON'T HAVE THE CORRECTION.

7           MR. KAUFMAN:   WELL, IT'S IN HANDWRITING ON HERE.   I

8   CAN READ IT TO YOU.

9           MR. GARRISON: LET'S PLAY IT FIRST, AND THEN YOU CAN

10   READ THE CORRECTION.

11           MR. KAUFMAN:   FAIR ENOUGH.

12   BY MR. GARRISON:

13   Q.   BY THE WAY, THERE WERE CONSTANT BREAKS IN YOUR DEPOSITION,

14   WEREN'T THERE?   YOU WENT TO THE BATHROOM OR SOMETHING LIKE

11:40:23   15   THAT, TOOK A BREAK IN THE DEPO?

16           MR. KAUFMAN:   OBJECTION.   RELEVANCE.

17           MR. GARRISON:   IT'S RELEVANT.   JUST GIVE ME ONE

18   QUESTION, YOUR HONOR, IF I MAY.

19           THE COURT:   ALL RIGHT.

20   BY MR. GARRISON:

21   Q.   IS THAT TRUE, YOU HAD A CHANCE TO STOP AND TALK TO YOUR

22   LAWYER AND COME BACK IN YOUR DEPO; ISN'T THAT RIGHT?

23   A.   I TOOK A FEW BREAKS.

24   Q.   AFTER EVERY BREAK, THE LAWYER TAKING THE DEPO SAID, NOW

25   THAT YOU HAD A CHANCE TO SPEAK WITH YOUR LAWYER, IS THERE ANY

11:40:50  1   TESTIMONY YOU WANT TO CHANGE AND YOUR ANSWER WAS ALWAYS NO;

2   ISN'T THAT TRUE?

3          MR. KAUFMAN:  YOUR HONOR, MAY WE APPROACH ON THIS?

4          THE COURT:  YEAH.

5          (THE FOLLOWING DISCUSSION WAS HELD AT SIDEBAR:)

6          MR. KAUFMAN:  THERE'S A STIPULATION AT THE END OF

7   EVERY DEPOSITION THAT THE PARTIES HAVE AN OPPORTUNITY TO READ

8   OVER THE DEPOSITION AND MAKE CORRECTIONS WITHIN A 30-DAY

9   WINDOW, AND HE DID THAT.  TO PUT IN THIS TESTIMONY THAT HE

10  COULDN'T MAKE A CORRECTION OR IT'S NEFARIOUS IS COUNTER TO THAT

11  STIPULATION.  I DON'T THINK THESE QUESTIONS SHOULD BE

12  ALLOWED.

13         THE COURT:  I AGREE.  JUST PUT IN WHAT IT IS AND THE

14  CORRECTION.

11:42:06  15  MR. GARRISON:  MAY I MAKE A RECORD ON THAT, JUDGE?

16  CLEARLY, IF WE ASK HIM IN HIS DEPO IF WE WOULD LIKE TO MAKE A

17  CHANGE IN HIS DEPO, AND HE DOESN'T, AND HE DOESN'T AFTER HE

18  TALKS TO HIS LAWYER, I THINK THAT GOES TO HIS CREDIBILITY.

19         THE COURT:  I THINK HE ALREADY SAID THAT.

20         (SIDEBAR DISCUSSION CONCLUDED.)

21         MR. GARRISON:  191, 19 THROUGH 24.

22         (VIDEO PLAYED.)

23         MR. GARRISON:  IF THERE WAS A CORRECTION, DO YOU WANT

24  TO READ IT, MR. KAUFMAN?

25         MR. KAUFMAN:  THE CORRECTION SAYS, YES, THAT IS THE

100

11:43:17   1   WAY THE SYSTEM WORKS TODAY, BUT IT IS NOT THE WAY THE SYSTEM

2   WORKED WHEN THE PLAINTIFF'S WERE EMPLOYED.

3   BY MR. GARRISON:

4   Q.  HAVE YOU TALKED TO ANYBODY AT DOHERTY HOW THE SYSTEM WORKED

5   WHEN THE PLAINTIFF WAS EMPLOYED?

6   A.  NO.  I WAS JUST RESPONSIBLE FOR MY OWN.

7   Q.  SO IT'S YOUR TESTIMONY HERE TODAY THAT AS FAR AS YOU KNOW,

8   IT WAS NOT DANNY VALENTINI'S RESPONSIBILITY TO REVIEW THE TIME

9   CARDS IN 2008, '9 OR '10 BEFORE SUBMISSION; IS THAT TRUE?

10   A.  I WASN'T SURE WHOSE RESPONSIBILITY IT WAS.

11   Q.  YOU DON'T KNOW EITHER WAY?

12   A.  YEAH.

13   Q.  THE PERSON WHO IS IN CHARGE OF HR FOR YOUR COMPANY IS

14   RACHEL VOGES-KELSO; IS THAT RIGHT?

11:43:59 15   A.  THAT'S CORRECT.

16   Q.  SHE'S THE DOHERTY PERSON WHO LIVES IN ARIZONA AND WORKS

17   REMOTELY TO YOU?

18   A.  YES.

19   Q.  IS THAT A QUESTION YOU THINK I SHOULD REFER TO HER; SHE

20   WOULD KNOW THE ANSWER MORE THAN YOU?

21   A.  YES.

22   Q.  AFTER YOU GOT THIS E-MAIL FROM MS. LEONARD, YOU SENT AN

23   E-MAIL TO KELLY BUTLER; ISN'T THAT TRUE?

24   A.  IT DIDN'T LOOK LIKE I DID ON THIS ONE, BUT I DO SEND

25   REMINDERS TO THE HMA'S ON WHEN TO PUT IN THEIR TIME CARDS.

101

11:44:51   1   Q.  WHAT DO THOSE REMINDERS SAY?

           2   A.  JUST IF I RECEIVED ANYTHING THAT WAS MISSING I WOULD JUST

           3   TELL THEM TO JUST REMIND THEM BECAUSE I WOULD DO IT MYSELF, AND

           4   I KNOW PEOPLE WOULD FORGET.  SO IT WAS JUST A COURTESY FOR ME

           5   TO SEND OUT E-MAILS JUST TO REMIND THEM.

           6   Q.  DO YOU RECOLLECT AS YOU SIT HERE TODAY SENDING ANY E-MAIL

           7   TO KELLY BUTLER AFTER RECEIVING THIS E-MAIL FROM ROBIN

           8   LEONARD?

           9   A.  I DON'T REMEMBER THE SPECIFICS ON THIS E-MAIL.

          10   Q.  OKAY.  FAIR ENOUGH.  DO YOU REMEMBER SENDING ANY E-MAIL OF

          11   ANY KIND TO KELLY BUTLER AFTER RECEIVING THIS ROBIN LEONARD

          12   E-MAIL IN 2008?

          13   A.  I DON'T REMEMBER THE SPECIFICS ON THIS PARTICULAR E-MAIL.

          14   Q.  MAKE SURE WE'RE SAYING THE SAME THING.  YOU GET AN E-MAIL

11:45:35  15   FROM MS. LEONARD.  I UNDERSTAND THAT.  THEREAFTER, DID YOU SEND

          16   AN E-MAIL TO KELLY BUTLER ABOUT THE 41.5 HOURS OF OVERTIME SHE

          17   REPORTED?  YES OR NO?

          18   A.  I WASN'T RESPONSIBLE FOR THE OVERTIME.

          19          THE COURT:  WELL, JUST ANSWER THE QUESTION.

          20   BY MR. GARRISON:

          21   Q.  DO YOU UNDERSTAND MY QUESTION?

          22   A.  CAN YOU REPEAT IT PLEASE?

          23   Q.  SURE.  IT'S TRUE THAT YOU HAD E-MAIL COMMUNICATION WITH THE

          24   PAYROLL COMPANY REGARDING OVERTIME KELLY BUTLER REPORTED;

          25   CORRECT?

11:46:02   1   A.   I HAD COMMUNICATION WITH PAYROLL.

2   Q.   THEREAFTER, COMMUNICATION IS OVER.   DID YOU SEND AN E-MAIL

3   TO KELLY BUTLER OF ANY KIND REGARDING THE OVERTIME THAT SHE HAD

4   REPORTED?

5   A.   IT WASN'T MY RESPONSIBILITY TO TRACK OVERTIME.

6               THE COURT:   HE ASKED YOU, DID YOU SEND IT OR DIDN'T

7   YOU.   WHETHER IT WAS YOUR RESPONSIBILITY OR NOT IS NOT THE

8   POINT.   EITHER YOU DID OR YOU DIDN'T OR YOU DON'T RECALL.

9               THE WITNESS:   I DON'T RECALL.

10   BY MR. GARRISON:

11   Q.   AFTER YOU GOT THAT E-MAIL FROM THE PAYROLL COMPANY

12   REGARDING THE 41.5 HOURS OF OVERTIME THAT KELLY BUTLER WORKED

13   IN FEBRUARY OF 2008, DID YOU EVER DISCUSS ANYTHING ABOUT THE

14   41.5 HOURS OF OVERTIME WITH KELLY BUTLER AT ANY TIME?

11:46:53   15   A.   I DON'T REMEMBER.

16   Q.   YOU DON'T KNOW EITHER WAY?

17   A.   I DON'T KNOW EITHER WAY.

18   Q.   YOU KNOW LAURA DAWSON, DON'T YOU?   SHE'S AN HMA THAT WORKED

19   FOR MR. VALENTINI?

20   A.   YES.

21   Q.   YOU TALKED TO LAURA DAWSON ABOUT OVERTIME, DIDN'T YOU?

22   A.   I DON'T REMEMBER.

23   Q.   NOT ONE TIME EVER?

24   A.   I KNOW SHE DID WORK OVERTIME AT SOME POINT, AND SHE WAS

25   PAID FOR IT.

11:47:31   1   Q.  PLEASE LISTEN TO MY QUESTION.  DID YOU EVER HAVE A

           2   DISCUSSION PERSONALLY WITH LAURA DAWSON AT ANY TIME ABOUT

           3   OVERTIME?

           4   A.  I DON'T REMEMBER.

           5   Q.  DID YOU EVER SEND AN E-MAIL TO LAURA DAWSON AT ANY TIME

           6   ABOUT OVERTIME?

           7   A.  I DON'T REMEMBER.  I WASN'T RESPONSIBLE FOR OVERTIME.

           8   Q.  WE GET YOU WEREN'T RESPONSIBLE.  LET'S JUST MOVE THROUGH

           9   THIS; OKAY?  SO HERE IS THE NEXT QUESTION:  DID YOU EVER HAVE

          10   ANY CELL PHONE CALLS WITH LAURA DAWSON BEFORE 9:00 IN THE

          11   MORNING EVER WHEN SHE WORKED AS AN HMA FOR YOU?

          12   A.  PROBABLY.  I DON'T REMEMBER THAT IT BEING FREQUENT.

          13   Q.  OKAY.  DID YOU EVER HAVE ANY CELL PHONE CALLS FROM LAURA

          14   DAWSON AFTER 5:00 WHEN SHE WORKED AS AN HMA?

11:48:20  15   A.  IT PROBABLY HAPPENED.

          16   Q.  DID YOU EVER RECEIVE WORK-RELATED E-MAILS FROM LAURA DAWSON

          17   BEFORE 9:00 IN THE MORNING WHEN SHE WORKED FOR HSL?

          18   A.  NOT THAT I REMEMBER, BUT IT COULD HAVE HAPPENED.

          19   Q.  I WANT TO KNOW YOUR BEST RECOLLECTION.  IS IT YES OR NO?

          20        MR. KAUFMAN:  OBJECTION, YOUR HONOR.  ARGUMENTATIVE.

          21        THE COURT:  SUSTAINED.

          22   BY MR. GARRISON:

          23   Q.  GIVE ME YOUR BEST RECOLLECTION.  I'D LIKE A, IT DID HAPPEN,

          24   IT DIDN'T HAPPEN, OR I DON'T KNOW.

          25   A.  I DON'T KNOW.

11:48:45   1   Q.   SAME QUESTION ABOUT AFTER 5:00.  DO YOU RECOLLECT EVER

           2   RECEIVING ANY E-MAILS FROM MS. DAWSON AFTER 5:00 P.M.?

           3   A.   IT PROBABLY HAPPENED.

           4   Q.   SAME QUESTION FOR TONI MCGRAW.  DO YOU KNOW TONI MCGRAW?

           5   A.   YES.

           6   Q.   AND TONI MCGRAW WAS AN HMA THAT WORKED UNDER MR. VALENTINI

           7   AS WELL; CORRECT?

           8   A.   YES.

           9   Q.   AND DID YOU EVER DISCUSS ANY ISSUE WITH OVERTIME WITH TONI

          10   MCGRAW EVER?

          11   A.   NOT THAT I REMEMBER.

          12   Q.   DID YOU EVER SEND AN E-MAIL TO TONI MCGRAW ABOUT OVERTIME

          13   EVER?

          14   A.   NO.

11:49:21  15   Q.   DID YOU EVER RECEIVE A E-MAIL FROM TONI MCGRAW BEFORE 9:00

          16   IN THE MORNING THAT WAS WORK-RELATED?

          17   A.   POSSIBLE, I DON'T REMEMBER.

          18   Q.   SAME QUESTION ABOUT AFTER 5:00.  DID YOU RECEIVE AN E-MAIL

          19   FROM TONI MCGRAW AFTER 5:00 THAT WAS WORK-RELATED EVER?

          20   A.   THESE ARE ALL POSSIBILITIES.  I DON'T REMEMBER ALL THE

          21   SPECIFICS ON THESE.

          22   Q.   SAME QUESTION ON SHERI CLARK.  SHE WAS AN HMA THAT WORKED

          23   UNDER MR. VALENTINI; CORRECT?

          24   A.   YES.

          25   Q.   AND SHERI CLARK IS SOMEONE ALSO THAT -- STRIKE THAT.

11:49:53   1          DID YOU EVER DISCUSS OVERTIME AT ANY TIME WITH SHERI

           2    CLARK?

           3    A.   NO.

           4    Q.   DID YOU EVER SEND AN E-MAIL REGARDING OVERTIME TO SHERI

           5    CLARK?

           6    A.   NO.

           7    Q.   DID YOU EVER GET ANY E-MAILS FROM SHERI CLARK BEFORE 9:00

           8    IN THE MORNING?

           9    A.   EVERYONE WORKS ON A LAPTOP.  SO IT'S POSSIBLE THEY COULD

          10    SEND IT AT ANY TIME.  I DON'T KNOW.  IT'S A PROBABILITY THAT

          11    SHE PROBABLY SENT SOME E-MAILS BEFORE OR AFTER.  I JUST DON'T

          12    REMEMBER ALL THE SPECIFICS ON THOSE.

          13    Q.   THAT'S FAIR.  DO YOU KNOW MARK BUCHANAN?

          14    A.   YES.

11:50:26  15    Q.   HE USED TO WORK AT HSL WITH YOU; CORRECT?

          16    A.   THAT'S CORRECT.

          17    Q.   YOU GUYS WORKED TOGETHER, AND YOU WERE FRIENDLY, WEREN'T

          18    YOU?

          19    A.   I WAS FRIENDLY WITH EVERYONE.

          20    Q.   YOU TALKED TO MARK.  IS IT FAIR TO SAY YOU WERE FRIENDS, OR

          21    IS THAT A MISCHARACTERIZATION?

          22    A.   I FELL LIKE I WOULD TALK TO EVERYONE THE SAME AT THE

          23    OFFICE.  I HAVEN'T TALKED TO HIM IN QUITE SOME TIME.

          24    Q.   WHEN HE WAS AT THE COMPANY, WERE YOU FRIENDS?

          25    A.   YEAH.  I WOULD SAY I WAS FRIENDS WITH HIM WHEN HE WAS

11:50:50  1  WORKING THERE.

2  Q.  DID YOU TELL MARK BUCHANAN THAT YOU WERE WORKING OVERTIME

3  HOURS WITHOUT BEING PAID?

4  A.  I DON'T REMEMBER.

5  Q.  DID YOU TELL MARK BUCHANAN THAT THE REASON YOU WERE WORKING

6  OVERTIME HOURS WITHOUT BEING PAID IS BECAUSE YOU THOUGHT TODD

7  JOHNSON WOULD FIRE YOU IF YOU REPORTED OVERTIME?

8  A.  I NEVER FELT MY JOB WAS IN JEOPARDY.

9  Q.  YOU DIDN'T THINK IT WOULD AFFECT YOUR CAREER EVER?

10  A.  I DIDN'T FEEL LIKE IT WAS, MY JOB WAS COMPROMISED OR ANY

11  TYPE OF JEOPARDY.

12          MR. GARRISON:  NOTHING FURTHER, YOUR HONOR.

13          MR. KAUFMAN:  JUST A LITTLE BIT OF, DIRECT, I

14  GUESS.

11:51:29  15                    CROSS-EXAMINATION

16  BY MR. KAUFMAN:

17  Q.  MR. YIP, WERE YOU CLASSIFIED WITHIN HSL AS AN EXEMPT

18  EMPLOYEE OR NON-EXEMPT EMPLOYEE?

19  A.  A NON-EXEMPT.

20  Q.  AND WHAT WAS YOUR, IF YOU CAN REMEMBER, IN THIS PERIOD OF

21  2008 TO 2010, APPROXIMATELY HOW MUCH WAS YOUR HOURLY WAGE?

22  A.  IT WAS 60,000 A YEAR.  I DON'T KNOW THE --

23  Q.  $29 AND CHANGE?

24  A.  YEAH, PROBABLY SOMEWHERE AROUND THERE.

25  Q.  AND DID YOU EVER UNDERSTAND THAT IN YOUR ROLE AS AN

11:52:09   1    ASSISTANT TO DANNY VALENTINI THAT YOU YOURSELF WERE A

           2    MANAGER?

           3    A.  NO, I WAS NEVER A MANAGER.

           4    Q.  HOW LONG HAD YOU WORKED WITH MR. VALENTINI BEFORE THE TWO

           5    OF YOU BECAME HSL EMPLOYEES?

           6    A.  I HAD BEEN WORKING WITH DANNY VALENTINI SINCE 2002.

           7    Q.  CONTINUOUSLY OR WERE THERE BREAKS IN THERE?

           8    A.  IT WAS CONTINUOUSLY, JUST WITH THE DIFFERENT COMPANIES.

           9    Q.  AND DID YOU AT ANY TIME FROM 2002 UNTIL THE PRESENT DAY,

         10    HAS THERE EVER BEEN A TIME WHERE DANNY VALENTINI EVER

         11    DISCIPLINED YOU?

         12    A.  NO, THERE WAS NOT A TIME.

         13    Q.  HAS HE EVER THREATENED YOU THAT YOU THOUGHT THAT YOUR JOB

         14    WAS IN JEOPARDY?

11:52:52  15    A.  NO, I NEVER FELT IT WAS IN JEOPARDY.

         16    Q.  NOW THEY PLAYED REPEATEDLY THIS DEPOSITION TESTIMONY WHERE

         17    YOU WERE ASKED, WOULD YOU THINK IT WOULD AFFECT YOUR CAREER IF

         18    YOU REPORTED OVERTIME; AND YOU SAID, WELL, PROBABLY, I GUESS IT

         19    COULD AFFECT MY CAREER.  WHAT DID YOU MEAN BY THE NOTION THAT

         20    IT COULD AFFECT YOUR CAREER IF YOU NEVER FELT YOUR JOB WAS IN

         21    JEOPARDY?

         22    A.  I JUST NEVER FELT MY JOB WAS IN JEOPARDY.  I WORKED WITH

         23    DANNY FOR A LONG TIME AND WORKING AT THE SAME COMPANY.  I WAS

         24    NEVER TOLD NOT TO INPUT OVERTIME, AND I WAS MORE CONCERNED AT

         25    THAT TIME TO JUST DOING GOOD JOB AT MY COMPANY AND HELPING OUR

11:53:39  1  CLIENTS AND EMPLOYEES RATHER THAN BEING CONCERNED ABOUT THE

        2  LITTLE OVERTIME HERE AND THERE.

        3          MR. GARRISON:  MOVE TO STRIKE AS NONRESPONSIVE, YOUR

        4  HONOR.

        5          THE COURT:  SUSTAINED, ACTUALLY.  HE DIDN'T RESPOND

        6  TO THE QUESTION.

        7  BY MR. KAUFMAN:

        8  Q.  OKAY.  I'LL MOVE ON, YOUR HONOR.  DID YOU, TO YOUR

        9  KNOWLEDGE, EVER APPROVE OVERTIME FOR HOME MORTGAGE

       10  ASSOCIATES?

       11  A.  NO, I DID NOT.

       12  Q.  NOW YOU MENTIONED THERE WAS SOME CHANGE IN 2011 IN TERMS OF

       13  HOW OVERTIME WAS APPROVED.  WHAT, TO THE BEST OF YOUR

       14  RECOLLECTION, WAS THIS CHANGE THAT TOOK PLACE IN 2011?

11:54:27 15  A.  EVERYONE, ALL THE EMPLOYEES, BECAME NON-EXEMPT.

       16  Q.  WHEN YOU SAY "ALL THE EMPLOYEES," I THINK YOU SAID THERE

       17  WERE 20 HOME MORTGAGE CONSULTANTS.  WERE THOSE THE EMPLOYEES,

       18  DID THEY ALL BECOME NON-EXEMPT?

       19          MR. GARRISON:  OBJECTION.  RELEVANCE.  BEYOND 2010,

       20  YOUR HONOR.

       21          THE COURT:  WELL, I THINK IT MAY HAVE SOME RELEVANCE.

       22  OVERRULED.

       23          MR. KAUFMAN:  YOUR HONOR, IF YOU WANT A STIPULATION

       24  THAT THEY CAN'T PUT IN ANY EVIDENCE OF E-MAILS FROM 2011 OR

       25  ANYTHING, I'LL ACCEPT THAT STIPULATION.  BUT THEY THEMSELVES

11:55:00   1    ARE MAKING AN ISSUE OF THIS.

           2            THE COURT:  WELL, LET'S NOT HAVE A SPEAKING

           3    OBJECTION.  OVERRULED OBJECTION.

           4    BY MR. KAUFMAN:

           5    Q.  WHEN THAT HAPPENED, DID THAT CAUSE A SIGNIFICANT INCREASE

           6    OF THE NUMBER OF EMPLOYEES WHOSE TIME WAS TRACKED?

           7    A.  CAN YOU REPEAT THAT?

           8    Q.  WHEN THEY MADE THESE 20 HOME MORTGAGE CONSULTANTS

           9    NON-EXEMPT, DID THOSE EMPLOYEES BEGIN ENTERING THEIR TIME INTO

          10    THE TIMEKEEPING SYSTEM?

          11    A.  YES.

          12    Q.  AND DO YOU RECALL THERE BEING ANY DISCUSSIONS AT THAT TIME

          13    ABOUT THEY WANTED TO MAKE SURE THAT THEY WERE INPUTTING THEIR

          14    TIME INTO THE TIMEKEEPING SYSTEM?

11:55:36  15    A.  CAN YOU REPEAT IT ONE MORE TIME?

          16    Q.  BAD FORM.  I'M DOING TERRIBLE QUESTIONS HERE.  AT THE TIME

          17    THIS HAPPENED, IT WAS APRIL 2011.  WAS THERE ANY DISCUSSIONS

          18    THAT YOU WERE PART OF THAT THERE WOULD, IT WOULD BE IMPORTANT

          19    TO MAKE SURE THAT ALL THE HOME MORTGAGE CONSULTANTS WERE

          20    INPUTTING THEIR TIME INTO THE TIMEKEEPING SYSTEM?

          21    A.  I BELIEVE THEY SHOULD INPUT THEIR TIME ACCURATELY AND BE

          22    PAID FOR THE TIME THEY WORK.

          23    Q.  DO YOU REMEMBER, THOUGH, SPECIFICALLY WHETHER THERE WAS ANY

          24    DISCUSSIONS ABOUT HOW THAT NOW THAT THINGS WERE CHANGING WITH

          25    THE HOME MORTGAGE CONSULTANTS BECOMING NON-EXEMPT THAT THEY

11:56:10  1  WOULD HAVE TO BE INPUTTING THEIR TIME INTO THE TIMEKEEPING

2  SYSTEM?

3  A.  I'M SORRY.  CAN YOU REPEAT THAT?

4  Q.  ALL I'M ASKING IS, WHEN THEY MADE THE HOME MORTGAGE

5  CONSULTANTS NON-EXEMPT, WAS THERE DISCUSSION THAT NOW THEY

6  WOULD BE INPUTTING THEIR TIME INTO THE TIMEKEEPING SYSTEM,

7  WHEREAS BEFORE WHEN THEY WERE EXEMPT THEY DID NOT?

8  A.  YEAH.  THEY WERE RESPONSIBLE FOR INPUTTING THEIR OWN

9  TIME.

10  Q.  AND THEY HADN'T BEEN BEFORE 2011?

11  A.  THAT'S CORRECT.

12         MR. KAUFMAN:  OKAY.  I HAVE NO FURTHER QUESTIONS.

13         MR. GARRISON:  MAY I PROCEED?

14                         REDIRECT

11:56:41  15  BY MR. GARRISON:

16  Q.  I'M A LITTLE CONFUSED.  I THOUGHT THAT OVERTIME AND TIME

17  REPORTING WAS NEVER YOUR RESPONSIBILITY; IS THAT RIGHT?

18  A.  YEAH.  I WAS RESPONSIBLE FOR INPUTTING MY OWN TIME.

19  Q.  RIGHT.  SO HOW WOULD YOU KNOW WHAT OTHERS HAD TO DO WITH

20  INPUTTING THEIR TIME IF IT WASN'T YOUR RESPONSIBILITY TO WORRY

21  ABOUT IT 2011?

22  A.  WELL, IT WAS A CHANGE.  AND THEN IT WAS ALL -- IT WAS

23  IMPLEMENTED FOR EVERYONE THAT THEY WERE RESPONSIBLE FOR

24  INPUTTING THEIR OWN TIME.

25  Q.  IT HAD NO AFFECT ON YOU, THOUGH, THAT CHANGE; CORRECT?  YOU

11:57:12  1   WERE ALWAYS NON-EXEMPT?

2   A.   YES, I WAS ALWAYS NON-EXEMPT.

3   Q.   AND YOU HAVE NO DUTIES, YOU'RE TELLING ME, IN CONNECTION

4   WITH OVERTIME REPORTING; ISN'T THAT WHAT YOUR TESTIMONY IS?

5   A.   THAT'S CORRECT.   I WASN'T RESPONSIBLE FOR THE OVERTIME.

6   Q.   SO WHY WOULD YOU BE INVOLVED IN CONVERSATIONS WITH PEOPLE

7   THAT YOU DIDN'T SUPERVISE ABOUT HOW THEY INPUTTED THEIR TIME?

8   A.   I JUST HEARD IT FROM DOHERTY EVERYONE WAS RESPONSIBLE FOR

9   INPUTTING THEIR OWN TIME IN THE TIME-TRACKING SYSTEM.

10   Q.   THE CHIEF OFFICER IN HSL BETWEEN 2008 AND 2011 WAS MIKE

11   REZA; IS THAT RIGHT?

12              MR. KAUFMAN:   OBJECTION.   VAGUE AS TO CHIEF OFFICER.

13              MR. GARRISON:   SENIOR PERSON IN CALIFORNIA FOR HSL.

14              THE COURT:   AREN'T WE OUTSIDE THE SCOPE AT THIS

11:57:56  15  POINT?

16   BY MR. GARRISON:

17   Q.   SIR, DID YOU HAVE A TITLE IN 2008 THROUGH 2011 AT HSL?

18   A.   FOR MYSELF?

19   Q.   YEAH.

20   A.   YES.

21   Q.   THAT WAS AREA ADMINISTRATOR; CORRECT?

22   A.   THAT'S CORRECT.

23   Q.   AND THE ONLY OTHER PEOPLE THAT HAD TITLES WERE DANNY

24   VALENTINI WHO WAS ABOVE YOU; CORRECT?

25   A.   YES.

112

11:58:14  1   Q.  AND MIKE REZA WHO WAS ABOVE HIM; CORRECT?

2   A.  THAT'S CORRECT.

3        MR. GARRISON:  I HAVE NOTHING FURTHER.

4        THE COURT:  ALL RIGHT.  THANK YOU, SIR.  YOU MAY STEP

5   DOWN.  ALL RIGHT.  LADIES AND GENTLEMEN, IT'S LUNCHTIME, AND

6   WE'LL TAKE A NOON RECESS.  YOU'LL BE EXCUSED UNTIL 1:00, AND

7   PLEASE REMEMBER MY ADMONISHMENT NOT TO DISCUSS THIS MATTER

8   AMONG YOURSELVES OR ANYONE ELSE.  LUNCH IS ON YOUR OWN.  AND MY

9   CLERK WILL COME OUT AND GET YOU ABOUT 1:00.  SO HAVE A GOOD

10  LUNCH.

11       (LUNCH RECESS FROM 11:58 TO 1:05 P.M.)

12       THE COURT:  ALL RIGHT.  NEXT WITNESS.

13       MR. TEEPLE:  YES, YOUR HONOR.  WE WOULD CALL DANNY

14  VALENTINI.

13:05:52  15      THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

16       (OATH ADMINISTERED.)

17       THE WITNESS:  YES.

18       THE CLERK:  THANK YOU.  BE SEATED IN THE FIRST CHAIR.

19  PLEASE STATE AND SPELL YOUR NAME FOR THE RECORD.

20       THE WITNESS:  MY NAME IS DANNY, D-A-N-N-Y, LAST NAME

21  IS V-A-L-E-N-T-I-N-I.

22       MR. TEEPLE:  THANK YOU, YOUR HONOR.

23                    DIRECT EXAMINATION

24  BY MR. TEEPLE:

25  Q.  GOOD AFTERNOON, MR. VALENTINI.  WE NEVER MET.  I'M GRANT

13:06:28  1  TEEPLE, AND I REPRESENT KELLY BUTLER.  HOW ARE YOU TODAY?

2  A.   FINE.  THANK YOU.

3  Q.   IS THERE ANY REASON THAT YOU CAN'T GIVE YOUR BEST TESTIMONY

4  TODAY?

5  A.   NO.

6  Q.   YOU WERE DEPOSED IN THIS MATTER.  DO YOU RECALL THAT?

7  A.   YES.

8  Q.   WHERE WERE YOU EMPLOYED IN 2008, AS OF JANUARY OF 2008?

9  A.   EMPLOYED WITH HOMESERVICES LENDING.

10  Q.   AND WHERE WAS YOUR OFFICE LOCATED?

11  A.   INITIALLY LOCATED IN MISSION VALLEY, SAN DIEGO, AND WE

12  TRANSFERRED -- WE CLOSED THAT OFFICE AND MOVED UP TO THE DEL

13  MAR, SAN DIEGO AREA, NORTH COUNTY.

14  Q.   AND HAVE YOU BEEN THERE CONTINUOUSLY UNTIL TODAY?

13:07:04  15  A.   YES.

16  Q.   FROM 2008 UNTIL AUGUST OF 2010, DID YOU HAVE ANY POSITIONS

17  OR TITLES WITH HSL?

18  A.   IT WOULD BE BRANCH MANAGER.

19  Q.   HOW MANY BRANCHES DID YOU MANAGE DURING THAT TIME?

20  A.   SAN DIEGO AND PART OF ORANGE COUNTY IN 2008 OF JANUARY.

21  Q.   AND DO YOU KNOW KELLY BUTLER?

22  A.   YES.

23  Q.   WHAT BRANCH DID YOU UNDERSTAND SHE WAS IN?

24  A.   SHE WAS WORKING OUT OF THE LAGUNA NIGUEL REAL ESTATE

25  OFFICE, OUR AFFILIATE PARTNER OFFICE.

13:07:41   1    Q.   HAVE YOU EVER BEEN AT THAT OFFICE?

           2    A.   A FEW TIMES, TO VISIT MY FORMER MANAGER, MIKE REZA.

           3    Q.   DID YOU EVER GO THERE TO VISIT KELLY?

           4    A.   MOST OF THE TIME WHEN I WOULD SEE KELLY OR JIM OLMSTED, WHO

           5    WORKED WITH KELLY, IT WOULD BE WHEN I HAD AN OPPORTUNITY TO GO

           6    VISIT MY FORMER MANAGER MIKE REZA.

           7    Q.   TELL THE JURY, IF YOU WILL, WHEN YOU WALK IN THE DOOR OF

           8    THE IRVINE BRANCH WHAT THE OFFICE LOOKED LIKE THAT KELLY WORKED

           9    IN.

          10    A.   IT LOOKS LIKE A VERY TYPICAL REAL ESTATE OFFICE WITH

          11    CUBICLES, SOME PRIVATE OFFICES, AND THEIR OFFICE -- IF YOU'RE

          12    ASKING WHERE THEIR OFFICE WAS OR NOT?

          13    Q.   YOU'RE DOING A GREAT JOB.   IF YOU COULD DESCRIBE THEIR

          14    OFFICE, THAT WOULD BE GREAT.

13:08:28  15    A.   IT'S A OFFICE WITH CUBICLES AND SOME PERIPHERAL ENCLOSED

          16    OFFICES ON THE OUTSIDE, AND I THINK THEY ALSO HAD AT THAT TIME

          17    A SECOND FLOOR WHICH IS WHERE MY MANAGER ACTUALLY WORKED OR

          18    HOUSED.

          19    Q.   IS IT FAIR TO SAY THAT KELLY'S OFFICE WAS LOCATED IN THE

          20    MIDDLE OF THE PRUDENTIAL OFFICE UP THERE, REAL ESTATE OFFICE?

          21    A.   I DON'T RECOLLECT IN THE MIDDLE, BUT I RECOLLECT SOMEWHERE

          22    IN THE BACK AREA OF ONE OF THE OFFICES, ENCLOSED OFFICES.

          23    Q.   THEY'RE IN THE SAME FLOOR OF THE BUILDING, FAIR TO SAY?

          24    A.   WITH THE REAL ESTATE AGENTS, YES.

          25    Q.   IF YOU KNOW, WHY IS IT THAT HER OFFICE IS LOCATED IN THE

13:09:05   1    MIDDLE OF A REAL ESTATE OFFICE?

           2    A.   WHY IS HER OFFICE LOCATED IN THE MIDDLE OF A -- FIRST OF

           3    ALL, WE'RE AFFILIATE PARTNERS WITH HOMESERVICES LENDING AND THE

           4    REAL ESTATE COMPANY, AND OUR MODEL IS CONSIDERED AN INHOUSE

           5    LENDING MODEL, AND THAT MODEL DOES ALLOW US TO HAVE AN OFFICE

           6    IN THAT REAL ESTATE OFFICE, AND THAT'S PROBABLY THE BEST WAY

           7    TO, YOU KNOW, HAVE ACCESS TO THE SOURCE OF BUSINESS FROM THE

           8    REAL ESTATE AGENTS.

           9    Q.   AND WHAT DOES THAT BUSINESS GET YOU?

          10    A.   REAL ESTATE REFERRALS FOR BORROWERS LOOKING FOR HOME

          11    LOANS.

          12    Q.   WAS IT AN EFFECTIVE MODEL, IN YOUR VIEW?

          13    A.   I THINK IT IS AN EFFECTIVE MODEL, YES.

          14    Q.   STILL USE IT TODAY?

13:09:54  15    A.   THE MODEL IS STILL GOOD TODAY.

          16    Q.   NOW, WHO WAS KELLY BUTLER'S SUPERVISOR?

          17    A.   FROM A TECHNICAL FLOW CHART STANDPOINT, I'M HER SUPERVISOR.

          18    FROM A DAILY PROCESSES AND DAILY FUNCTIONS, THEN THE HMC OR JIM

          19    OLMSTED WHO WAS WORKING WITH HER WOULD PROBABLY KNOW A LOT MORE

          20    ABOUT HER DAILY FUNCTIONS AND SCHEDULES.

          21    Q.   I APPRECIATE YOUR ANSWER, BUT I WANT TO BE SUPER CLEAR

          22    ABOUT THIS.  IS IT YOUR TESTIMONY THAT JIM OLMSTED WAS A

          23    SUPERVISOR?

          24    A.   NO, I DID NOT SAY THAT.

          25    Q.   I DIDN'T THINK SO.

13:10:34   1   A.  JIM WOULD SEE OR SUPERVISE HIS FUNCTIONS AS WELL AS KELLY'S

           2   IN REGARDS TO THE DAILY WORK AND THEIR DAILY WORKLOAD.  BUT

           3   FROM A FLOW CHART STANDPOINT, ORGANIZATIONAL STANDPOINT, THAT

           4   LINE WOULD COME TO ME.

           5   Q.  SO LET ME SEE IF I CAN TRY TO SAY IT BACK A DIFFERENT WAY.

           6   THE JURY HAS ALL THE ACRONYMS.  WE'VE BEEN POUNDING THEM WITH

           7   THEM FOR TWO DAYS NOW.  JIM IS A BROKER OR HMC, RIGHT?

           8   A.  HMC, LOAN OFFICER.

           9   Q.  KELLY IS AN HMA WHICH IS AN ASSISTANT TO AN HMC, RIGHT?

          10   A.  CORRECT.

          11   Q.  SO KELLY IS ASSIGNED TO WORK WITH JIM AND ASSIST HIM,

          12   RIGHT?

          13   A.  CORRECT.

          14   Q.  BEYOND THAT, YOU'RE NOT SAYING THAT MR. OLMSTED SUPERVISED

13:11:22  15   HER IN ANY WAY, FAIR TO SAY?

          16   A.  FAIR TO SAY THAT.  I'M HER SUPERVISOR.

          17   Q.  WHAT DOES THAT MEAN, A "TECHNICAL FLOW CHART SUPERVISOR;"

          18   WHAT DOES THAT MEAN?

          19   A.  WELL, IN MANY MODELS, OUTSIDE SALES MODELS, MOST LOAN

          20   OFFICERS WOULD HOUSE WITH THEIR MANAGER SO THAT DIRECT

          21   SUPERVISION ON A DAILY BASIS WOULD BE THAT WAY.  BUT IN THIS

          22   CASE, WHEN WE GOT OFFICES DISPERSED IN DIFFERENT PARTS OF THE

          23   COUNTY, WHAT I MEANT BY THAT IS THAT ON A DAILY BASIS THEY

          24   DETERMINE WHAT THEIR WORKLOAD IS, AND THEY DETERMINE THEIR

          25   TIMING OF WHAT THEY NEED TO DO, AND I AM ULTIMATELY RESPONSIBLE

13:12:06   1    FOR THE MANAGER THAT SHE WOULD REPORT TO.

           2    Q.   WHAT TYPES OF DUTIES DID YOU HAVE AS A SUPERVISOR OF KELLY

           3    BUTLER?   WHAT WOULD YOU BE SUPERVISING?

           4    A.   OF KELLY BUTLER?

           5    Q.   CORRECT.   YOU'RE HER SUPERVISOR.   WHAT WOULD YOU

           6    SUPERVISE?

           7    A.   I'M IN DEL MAR.   WITH LAGUNA NIGUEL, I WOULD HAVE REPORTS

           8    WEEKLY, DAILY, MONTHLY IN TERMS OF WORKLOAD, LOAN VOLUME, THOSE

           9    TYPES OF THINGS.   BUT ON A DAILY BASIS, OBVIOUSLY WHEN SHE'S

          10    45- TO AN HOUR AWAY FROM MY OFFICE, THERE WASN'T A DAILY

          11    SUPERVISION OF WHAT SHE DID.

          12    Q.   SO I APPRECIATE YOUR ANSWER NOW ABOUT HOW FREQUENT YOU

          13    WOULD SUPERVISE HER.   I WANT TO ASK YOU ABOUT THE SUBSTANCE OF

          14    WHAT YOU WOULD SUPERVISE.   WHAT WERE YOU SUPERVISING IN YOUR

13:13:04  15    RELATIONSHIP WITH MS. BUTLER?

          16    A.   CAN YOU VERIFY "SUPERVISION" PLEASE?

          17    Q.   I'M TRYING TO FIND THAT OUT FROM YOU, SIR.   LET ME ASK A

          18    NEW QUESTION.   LIST FOR ME, IF YOU WOULD, THE DIFFERENT ASPECTS

          19    OF HOW -- LET ME TRY A NEW ONE.   WHAT CONDUCT OF MS. BUTLER'S

          20    WERE YOU SUPERVISING?

          21    A.   I WOULD SUPERVISE -- MY EXTENT OF SUPERVISION WOULD BE

          22    REPORTS ON LOAN VOLUME, LOAN REQUESTS, IF THEY HAD REQUESTS --

          23    BOTH THE AGENCY, LOAN OFFICER, OR KELLY BUTLER -- IF THEY HAD

          24    REQUESTS IN TERMS OF PRIORITIES ON THEIR LOAN, DEADLINES.

          25    THOSE TYPE OF THINGS.   THOSE WOULD BE SOME SORT OF SUPERVISORY

13:13:56   1   ROLE AND DIRECT SUPERVISORY BUT OTHER THAN THAT, THERE WOULDN'T

2   BE DIRECT DAILY SUPERVISION WITH KELLY.

3   Q.   I APPRECIATE YOUR ANSWER.   I WANT YOU TO KNOW I'M NOT

4   TRYING TO ELICIT ANYTHING ABOUT THE FREQUENCY OF YOUR

5   SUPERVISION.   I'M REALLY TRYING TO FOCUS ON THE TOPIC.   SO WITH

6   THAT IN MIND -- AND YOU'RE DOING A GOOD JOB, YOU'VE GIVEN US

7   SOME TOPICS ABOUT LOAN VOLUME AND WHERE LOANS ARE AT -- ANY

8   OTHER TOPICS, CATEGORIES, IF YOU WILL, OF SUPERVISION THAT YOU

9   CONSIDERED WITHIN THE SCOPE OF YOUR DUTIES?

10   A.   PART OF THE -- OUR SYSTEM ALSO DOES TRACK FOR QUALITY OF

11   SUBMISSIONS.   SO I GET THOSE KINDS OF REPORTS.   SO WE CAN KEEP

12   TRACK OF THAT.   TIMING OF THE SUBMISSIONS, THE TIMING OF THE

13   WHOLE PROCESS.   CUSTOMER SERVICE SCORES WHICH ARE RELATED TO

14   THEIR PERFORMANCE.   SO THOSE TYPES OF THINGS WOULD BE THINGS I

13:14:51   15   WOULD BE SUPERVISING ALSO.

16   Q.   STOPPING RIGHT THERE ON THOSE, DID YOU EVER HAVE ANY

17   NEGATIVE FEEDBACK WITH RESPECT TO MS. BUTLER OR THE QUALITY OF

18   HER WORK?

19   A.   FROM?

20   Q.   ANYONE.

21   A.   CUSTOMERS OR OTHER LOAN OFFICERS?

22   Q.   ANYBODY.

23   A.   I CAN'T SAY THAT I DID.

24   Q.   DO YOU HAVE ANY CRITICISMS OF THE QUALITY OF MS. BUTLER'S

25   WORK?

13:15:13   1   A.   I CAN'T SAY THAT I DO.

2   Q.   NOW, HAVE YOU COMPLETED YOUR LIST OF THE TOPICS OR THE

3   AREAS OF SUPERVISION THAT YOU CAN RECALL?

4   A.   THE TOPICS OR THE AREAS OF SUPERVISION?   AGAIN, FROM

5   REPORTS.

6   Q.   WE TALKED ABOUT THOSE.

7   A.   YEAH, IF I'M AN HOUR AWAY, IF I'M 60 MILES A WAY -- ARE YOU

8   REFERRING TO AN OBSERVATION OF SUPERVISION, OR ARE YOU

9   REFERRING TO SOMETHING ELSE?

10   Q.   NO.   YOU ARE DOING A GREAT JOB.   YOU SAY THE THINGS I WOULD

11   SUPERVISE WITH HER WOULD BE HER LOAN PRODUCTIVITY, THE QUALITY

12   OF HER WORK, THE PRODUCTIVITY, HOW MANY LOANS SHE'S DOING.   SEE

13   HOW WE'RE MAKING THIS LIST?   IS THAT LIST NOW EXHAUSTED?   IS

14   THERE ANYTHING ELSE WE CAN ADD TO THAT LIST?

13:16:02   15   A.   VOLUME OF LOANS.

16   Q.   ANYTHING ELSE?

17   A.   I THINK I MENTIONED MOST OF THEM.

18   Q.   THAT'S ALL YOU CAN RECALL AS YOU SIT HERE TODAY?

19   A.   THAT'S WHAT I CAN RECALL AT THIS MOMENT IN TIME.

20   Q.   WHAT ROLE DID YOU HAVE WITH RESPECT TO HER -- COULD YOU

21   FIRE HER?   DID YOU HAVE THAT POWER IF YOU WANTED TO?

22   A.   WITHIN THE RULES OF PROCESSES, I COULD, YES.

23   Q.   TELL ME, WHAT ROLE, IF ANY, DID YOU HAVE IN HER OVERTIME.

24   A.   LIKE ALL HMA'S OR ASSISTANTS, PRIOR 2000 -- I'M SORRY --

25   APRIL 2011, MY UNDERSTANDING WAS THAT I DID NOT HAVE TO REVIEW

13:16:55   1   OR APPROVE TIME CARDS FOR HMA'S.

2   Q.   THAT'S WHAT YOU DIDN'T HAVE TO DO.   IS THERE ANYTHING YOU

3   DID HAVE TO DO WITH RESPECT TO OVERTIME?

4   A.   WHEN THERE WAS A REQUEST FOR OVERTIME, I WOULD APPROVE

5   IT.

6   Q.   SO WITH RESPECT TO OVERTIME, IS IT FAIR TO SAY FROM YOUR

7   PERSPECTIVE THE ONLY JOB YOU HAD WAS TO APPROVE OR NOT APPROVE

8   A REQUEST FOR OVERTIME?

9   A.   YES.

10   Q.   LIMITED TO OVERTIME.   ISN'T IT ALSO THE CASE THAT THERE

11   WERE TIMES WHEN EMPLOYEES WOULD WORK OVERTIME, AND YOU WOULD

12   FIND OUT AFTER THE FACT, AND THEN YOU WOULD HAVE TO DO AN

13   APPROVAL?

14   A.   I WOULDN'T SAY IT -- NO, NO.

13:17:39   15   Q.   SO THERE'S NEVER A TIME WHEN SOMEONE CAME AND SAID, HEY, I

16   WORKED 15 HOURS LAST WEEKEND; I WANT TO GET THAT APPROVED; WILL

17   YOU GIVE ME THE TIME?   NOTHING LIKE THAT EVER HAPPENED?

18   A.   NO. THAT TYPE OF CONVERSATION, THAT TYPE OF REQUEST, NO.

19   Q.   NOW, WHO THEN DID THE HUMAN RESOURCES FOR YOUR BRANCH?

20   A.   DOHERTY SERVICES.   IT'S AN OUTSOURCED HR COMPANY.

21   Q.   IS THERE A LADY NAMED KELLY THERE THAT YOU WORKED WITH?

22   EXCUSE ME.   WAS IT RACHEL?

23   A.   RACHEL, YES.

24   Q.   I APOLOGIZE.   MY CLIENT IS KELLY.   IT WAS A MENTAL PAUSE.

25   AND WHO IS RACHEL?   WHAT DOES SHE DO FOR DOHERTY?

13:18:30  1    A.   SHE'S OUR CALIFORNIA REPRESENTATIVE.

       2    Q.   I'M GOING TO HAVE YOU LOOK AT EXHIBIT 11.  THERE'S A

       3    NOTEBOOK UP THERE, BUT IT WILL POP UP ON THE SCREEN NEXT TO YOU

       4    IF YOU WANT TO BE PATIENT.  THIS HAS ALREADY BEEN ENTERED INTO

       5    EVIDENCE, YOUR HONOR.  IF YOU, FIRST OF ALL, SCROLL DOWN HERE,

       6    IF YOU WILL, LET'S START AT THE BOTTOM OF IT.  NOW, WE HAVE

       7    LAURA DAWSON, CHRISTOPHER LOGAN.  WE GOT A "FROM ROBIN LEONARD

       8    TO DANNY VALENTINI, MICHAEL YIP." "TIME SHEET APPROVAL IS NOON

       9    TODAY."  WHAT IS TIME SHEET APPROVAL, SIR?

      10    A.   THAT PROBABLY -- I THINK WHAT ROBIN IS REFERRING TO IS HER

      11    TIME LIMIT FOR APPROVING TIME SHEETS FOR HER PROCESSES.  THAT'S

      12    WHAT I ASSUME.

      13    Q.   DON'T MOVE THE SCREEN AT ALL.  LOOK AT THE VERY LAST LINE

      14    WE HAVE ON THE SCREEN THERE.  IT SAYS, "ALSO, THERE IS OVERTIME

13:20:02 15    BEING SUBMITTED BY KELLY BUTLER 41.5 AND CRYSTAL VIGIL, 2.51

      16    HOURS, I DO NEED MANAGER APPROVAL ON THESE BEFORE I CAN ISSUE

      17    PAYMENT."  DO YOU SEE THAT, SIR?

      18    A.   YES.

      19    Q.   WHO IS THE MANAGER?

      20    A.   I WOULD ASSUME THAT'S ME.

      21    Q.   SO YOU GOT E-MAILS LIKE THIS FROM TIME TO TIME FROM YOUR

      22    HUMAN RESOURCES TO APPROVE OVERTIME; FAIR TO SAY?

      23    A.   OBVIOUSLY, THIS ONE SHOWS THAT.

      24    Q.   DO YOU HAVE A RECOLLECTION?  I KNOW WHAT THAT SHOWS.  I

      25    WANT TO KNOW WHAT YOUR RECOLLECTION IS.  MAYBE THIS REFRESHES

13:20:36   1   YOUR RECOLLECTION.

2   A.   EXACTLY.   I DON'T RECOLLECT THOSE, BUT THIS DOES OBVIOUSLY

3   SHOW THAT I DID RECEIVE IT, YES.

4   Q.   THAT REFRESHES YOUR RECOLLECTION THEN, SIR?

5   A.   I WOULD ASSUME THAT WOULD BE THE CASE.

6   Q.   SO WHEN PEOPLE WORKED OVERTIME, YOU HAD TO APPROVE IT AT

7   SOME POINT, WOULDN'T YOU SAY, EVEN IF IT'S AFTER THE FACT?

8   A.   I THINK THAT'S OUR POLICY.   IF THEY WORKED THOSE HOURS, AND

9   THEY MARKED THOSE HOURS DOWN, THEN WE DO PAY THAT.

10   Q.   NOW, WHEN WE TALK ABOUT YOUR POLICY, TELL ME WHAT THE HSL

11   POLICY IS FOR OVERTIME AS YOU UNDERSTAND IT?

12   A.   AS I UNDERSTAND IT?

13   Q.   AND THAT WAS EFFECTIVE FROM 2008 TO 2010.

14   A.   SURE.   AS I UNDERSTAND IT, ALL EMPLOYEES SHOULD MARK DOWN

13:21:27   15   THE HOURS THAT THEY WORK AND INCLUDING OVERTIME.   WE DO ASK

16   THAT THE EMPLOYEE ASK FOR PRIOR APPROVAL FOR OVERTIME, BUT

17   WHETHER THEY DO ASK OR NOT, WHATEVER HOURS THEY DO MARK ON

18   THEIR TIME CARDS, THEY SUBMIT THOSE ONLINE DIRECTLY TO DOHERTY,

19   AND THOSE WOULD GET PAID.

20   Q.   DO YOU ALSO HAVE AN UNDERSTANDING THAT THAT'S THE LAW, IF

21   AN EMPLOYEE WORKS THE TIME YOU HAVE TO PAY THEM WHETHER THEY

22   ASK FOR IT AHEAD OF TIME OR NOT?

23           MR. KAUFMAN:   OBJECTION.   CALLS FOR LEGAL CONCLUSION

24   ABOUT WHAT FLSA REQUIRES.

25           THE COURT:   SUSTAINED.

123

13:22:08   1          MR. TEEPLE:  I APOLOGIZE, YOUR HONOR.  I THOUGHT I

           2   WAS CAREFUL ABOUT HIS UNDERSTANDING.  MAY I REPHRASE?

           3          THE COURT:  REPHRASE.  PROBABLY FOUNDATION HAS TO BE

           4   LAID FOR THIS.

           5   BY MR. TEEPLE:

           6   Q.  DID YOU GET TRAINING FROM DOHERTY CONCERNING THE RULES

           7   CONCERNING OVERTIME?

           8   A.  WE HAD LOTS OF TRAINING.

           9   Q.  YOU'VE BEEN THROUGH THESE MANUALS THE EMPLOYEE'S SIGN?

          10   YOU'RE AWARE OF THEM?

          11   A.  THERE'S BEEN MANY, MANY MANUALS, SIR.

          12   Q.  ALTHOUGH, YOU MAY NOT REMEMBER THEM, IS IT FAIR TO SAY YOU

          13   REVIEWED THEM AT SOME POINT IN TIME?

          14   A.  I'M SURE WE WENT THROUGH THESE PROCESSES.

13:22:38  15   Q.  IS IT FAIR TO SAY IT'S YOUR UNDERSTANDING, IF IT'S NOT YOUR

          16   UNDERSTANDING, LET ME KNOW, BUT YOUR UNDERSTANDING OF THE LAW

          17   IS IF AN EMPLOYEE WORKS THE TIME, THEY GET PAID WHETHER IT'S

          18   ASKED FOR IN ADVANCE OR NOT?

          19   A.  CORRECT.

          20   Q.  WHO IS RESPONSIBLE FOR REVIEWING THE TIME CARDS AT HSL?

          21   A.  PRIOR TO APRIL 2011 -- POST-APRIL 2011, I AM RESPONSIBLE.

          22   Q.  YOU WERE RESPONSIBLE FOR REVIEWING?

          23   A.  POST-APRIL 2011, I AM REVIEWING AND APPROVING TIME CARDS.

          24   PRIOR 2011, APRIL, MY UNDERSTANDING IS THAT I DID NOT HAVE TO

          25   REVIEW AND APPROVE TIME CARDS.

13:23:36  1    Q.   FROM JANUARY 2008 UNTIL AUGUST OF 2010, AND THAT'S WHEN

2    MS. BUTLER WAS EMPLOYED?

3    A.   UH-HUH.

4    Q.   YOU'RE HER SUPERVISOR.   WHO IS RESPONSIBLE FOR REVIEWING

5    HER TIME CARDS?

6    A.   I WOULD HAVE TO ASSUME THAT MAYBE DOHERTY.

7    Q.   ONE OF THE THINGS --

8            MR. KAUFMAN:   YOUR HONOR, CAN HE FINISH HIS ANSWER? I

9    FEEL LIKE HE'S BEING CUT OFF IN THE MIDDLE OF ANSWERING A

10   QUESTION.

11           MR. TEEPLE:   I APOLOGIZE.   YOU'RE RIGHT.   HAVE YOU

12   FINISHED YOUR ANSWER, SIR?

13           THE WITNESS:   I THINK WHAT I UNDERSTAND IS THAT

14   EMPLOYEES ARE TO INPUT THEIR TIME, INCLUDING OVERTIME, SUBMIT

13:24:14 15   IT TO DOHERTY, AND THOSE GET PAID ACCORDINGLY.

16   BY MR. TEEPLE:

17   Q.   SO WHO IS RESPONSIBLE AT HSL FOR REVIEWING EMPLOYEES' TIME

18   CARDS FROM JANUARY OF '08 THROUGH AUGUST OF 2010?   I'M LOOKING

19   FOR A NAME OF A PERSON OR POSITION.

20   A.   BETWEEN THAT TIME, SIR, I DON'T KNOW EXACTLY WHO WOULD HAVE

21   BEEN APPROVING THOSE CARDS.

22   Q.   IS WASN'T YOU, FAIR SO SAY?

23   A.   AT THAT TIME YOU MENTIONED, MY UNDERSTANDING IS THAT I WAS

24   NOT RESPONSIBLE FOR APPROVING AND REVIEWING THE TIME CARDS.

25   Q.   DID SOMEONE TELL YOU THAT?

13:24:54  1    A.   NO.   I THINK IT WAS SOMETHING THAT WASN'T TOLD OTHERWISE,

2    AND THIS WAS THE SAME PROCESS THAT WE HAD WITH THE PREVIOUS

3    COMPANY, PRIOR HOMESERVICES COMING INTO PLAY, WHERE I DID NOT

4    REVIEW OR APPROVE TIME CARDS EITHER.

5    Q.   I KNOW I'M KIND OF ASKING THE QUESTION TWICE, BUT IT'S

6    IMPORTANT.   IS IT FAIR TO SAY, AS YOU SIT HERE TODAY, YOU DON'T

7    RECALL ANYONE EVER SAYING, MR. VALENTINI, YOU'RE RESPONSIBLE

8    FOR REVIEWING TIME CARDS FOR THE 2008 TO 2010 TIME PERIOD?

9    A.   I DON'T RECALL ANYBODY TELLING ME TO DO SOMETHING ON THE

10    CONTRARY.

11    Q.   THANK YOU.   MR. YIP WAS JUST ON THE STAND BEFORE.   DID YOU

12    HAVE AN OPPORTUNITY TO SPEAK WITH HIM?

13    A.   IN REGARDS TO RIGHT AFTER HIS TESTIMONY?

14    Q.   YES.

13:25:48  15    A.   JUST FOR A BRIEF, HOW DID IT GO, AND HE SAID IT WENT

16    WELL.

17    Q.   WHO ELSE HAVE YOU HAD AN OPPORTUNITY TO DISCUSS YOUR

18    TESTIMONY HERE TODAY WITH?

19    A.   THAT'S IT.

20    Q.   DIDN'T DISCUSS IT WITH THE ATTORNEYS?

21    A.   WELL, THE ATTORNEYS, YES, YES.

22         MR. KAUFMAN:   YOUR HONOR, OBVIOUSLY, ANY QUESTIONS

23    ABOUT WHAT WE DISCUSSED IS PRIVILEGED.

24         THE COURT:   SURE.   I'M SURE HE KNOWS THAT.

25         MR. TEEPLE:   WASN'T GOING TO ASK THE QUESTION.   I

13:26:14  1   JUST WANTED TO KNOW IF IT HAPPENED.

2   BY MR. TEEPLE:

3   Q.  MR. YIP TESTIFIED HE FREQUENTLY WORKED OVER 40 HOURS A WEEK

4   IN 2008, 2009, AND 2010.  DO YOU HAVE A DIFFERENT UNDERSTANDING

5   THAN THAT?

6        MR. KAUFMAN:  OBJECTION, YOUR HONOR.

7   MISCHARACTERIZES THE TESTIMONY.

8        THE COURT:  SUSTAINED.  THAT WASN'T EXACTLY WHAT HE

9   SAID.

10   BY MR. TEEPLE:

11   Q.  WHAT IS YOUR UNDERSTANDING ABOUT WHETHER OR NOT -- DO YOU

12   BELIEVE MR. YIP WORKED MORE THAN 40 HOURS A WEEK REGULARLY IN

13   2008?

14   A.  I DO BELIEVE HE WORKED MORE THAN 40 HOURS.  I DON'T KEEP

13:26:44  15  TRACK OF MICHAEL YIP'S HOURS.  I'VE KNOWN HIM FOR OVER 11

16   YEARS, AND I TRUST HIM.  I TRUST HIS WORK.  I DON'T KEEP TRACK

17   OF HIS HOURS.

18   Q.  AS YOU SIT HERE TODAY, DO YOU HAVE A BELIEF WHETHER HE DID

19   WORK OVER 40 HOURS OR NOT?

20   A.  LIKE I SAID, I DON'T KEEP TRACK OF MICHAEL'S HOURS.  I

21   DIDN'T WITHIN THAT PERIOD OF TIME ALSO.

22   Q.  ARE YOU COME COMPLETED WITH YOUR ANSWER?

23   A.  SURE.

24   Q.  I'M REALLY NOT ASKING WHAT YOU KEEP TRACK OF OR NOT.

25   PEOPLE CAN GET AN UNDERSTANDING FROM ALL KINDS OF DIFFERENT

13:27:20  1    SOURCES.  SO RATHER THAN ME GOING THROUGH EVERY POSSIBLE SOURCE

        2    OF HOW YOU MIGHT KNOW SOMETHING, I JUST WANT TO ASK YOU IF YOU

        3    KNOW IT.  SO AS YOU SIT HERE TODAY, DO YOU HAVE A BELIEF EITHER

        4    WAY WHETHER HE WORKED OVER 40 HOURS A WEEK EVER?

        5    A.  YEAH.  I'M SURE THERE WERE TIMES MICHAEL YIP WORKED OVER 40

        6    HOURS.

        7    Q.  DID YOU EVER PAY HIM OVERTIME FOR 2008?

        8    A.  I'D HAVE TO LOOK AT THE RECORDS ON THAT.

        9    Q.  IF HE SAYS NO, DO YOU HAVE ANY REASON TO DISBELIEVE HIM?

        10   A.  I DO NOT.

        11   Q.  SAME ANSWER FOR 2009.  DO YOU KNOW IF HE WAS EVER PAID?

        12   A.  I'D HAVE TO LOOK AT IT.

        13   Q.  SAME QUESTION FOR 2010.

        14   A.  AGAIN, THE SAME ANSWER.

13:27:56  15   Q.  ARE YOU AWARE HE TESTIFIED IN HIS DEPOSITION THAT HE WORKED

        16   MORE THAN 40 HOURS A WEEK IN 2008?

        17   A.  I'M AWARE OF THAT.

        18   Q.  WERE YOU AWARE OF IT BEFORE I JUST SAID IT?

        19   A.  I'M ASSUMING THAT WHILE YOU'RE QUESTIONING ME.  SO I'M

        20   ASSUMING THAT.  YOU'RE GOING THERE.

        21   Q.  I'M ASKING A POOR QUESTION.  WERE YOU AWARE BEFORE TODAY

        22   THAT HE WORKED MORE THAN 40 HOURS A WEEK IN 2008?

        23   A.  NO.

        24   Q.  YOU WEREN'T AWARE OF THAT BEFORE TODAY?

        25   A.  NO.

13:28:27   1    Q.   WOULD YOUR ANSWER BE THE SAME FOR 2009 AND 2010?

         2    A.   I'D HAVE TO LOOK AT THE RECORDS.

         3    Q.   I'M NOT ASKING YOU WHAT ACTUALLY HAPPENED.   I WANT TO KNOW

         4    WHAT'S IN DANNY VALENTINI'S MIND, WHAT YOU'RE AWARE OF.   LET ME

         5    REPHRASE IT BECAUSE IF YOU'RE TELLING ME YOU'RE GOING TO LOOK

         6    AT RECORDS, I'M NOT GETTING WHAT'S IN YOUR MIND.   I'M GETTING

         7    WHAT YOU GO DO.   AS YOU SIT HERE TODAY, IS IT YOUR TESTIMONY

         8    THAT BEFORE THIS DAY, TODAY, YOU'VE NEVER HAD ANY INFORMATION

         9    WHICH SUGGESTS TO YOU HE WORKED MORE THAN 40 HOURS IN A WEEK?

        10    A.   NO.   BUT I THINK THE ORIGINAL QUESTION WAS DID I BELIEVE

        11    THAT HE WORKED OVERTIME ONCE IN A WHILE?   IS THAT WHAT YOU

        12    ASKED ME ALSO?

        13    Q.   IT'S DIFFERENT THAN MY QUESTION, BUT I'LL GO WITH THAT.

        14    WHAT'S YOUR ANSWER?

13:29:21  15    A.   I'M JUST TRYING TO UNDERSTAND THE QUESTION AND FINALIZE

        16    IT.

        17    Q.   PLEASE, IF I ASK YOU A QUESTION YOU DON'T UNDERSTAND, LET

        18    ME KNOW.

        19    A.   OKAY.

        20    Q.   IS IT FAIR TO SAY THAT YOU THOUGHT KELLY WAS A HARD

        21    WORKER?

        22    A.   I WOULD ASSUME THAT.

        23    Q.   WELL, YOU HAD YOUR DEPOSITION TAKEN IN THIS CASE, RIGHT?

        24    DO YOU RECALL TESTIFYING THAT SHE WAS A HARD WORKER?

        25    A.   IF I SAID THAT, THEN I CONCUR WITH THAT.

13:29:51  1    Q.  WELL, AS YOU SIT HERE TODAY, DO YOU KNOW OF ANY FACT THAT

          2    SUGGESTS OTHERWISE?

          3    A.  NO.  I THINK SHE WAS A GOOD WORKER.  KELLY IS A GOOD

          4    WORKER.

          5    Q.  DO YOU RECALL TESTIFYING SHE WAS AN HONEST WORKER?

          6    A.  I BELIEVE I DID.

          7    Q.  DO YOU RECALL TESTIFYING THAT SHE WAS VERY SUPPORTIVE?

          8    A.  I CAN'T REMEMBER THAT, BUT IF I SAID IT, I STAND BY IT.

          9    Q.  DO YOU RECALL TESTIFYING THAT YOU SAID THAT SHE HAD A

         10    STRONG WORK ETHIC?

         11    A.  AGAIN, I CAN'T REMEMBER THAT, BUT IF I SAID IT, I STAND BY

         12    IT.

         13    Q.  DO YOU RECALL TESTIFYING THAT YOU THOUGHT KELLY WAS

         14    HONEST?

13:30:27 15    A.  I THINK I DID SAY THAT, YES.

         16    Q.  AND DO YOU HAVE ANY REASON TO BELIEVE AS YOU SIT HERE TODAY

         17    THAT SHE DIDN'T WORK ALL THE HOURS SHE'S CLAIMING SHE WORKED?

         18    A.  I DON'T KNOW.

         19    Q.  YOU DON'T HAVE ANY REASON TO DISBELIEVE HER DO YOU?

         20    A.  I THINK YOU'RE ASKING ABOUT MY TESTIMONY.  BUT I SAID --

         21    AND I AGREED WITH MY TESTIMONY THAT I DID SAY THAT IN MY

         22    TESTIMONY.  BUT YOU'RE ASKING ME THE QUESTION  --

         23    Q.  MAY I ASK IT AGAIN?

         24    A.  YES.

         25    Q.  AS YOU SIT HERE TODAY, ARE YOU AWARE OF ANY FACT THAT

13:31:02  1    SUGGESTS TO YOU TODAY THAT THE AMOUNT OF TIME KELLY BUTLER IS

       2    CLAIMING IS INACCURATE?

       3    A.  I DON'T KNOW THE AMOUNT OF TIME THAT SHE'S CLAIMING.

       4    Q.  AS YOU SIT HERE TODAY, ARE YOU AWARE OF ANY FACT AS YOU SIT

       5    HERE TODAY THAT SUGGESTS TO YOU THAT MRS. BUTLER DID NOT WORK

       6    OVERTIME?

       7    A.  I WOULD THINK THAT SHE PROBABLY WORKED SOME OVERTIME,

       8    YES.

       9    Q.  OTHER THAN THE 40.1 HOURS WE LOOKED AT?

      10    A.  I WOULD ASSUME SO.  THERE MIGHT HAVE BEEN TIMES, YES.

      11    Q.  WE HAVE IN EVIDENCE HERE, AND I BELIEVE IT'S EXHIBIT THREE,

      12    ABOUT A PHONE-BOOK THICK OF MS. BUTLER'S TIME -- EXCUSE ME --

      13    OF HER PHONE RECORDS.  DO YOU RECALL DISCUSSING THOSE IN HER

      14    DEPOSITION?

13:32:09 15    A.  YES.

      16    Q.  DO YOU RECALL THAT THERE WERE CALLS FROM YOU AS EARLY AS

      17    5:00 IN THE MORNING AND AS LATE AS AT 9:00 AT NIGHT?

      18    A.  I DON'T RECALL THE SPECIFIC PHONE CALLS OR THE SPECIFIC

      19    ITEMS.  I DON'T KNOW HOW LONG THEY WERE.  THEY COULD HAVE BEEN

      20    MESSAGES, ONE-MINUTE MESSAGES.  I DON'T KNOW.

      21    Q.  LET ME ASK THE QUESTION AGAIN.  I DON'T THINK I DID A GOOD

      22    JOB.  I DON'T WANT YOU TO TELL ME WHAT WAS SAID IN THE CALL.  I

      23    DON'T WANT YOU TO TELL ME WHAT YOU THINK THE CALL WAS ABOUT.  I

      24    JUST WANT TO KNOW IF YOU RECALL CONTACTING MS. BUTLER AS EARLY

      25    AS 5:00 IN THE MORNING FOR ANY REASON?

13:32:44   1    A.   I REALLY DON'T.

           2    Q.   IF IT'S IN THE PHONE RECORDS, YOU DON'T DISPUTE IT,

           3    RIGHT?

           4    A.   IF IT'S IN THE PHONE RECORDS, I DON'T DISPUTE IT.

           5    Q.   WHAT WAS YOUR CELL NUMBER IN 2008?

           6    A.   619-991-0706.

           7    Q.   NOW WAS MS. BUTLER A PERSONAL FRIEND OF YOURS?

           8    A.   I DIDN'T SOCIALIZE WITH KELLY, NO.

           9    Q.   YOU HAD A PROFESSIONAL RELATIONSHIP WITH HER, FAIR TO

          10    SAY?

          11    A.   CORRECT.

          12    Q.   I'LL REPRESENT TO YOU THAT MS. BUTLER SAID THERE WERE OVER

          13    900 CALLS WITH YOU THAT OCCURRED BEFORE 9:00 A.M. OR AFTER 5:00

          14    P.M. ON THE TIME PERIOD THAT WE'RE TALKING ABOUT.   ARE YOU

13:33:24  15    AWARE OF ANY FACT THAT SUGGESTS TO YOU TODAY THAT THOSE CALLS

          16    WEREN'T RELATED TO BUSINESS?

          17         MR. KAUFMAN:   YOUR HONOR, I JUST WANT TO OBJECT.   IT

          18    MISCHARACTERIZES THE RECORD.

          19         THE COURT:   SUSTAINED.   REPHRASE.

          20    BY MR. TEEPLE:

          21    Q.   WHEN YOU WOULD CALL MS. BUTLER BEFORE 9:00 A.M. OR AFTER

          22    5:00 P.M., IS THERE ANY REASON OTHER THAN WORK THAT YOU CAN

          23    THINK OF THOSE CALLS WOULD BE ABOUT?

          24    A.   I DON'T KNOW.   I DON'T KNOW.

          25    Q.   IF SHE SAYS THEY'RE ABOUT WORK, DO YOU HAVE ANY REASON TO

13:33:56    1    DISBELIEVE HER?

            2    A.   THEY COULD BE WORK.  I JUST DON'T KNOW.

            3    Q.   YOU DON'T KNOW.  FAIR TO SAY.  NOW SHE WORKS IN THIS

            4    OFFICE, IN THIS PRUDENTIAL OFFICE, WITH ALL THESE REAL ESTATE

            5    AGENTS SO SHE CAN HAVE RELATIONSHIPS WITH THEM TO GET THEIR

            6    BUSINESS, WOULDN'T YOU SAY?

            7    A.   I THINK THE PRIMARY RESPONSIBILITY FOR REALTOR RELATIONSHIP

            8    WAS WITH THE HMC, THE LOAN OFFICER, JIM OLMSTED.

            9    Q.   DID THE HMA'S, OF WHICH MS. BUTLER WAS ONE, HAVE ANY DUTY

           10    TO ASSIST WITH SALES-RELATED FUNCTIONS?

           11    A.   I DON'T THINK SO.

           12    Q.   YOU DON'T?

           13    A.   NO.

           14    Q.   WHO IS MARK -- LET ME MAKE SURE I HAVE THE RIGHT E-MAIL

13:34:43   15    HERE.  WHO IS MARK BUCHANAN?

           16    A.   HE'S A LOAN OFFICER IN SAN DIEGO, MISSION VALLEY, FORMER.

           17    Q.   AND WERE YOU INVOLVED IN TRANSMITTING INCENTIVE

           18    COMPENSATION PLANS TO HIM?

           19    A.   I DON'T UNDERSTAND THE QUESTION, SIR.  I'M SORRY.

           20    Q.   YOUR HONOR, WE HAVE MARKED NEXT IN ORDER EXHIBIT 35.  MAY I

           21    APPROACH THE WITNESS?

           22         THE COURT:  LET HIM LOOK AT IT.  IS THERE ANY

           23    OBJECTION?

           24         MR. KAUFMAN:  I DON'T UNDERSTAND THE IMPEACHMENT

           25    ASPECT OF THIS.  SO I WOULD OBJECT IF THIS WAS NEVER DISCLOSED,

13:36:00   1   AND I DON'T THINK IT IMPEACHES ANYTHING.

           2            THE COURT:  IT WAS NOT PART OF THE EXHIBITS?

           3            MR. KAUFMAN:  NO.

           4            MR. TEEPLE:  MAY WE HAVE A SIDEBAR, YOUR HONOR?

           5            THE COURT:  LET ME FIRST ASK YOU, IS IT PART OF THE

           6   EXHIBITS?

           7            MR. TEEPLE:  NO.

           8            THE COURT:  OKAY.  LET'S HAVE A SIDEBAR.

           9            (THE FOLLOWING DISCUSSION WAS HELD AT SIDEBAR:)

          10            MR. TEEPLE:  WE HEARD FOR THE FIRST TIME MR. KAUFMAN

          11   SAY HE HEARD FOR THE FIRST TIME THAT THE HMA'S DIDN'T HAVE ANY

          12   SALES OR MARKETING RESPONSIBILITIES AND THAT WAS SURPRISING TO

          13   US.  SO WE DIDN'T MARK ANY EXHIBITS ABOUT THAT.  NOW WE GET

          14   INTO TRIAL, AND HE'S CONTESTING GREATLY THAT THAT WAS NEVER

13:43:51  15   EVER ANY OF THEIR DUTIES.  WE HAVE A DOCUMENT HERE FROM HSL

          16   THAT SAYS THEY PERFORM SALES-RELATED FUNCTIONS, AND SO THIS IS

          17   WHAT I WANT TO GET IN.  IT WAS SENT TO THIS WITNESS, OR EXCUSE

          18   ME, IT WAS SENT FROM HIM.

          19            MR. KAUFMAN:  YOUR HONOR, AS I READ THIS, THIS HAS

          20   NOTHING TO DO WITH KELLY BUTLER AT ALL.  IT LOOKS LIKE IT WAS

          21   SENT FROM MICKEY SANDAMAN.  I'M NOT SURE I KNOW WHO MICKEY

          22   SANDAMAN IS.  THERE'S NOTHING SENT FROM DANNY VALENTINI HERE,

          23   AND THIS ATTACHED DOCUMENT HERE, WE HAVE NEVER SAID IT APPLIES

          24   TO MS. BUTLER.  SHE NEVER SIGNED ONE OF THIS OR HAD ANYTHING TO

          25   DO WITH HER.  IF THEY WANT TO PUT THIS IN THEY COULD HAVE PUT

13:43:52   1   ON WITH MS. BUTLER AND ASKED HER ABOUT A COMPENSATION PLAN.

           2   THEY CAN'T WAIT UNTIL THE MIDDLE OF TRIAL AND CLAIM IMPEACHMENT

           3   AND THAT IT'S SOMETHING MR. VALENTINI --

           4           MR. GARRISON:   CAN I DIRECT YOU TO ONE THING THAT MAY

           5   EXPEDITE THE PROCESS?   THIS IS AN ATTACHMENT TO AN E-MAIL

           6   TALKING ABOUT WHAT HMA'S DO FOR MORTGAGE BROKERS TO DETERMINE

           7   IF THEY WANT AN HMA.   IT DEFINES HMA'S ARE TO ASSIST HOME

           8   MORTGAGE CONSULTANTS, HMC'S, IN SALES.   THAT'S WHAT IT SAYS

           9   VERBATIM.   THAT'S WHAT WAS SENT TO DANNY VALENTINI.   IT'S THIS

          10   PARAGRAPH, SIR.

          11           THE COURT:   ARE YOU GOING TO ASK SOMEONE THAT

          12   RECEIVED THIS THAT CAN TESTIFY TO THIS?

          13           MR. GARRISON:   HE SENT IT.

          14           MR. KAUFMAN:   HE DIDN'T SEND IT.   WHERE DOES IT SAY

13:43:52  15   HE SENT IT?   TO WHO?

          16           MR. TEEPLE:   THAT'S NOT THE TRANSMISSION.   IT'S FROM

          17   MICHAEL YIP.

          18           MR. GARRISON:   NO, NO.   DANNY VALENTINI SENT IT.

          19           MR. KAUFMAN:   TO WHO?

          20           MR. TEEPLE:   TO MARK BUCHANAN.

          21           MR. KAUFMAN:   HOW DO YOU KNOW THAT?

          22           MR. TEEPLE:   BECAUSE MARK BUCHANAN DID TESTIFY.

          23           MR. KAUFMAN:   WHY DOESN'T MARK BUCHANAN TESTIFY?

          24           MR. TEEPLE:   HE IS.

          25           MR. KAUFMAN:   I DON'T THINK IT'S IMPEACHMENT.

13:43:53  1   THERE'S NO FOUNDATION.  THIS HAS NOTHING TO DO WITH KELLY

        2   BUTLER WHICH IS THE PLAINTIFF IN THIS CASE.  THERE'S NOTHING

        3   HERE THAT SHOWS SHE HAD ANYTHING LIKE THIS THAT SHE SIGNED.

        4         THE COURT:  I HAVEN'T READ THIS.  IS THIS TO PEOPLE

        5   AS A WHOLE, OR IS THIS AS TO ONE INDIVIDUAL?

        6         MR. TEEPLE:  THIS WAS SENT TO ONE HMC, ONE

        7   INDIVIDUAL, AND THEY SAY WE'RE GOING TO GIVE YOU AN HMA, AND IT

        8   DESCRIBES WHAT HMA'S DO AT THAT TIME.

        9         THE COURT:  THE PROBLEM I HAVE WHEN SOMETHING COMES

       10   OUT OF THE BLUE -- LET ME READ IT FIRST.

       11         MR. KAUFMAN:  SURE.

       12         THE COURT:  DANNY VALENTINI WAS CC'D ON IT, BUT IT

       13   WAS PRIMARILY TO SANDRA MC -- WHOEVER THAT IS.

       14         MR. TEEPLE:  THIS IS A TRANSMISSION FROM DANNY

13:43:54 15   VALENTINI AND TO MARK BUCHANAN.

       16         MR. GARRISON:  HE FORWARD THIS WHOLE PACKAGE TO MARK

       17   BUCHANAN.  WE DIDN'T KNOW --

       18         THE COURT:  WAIT A MINUTE.  IT'S TOO HARD FOR HER TO

       19   PICK IT UP WHEN EVERYONE IS TALKING.  ALL RIGHT.  IMPEACHMENT

       20   CAN BE FROM ANY SOURCE.  SO THE FACT THAT IT'S NOT PART OF THE

       21   EXHIBITS IS KIND OF IRRELEVANT.  THE QUESTION IS WHETHER IT

       22   REALLY APPLIES TO KELLY WHO IS NOT INVOLVED IN THIS.  THE ONLY

       23   WAY I THINK WE CAN FIND THAT OUT IS ASK MR. VALENTINI IF, YOU

       24   KNOW, WHAT THIS IS ALL ABOUT.  LET HIM EXPLAIN.  I THINK YOU

       25   GOT TO LAY A FOUNDATION WITH HIM FIRST, AND THEN ASK HIM.

```
13:43:54   1              MR. TEEPLE:  THANK YOU.

           2              MR. KAUFMAN:  ONE LAST THING BEFORE WE GO OFF.  THEY

           3    HAVE HER PERSONNEL FILE.  SO IF SHE, KELLY BUTLER, HAD A

           4    DOCUMENT LIKE THIS, IT WOULD BE IN THERE, AND IT'S NOT.  SO

           5    EVEN IF THIS SOMEHOW APPLIED TO MARK BUCHANAN AND HIS HOME

           6    MORTGAGE ASSOCIATE, I DON'T KNOW HOW IT HAS TO DO WITH THIS

           7    CASE.

           8              THE COURT:  I UNDERSTAND, BUT WE WILL GIVE HIM AN

           9    OPPORTUNITY TO ASK IT, AND IN YOUR CROSS-EXAMINATION YOU CAN

          10    BRING ALL THIS OUT.

          11              MR. KAUFMAN:  OKAY.

          12              (END OF SIDEBAR DISCUSSION.)

          13    BY MR. TEEPLE:

          14    Q.  MAY I APPROACH THE WITNESS?  SIR, I WANT TO SHOW YOU WHAT'S

13:44:11  15    MARKED FOR ONLY IDENTIFICATION AT THIS TIME AS ITEM 35.  DO YOU

          16    SEE THAT, SIR?

          17    A.  YES.

          18    Q.  DO YOU SEE THAT?  AND YOU'RE DANNY VALENTINI, SVP, REGIONAL

          19    MANAGER; FAIR TO SAY?

          20    A.  YES.

          21    Q.  AND WHO IS MARK BUCHANAN?

          22    A.  FORMER LOAN OFFICER AT OUR MISSION VALLEY OFFICE.

          23    Q.  DID YOU EVER HAVE OCCASION TO TRANSMIT TO HIM -- IF YOU

          24    LOOK, THERE IS AN ATTACHMENT B ABOUT THREE PAGES IN -- AN

          25    INCENTIVE COMPENSATION PLAN?
```

13:44:52   1   A.   OKAY.   YES.

           2   Q.   DO YOU RECOGNIZE THAT, SIR?

           3   A.   I SEE IT HERE.

           4   Q.   DO YOU RECOGNIZE IT?

           5   A.   THEY CHANGED OVER THE YEARS BUT.

           6   Q.   AND 2008, AN HMA, DID THEY ALL HAVE THE SAME DUTIES ACROSS

           7   YOUR BRANCH?

           8   A.   GENERALLY SPEAKING, YES.

           9   Q.   OKAY.   AND YOU WOULD GIVE HMC'S, LIKE MR. BUCHANAN, AN HMA

          10   JUST LIKE MR. OLMSTED HAD MS. BUTLER; FAIR TO SAY?   YES?

          11   A.   YES.

          12   Q.   AND AS YOU SIT HERE TODAY IS THERE ANY REASON FOR YOU TO

          13   BELIEVE THAT THE HMA'S THAT YOU WOULD GIVE TO MR. BUCHANAN

          14   WOULD HAVE DIFFERENT DUTIES THAN MR. OLMSTED?   SAME DUTIES,

13:45:42  15   RIGHT?

          16   A.   THERE'S IN NUANCES DEPENDING ON THE RELATIONSHIP OF THOSE

          17   TWO INDIVIDUALS.   THERE'S SOME FUNCTIONS THAT COULD BE A LITTLE

          18   DIFFERENT FROM PAIR TO PAIR.   BUT GENERALLY SPEAKING, THE

          19   FUNCTION OF THE LOAN OFFICER IS TO SOLICIT BUSINESS, QUOTE

          20   RATES, MEET WITH THE CLIENT, SOLICIT BUSINESS FROM REALTORS;

          21   AND THE HMA IS ONE THAT WOULD HELP MORE OF THE PROCESSING, MORE

          22   OF THE PAPERWORK, FORMS, SUBMISSIONS, FOLLOW THROUGH WITH THE

          23   CONDITIONS.

          24   Q.   OKAY.   YOUR HONOR, I MOVE IN EXHIBIT 35.

          25             THE COURT:   I THINK YOU NEED TO ASK A FEW MORE

13:46:29   1   FOUNDATIONAL QUESTIONS.

2          MR. TEEPLE:  VERY FINE.

3   BY MR. TEEPLE:

4   Q.   SO THE HMA'S GENERALLY HAD THE SAME DUTIES ACROSS YOUR

5   BRANCHES IN 2007 AND '8, FAIR TO SAY?

6   A.   THEY WERE PRIMARILY IN THE PROCESSING OF THE LOAN.

7   Q.   YOU SHOULD BE ABLE TO TAKE ONE HMA OUT OF ONE BRANCH, LIKE

8   MS. KELLY BUTLER, AND DROP HER IN ANOTHER HMA BRANCH LIKE MR.

9   BUCHANAN'S, AND IN A THEORY, THEY WOULD BE EQUIPPED TO DO THE

10  SAME THING; IS THAT FAIR TO SAY?

11  A.   THEORETICALLY, YES.

12  Q.   YOUR HONOR, I MAY HAVE EXHAUSTED MY FOUNDATION.

13         THE COURT:  I THINK WHEN IT COMES WITH A DOCUMENT

14  LIKE THIS, YOU NEED TO GET RIGHT TO THE POINT.  DID THIS APPLY

13:47:31  15  TO YOUR CLIENT, AS FAR AS HE KNOWS?

16         MR. TEEPLE:  I'M OFFERING IT TO DEFINE THE POSITION

17  HMA ACROSS THE BRANCHES.  THAT'S HOW IT IS USED.

18         THE COURT:  ALL RIGHT.  I GUESS HE ANSWERED YES TO

19  THAT.  SO I ASSUME THAT WOULD BE SUFFICIENT THEN.

20         MR. TEEPLE:  ALL RIGHT.  MAY I PUBLISH IT?

21         THE COURT:  YES.

22         MR. TEEPLE:  THANK YOU, YOUR HONOR.

23  BY MR. TEEPLE:

24  Q.   I REPRESENT TO THE JURY IT'S AN E-MAIL TO MR. VALENTINI.

25  I'M GOING TO GET RIGHT TO THE HEART OF THE MATTER AND GET

13:48:04  1   THROUGH THIS.  SEE IF I CAN ZOOM IN ON THIS.  HOMESERVICES

2   LENDING INCENTIVE COMPENSATION PLAN.  DOES THIS TELL THE HMC'S

3   HOW THEY'RE GOING TO BE COMPENSATED, THIS DOCUMENT, SIR?

4   A.  THIS IS THE 2007 COMPENSATION PLAN FOR HMA'S?

5   Q.  YEAH, AND THIS GENERALLY DESCRIBES WHAT YOU'RE GOING TO

6   PROVIDE FOR THEM?

7   A.  IT'S 2007, BUT I ASSUME IT DOES.

8   Q.  AND LOOKING HERE IT SAYS KIND OF HIGHLIGHTED -- LET ME MOVE

9   IT OVER.  "UPON REQUEST BY EMPLOYEE," THAT WOULD BE THE HMC,

10  FAIR TO SAY?

11  A.  I WOULD ASSUME THAT, YES.

12  Q.  "HOMESERVICES LENDING OR A PARTICIPATING EMPLOYER HAS HIRED

13  A MORTGAGE ASSISTANT OR ASSOCIATE, HMA, TO ASSIST THE HOME

14  MORTGAGE CONSULTANT," I'M GOING TO SAY THAT'S HMC, "SALES

13:49:05  15  MANAGER OR BRANCH SALES MANAGER BY PERFORMING SALES RELATED

16  FUNCTIONS."  DO YOU SEE THAT, SIR?

17  A.  YES.

18  Q.  DID YOU EVER TELL ANYONE THAT THIS SENTENCE I JUST READ WAS

19  INACCURATE?

20  A.  THE WAY I READ THIS AND THE WAY HMA'S FUNCTION, THEY ARE

21  PART OF THE AGENCY'S SUPPORT FOR SALES ACTIVITIES.  BUT, BUT,

22  WHAT THEY DO IS PROCESS LOANS.  THEY TAKE INFORMATION.  THEY DO

23  NOT DO THE SALES ACTIVITIES THAT THE HMC'S DO WHICH IS

24  SOLICITING BUSINESS, TALKING TO AGENTS, MEETING WITH CLIENTS

25  AND SO FORTH.  THEY DON'T QUOTE RATES.  THEY DON'T LOCK IN

13:49:52    1   LOANS.  THEY DON'T DO ANY OF THAT.  IT'S PRIMARILY A SUPPORTIVE

            2   POSITION FOR THE HMC.

            3   Q.  SO IF MS. BUTLER AND MR. OLMSTED CAME AND SAID THAT MS.

            4   BUTLER DID ALL OF THOSE THINGS, SHE SHOULDN'T HAVE BEEN DOING

            5   THEM THEN; IS THAT YOUR VIEW?

            6   A.  I DON'T THINK SHE DID THOSE THINGS.

            7   Q.  YOU DON'T THINK SHE WAS MEETING THE AGENTS IN THAT BIG

            8   OFFICE AND TALKING WITH THEM ABOUT RATES?

            9   A.  JIM OLMSTED WAS THE HMC.

           10   Q.  I APOLOGIZE?

           11   A.  JIM OLMSTED WAS THE HMC.

           12   Q.  I DIDN'T ASK WHO THE HMC WAS.

           13   A.  THE PIPELINE IS UNDER JIM OLMSTED --

           14   Q.  MAY I ASK A QUESTION?  IS IT YOUR TESTIMONY THAT -- ARE YOU

13:50:29   15   AWARE OF ANY FACT THAT SUGGEST TO YOU THAT KELLY BUTLER WASN'T

           16   TALKING TO THE REAL ESTATE AGENTS EVERY DAY AT HER WORKPLACE?

           17   A.  I'M SURE SHE TALKED TO REAL ESTATE AGENTS, BUT I WOULDN'T

           18   CONSIDER THAT NECESSARILY A SALES FUNCTION.

           19   Q.  ARE YOU AWARE OF THE FACT THAT WAS HAVING A RELATIONSHIP

           20   WITH THE REAL ESTATE AGENTS IMPORTANT TO GETTING BUSINESS?

           21   A.  SHE'S A SUPPORT MECHANISM FOR THE HMC THAT IS RESPONSIBLE

           22   FOR THE SALES FUNCTIONS.

           23   Q.  LISTEN CAREFULLY TO MY QUESTION.  I KNOW THAT'S PROBABLY

           24   TRUE, BUT THAT DOESN'T HAVE ANYTHING TO DO WITH MY QUESTION.

           25   DO YOU BELIEVE HAVING A RELATIONSHIP WITH THE REAL ESTATE

13:51:02   1   PEOPLE IS IMPORTANT TO GENERATING BUSINESS?  YES OR NO?

2   A.   YES, GENERALLY YES.

3   Q.   DO YOU KNOW THAT KELLY DID THAT?

4   A.   I DON'T KNOW BECAUSE I WASN'T IN LAGUNA NIGUEL EVERY DAY.

5   Q.   DO YOU KNOW ANYTHING ABOUT WHAT HER DAY TO DAY ACTIVITIES

6   WERE IN LAGUNA NIGUEL RATHER THAN ME GOING THROUGH THEM ALL?

7   IS IT FAIR TO SAY YOU JUST DON'T KNOW WHAT SHE WAS DOING UP

8   THERE?

9   A.   AGAIN, I WOULD SUPERVISE -- I WOULD TRACK THEIR BUSINESS

10   THROUGH REPORTS, THROUGH THE NUMBER OF LOANS, THROUGH THE

11   CUSTOMER SERVICE SCORES AND SO FORTH.

12   Q.   I DIDN'T ASK YOU, SIR, HOW YOU TRACKED THEIR PRODUCTIVITY.

13   I'M ASKING, WHEN KELLY GOT THERE AT 9:00 IN THE MORNING WITH

14   THE OTHER REAL ESTATE AGENTS, WHEN THEY'RE THERE WITH HER

13:51:46  15   THROUGH THE DAY, DO YOU KNOW WHAT SHE WAS DOING?

16   A.   OBVIOUSLY, IF I'M 45 MINUTES AWAY, 60 MILES AWAY, I

17   WOULDN'T KNOW WHAT SHE'S DOING AT THAT PARTICULAR MOMENT IN

18   TIME, NO.

19   Q.   THAT'S TRUE THE WHOLE TIME SHE WAS WORKING THERE; IS THAT

20   FAIR TO SAY?

21   A.   UNLESS I WAS THERE SUPERVISING, YES.

22   Q.   WHICH WAS NEVER, RIGHT?

23   A.   I WOULD VISIT THEM ONCE IN A WHILE.

24   Q.   YOU KNOW MARK BUCHANAN, RIGHT?

25   A.   YES.

13:52:44   1    Q.  YOU HAD FREQUENT CONTACT WITH HIM BECAUSE YOU WERE

           2    SUPERVISING HIM AS AN HMC, FAIR TO SAY?

           3    A.  HE WAS IN SAN DIEGO.  SO IT WAS EASIER FOR ME TO VISIT THAT

           4    OFFICE.

           5    Q.  DID YOU EVER FORWARD MARK BUCHANAN E-MAILS FROM TODD

           6    JOHNSON?

           7    A.  I DON'T RECOLLECT.  I MAY HAVE.

           8    Q.  DO YOU RECALL BEING REPRIMANDED BY TODD JOHNSON FOR PAYING

           9    TOO MUCH OVERTIME, THAT YOUR BRANCH HAD THE HIGHEST OVERTIME OF

          10    ANY BRANCH?

          11    A.  NO.

          12              MR. KAUFMAN:  OBJECTION, YOUR HONOR.  VAGUE AS TO

          13    TIME.  WE'RE TALKING ABOUT 2011.  I BELIEVE PLAINTIFF'S COUNSEL

          14    HAS TAKEN A POSITION THAT THAT WHOLE PERIOD --

13:53:25  15              THE COURT:  LAY A FOUNDATION AS TO TIME.

          16    BY MR. TEEPLE:

          17    Q.  WERE YOU EVER REPRIMANDED FOR ISSUING TOO MUCH OVERTIME?

          18    A.  NO.

          19    Q.  DID TODD JOHNSON EVER TELL YOU THAT YOU NEEDED TO USE BEST

          20    PRACTICES TO ENSURE CONTINUED INCOME FOR HSL WITH RESPECT TO

          21    MINIMIZING OVERTIME?

          22    A.  I DON'T RECOLLECT THAT SPECIFIC COMMENT, NO.

          23    Q.  ISN'T IT TRUE THAT YOU TOLD MARK BUCHANAN THAT IF YOU PAID

          24    OUT OVERTIME THAT TODD JOHNSON WOULD FIRE YOU?

          25    A.  NO.

13:53:59  1    Q.  I WOULD LIKE TO HAVE THE WITNESS LOOK AT EXHIBIT 12.  DO

          2    YOU ANY OBJECTION?

          3              MR. KAUFMAN:  NO.  I HAVE NO OBJECTION.

          4              MR. TEEPLE:  MAY I MOVE IT INTO EVIDENCE, YOUR

          5    HONOR?

          6              THE COURT:  EXHIBIT 12?

          7              MR. KAUFMAN:  NO OBJECTION.

          8              THE COURT:  ALL RIGHT.  BE ENTERED.

          9              (EXHIBIT 12 ADMITTED.)

         10    BY MR. TEEPLE:

         11    Q.  WOULD YOU SCROLL UP A LITTLE BIT PLEASE?  ALL THE WAY, TO

         12    THE BOTTOM -- NOW, WHO IS LAURA DAWSON?

         13    A.  LAURA DAWSON IS MARK BUCHANAN'S HMA.

         14    Q.  MUCH LIKE KELLY BUTLER IN TERMS OF CAPACITY AND DUTY?

13:55:11 15    A.  CORRECT.

         16    Q.  DO YOU SEE AT THE BOTTOM OF THE STRING IT'S SENT TO MARK?

         17    "SINCE I HAVE SO MANY THINGS, CAN I GET OVERTIME THIS WEEKEND?"

         18    CAN YOU SCROLL UP?  AND THEN MARK SENDS A QUESTION MARK,

         19    FORWARDS IT TO YOU WITH A QUESTION MARK.  DO YOU SEE THAT,

         20    SIR?

         21    A.  YES.

         22    Q.  AND LET'S SCROLL UP A LITTLE FURTHER.  AND YOU SAY, "YES,

         23    LET'S'S GO WITH FIVE TO SIX HOURS.  I KNOW TODD HAS SENT AN

         24    E-MAIL REQUESTING WE DO NOT ISSUE OVERTIME.  LESS GO FOR FIVE

         25    OR SIX HOURS.  OKAY."  MR. VALENTINI, IS THAT A TRUE STATEMENT?

13:55:50  1   DID TODD SEND YOU AN E-MAIL REQUESTING THAT YOU DO NOT ISSUE

2   OVERTIME?

3   A.   READING THIS, THAT'S NOT WHAT I MEANT IN MY E-MAIL.   WHAT I

4   MEANT TO EMPHASIZE IS WE NEED TO GET PRIOR APPROVAL FOR THAT.

5   Q.   IS IT FAIR TO SAY THAT BETWEEN 2008 TO 2010 YOU TOLD MARK

6   BUCHANAN THAT YOU COULD NOT PAY HIM OVERTIME BECAUSE TODD

7   JOHNSON WOULD NOT ALLOW IT; IS THAT TRUE OR FALSE?

8   A.   I DON'T RECOLLECT THAT AT ALL.

9   Q.   IS IT THAT YOU JUST DON'T REMEMBER, OR IT COULDN'T HAVE

10   HAPPENED?

11   A.   NO.

12   Q.   IT DIDN'T HAPPEN; OKAY.   DID YOU TALK WITH LAURA DAWSON

13   EVER ABOUT OVERTIME?

14   A.   I CAN'T SAY THAT I REMEMBER EVER DOING THAT EXCEPT THROUGH

13:56:43  15   E-MAILS AND REQUEST.

16   Q.   DID YOU EVER TELL LAURA DAWSON THAT YOU COULD NOT PAY ALL

17   THE OVERTIME THAT SHE WORKED?

18   A.   NO.

19   Q.   DID YOU EVER TELL HER YOU COULDN'T PAY HER ALL THE OVERTIME

20   SHE WORKED, AND IF SHE DIDN'T LIKE IT, SHE COULD LEAVE?

21   A.   I DON'T, I DON'T, NO.

22   Q.   DID LAURA LEAVE, IF YOU KNOW?

23   A.   SHE LEFT AFTER MARK DID.

24   Q.   DID LAURA EVER WRITE YOU A LETTER ABOUT OVERTIME?

25   A.   THERE WAS ONE LETTER THAT I SAW IN THE DEPOSITION THAT SHE

13:57:17   1    WROTE THE DAY THAT SHE LEFT I BELIEVE.

           2    Q.   THE NEXT EXHIBIT I'D LIKE TO HAVE IN EVIDENCE IS 48.  OH,

           3    IT'S NOT 48.  OH, EXHIBIT 8.

           4           MR. KAUFMAN:  NO OBJECTION.

           5           THE COURT:  ALL RIGHT.

           6           MR. TEEPLE:  MOVE IT INTO EVIDENCE, YOUR HONOR.

           7           THE COURT:  YES.

           8           MR. TEEPLE:  THANK YOU.

           9           (EXHIBIT 8 ADMITTED.)

          10    BY MR. TEEPLE:

          11    Q.   FROM LAURA TO YOU, SCROLL UP A LITTLE BIT.  THERE YOU GO.

          12    FIRST PARAGRAPH.  FIRST FULL PARAGRAPH.  "AS WE DISCUSSED

          13    YESTERDAY, YOU ARE AWARE THAT I HAVE BEEN WORKING UNPAID

          14    OVERTIME SINCE I JOINED HOMESERVICES LENDING.  YOU HAVE

13:58:13  15    RECENTLY ASSIGNED ME TO WORK WITH GREG AND TIM TELLING ME

          16    THINGS WILL BE DIFFERENT.  THEY AREN'T.  I AM STILL BEING

          17    EXPECTED TO WORK LONG DAYS WITHOUT BEING PAID OVERTIME."  DO

          18    YOU RECALL GETTING THAT LETTER, SIR?

          19    A.   I DO RECALL, YES.

          20    Q.   IS THAT YOUR RECOLLECTION THAT SHE WAS WORKING LONG DAYS

          21    WITHOUT BEING PAID OVERTIME?

          22    A.   NO.

          23    Q.   DO YOU BELIEVE SHE WAS MISSTATING THIS?

          24    A.   WHEN I RECEIVED THIS LETTER, I THOUGHT, QUITE FRANKLY, IT

          25    WAS A SETUP FOR HER LEAVING THAT DAY, AND THREE DAYS LATER

13:58:41   1   THERE WAS A LAWSUIT FROM ALL THE PLAINTIFFS THAT YOU'RE

2   REPRESENTING.

3   Q.   OKAY.   DO YOU KNOW TONI MCGRAW?

4   A.   YES.

5   Q.   WHO IS THAT?

6   A.   HMA

7   Q.   FOR WHO?

8   A.   SHE WAS MOVED FROM ONE AGENCY TO ANOTHER.   THERE WERE A

9   COUPLE TIMES, PERIODS, WHERE SHE LEFT THE COMPANY, CAME BACK.

10   SHE WAS A JUNIOR AGENCY AT ONE POINT IN TIME.   SO THERE WERE

11   SOME CHANGES WITH TONI.

12   Q.   I'D LIKE TO MOVE IN EXHIBIT 16 IF COUNSEL WILL LET ME KNOW

13   IF THEY HAVE AN OBJECTION.

14           MR. KAUFMAN:   NO OBJECTIONS.

13:59:20  15           MR. TEEPLE:   MAY I MOVE IT INTO EVIDENCE, YOUR

16   HONOR?

17           THE COURT:   YES.

18           (EXHIBIT 16 ADMITTED.)

19   BY MR. TEEPLE:

20   Q.   SO WE HAVE EXHIBIT 16.   LET'S START FROM THE BOTTOM.   IT

21   STARTS WITH, "IS THAT FOR TWO WEEKS OR ONE?"  AND THEN TONI

22   ANSWERS BACK, "I USUALLY WORK 8 A.M. TO 7:30.   SOMETIMES I'M

23   HERE UNTIL 10:00 OR 10:30.   I COME IN AT 6:30 A.M. A COUPLE

24   DAYS A WEEK IF I CAN'T STAY LATE AND I HAVE WORKED THREE HOURS

25   EVERY SATURDAY FOR THE PAST FOUR WEEKS," EQUALS 12 HOURS, "WE

14:00:00  1  ARE ROCKING THIS MONTH.  I DO THE SUBMISSION AND PRE-QUALS

2  AFTER HOURS BECAUSE THE PHONES ARE NOT RINGING.  IT'S REALLY

3  BUSY DURING THE DAY."  YOU WRITE, "OKAY, PUT IN EIGHT HOURS".

4      NOW HE JUST TOLD YOU HE WORKED 12 HOURS, RIGHT?

5          MR. KAUFMAN:  SHE.

6  BY MR. TEEPLE:

7  Q.  SHE.  TONI WITH AN "I."  SHE TOLD YOU SHE PUT IN 12 HOURS,

8  RIGHT?

9  A.  IF I READ THAT E-MAIL CAREFULLY, OBVIOUSLY SHE HAD SOME

10  SENTENCES IN THERE, BUT I KNOW WHEN I READ THAT E-MAIL, AND I

11  ANSWERED BACK, I THOUGHT I WAS GIVING HER EXACTLY WHAT SHE WAS

12  ASKING FOR.

13  Q.  SO IT WAS A MATH ERROR ON YOUR PART?

14  A.  I GO THROUGH E-MAILS.  THERE'S A NUMBER OF E-MAILS THAT I

14:00:46  15  WORK WITH EVERY SINGLE DAY, OVER A HUNDRED I RESPOND TO, AND

16  THAT MAY HAVE BEEN QUICK, AND I THOUGHT I GAVE HER WHAT SHE WAS

17  ASKING FOR.

18  Q.  CAN YOU SCROLL DOWN TO THE BOTTOM?

19  A.  I WOULD NOT DENY ANY OVERTIME REQUEST FOR TONI.  I NEVER

20  DID.

21  Q.  WELL, IT SAYS THERE, "THREE HOURS EVERY SATURDAY FOR THE

22  PAST FOUR WEEKS," THAT WOULD BE 12 HOURS.  IS THAT YOUR

23  HANDWRITING THERE?  IT SAYS "12 HOURS."

24  A.  I DON'T THINK IT'S MY HANDWRITING.

25  Q.  BUT WE HAVE THE OTHER PART -- HE USUALLY WORKS FROM 8:00

14:01:26   1   A.M. TO 7:00/7:30.  DO YOU SEE THAT?  IF THAT'S THE TIME YOU

           2   USUALLY WORK, THAT'S GOING TO EXCEED 40 HOURS, ISN'T IT?

           3   A.  I'M TRYING TO PUT THIS IN CONTEXT.  SOMETIMES SOMEONE WILL

           4   CALL ME, AND WE TALK ABOUT IT VERBALLY.  SO WHEN I RECEIVE AN

           5   E-MAIL AT WHATEVER TIME OF THE DAY, I ASSUME THAT'S WHAT

           6   THEY'RE E-MAILING ABOUT, AND I JUST APPROVE WHAT I THINK

           7   THEY'RE LOOKING FOR AND WHAT THEY'RE REQUESTING.

           8   Q.  SO YOU LOOK AT THE E-MAIL THAT SAID 8:00 A.M. TO 7:00 AT

           9   NIGHT AND THOUGHT AND THAT THAT'S THEIR USUALLY WORK PERIOD,

          10   AND YOU THOUGHT THEY WERE ONLY ASKING FOR EIGHT HOURS; IS THAT

          11   FAIR TO SAY?

          12   A.  I DID NOT DO THE MATHEMATICAL CALCULATION ON THAT E-MAIL.

          13   Q.  WHAT DID YOU DO TO INVESTIGATE AND MAKE SURE THEY WERE ONLY

          14   WORKING 40-HOUR WEEKS AFTER YOU GOT THAT E-MAIL?  WHAT STEPS

14:02:14  15   DID YOU TAKE?

          16   A.  I ALWAYS EXPECT THE EMPLOYEES WILL MARK DOWN THE HOURS THAT

          17   THEY WORK.

          18   Q.  MOVE TO STRIKE AS NONRESPONSIVE.

          19        THE COURT:  ALL RIGHT.  IT WILL BE STRUCK.

          20   BY MR. TEEPLE:

          21   Q.  I'D LIKE YOU TO ANSWER MY QUESTION, SIR.  WHAT STEPS, IF

          22   ANY -- YOU DIDN'T TAKE ANY STEPS TO INVESTIGATE OVERTIME WITH

          23   TONI MCGRAW, DID YOU?

          24   A.  I THOUGHT I GAVE HER WHAT SHE WAS REQUESTING, EIGHT HOURS,

          25   AND THAT WAS IT.

14:02:43  1    Q.  DID YOU TAKE ANY STEPS TO INVESTIGATE, SIR?

        2    A.  NOT IN THIS SPECIFIC INCIDENT.

        3    Q.  EVER?

        4    A.  I DON'T RECALL ANY OTHER INSTANCES WITH THIS SITUATION.

        5    Q.  HOW ABOUT THE 900 PHONE CALLS THAT CAME FROM BEFORE 9:00

        6    A.M. AND AFTER 5:00 P.M. WITH RESPECT TO MS. BUTLER?  DID YOU

        7    EVER DO ANYTHING TO FIGURE OUT IF SHE WAS WORKING OVERTIME?

        8            MR. KAUFMAN:  OBJECTION, YOUR HONOR.  I THINK HE

        9    ALREADY STATED THIS.  MISCHARACTERIZED --

       10            THE COURT:  SUSTAINED.

       11    BY MR. TEEPLE:

       12    Q.  WHAT ABOUT ALL THE CALLS YOU GOT FROM MS. BUTLER EARLY IN

       13    THE MORNINGS AND LATE IN THE EVENINGS; DID THAT EVER MAKE YOU

       14    CURIOUS AS TO WHETHER OR NOT SHE'S WORKING MORE THAN 40

14:03:25 15    HOURS?

       16    A.  I DON'T KNOW HOW LONG THAT CALL WOULD BE.  I DON'T KNOW IF

       17    THAT'S SOMETHING THAT SHE'S WORKING OR NOT.

       18    Q.  SINCE YOU DON'T KNOW, DID YOU DO ANYTHING TO CHECK?

       19    A.  FOR A PHONE CALL THAT LASTS FOR ONE MINUTE OR A VOICE MAIL?

       20    Q.  FOR ALL OF THE CALLS YOU EVER GOT, DID YOU EVER DO ANYTHING

       21    TO CHECK TO SEE IF SHE WAS WORKING OVERTIME?

       22    A.  I DIDN'T HAVE THE BENEFIT OF A REPORT THAT HAD 900 CALLS

       23    TRACKED.

       24    Q.  IT'S JUST A YES-OR-NO QUESTION.  DID YOU EVER DO ANYTHING

       25    TO INVESTIGATE WHETHER MS. BUTLER WAS WORKING OVERTIME?  YES OR

14:03:59   1    NO?

2    A.  I WOULD NOT HAVE THAT FOCUS TO CHECK IF SOMEBODY WORKED

3    OVERTIME IF IT WAS A VOICEMAIL LEFT ON MY PHONE OR IF I LEFT A

4    VOICEMAIL ON HER PHONE FOR ONE MINUTE.  I WOULDN'T THINK OF

5    OVERTIME ISSUES AT THAT PARTICULAR POINT IN TIME.

6    Q.  DID YOU EVER DO ANYTHING TO INVESTIGATE, SIR?  YES OR NO?

7            THE COURT:  IT'S AMBIGUOUS.  ARE YOU TALKING ABOUT

8    INVESTIGATE AS IT RELATES TO THE 900 PHONE CALLS OR INVESTIGATE

9    AS AS TO WHETHER OR NOT KELLY WAS WORKING OVERTIME?

10           MR. TEEPLE:  YES, THE BROADER QUESTION.  AND LET ME

11   REPHRASE HIS HONOR'S QUESTION BECAUSE IT'S EXACTLY THE QUESTION

12   I INTENDED.

13   BY MR. TEEPLE:

14   Q.  FOR ANY REASON, DID YOU EVER DO ANYTHING TO INVESTIGATE

14:04:40  15   WHETHER OR NOT MS. BUTLER WAS WORKING OVERTIME?

16   A.  WITHIN THE CONTEXT OF THE THE 900 CALLS?

17   Q.  FOR ANY REASON.  I JUST SAID FOR ANY REASON.

18   A.  I CAN'T RECOLLECT DOING THAT.

19   Q.  DO YOU KNOW SHERI CLARK?

20   A.  YES.

21   Q.  SHE WAS AN HMA THAT YOU SUPERVISED FROM 2008 THROUGH

22   2011?

23   A.  YES.

24   Q.  DID YOU DISCUSS OVERTIME WITH SHERI CLARK?

25   A.  I DON'T RECOLLECT.

14:05:15   1   Q.  DID YOU TELL SHERI CLARK YOU COULD NOT PAY OVERTIME WORKED

2   BECAUSE TODD JOHNSON WOULDN'T ALLOW IT?

3   A.  NO.

4   Q.  LET'S LOOK AT EXHIBIT 9.

5            MR. KAUFMAN:  NO OBJECTION.

6            MR. TEEPLE:  I MOVE EXHIBIT 9 IN, YOUR HONOR.

7            THE COURT:  ALL RIGHT.  ADMITTED.

8            (EXHIBIT 9 ADMITTED.)

9   BY MR. TEEPLE:

10   Q.  THIS IS ANOTHER ONE.  WE'LL START AT THE BOTTOM.  "SHERI, I

11   THOUGHT I APPROVED SEVEN TO NINE HOURS.  I WAS ASKED ABOUT THE

12   14.5 HOURS."  SHE REPLIES, "I E-MAILED YOU THE HOURS AND WHY ON

13   THE 6TH AND 7TH, AND WE TALKED ABOUT 15 HOURS WHEN WE HAD LUNCH

14   ON THE 12TH.  I SAID I WAS ALREADY UP TO 15 HOURS FROM THE WEEK

14:06:35  15   BEFORE AND I WOULD TRY NOT TO LIST ANY MORE THAN THAT, AND YOU

16   SAID YOU SAW THE E-MAILS.  I ACTUALLY HAD AN ADDITIONAL EIGHT

17   LAST WEEK THAT I DID NOT LIST."

18            SO DO YOU RECALL TALKING WITH HER ABOUT THE 15 HOURS

19   THAT SHE RECITES HERE IN THE E-MAIL, SIR?

20   A.  THIS IS PROBABLY IN THE CONTEXT OF DOHERTY JUST CALLING OR

21   CHECKING TO SEE IF THIS WAS CORRECT, AND I PROBABLY WAS

22   FOLLOWING UP ON THAT.

23   Q.  MY QUESTION IS SIMPLE.  DO YOU RECALL THE CONVERSATION WITH

24   SHERI ABOUT THE 15 HOURS?

25   A.  I DON'T RECOLLECT THE CONVERSATION, BUT I SEE THE E-MAIL

14:07:13   1    HERE.

2    Q.   DOES THAT REFRESH YOUR RECOLLECTION?

3    A.   OBVIOUSLY THERE'S AN E-MAIL THERE.

4    Q.   LET'S GO TAKE IT TO THE TOP PLEASE.   YOU WRITE, "NOW THAT

5    GOSSARD IS OFF YOUR TABLE, I HOPE WE CAN CUT THE OT HOURS.   I

6    APPROVED THE OT AT 14.5 HOURS. THANKS."   DO YOU SEE THAT?

7    A.   YES.

8    Q.   SO SHE DISCUSSES THE 15 WITH YOU AND MENTIONS IN THE E-MAIL

9    SHE WORKED ANOTHER EIGHT.   IS THERE ANY OTHER REASON YOU DIDN'T

10    MAKE SURE SHE WAS PAID THAT OTHER EIGHT?

11    A.   I THOUGHT SHE HAD MARKED ALL THOSE DOWN QUITE FRANKLY.   I

12    APPROVED WHAT I THOUGHT SHE WAS ASKING FOR, SIR.

13    Q.   ONCE YOU HEARD SHE WORKED THOSE ADDITIONAL EIGHT, DID YOU

14    TAKE ANY ACTIONS STEP TO MAKE SURE SHE WAS PAID FOR THOSE

14:08:07  15    ADDITIONAL EIGHT?

16    A.   I DID NOT.

17    Q.   THANK YOU.

18    A.   BUT I DID APPROVE THE 14-AND-A-HALF THAT I APPARENTLY

19    DIDN'T KNOW ABOUT.

20    Q.   DID YOU EVER MEET WITH MIKE REZA?

21    A.   YES.

22    Q.   DID YOU EVER MEET WITH HIM REGARDING TIME CARD REVIEW, AND

23    DID HE EVER TELL YOU THAT YOU NEED TO BE REVIEWING THE TIME

24    CARDS?

25    A.   NO.

14:08:35   1    Q.   DID -- I CALL HER R.V.K., BUT IT'S RACHEL VOGES-KELSO.

          2    SHE'S THE LADY FROM DOHERTY, RIGHT?

          3    A.   CORRECT.

          4    Q.   DID SHE EVER TELL YOU YOU HAD TO BE REVIEWING AND APPROVING

          5    TIME CARDS PRIOR TO 2011?

          6    A.   AS I SAID, MY EXPECTATIONS WERE THAT I WASN'T TO REVIEW, I

          7    DIDN'T NEED TO REVIEW OR APPROVE TIME CARDS.

          8    Q.   DO WE HAVE EXHIBIT 5 IN?

          9              MR. KAUFMAN:   NO OBJECTIONS.

         10              MR. TEEPLE:   I MOVE IN EXHIBIT 5, YOUR HONOR.

         11              THE COURT:   BE ENTERED.

         12              (EXHIBIT 5 ADMITTED.)

         13    BY MR. TEEPLE:

         14    Q.   ALL RIGHT.   SIR, DO YOU SEE EXHIBIT 5 THERE ON THE

14:09:28  15    SCREEN?

         16    A.   YES.

         17    Q.   WHAT IS IT?

         18    A.   IT'S AN E-MAIL TO THE AGENCY.

         19    Q.   I APOLOGIZE.   CAN YOU REPEAT YOUR ANSWER?

         20    A.   IT WAS AN E-MAIL THAT I SENT TO THE HMC'S.

         21    Q.   ALL RIGHT.   IF YOU WILL, SCROLL DOWN A BIT.   I'LL GET RIGHT

         22    TO IT CAUSE I'M GETTING SHORT ON MY PROMISED TIME ALLOTMENT.

         23    DO YOU SEE ITEM SIX THERE?

         24    A.   YES.

         25    Q.   IT SAYS, "ARE YOU IN YOUR OFFICE SATURDAY OR SUNDAY?"   IS

14:09:59  1   IT FAIR TO SAY YOU EXPECTED HMC'S TO BE IN THEIR OFFICE ON

2   SATURDAYS AND SUNDAYS?

3   A.   I DID NOT EXPECT THAT.

4   Q.   DID YOU ENCOURAGE IT?

5   A.   I SUGGESTED IT.

6   Q.   ONE MOMENT PLEASE.   MY NOT TALKING IS A GOOD THING HERE.

7   A.   WHAT IS THE DATE OF THIS E-MAIL, SIR?

8   Q.   SCROLL TO THE TOP, UZIEL.   SEPTEMBER 2008, SIR.

9   A.   SO IT WAS PRIOR APRIL 2011.

10   Q.   SEPTEMBER OF 2008.

11   A.   THIS WAS FOR THE HMC'S I BELIEVE.

12   Q.   OKAY.   TWO MORE TO GO, AND WE'RE DONE.   THE NEXT ONE WILL

13   BE EXHIBIT 18.   18?

14            MR. KAUFMAN:   IT'S ABOUT 100 PAGES LONG.

14:11:16 15            MR. TEEPLE:   I'M LOOKING FOR PAGES 80 AND 81.

16            MR. KAUFMAN:   THAT'S FINE.

17            MR. TEEPLE:   JUST PAGES 80 AND 81 OF EXHIBIT 18, YOUR

18   HONOR.

19            THE COURT:   ALL RIGHT.

20            (EXHIBIT 18 ADMITTED.)

21            THE COURT:   THAT WILL BE MARKED AS 18.   OTHERWISE, IT

22   WILL BE CONFUSING.

23   BY MR. TEEPLE:

24   Q.   THAT'S FINE.   ONLY TWO PAGES WE'RE USING.   LOOK AT THE

25   SUBJECT, "A BLITZING WE WILL GO, IMPORTANT." DO YOU KNOW WHAT

14:11:58  1    THIS IS ABOUT, SIR?

        2    A.   I BELIEVE SO, YES.

        3    Q.   WHAT IS IT?

        4    A.   IT'S A SEMI-ANNUAL EVENT THAT WE HAVE THAT WE WILL

        5    BLITZ REAL ESTATE AGENTS AND OPEN HOUSES AND SO ON AND SO

        6    FORTH.   JUST A SALES ACTIVITY.

        7    Q.   AND THIS IS WHERE THEY NEED TO GO TO FIVE OPEN HOUSES PER

        8    WEEKEND?   YES?

        9    A.   THEY DO CHANGE. THOSE PERIMETERS DO CHANGE.

       10    Q.   LET'S SCROLL UP, PLEASE.   STOP RIGHT THERE.   MARK BUCHANAN

       11    THEN WRITES TO YOU, QUESTION MARK, QUESTION MARK, QUESTION

       12    MARK.   AND YOU REPLY, "I'M TAKING CARE OF IT.   COMPANY EXPECTS

       13    YOU TO DO AT LEAST FIVE OPEN HOUSES PER WEEKEND OVER THE NEXT

       14    SIX WEEKS.   YEAH.   WHAT A STUPID THING TO DO.   THIS IS WHERE

14:12:47 15    PELTIER FAILS.   HE SHOULD TELL WAILS TO BACK OFF.   YOU GUYS

       16    LIVE WITH THE AGENTS."   SCROLL UP, PLEASE.   AND HE WRITES, "WHY

       17    IS TODD BEHIND IT?   WHY DOES HE NOT TELL THEM?"   DID YOU THINK

       18    THE "A BLITZING WE WILL GO" PROGRAM WAS NOT APPROPRIATE FOR

       19    YOUR INHOUSE HMC'S?

       20    A.   NOT MY BEST E-MAIL, SIR.   NOT MY BEST E-MAIL.   BUT I THINK

       21    I WAS TRYING TO UNDERSTAND MARK'S POINT.   I PROBABLY DIDN'T

       22    WRITE THAT VERY WELL, AND IT WASN'T VERY PROFESSIONAL.   BUT I

       23    THINK I TRY TO UNDERSTAND THE FACT THAT HE IS IN THE OFFICE,

       24    AND HE WORKS THERE EIGHT HOURS A DAY, AND HE PROBABLY DIDN'T

       25    SEE A NEED TO ACTUALLY DO A LOT OF THE BLITZ' BECAUSE HE WAS

14:13:38   1   PRETTY HIGH PERFORMING, HIGH PRODUCING LOAN OFFICER.  SO HE

         2   DIDN'T SEE A NEED FOR HIM TO ACTUALLY DO THE BLITZ'.  SO I

         3   THINK THE APPROACH, THE CONTENT, ISN'T THE BEST CONTENT OR THE

         4   WAY TO WRITE AN E-MAIL, BUT I WAS TRYING TO PLACATE OR

         5   UNDERSTAND HIS ISSUES.  HE WAS A HIGH PRODUCING LOAN OFFICER.

         6   Q.  ALL RIGHT.  VERY FINE.  HERE IS MY LAST ITEM FOR YOU I

         7   BELIEVE.  WERE YOU AWARE THAT MR. YIP TESTIFIED IN HIS

         8   DEPOSITION THAT HE DIDN'T RECORD ALL HIS OVERTIME?  I KNOW WE

         9   TOUCHED ON THIS.  I JUST DIDN'T COMPLETE IT.  SO LET ME START

        10   THE QUESTION AGAIN.  ARE YOU AWARE MR. YIP TESTIFIED IN HIS

        11   DEPOSITION THAT HE DIDN'T RECORD ALL OF HIS OVERTIME HOURS ON

        12   HIS TIME SHEETS BECAUSE HE FEARED IT WOULD NEGATIVELY AFFECT

        13   HIS CAREER AT HSL?

        14           MR. KAUFMAN:  OBJECTION.  MISCHARACTERIZES TESTIMONY,

14:14:31  15   YOUR HONOR.  "FEARED?"  SHOW IT TO ME.

        16           MR. TEEPLE:  I'M JUST READING THE TESTIMONY.

        17           THE COURT:  WHAT WAS THE QUESTION TO HIM?

        18           MR. TEEPLE:  I'LL REPHRASE.

        19   BY MR. TEEPLE:

        20   Q.  ARE YOU AWARE MR. YIP WAS CONCERNED ABOUT HIS CAREER IF HE

        21   REPORTED OVERTIME?

        22   A.  I WOULD NEVER HAVE THOUGHT MR. YIP BEING AFRAID OF HIS

        23   CAREER WITH ME.

        24   Q.  ALL RIGHT.  NOTHING FURTHER, YOUR HONOR.  THANK YOU.

        25   SORRY.  I GOT ONE MORE THING.  I APOLOGIZE.  THE POLICY OF

14:15:00   1   GETTING APPROVAL BEFORE OVERTIME IS WORKED, DO YOU HAVE THAT IN

2   YOUR MIND, SIR?   THEY HAVE TO COME ASK YOU FIRST, RIGHT?

3   A.   CAN YOU PLEASE REPHRASE THE QUESTION OR ASK AGAIN PLEASE?

4   Q.   FOR AN HMC TO GET OVERTIME, THE POLICY IS THEY HAVE TO COME

5   TO YOU FIRST?

6            MR. KAUFMAN:   OBJECTION, YOUR HONOR.   HMC?

7   BY MR. TEEPLE:

8   Q.   HMA?

9   A.   YES.

10   Q.   NOW, IF AN HMA GETS A PHONE CALL FROM A REALTOR THAT SHE'S

11   MET IN THE PRUDENTIAL OFFICE AND SAYS, I'M RIDING HOME WITH

12   MR. AND MRS. HOMEBUYER WHO HAVE JUST MADE AN OFFER THAT'S BEEN

13   ACCEPTED, AND THEY WANT TO COME RIGHT NOW AND TALK TO YOU ABOUT

14   PRE-QUALIFYING, DID YOU EXPECT THE HMA, IF IT WAS AFTER THEIR

14:15:48   15   40TH HOUR OF WORK, TO SAY, I'M SORRY, I CAN'T TALK TO YOU UNTIL

16   I GET CLEARANCE FROM MR. VALENTINI?

17   A.   NO.   I THINK THE RECORD SHOWS THAT THERE HAVE BEEN MANY

18   OVERTIME HOURS THAT WE DID PAY THAT DID NOT GET PRIOR APPROVAL.

19   SO OBVIOUSLY, IF SOMEONE DOES GET SOME OVERTIME, AND THEY GOT A

20   CUSTOMER TO DEAL WITH, THEY'LL JUST DO IT, AND THEY'LL PUT

21   THEIR TIME CARD THROUGH AND THE COMPANY PAID IT.   AND I WOULD

22   NOT HAVE A PROBLEM IF THEY CAME BACK AND SAID I WORKED FOUR

23   HOURS LAST NIGHT.   I WOULDN'T HAVE AN ISSUE WITH IT.

24   Q.   IF SOMEONE WORKED OVERTIME, AND YOU FOUND OUT AFTER THE

25   FACT, AS LONG AS YOU'RE SATISFIED THAT THEY'RE REALLY WORKING

```
14:16:23   1   FOR YOU, YOU'LL PAY IT; RIGHT?

           2   A.   RIGHT.

           3              MR. TEEPLE:  NOTHING FURTHER.  THANK YOU.

           4              MR. KAUFMAN:  YOUR HONOR?

           5              THE COURT:  YOU WANT A BREAK?

           6              MR. KAUFMAN:  WE WANT A BREAK, BUT BEFORE THE BREAK,

           7   THE NEXT TWO WITNESSES ARE PEOPLE THAT HAVE TO LEAVE TODAY,

           8   WHEREAS MR. VALENTINI, ALTHOUGH I THINK WE'LL GET THROUGH ALL

           9   OF THEM, HE'S LOCAL.

          10              THE COURT:  YOU WANT THEM OUT OF ORDER?  ALL RIGHT.

          11   I ASSUME THEY'LL BE SHORT.  OKAY.

          12              MR. TEEPLE:  NO OBJECTION.

          13              MR. KAUFMAN:  WE'LL TAKE A BREAK RIGHT NOW, YOUR

          14   HONOR.

14:16:57  15              THE COURT:  YEAH.  TRY TO MAKE IT PRETTY QUICK.  MAKE

          16   IT FIVE OR SEVEN MINUTES IF YOU CAN BECAUSE IT WILL BE TEN

          17   MINUTES BEFORE WE GET BACK.

          18              (RECESS.)

          19              THE COURT:  ALL RIGHT.

          20              MR. GARRISON:  YOUR HONOR WE CALL MARK BUCHANAN OUT

          21   OF ORDER, SIR.

          22              THE COURT:  ALL RIGHT.

          23              THE CLERK:  PLEASE RAISE YOUR RIGHT HAND.

          24              (OATH ADMINISTERED.)

          25              THE WITNESS:  YES.
```

14:28:24   1              THE CLERK:  THANK YOU.  BE SEATED IN THAT FIRST

         2      CHAIR.  PLEASE STATE AND SPELL YOUR NAME FOR THE RECORD.

         3              THE WITNESS:  MARK BUCHANAN, M-A-R-K,

         4      B-U-C-H-A-N-A-N.

         5              MR. GARRISON:  MAY I PROCEED, YOUR HONOR?

         6              THE COURT:  YES.

         7                        DIRECT EXAMINATION

         8      BY MR. GARRISON:

         9      Q.  SIR, COULD YOU GIVE US YOUR EDUCATIONAL BACKGROUND BRIEFLY,

        10      STARTING WITH HIGH SCHOOL?

        11      A.  I GRADUATED HIGH SCHOOL FROM MONROE SENIOR HIGH IN

        12      WASHINGTON IN 1982, AND THEN I WENT ON TO JUNIOR COLLEGE IN

        13      BELLEVUE FOR A YEAR, MOVED TO BELLEVUE, WASHINGTON.  THEN I

        14      WENT TO SAN DIEGO AND WENT TO MESA COLLEGE FOR A YEAR, AND THEN

14:29:05  15      TRANSFERRED TO UNIVERSITY SAN DIEGO WHERE I GRADUATED WITH A

        16      BUSINESS DEGREE IN 1990.

        17      Q.  DID YOU BECOME A LOAN OFFICER AT SOME POINT IN TIME?

        18      A.  YES, IN THE MIDDLE OF '91.

        19      Q.  AT SOME POINT IN TIME DID YOU BEGIN WORKING FOR A COMPANY

        20      CALLED FIRST CAPITAL?

        21      A.  YEAH, IN JUNE '96.

        22      Q.  WERE YOU ONE OF THE PEOPLE THAT TRANSITIONED FROM FIRST

        23      CAPITAL OVER TO HSL?

        24      A.  YES.

        25      Q.  WHEN DID THAT HAPPEN APPROXIMATELY?

14:29:36   1    A.   THE TRANSITION WAS THE END OF DECEMBER '07.

           2    Q.   AND IN HSL TERMINOLOGY, WERE YOU AN HMC OR A LOAN OFFICER

           3    FOR THEM AS WELL?

           4    A.   HMC IS WHAT I RECALL.

           5    Q.   THERE'S A DOCUMENT IN FRONT OF YOU THERE WHICH IS MARKED

           6    EXHIBIT 35.  DO YOU SEE IF YOU RECOGNIZE THAT?

           7    A.   YES.

           8    Q.   IS THAT AN E-MAIL YOU RECEIVED FROM DANNY VALENTINI?  I

           9    THINK THE HEADER WAS CUT OFF, BUT OTHER THAN THAT.

          10    A.   IT DOESN'T HAVE MY NAME ON IT, BUT IT LOOKS LIKE IT WAS AN

          11    E-MAIL BLAST.

          12    Q.   DID YOU GET INFORMATION FROM MR. VALENTINI ON AN ANNUAL

          13    BASIS ABOUT YOUR ABILITY TO HAVE AN HMA OR HOME MORTGAGE

          14    ASSISTANT?

14:30:39  15    A.   YES.

          16    Q.   AND LOOK AT EXHIBIT B, WHICH IS THE ATTACHMENT TO THE

          17    E-MAIL THERE.  DO YOU RECOGNIZE THAT DOCUMENT?

          18    A.   YES.  IT WAS ONE OF THAT FOUR OR FIVE ATTACHMENTS THAT WE

          19    RECEIVED EVERY YEAR, WHAT OUR ANNUAL COMPENSATION PLAN WAS

          20    GOING TO BE FOR THE HOME MORTGAGE CONSULTANT, THE LOAN OFFICER,

          21    THE JUNIOR LOAN OFFICER -- I FORGOT THE NAME -- AND THEN THE

          22    ASSISTANT, WHICH WAS THE HMA, AND THERE WOULD BE A COUPLE OTHER

          23    THINGS.  SO WE GET A NEW ONE EVERY YEAR.

          24    Q.   WAS IT ESSENTIALLY THE SAME DESCRIPTION FOR THE HMA?

          25    A.   FOR 2008, 2009, YES, FOR SURE.  I DON'T RECALL 2010.

14:31:23   1    Q.   FAIR ENOUGH.  FOR 2008, '9, THAT DESCRIPTION THAT IS

           2    EXHIBIT 35 IS CORRECT; IS THAT RIGHT?

           3    A.   YES.

           4    Q.   AND WERE YOU EXPECTED IF YOU WANTED TO HAVE AN HMA TO GIVE

           5    A PERCENTAGE OF YOUR INCOME THAT YOU EARNED TOWARDS DEFERRING

           6    THE COST OF AN HMA?

           7    A.   YES.

           8    Q.   WAS IT YOUR CHOICE WHETHER TO HAVE AN HMA OR NOT?

           9    A.   YES.

          10    Q.   WHY WOULD A LOAN OFFICER LIKE YOURSELF WANT TO HAVE AN HMA?

          11    A.   WELL, ASSISTANT, YOU KNOW, JUST KEEP IT SIMPLE, YOU KNOW,

          12    AN ASSISTANT WILL HELP YOU DEVELOP BUSINESS AND MARKET.

          13    Q.   IN YOUR CASE -- WELL THERE ALSO WERE OTHER FUNCTIONS THE

          14    HMA DID AS WELL.  THEY DID PAPERWORK FUNCTIONS; IS THAT

14:32:11  15    RIGHT?

          16    A.   IN REALITY, YES.

          17    Q.   AND IN YOUR CASE, WERE YOU A VERY BUSY LOAN OFFICER IN

          18    2008, '9, AND '10?

          19    A.   YES.

          20    Q.   DID YOUR HMA DO ANY MARKETING OR MOSTLY ONLY LOAN

          21    PROCESSING FOR YOU?

          22    A.   I WOULD SAY 75, 80 PERCENT OF THE TIME WAS SPENT ACTUALLY

          23    PROCESSING AND NOT MARKETING.

          24    Q.   IN YOUR CASE BECAUSE OF THE VOLUME OF BUSINESS; IS THAT

          25    RIGHT?

14:32:35  1  A.   CORRECT BECAUSE OF HIGH VOLUME, AND ALSO WE WORK A LOT OF

2  FIRST-TIME HOMEBUYERS, DID A LOT OF GOVERNMENT LOANS.   SO

3  THEY'RE A LITTLE BIT MORE INTENSIVE AND TOOK A LITTLE BIT MORE

4  WORK.

5  Q.   IS THE VALUE TO A LOAN OFFICER AND A HMA HAVING SOMEONE

6  HELP THEM WITH WHATEVER THAT PARTICULAR OFFICER NEEDS?

7  A.   CAN YOU REPEAT THE QUESTION.

8  Q.   IS THE REASON YOU HIRE AN ASSISTANT TO DO WHATEVER YOU NEED

9  TO DO TO DRIVE YOUR BUSINESS?

10  A.   YES.

11  Q.   AND THAT WOULD BE HMC SPECIFIC, YOU COULD DIRECT LAURA AS

12  TO WHAT YOU WANTED HER TO DO, YOUR ASSISTANT?

13  A.   YES.

14  Q.   WHERE DID YOU WORK WHEN YOU WORKED FOR HSL?

14:33:10  15  A.   I WAS LOCATED IN THE MISSION VALLEY PRUDENTIAL REAL ESTATE

16  OFFICE.

17  Q.   WHO WAS YOUR SUPERVISOR?

18  A.   DANNY VALENTINI.

19  Q.   AND DID YOU HAVE AT ANY TIME ANY HMA'S?

20  A.   YES.

21  Q.   WHAT WERE THEIR NAMES?

22  A.   LAURA DAWSON WAS THE MAIN ONE.   TONI MCGRAW STEPPED IN WHEN

23  LAURA WAS ON MATERNITY LEAVE.   I ALSO HAD A SECOND ONE FOR A

24  SHORT PERIOD, STEVE EPERIS.

25  Q.   WERE YOU EVER, DID YOU EVER BECOME AWARE OF ISSUES WITH ANY

14:33:45   1   OF YOUR HMA'S GETTING OVERTIME APPROVED?

          2   A.   I'M SORRY.  SAY IT AGAIN.

          3   DID YOU EVER BECOME AWARE THAT ANY OF YOUR HMA'S WERE HAVING

          4   DIFFICULTY GETTING THEIR OVERTIME APPROVED IF THEY WANTED TO

          5   WORK OVERTIME?

          6   A.   YES.

          7   Q.   HOW DID YOU BECOME AWARE OF THAT?

          8   A.   HOW?

          9   Q.   YEAH.

         10   A.   DANNY, FROM THE HMA'S.

         11   Q.   DID YOU EVER DISCUSS HMA OVERTIME WITH DANNY ANY TIME?

         12   A.   OFTEN.

         13   Q.   HOW MANY TIMES IS YOUR BEST GUESS OVER THE TIMES YOU WERE

         14   THERE?

14:34:14  15   A.   WEEKLY.

         16   Q.   WHY?

         17   A.   IT WAS JUST CONSTANT BATTLE.  HOMESERVICES WAS, WHEN WE

         18   HIRED ON IN 2008, WE HAD WHAT'S CALLED AN HMAP WHICH IS LIKE A

         19   HOME PERSON, PROCESSOR, AND THEY GOT RID OF THAT PROCESSING

         20   FUNCTION.  SO THEY HAD, I THINK, TWO OF THOSE IN SAN DIEGO, AND

         21   THEY CUT THAT POSITION OUT.  SO OUR HMA'S KIND OF ASSUMED SOME

         22   OF THAT PROCESSING WORK, AND IT WAS KIND OF UNFAIR TO US

         23   BECAUSE NOW OUR ASSISTANTS WERE DOING THE PROCESSING.  AND WHEN

         24   BUSINESS STARTED GETTING BUSY, LAURA WHO WORKED WITH ME, WE

         25   WORKED A LOT OF LONG HOURS, AND YOU KNOW, VERY EARLY ON HSL

14:34:59   1   STATED, DANNY AT LEAST, SAID THAT THEY JUST DON'T PAY OVERTIME,

2   JUST NOT.

3   Q.   WELL, HOW MANY HOURS ON AVERAGE WOULD YOU SAY YOU WORKED

4   BETWEEN 2008 AND 2011 IN A WEEK?   DO YOU HAVE AN ESTIMATE FOR

5   ME?

6   A.   BEST GUESS, 80, 90 HOURS A WEEK.

7   Q.   AND WOULD YOUR HMA WORK A LOT OF HOURS AS WELL?

8   A.   YES.

9   Q.   WHY?

10   A.   WE WERE BUSY.

11   Q.   DID YOU NEED THAT PERSON TO BE THERE IF YOU WERE WORKING?

12   A.   YEAH.   SHE WAS AN INTRICAL PART OF MY BUSINESS.

13   Q.   WHY?

14   A.   BECAUSE THEY DID ALL THE PROCESSING; WITHOUT HER, I

14:35:36   15   WOULDN'T BE ABLE TO FUNCTION.   WITHOUT HER, I MIGHT AS WELL

16   TOOK TIME OFF.

17   Q.   TELL ME ABOUT CONVERSATIONS YOU WOULD HAVE WITH DANNY

18   REGARDING OVERTIME.   DID HE EVER TELL YOU WHY OVERTIME WAS AN

19   ISSUE OR A PROBLEM?

20   A.   THE MORTGAGE INDUSTRY WENT THROUGH A LOT OF TURMOIL AFTER

21   2007 AND PROFITS WERE VERY IMPORTANT AND COST CUTTING WAS

22   PREVALENT, AND THEY WERE JUST, THEY WERE VERY TIGHT ON COST,

23   AND THEY JUST DIDN'T WANT TO SPEND THE MONEY.

24   Q.   WHEN YOU SAY "THEY," WHO DO YOU MEAN?

25   A.   HSL, WELLS FARGO.

14:36:07   1   Q.   WHO TOLD THAT YOU?

           2   A.   DANNY.  WE TALK ABOUT IT ALL THE TIME.

           3   Q.   HOW MANY TIMES OVER THE YEARS YOU WERE THERE DID DANNY TELL

           4   YOU THAT HSL DID NOT WANT TO SPEND THE MONEY ON OVERTIME?

           5   A.   I --

           6   Q.   BEST ESTIMATE.

           7   A.   20.

           8   Q.   DID YOU EVER DISCUSS OVERTIME DIRECTLY WITH TODD JOHNSON?

           9   DO YOU KNOW WHO TODD JOHNSON IS?  HE'S SEATED OVER HERE.

          10   A.   YES.

          11   Q.   DID YOU EVER DISCUSS OVERTIME WITH MR. JOHNSON?

          12   A.   WE MENTIONED A FEW DIFFERENT OCCASIONS, AND IT WAS ONE OF

          13   OUR BULLET POINTS AT ONE OF OUR MEETINGS.

          14   Q.   TELL ME ABOUT THOSE DISCUSSIONS.

14:36:43  15   A.   ONE TIME WE MET FOR DINNER WITH DANNY, MIKE REZA AND BRIAN

          16   SHAW AND TODD, AND ONE OF THE THINGS ON OUR AGENDA WAS TRY TO

          17   ALLOW HIM TO HIRE ANOTHER SECOND HMA, AND THE OTHER PART WAS TO

          18   GET THE -- WE USED TO DO THE E-REALTY BUSINESS, AND THEY SET UP

          19   A CALL CENTER IN ORANGE COUNTY, AND THEY TOOK THE E-REALTY

          20   BUSINESS AWAY FROM US.  SO WE WERE MAKING A PLAY THAT WE HAD

          21   THE HIGHEST CAPTURE RATE IN THAT BUSINESS; SO WE THOUGHT IT WAS

          22   STUPID THEY WERE MOVING IT TO ORANGE COUNTY.  WITH REGARDS TO

          23   THE PROCESSOR, I EXPLAINED TO HIM WE WORKED LONG HOURS, AND

          24   IT'S A FUNCTION OF -- THEY WANTED US TO INCREASE OUR CAPTURE

          25   RATES TO GET MORE BUSINESS, AND THE ONLY WAY YOU CAN DO THAT IS

14:37:27  1  TO SERVICE THE CLIENTS, THE AGENTS AND THE CLIENTS.  AND THE

2  ONLY WAY YOU CAN SERVICE THE AGENTS AND CLIENTS IS TO HAVE THE

3  MANPOWER TO DO IT, AND WE WERE SEVERELY UNDER STAFFED.  THE

4  LOAN CENTER IN SAN BERNARDINO WAS INADEQUATE AND EVEN ON OUR

5  SIDE IN OUR OFFICE WE JUST DIDN'T HAVE THE MANPOWER TO DO IT.

6  Q.  WHAT SPECIFICALLY DO YOU RECOLLECT DISCUSSING WITH MR.

7  JOHNSON AT THAT MEETING ABOUT OVERTIME?

8  A.  I TOLD HIM, I SAID, MY GIRL LAURA WORKS SEVEN DAYS A WEEK.

9  SHE WORKS FROM HOME, AND THESE GIRLS ARE NOT COMPENSATED THE

10  SAME WAY IN WHICH WE WERE, AND IT WAS NOT FAIR.

11  Q.  WHAT DID HE SAY, IF ANYTHING?

12  A.  MR. JOHNSON IS NOT VERY ANIMATED OR TALKATIVE, AND IT WAS

13  VERY NONRESPONSIVE.

14  Q.  DID HE ANSWER YOUR QUESTION AT ALL?

14:38:10  15  A.  NO.

16  Q.  DID YOU TALK WITH MR. JOHNSON AGAIN ABOUT OVERTIME EVER?

17  A.  WE HAD A MEETING.  WE HAD A DINNER WITH MIKE REZA, DANNY

18  VALENTINI, MYSELF, BRIAN SHAW, GREG PARKER, TIM FIERRO, CURTIS

19  FOX, ALL THE TOP GUYS IN SAN DIEGO, AND WE PLANNED THE MEETING.

20  WE TOLD DANNY WHAT WE WANTED TO TALK ABOUT, SAME AGENDA, TALK

21  ABOUT THE DIFFICULTIES IN THE FULFILLMENT CENTER IN SAN

22  BERNARDINO, THE NEED FOR ADDITIONAL HMA STAFF.  I'M SURE WE HAD

23  A COUPLE OTHER THINGS.  DURING THE DINNER, MYSELF AND GREG

24  PARKER WERE THE TWO TOP PRODUCERS.  SO WE USUALLY BROUGHT UP

25  THE CONVERSATION.  EVEN DANNY WAS SCARED TO BRING UP SOME OF

14:38:54  1  OUR TOPICS.  SO GREG PARKER AND I WERE USUALLY THE GUYS THAT

2  BROUGHT THESE POINTS UP, AND I REMEMBER VERY SPECIFICALLY ONE

3  INCIDENT WHERE WE TALKED ABOUT THE NEED FOR ADDITIONAL HMA'S,

4  AND TODD ACTUALLY BECAME VERY IRRITATED, AND HE WAS SITTING

5  THERE CUTTING HIS STEAK AND GOT VERY ANGRY, VERY AGGRESSIVE AND

6  WAS SITTING THERE TALKING ABOUT HOW HE COULDN'T BELIEVE ANYONE

7  WOULD ASK FOR MORE HMA'S UNLESS THEY DID OVER TEN DEALS A

8  MONTH, AND IT WAS ABSURD, AND HE USED TO BE A LOAN OFFICER, AND

9  HE WAS QUITE ANGRY ABOUT IT, AND IT WAS A UNCOMFORTABLE

10  SITUATION AND EVERYBODY WENT PRETTY QUIET AND IT WAS VERY

11  AWKWARD.

12  Q.  HOW DID THAT END?  DID HE EVER SAY HE WAS GOING TO GIVE

13  OVERTIME OR WASN'T?

14  A.  NO.

14:39:47  15  Q.  DID YOU EVER DISCUSS WITH DANNY VALENTINI WHY HE HAD

16  TROUBLE GIVING OVERTIME, WHETHER IT WAS A MANDATE FROM THE

17  COMPANY THAT IT WASN'T TO HAPPEN?

18  A.  YEAH, HE SAID THAT.  ABSOLUTELY, HE SAID THAT.  TODD

19  JOHNSON DIDN'T ALLOW IT, DIDN'T WANT IT.  TODD JOHNSON RUN A

20  VERY TIGHT, ORDERLY SHIP.  HE DIDN'T WANT THINGS OUT OF ORDER,

21  AND I'M SURE -- THERE WAS WHAT WELLS FARGO CALLS METRICS, AND

22  THEY MONITOR EVERYTHING, AND TODD JOHNSON DIDN'T LIKE ANYTHING

23  OUT OF ORDER, AND I'M SURE THAT WOULD HAVE BEEN ONE OF THE

24  ISSUES, AND SO DANNY KNEW.  DANNY DIDN'T LIKE TODD EITHER.

25  DANNY FOUGHT FOR US.  HE KNEW WE NEEDED ADDITIONAL HELP, AND HE

14:40:24  1    TRIED TO DO WHAT HE COULD BUT.

         2    Q.   THERE'S A DOCUMENT IN FRONT OF YOU MARKED AS EXHIBIT 9.

         3    YOUR HONOR, IS EXHIBIT 9 IN EVIDENCE?  COULD YOU PUBLISH THAT

         4    WITH THE COURT'S PERMISSION?

         5             THE COURT:  YES.

         6             MR. GARRISON:  THANK YOU, SIR.

         7             THE WITNESS:  I DON'T THINK I HAVE IT.

         8    BY MR. GARRISON:

         9    Q.   IT'S GOING TO SHOW UP ON YOUR SCREEN RIGHT HERE.  IF YOU

        10    JUST TURN -- WE'RE PRETTY HIGH TECH HERE.  DO YOU RECOGNIZE

        11    THAT E-MAIL, SIR?

        12             MR. KAUFMAN:  YOUR HONOR, EXHIBIT 9 DOESN'T APPEAR TO

        13    BE SENT TO OR FROM MR. BUCHANAN.  YOU'RE LOOKING AT THE WRONG

        14    ONE.

14:41:08 15             MR. GARRISON:  I APOLOGIZE.

        16             MR. GARRISON:  EXHIBIT 12, YOUR HONOR, I APOLOGIZE.

        17    EXHIBIT 12.

        18             THE COURT:  IS THAT IN EVIDENCE?

        19             MR. GARRISON:  IT IS, YOUR HONOR.

        20             THE COURT:  OKAY.

        21    BY MR. GARRISON:

        22    Q.   DO YOU RECOGNIZE THIS E-MAIL?

        23    A.   YES.

        24    Q.   IS IT AN E-MAIL THAT WAS A CHAIN BETWEEN YOU AND MR.

        25    VALENTINI?

14:41:37   1   A.   THAT WAS WHAT?

2   Q.   AN E-MAIL CHAIN; THERE'S ABOUT THREE E-MAILS MEAL ON THE

3   CHAIN.

4   A.   I CAN'T SEE THE BOTTOM, BUT I RECOGNIZE IT.

5   Q.   CAN YOU SCROLL TO THE BOTTOM SO WE CAN SEE WHAT IT WAS

6   ABOUT?  DO YOU RECOLLECT LAURA DAWSON, WHO WAS AN HMA, SAYING

7   IF I'M NOT GETTING PAID THIS WEEKEND, I'M NOT GOING TO WORK, I

8   NEED TO GET PAID?

9   A.   YEAH.   THE SITUATION WAS THE GIRLS, LAURA AND TONI, THEY

10   REACH BREAKING POINTS.  SOMETIMES IT WOULD BE TOUGHER THAN

11   OTHERS.  THE THREE OF US SAT IN AN OFFICE TOGETHER, AND SO YOU

12   COULD SENSE WHEN THINGS WERE GETTING HOT.  THE GIRLS, YOU KNOW,

13   THAT I KNEW WOULD NOT ASK FOR OVERTIME THEMSELVES.  THEY WERE

14   SCARED TO ASK FOR OVERTIME, AND IT JUST WASN'T SOMETHING YOU

14:42:21  15   ASKED FOR.  SO GENERALLY, I WOULD BE THE GUY THAT WOULD SAY,

16   HEY, DANNY, CAN YOU THROW LAURA A BONE THIS WEEK AND PAY HER

17   SOME HOURS; SHE'S AT A BREAKING POINT.  AND I HAD TO NEGOTIATE

18   WITH DANNY TO GET WHAT I GOT, AND I ONLY DID IT AT TIMES WHEN

19   IT WAS REAL CRITICAL, OR I REALLY NEEDED HER, OR SHE WAS AT A

20   POINT WHERE SHE WAS CRACKING.

21   Q.   AND THEN THERE'S A QUESTION MARK WHEN SHE ASKED FOR

22   OVERTIME.  I WANT TO GO TO THE NEXT LINE AT THE TOP, SCROLL

23   BACK UP, PLEASE, UZIEL.

24        SPECIFICALLY, IT SAYS -- THE POINT I WANT TO ASK YOU

25   ABOUT IS THIS SENTENCE AND WHETHER YOU TALKED TO DANNY ABOUT

14:42:56   1    IT.  "I KNOW THAT TODD HAS SENT AN E-MAIL REQUESTING WE DO NOT

           2    ISSUE OVERTIME.  LET'S GO FOR IT.  FIVE TO SIX HOURS.  DO YOU

           3    RECOLLECT EVER DISCUSSING WITH DANNY VALENTINI ANY MANDATES HE

           4    GOT FROM TODD JOHNSON NOT TO ISSUE OVERTIME?

           5    A.   YES.

           6    Q.   TELL US ABOUT THAT.  WHAT DID HE TELL YOU?

           7    A.   HE JUST CALLED ME MARCO, AND HE SAID MACRO, IT'S NOT IN THE

           8    BUDGET.  WE CAN'T DO IT.  TODD DOESN'T WANT IT, AND IT'S NOT

           9    EVEN A DISCUSSION POINT.

          10    Q.   AT SOME POINT IN TIME -- I'M GOING TO TALK ABOUT YOU NOW

          11    FOR A MOMENT, YOU'RE NO LONGER WITH THE COMPANY NOW; IS THAT

          12    TRUE?

          13    A.   CORRECT.

          14    Q.   AT SOME POINT IN TIME DID THE REGULATIONS CHANGE TO WHERE

14:43:32  15    PEOPLE LIKE YOU HAD TO WORK OVERTIME, REPORT OVERTIME?

          16    A.   YES.  DANNY AND MICHAEL BOTH SEPARATELY TOLD ME IN EARLY

          17    2010 THAT WELLS FARGO WAS ACTUALLY BEING SUED, OR THERE WAS A

          18    CLASS-ACTION LAWSUIT GOING ON BECAUSE OF OVERTIME.  AND YOU

          19    KNOW, IT PIQUED MY INTEREST.  I SAID, WHAT DO YOU MEAN? HE

          20    SAID, WELL, SUPPOSEDLY SOME LAW CHANGED AND THAT LOAN OFFICERS

          21    ARE NOW ENTITLED TO OVERTIME.  I SAID, THAT'S INTERESTING, HOW

          22    IS THAT GOING TO WORK?

          23    Q.   WHAT DID YOU MEAN BY "HOW IS THAT GOING TO WORK"?

          24    A.   WELL, I MEAN, THE WAY WE CARRY OUT OUR DAILY LIFE IS WE

          25    DON'T WORK 8:00 TO 5:00.  YOU KNOW, WE DON'T TAKE LUNCH.  WE

14:44:21  1   DON'T TAKE BREAKS.  WE DON'T CLOCK IN.  IT WAS JUST GOING TO BE

        2   INTERESTING.  SO I SAID, WHEN IS HSL GOING TO START THIS, AND

        3   THEY WEREN'T SURE YET.  AND I THINK TOWARDS THE END OF THE

        4   2010, THERE WOULD BE E-MAILS OR CONFERENCE CALLS, AND THEY

        5   SAID, YEAH, IN APRIL 2011, THIS NEW OVERTIME LAW WAS GOING TO

        6   COME INTO EFFECT AFFECTING HSL.  SO APPARENTLY THE LAW WAS IN

        7   EFFECT, BUT WE DIDN'T ADOPT IT UNTIL APRIL 2011.  SO AS WE GOT

        8   CLOSER TO 2011, I STARTED LIKING IT BECAUSE, AND I TALKED WITH

        9   DANNY MANY TIMES.  AND I SAID, YOU MEAN TO TELL ME WE'RE GOING

       10   TO GET PAID OVERTIME NOW?

       11   Q.  WHAT DID HE SAY?

       12   A.  HE SAYS, WELL, YEAH, THAT'S THE LAW.  I SAID, WHAT'S THE

       13   RATE BECAUSE WE'RE ON COMMISSION.  OUR INCOME CHANGES EVERY

       14   MONTH.  SO ONE MONTH IT'S THIS, AND ONE MONTH IT'S THIS.  IT

14:45:04 15   CHANGES BECAUSE WE'RE COMMISSION.  I SAID, HOW ARE THEY GOING

       16   TO CALCULATE OUR OVERTIME SINCE WE DON'T HAVE A FIXED HOURLY

       17   RATE.  HE DIDN'T KNOW, AND AS WE GOT CLOSE TO APRIL THERE WAS A

       18   FORMULA THAT CAME OUT, AND DEPENDING ON HOW MUCH YOU WERE

       19   MAKING, YOU COULD MAKE 80 BUCKS AN HOUR IN OVERTIME.  SO I WAS

       20   ACTUALLY GETTING EXCITED ABOUT IT BECAUSE EVERY YEAR HSL

       21   CHANGED OUR COMPENSATION PLANS, AND WE WERE MAKING LESS AND

       22   LESS.  SO I FIGURED, FINALLY, I'M GOING TO START MAKING

       23   OVERTIME, AND I WORKED A LOT OF HOURS SO I LIKE ID.

       24   Q.  DID DANNY EVER TELL YOU THAT YOU COULD NOT WORK OVERTIME?

       25   A.  WELL, THE LAST MONTH OR TWO BEFORE APRIL, ACTUALLY, I MADE

14:45:41   1    UP A CLOCK, AND I PUT IT ON MY DOOR, AND IT SAID, YOU KNOW,

2    HOURS WERE 8:00 TO 12:00 AND FROM 1:00 TO 5:00.  I SAID, IF YOU

3    NEED ANYTHING ELSE, CALL DANNY OUTSIDE THOSE HOURS BECAUSE HE

4    SAID, NO, IT'S NOT GOING TO WORK LIKE THAT.  YOU'RE NOT GOING

5    TO BE ABLE TO REPORT YOUR HOURS.  I SAID, WHAT DO YOU MEAN?  HE

6    SAID, IT'S NOT GOING TO BE, YOU'RE NOT GOING TO BE ABLE TO

7    REPORT YOUR HOURS LIKE THAT.  THERE'S JUST NO WAY IT'S GOING TO

8    HAPPEN, AND WE TALKED ABOUT IT A LOT, AND DANNY AND I WENT TO

9    LUNCH QUITE OFTEN, AND IN THE LAST FEW MONTHS IT WAS A BIG

10   TOPIC BETWEEN THE TWO OF US.  AND HE FINALLY, THE LAST FEW

11   WEEKS, HE FINALLY SAID -- WHEN HE RECEIVED INSTRUCTION FROM

12   ABOVE THAT, NO, IT'S NOT GOING TO BE LIKE ME GETTING 20, 30, 40

13   HOURS IN OVERTIME, IT'S JUST NOT GOING TO HAPPEN, I ACTUALLY

14   QUIT THE DAY BEFORE.  I RESIGNED THE DAY BEFORE THE LAW WENT

14:46:38   15   INTO EFFECT.  I WASN'T GOING TO WORK FOR THE COMPANY.  THEY DID

16   IT TO THE GIRLS, AND NOW THEY WANT ME TO SAY I WORK 40 HOURS A

17   WEEK, AND EVERYBODY IN THE COMPANY KNEW I DIDN'T WORK 40 HOURS.

18   I WASN'T GOING TO DO IT.

19   Q.  ARE YOU STILL IN THE BUSINESS?

20   A.  YES.

21   Q.  DID YOU EVER HAVE A PHONE CALL FROM MICHAEL YIP WHERE HE

22   TOLD YOU THAT HE THOUGHT, THAT HE WAS NOT WORKING OVERTIME?

23   A.  YES.

24   Q.  TELL US ABOUT THAT PHONE CALL.  HOW DID IT HAPPEN?

25   A.  I DON'T REMEMBER IF I CALLED HIM OR HE CALLED ME.  MICHAEL

14:47:06   1   AND I WERE ACTUALLY, WE GRADUATED USD, SAME SCHOOL, AND WE HAD

           2   SOME COMMON INTERESTS.  NICE KID.  AND AFTER -- I ACTUALLY SUED

           3   HSL MYSELF.  AFTER THAT LAWSUIT WAS INITIATED AND SOME OF THE

           4   GIRLS I WORKED WITH SUED, MAYBE I HAD A KEY OR SOMETHING --

           5   I HAD SOMETHING.  THERE A REASON FOR US TO TALK, AND HE HAD

           6   HEARD ABOUT THE LAWSUIT.  AND HE STARTED -- AND I REALLY DIDN'T

           7   WANT TO TALK TO HIM ABOUT IT BECAUSE, YOU KNOW, HE WORKED FOR

           8   HSL.  SURPRISINGLY, HE KIND OF OPENED UP ON A FEW THINGS, AND

           9   ONE OF THE THINGS HE SAID WAS THAT -- I ACTUALLY TOLD HIM, YOU

          10   KNOW, MICHAEL, THIS OVERTIME THING, THESE GIRLS, YOU KNOW IT'S

          11   WRONG, AND I SAID, DO YOU PUT IN FOR OVERTIME?  HE SAYS, NO.  I

          12   SAID, YOU SHOULD BE.  AND HE ACTUALLY TOLD ME -- AND I REMEMBER

          13   I WAS AT MY OTHER COMPANY, AND I WAS OUT IN THE PARKING LOT

          14   AFTER HOURS, 7:00 IN THE NIGHT, AND I REMEMBER STANDING IN THE

14:48:04  15   PARKING LOT, AND I WAS VERY INTRIGUED HE WAS TALKING TO ME, AND

          16   HE FLAT OUT TOLD ME HE WAS ON A CONFERENCE CALL -- I THINK IT

          17   WAS A CONFERENCE CALL FOR WHATEVER HIS JOB TITLE, ADMIN

          18   PEOPLE --

          19           THE COURT:  COUNSEL, YOU KNOW, THIS IS A DIALOGUE.

          20   WE'RE GOING TO BE HERE FOR ANOTHER HOUR.  JUST ASK THE

          21   QUESTION, AND LET HIM ANSWER AND NOT RUN WILD WITH THE ENTIRE

          22   STORY OF HIS LIFE.

          23           MR. GARRISON:  I'LL DO IT, YOUR HONOR.

          24           MR. KAUFMAN:  I WANT TO OBJECT.  ALL THIS GOES INTO

          25   HEARSAY ABOUT CONVERSATION HE HAD WITH OTHER PEOPLE ABOUT

14:48:33   1   OVERTIME THEY SUPPOSEDLY WORKED.

2            THE COURT:  THERE'S HEARSAY FILLED WITH IT.  I'M NOT

3   BLAMING THE WITNESS.  IF NOBODY OBJECTS, YOU KNOW, HE CAN SAY

4   WHAT HE WANTS.  BUT KEEP THE QUESTIONS DIRECT.  HE'LL GET TO

5   IT.  HE COULD HAVE FINISHED HIS TESTIMONY BY NOW.

6   BY MR. GARRISON:

7   Q.  MR. BUCHANAN, I SIMPLY WANT TO KNOW WHAT MR. YIP TOLD YOU

8   ABOUT TURNING IN HIS HOURS.

9            MR. KAUFMAN:  YOUR HONOR, OBJECTION.  HEARSAY.

10           THE COURT:  SUSTAINED.

11           MR. GARRISON:  MR. YIP TESTIFIED THAT HE NEVER TALKED

12   TO MR. BUCHANAN ON THE STAND ABOUT OVERTIME SPECIFICALLY.  HE

13   SAID IT NEVER HAPPENED.

14           MR. KAUFMAN:  YOUR HONOR, HE IS ASKING WHAT MR. YIP

14:49:12   15   SAID FOR THE TRUTH OF THE MATTER STATED.  THAT'S HEARSAY.

16           THE COURT:  THAT'S HEARSAY.

17           MR. GARRISON:  I'M ASKING IT TO IMPEACH MR. YIP.

18   JUST SO WE'RE CLEAR FOR THE RECORD, YOUR HONOR.

19           THE COURT:  WELL, YOU CAN ASK HIM WHETHER MR. YIP

20   SAID THIS.  THAT'S FINE.

21   BY MR. GARRISON:

22   Q.  DID MR. YIP TELL YOU ABOUT NOT TURNING IN HIS OVERTIME?

23   A.  HE TOLD ME HE WAS ON A CONFERENCE CALL --

24   Q.  JUST STOP THERE.  THERE'S RULES WE HAVE TO FOLLOW.  HE DID

25   TELL YOU ABOUT NOT TURNING IN HIS OVERTIME, RIGHT?

175

14:49:43  1  A.  YES.

2  Q.  DID HE TELL YOU THAT ONE OF THE REASONS HE DIDN'T TURN IN

3  HIS OVERTIME WAS HE WAS WORRIED IT WOULD AFFECT HIS JOB?

4  A.  YES.

5          MR. KAUFMAN:  OBJECTION.  HEARSAY.

6          THE COURT:  ALL RIGHT.  HE RESPONDED.  MOVE ON.

7          MR. GARRISON:  THANK YOU, YOUR HONOR.  I HAVE NOTHING

8  FURTHER.

9                  CROSS-EXAMINATION

10  BY MR. KAUFMAN:

11  Q.  GOOD AFTERNOON, MR. BUCHANAN.

12  A.  HI.

13  Q.  FIRST QUESTION -- WE MIGHT AS WELL GET IT OUT IN THE OPEN

14  -- YOU FILED YOUR OWN LAWSUIT ON APRIL 29TH, 2011; CORRECT?

14:50:26  15  A.  YES, SIR.

16  Q.  AND THEN SHORTLY AFTER THAT YOUR JUNIOR HMC AND TWO HOME

17  MORTGAGE ASSISTANTS WHO WORKED WITH YOU ALSO FILED LAWSUITS; IS

18  THAT CORRECT?

19  A.  THAT'S CORRECT.

20  Q.  NOW, YOU WERE, IF NOT THE HIGHEST, ONE OF THE VERY HIGHEST

21  PRODUCERS IN CALIFORNIA FOR HSL; ISN'T THAT TRUE?

22  A.  YES, SIR.

23  Q.  AND YOU HAD -- FOR MOST OF THAT TIME, YOU WORKED WITH ONE

24  HOME MORTGAGE ASSOCIATE, LAURA DAWSON?

25  A.  YES.

14:50:58   1    Q.   NOW, SHE WENT OUT ON MATERNITY LEAVE, AND THERE WAS A

           2    PERIOD WHERE WAS IT TONI MCGRAW TOOK OVER?

           3    A.   THAT'S CORRECT.

           4    Q.   FOR A COUPLE WEEKS.  NOW, THE WAY THE COMMISSION SYSTEM WAS

           5    SET UP, AT LEAST STARTING AROUND 2009, THERE WAS A SHARING OF

           6    COMMISSIONS GENERATED ON YOUR LOAN,AND A PORTION WENT TO LAURA

           7    DAWSON; ISN'T THAT CORRECT?

           8    A.   THAT'S CORRECT.

           9    Q.   AND ISN'T IT TRUE THAT YOU COMPLAINED THAT YOU THOUGHT THAT

          10    WAS TOTALLY UNFAIR THAT MS. DAWSON SHOULD GET ANY PORTION OF

          11    THE COMMISSION BECAUSE SHE DIDN'T DO SALES FUNCTIONS?

          12    A.   I COMPLAINED, YEAH, BECAUSE I WAS PAYING A PROCESSOR.

          13    THAT'S WHY I COMPLAINED.

          14    Q.   YOU COMPLAINED BECAUSE ALL SHE WAS DOING WAS ACTING AS A

14:51:45  15    LOAN PROCESSOR.  THAT WAS THE HMA JOB, AS YOU SAW IT?

          16    A.   CORRECT.

          17    Q.   SO THIS NOTION THAT YOU NEEDED TO HAVE A HMA TO GO OUT AND

          18    SOCIALIZE WITH THE OTHER REALTOR AND ANSWER QUESTIONS ABOUT

          19    THEIR SICK CATS SO YOU COULD GET BUSINESS, THAT DIDN'T APPLY TO

          20    YOU AT ALL, DIDN'T IT?

          21    A.   THAT'S WHAT WE WANTED, BUT IN REALITY, WE WERE SO BUSY WE

          22    NEEDED HER TO DO THE PROCESSING FUNCTION.

          23    Q.   THAT WAS HER JOB BECAUSE YOU ALREADY WERE THE HIGHEST

          24    PRODUCER WITHOUT HAVING AN HMA ACTING AS A MARKETING PERSON;

          25    ISN'T THAT TRUE?

14:52:22  1   A.  I'M SORRY?

2   Q.  YOU WERE ALREADY THE HIGHEST PRODUCER WITHOUT HAVING MS.

3   DAWSON DO ANY MARKETING WORK AT ALL?

4   A.  WHEN YOU SAY "MARKETING WORK," WHAT'S YOUR DEFINITION?  SHE

5   WAS IN THE OFFICE AND SOCIALIZED WITH THE AGENTS.  SO SHE DID

6   DO MARKETING WORK.

7   Q.  SOCIALIZING WITH THE AGENTS.  BUT HER JOB DUTY, SHE SPENT

8   THE GREAT BULK OF HER TIME WORKING THE LOAN FILES FROM THE TIME

9   YOU TOOK AN APPLICATION TO THE TIME THE LOAN CLOSED; SHE WAS

10  WORKING ON THE FILE, RIGHT?

11  A.  CORRECT, BUT HER JOB WAS TO BE A MARKETING PERSON.

12  Q.  HOW CAN YOU SAY HER JOB WAS TO BE A MARKETING PERSON IF SHE

13  SPENT NO TIME WHATSOEVER DOING MARKETING?

14  A.  THAT'S WHAT IT SAID IN THE CONTRACT.  THAT'S WHAT WE HIRED

14:53:01  15  HER FOR.

16  Q.  BUT THAT'S NOT WHAT YOU ACTUALLY USED HER FOR, IT IT?

17  A.  WE HAD TO IMPROVISE.

18  Q.  DO YOU KNOW OF A SINGLE HMA WHO SPENT A SIGNIFICANT PART OF

19  THEIR TIME DOING MARKETING AS OPPOSED TO LOAN PROCESSING?

20  A.  GABBY MATZ WHO STILL WORKS THERE WHO WAS MY PROCESSOR ABOUT

21  A YEAR.  I KNOW KELLY DID QUITE A BIT.

22  Q.  DO YOU KNOW WHAT KELLY SPENT HER TIME DOING?

23  A.  THROUGH -- YES.

24  Q.  THROUGH WHAT?  SHE WORKED 50 MILES AWAY FROM YOU, DIDN'T

25  SHE?

14:53:30  1    A.   THROUGH JIM OLMSTED WHO SHE WORKED WITH.

2    Q.   YOU'RE CLAIMING YOU HEARD FROM JIM OLMSTED SOMETHING AND

3    THAT'S THE SOURCE OF INFORMATION?

4    A.   JIM OLMSTED WAS ONE OF THE TOP PRODUCERS IN THE COMPANY.

5    EVERY YEAR WE WENT ON A TOP PRODUCER TRIP, AND WE ALWAYS

6    TALKED.   JIM OLMSTED CAME TO MY OFFICE AND SAT DOWN WITH ME AND

7    SPENT A DAY TO FIND OUT HOW I DID BUSINESS, AND WE TALKED VERY

8    DETAIL, YES

9    Q.   MR. OLMSTED TESTIFIED HE WASN'T IN THE PRESIDENT'S CLUB.

10   ARE YOU SAYING JIM OLMSTED WAS, IN FACT, IN THE PRESIDENT'S

11   CLUB?

12   A.   MAYBE NOT AT WELLS FARGO, BUT I WORKED WITH HIM FOR TEN

13   YEARS PRIOR TO THAT AT FIRST CAPITAL.

14   Q.   WELL, FIRST CAPITAL, THIS CASE DOESN'T INVOLVE FIRST

14:54:02 15    CAPITAL.   ARE YOU TALKING ABOUT THIS PERSON WHO WORKED FOR

16   SEVEN YEARS YOU MENTIONED SHE WAS DOING MARKETING DUTIES AT

17   FIRST CAPITAL?

18   A.   KELLY.

19   Q.   NO THE OTHER PERSON.

20   A.   GABBY?

21   Q.   YEAH.

22   A.   NO, DURING THIS PERIOD GABBY WAS ACTUALLY MY PROCESSOR.   SO

23   WHEN SHE WAS AT HSL SHE DID MARKETING WHERE SHE'S STILL

24   EMPLOYED.

25   Q.   NOW MS. BUTLER NEVER WORKED FOR YOU; CORRECT?

14:54:27   1   A.   THAT'S CORRECT.

          2   Q.   SHE NEVER WORKED ON YOUR FILES?

          3   A.   SHE DID ON OCCASION SHE HELPED OUT.

          4   Q.   HOW OFTEN?

          5   A.   LESS THAN TEN TIMES MAYBE IN THE YEARS I KNEW HER.

          6   Q.   AND THE WORK, IF SHE DID HELP YOU ON ANY OF YOUR FILES, IT

          7   WAS DOING WHAT YOU CALL PROCESSOR WORK; CORRECT?

          8   A.   YEAH.   IT WAS GENERALLY BECAUSE LAURA WOULD BE GONE, AND I

          9   HAD AN EMERGENCY, AND IT WAS USUALLY AFTER HOURS, AND DANNY

         10   WOULD E-MAIL HER OR CALL HER AND SAY, CAN YOU HELP MARK AND

         11   BRIDGETTE.   SO I COULD CALL HER AND CONTACT HER AND HAVE HER

         12   HELP ME OUT.

         13   Q.   ALTHOUGH LAURA DAWSON WORKED WITH YOU, YOU DIDN'T VIEW

         14   YOURSELF AS HAVING ANY SUPERVISORY RESPONSIBILITY OVER HER;

14:55:05  15   CORRECT?

         16   A.   CORRECT.

         17   Q.   YOU DIDN'T DIRECT HER WORK?

         18   A.   NO.   I GIVE HER -- I SAY, HERE'S THE PRIORITIES OF WHAT WE

         19   NEED TO DO TODAY, BUT I WASN'T HER BOSS.

         20   Q.   DIDN'T YOU TESTIFY IN YOUR DEPOSITION THAT YOU DIDN'T KNOW

         21   WHAT HER ACTUAL WORK HOURS WERE WHEN SHE WORKED FOR HSL?

         22   A.   YEAH.

         23   Q.   DIDN'T YOU ALSO TESTIFY THAT YOU DIDN'T KEEP TRACK OF HER

         24   HOURS AT ALL?

         25   A.   I DIDN'T KEEP TRACK OF HER HOURS.

14:55:30  1   Q.  DIDN'T YOU ALSO TESTIFY THAT YOU NEVER SPOKE TO MS. DAWSON

2   ABOUT HOW SHE WAS REPORTING HER TIME IN THE DOHERTY TIMEKEEPING

3   SYSTEM?

4   A.  WHAT DO YOU MEAN?

5   Q.  YOU NEVER TALKED TO HER ABOUT HOW MS. DAWSON WAS RECORDING

6   HER TIME IN THE DOHERTY TIMEKEEPING SYSTEM?

7   A.  NO.

8   Q.  ISN'T IT ALSO TRUE THAT YOU RECEIVED MULTIPLE E-MAILS WHERE

9   DANNY VALENTINI APPROVED REQUESTS MADE BY LAURA DAWSON TO WORK

10  OVERTIME?

11  A.  I DO RECALL SOME.  I DON'T KNOW IF SOME WERE FROM ME AND

12  SOME WERE FROM LAURA WHERE I WAS CC'D.

13  Q.  AND YOU NEVER RECEIVED AN E-MAIL FROM MR. VALENTINI THAT

14  SAYS THAT MS. DAWSON SHOULD NOT BE PAID FOR THE TIME SHE

14:56:13 15  WORKED, DID YOU?

16  A.  NO.

17  Q.  DO YOU KNOW WHETHER MR. VALENTINI EVEN REVIEWED MS.

18  DAWSON'S TIME ENTRIES IN THE DOHERTY SYSTEM?

19  A.  I DON'T HAVE KNOWLEDGE OF THAT.

20  Q.  WERE YOU AWARE THAT MS. DAWSON RECORDED OVERTIME ON HER

21  TIME SHEETS AND WAS PAID FOR OVERTIME ON MORE THAN 30 OCCASIONS

22  DURING --

23        MR. TEEPLE:  OBJECTION.  RELEVANCE.

24        THE COURT:  SUSTAINED.

25        MR. KAUFMAN:  WELL, YOUR HONOR, THEY MADE THIS ENTIRE

14:56:38  1   POINT IN THIS CASE ABOUT HOW ALL THE HMA'S ARE THE SAME, AND

       2   THESE HMA'S DIDN'T GET PAID.  SO NOW WHEN I PUT IN EVIDENCE

       3   THEY DID GET PAID, THAT'S IRRELEVANT?

       4          MR. TEEPLE:  DIFFERENT BRANCH, YOUR HONOR.

       5          THE COURT:  ALL RIGHT.  I'LL ALLOW IT.

       6          MR. KAUFMAN:  THANK YOU, YOUR HONOR.

       7   BY MR. KAUFMAN:

       8   Q.  ISN'T THIS TRUE?

       9   A.  COULD YOU REPEAT THE QUESTION?

      10   Q.  THAT MS. DAWSON RECORDED AND WAS PAID FOR OVERTIME ON

      11   APPROXIMATELY 30 OCCASIONS?

      12   A.  I KNOW SHE WAS PAID.  I DON'T KNOW HOW MANY OCCASIONS.

      13   Q.  DO YOU HAVE ANY DOCUMENTS -- LET ME GO BACK A STEP.  DURING

      14   THE TIME YOU WORKED AS A HOME MORTGAGE CONSULTANT, THE COMPANY

14:57:39 15   TREATED THAT AS AN EXEMPT POSITION; ISN'T THAT CORRECT?

      16   A.  YEAH, WHERE I DIDN'T GET OVERTIME.

      17   Q.  YOU DIDN'T RECORD YOUR TIME?

      18   A.  RIGHT.

      19   Q.  NO TRACKING OF YOUR TIME AT ALL?

      20   A.  CORRECT.

      21   Q.  SO IF THEY WERE TO SAY, MARK, I WANT YOU TO GO TO BLITZ AN

      22   OPEN HOUSE, THAT WOULD BE A JOB DONE BY YOU THAT YOU WOULDN'T

      23   RECORD ANY TIME SPENT DOING IT?

      24   A.  ACTUALLY, MICHAEL YIP TRACKED THAT.

      25   Q.  IF HE TRACKED IT, BUT THE POINT IS IT WASN'T RECORDED FOR

14:58:09   1   TIMEKEEPING PURPOSES IF YOU WENT TO A WEEKEND OPEN HOUSE, WAS

           2   IT?

           3   A.   IT WAS RECORDED FOR PURPOSES OF THEY HAD A BLITZ, AND THEY

           4   HAD A CAMPAIGN.  SO LIKE ON THE WEST, THEY WOULD SAY THE WEST

           5   HAD 99 PERCENT PARTICIPATION RATE.  SO HE CALLED MICHAEL AND

           6   SAY, HEY, DID YOU DO OPEN HOUSES, AND I ACTUALLY REFUSED TO DO

           7   THEM.  I SAID, NO, I'LL SIT IN THE OFFICE AND WORK AND BE

           8   AVAILABLE, BUT IT WAS A WASTE OF OUR TIME TO GO TO EVERY OPEN

           9   HOUSE.  IT WAS STUPID.  SO MICHAEL YIP, I HAD TO GIVE HIM NAMES

          10   OF AGENTS OF OPEN HOUSES THAT I WENT TO SEE, AND I'D SAY, OKAY,

          11   HERE IS FIVE AGENTS, AND HE WOULD RECORD IT.

          12   Q.   THE BLITZ REQUEST, THAT WAS DIRECT TO THE EXEMPT HOME

          13   MORTGAGE CONSULTANTS NOT TO HOURLY EMPLOYEES; ISN'T THAT

          14   CORRECT?

14:58:50  15   A.   I DON'T REMEMBER.  I THINK SOME HMA'S PARTICIPATED IN THAT

          16   AS WELL.

          17   Q.   DO YOU KNOW OF ANY E-MAIL THAT WENT SAYING, HMA'S, GO OUT

          18   TO PARTICIPATE IN BLITZ'?  I HAVE NEVER SEEN IT, BUT HAVE

          19   YOU?

          20   A.   I DON'T RECALL AN E-MAIL.

          21   Q.   DO YOU HAVE ANY PERSONAL KNOWLEDGE OF THE HOURS THAT

          22   MS. BUTLER WORKED?

          23   A.   OTHER THAN TALKING TO JIM, NO.

          24   Q.   DO YOU HAVE ANY KNOWLEDGE OF WHETHER -- IF YOU JUST FOCUSED

          25   ON HER LOAN PROCESSING DUTIES, PUTTING ASIDE WHATEVER SUPPOSED

```
14:59:25    1   MARKETING DUTY SHE MAY HAVE DONE -- HOW MUCH TIME THAT TOOK?

            2   A.   I KNOW IN CONVERSATIONS WITH JIM WHAT WAS DRASTICALLY

            3   DIFFERENT WAS THAT MY GIRL SPENT MOST OF THE TIME PROCESSING

            4   AND JIM WAS OPPOSITE.   HIS GIRLS SPENT MORE TIME MARKETING.

            5   Q.   WHEN DID YOU HAVE THIS DISCUSSION?

            6   A.   MULTIPLE TIMES.

            7              MR. KAUFMAN:   I HAVE NO FURTHER QUESTIONS.

            8                        REDIRECT

            9   BY MR. GARRISON:

           10   Q.   COUPLE ISSUES I JUST WANT TO CLARIFY.   WHEN YOU SIGNED THIS

           11   CONTRACT TO GET AN HMA -- IT'S THE ONE IN FRONT OF YOU, EXHIBIT

           12   35.

           13   A.   OKAY.

           14   Q.   AND THAT SAID WHAT THE PERSON WAS SUPPOSED TO HELP YOU

15:00:01   15   WITH; CORRECT?

           16   A.   YES.

           17   Q.   IT SAID THEY WERE GOING TO HELP YOU WITH PERFORMING

           18   SALES-RELATED FUNCTIONS; CORRECT?

           19   A.   YES.

           20   Q.   IN YOUR BUSINESS, SALES-RELATED FUNCTIONS IS SOMETHING TO

           21   GET MORE CLIENTS; ISN'T THAT RIGHT?

           22   A.   ABSOLUTELY.

           23   Q.   WHY WOULD YOU TAKE A PERCENTAGE OF YOUR MONEY THAT YOU

           24   WOULD EARNED AND GIVE IT TO SOMEONE TO PROCESS LOANS BECAUSE

           25   THAT GIVES YOU MORE MONEY?
```

15:00:21  1    A.  NO.  WE WERE VERY BITTER ABOUT IT.  WE RESENTED IT.

2    Q.  SO WHEN YOU SAY LAURA DAWSON DID THIS ON QUESTIONS FROM

3    COUNSEL, WHAT YOU WERE -- STRIKE THAT.

4         DID YOU INTEND TO PAY YOUR COMMISSION SPLIT TO HAVE A

5    LOAN PROCESSOR OR SOMEONE TO HELP YOU DO WHAT YOU NEEDED TO

6    GROW YOUR BUSINESS?

7    A.  SOMEONE TO HELP ME GROW MY BUSINESS.

8    Q.  IT JUST DIDN'T WORK OUT THAT WAY FOR YOU?

9    A.  NO, SIR.

10   Q.  IN REGARD TO LAURA DAWSON'S TIME, YOU DIDN'T KEEP TRACK OF

11   HER TIME BECAUSE THAT WASN'T SOMETHING YOU WERE SUPPOSED TO DO;

12   CORRECT?

13   A.  CORRECT.

14   Q.  NOW, HOW MANY CONVERSATIONS, TO THE BEST ESTIMATE YOU CAN

15:00:59  15   GIVE ME, DID YOU HAVE WITH DANNY VALENTINI ABOUT LAURA NEEDING

16   OVERTIME OVER THE COURSE OF THE TIME YOU WERE THERE?

17   A.  AT LEAST MONTHLY, YEAH.

18   Q.  SO YOU'RE NOT SAYING SHE WASN'T PAID ANY OVERTIME.  WHAT

19   YOU'RE SAYING IS -- WERE THERE TIMES WHEN YOU ASKED FOR

20   OVERTIME, AND HE SAID YOU COULDN'T DO IT?

21   A.  YES.

22   Q.  WAS THOSE IN WRITING OR VERBAL?

23   A.  VERBAL.  HE JUST SAID, MACRO, CAN'T DO IT; IT'S NOT THERE.

24   HE ACTUALLY, IN FACT, WHAT HE DID IS HE ALLOWED ME TO BUY HER

25   SOME GIFT CERTIFICATES AND CALL THEM RAFFLE PRIZES FOR OPEN

15:01:39    1    HOUSE THINGS.  SO HE HAD SOME WORK AROUNDS --

            2               THE COURT:  WE'RE OFF AGAIN.

            3               MR. GARRISON:  I JUST WANT YOU TO ANSWER MY QUESTION,

            4    SIR.   I THINK THAT'S IT FOR ME, JUDGE.

            5               THE COURT:  ALL RIGHT.

            6               MR. KAUFMAN:  VERY QUICK, YOUR HONOR.

            7                        RECROSS-EXAMINATION

            8    BY MR. KAUFMAN:

            9    Q.   THERE ARE HOME MORTGAGE CONSULTANTS WHO DO ALL THE JOB

           10    WITHOUT HAVING A HOME MORTGAGE ASSOCIATE; ISN'T THAT TRUE?

           11    A.   YES.

           12    Q.   SO THERE'S SOME HOME MORTGAGE CONSULTANTS WHO DO ALL THE

           13    WORK THAT YOU ARE REFERRING TO AS THE PROCESSING ON THE LOAN?

           14    A.   THAT'S CORRECT.

15:02:13   15    Q.   AND ISN'T ONE OF THE IDEAS OF HAVING AN HMA IS BECAUSE IT

           16    FREES UP THE HOME MORTGAGE CONSULTANT FROM DOING THIS

           17    PROCESSING WORK, AND THEY HAVE MORE TIME TO GO OUT AND MARKET

           18    THEMSELVES; ISN'T THAT TRUE?

           19    A.   SAY AGAIN?

           20    Q.   IF THE HMA IS DOING THE PROCESSING WORK THAT WOULD NORMALLY

           21    BE DONE BY THE HMC, THE HMC HAS MORE TIME TO MARKET; ISN'T THAT

           22    RIGHT?

           23    A.   YES.

           24    Q.   AND BY HAVING LAURA DAWSON DO ALL THIS PROCESSING, IT GAVE

           25    YOU MORE TIME TO MARKET; ISN'T THAT TRUE?

15:02:45  1   A.   THAT'S CORRECT.

2            MR. KAUFMAN:   I HAVE NOTHING FURTHER.   THANK YOU.

3            THE COURT:   ALL RIGHT.   THANK YOU, SIR.

4            MR. TEEPLE:   YOUR HONOR, MAY THE WITNESS BE

5    EXCUSED?

6            THE COURT:   ANY PROBLEM WITH THAT?

7            MR. KAUFMAN:   NOT AT ALL.

8            THE COURT:   YOU'RE EXCUSED, SIR.

9            MR. TEEPLE:   I ASK BECAUSE HE'S TRAVELING, AND I

10   DIDN'T WANT TO HAVE A PROBLEM.

11           THE COURT:   THAT'S GOOD.   DO WE HAVE ANOTHER WITNESS

12   OUT OF ORDER?

13           (WHEREUPON PROCEEDINGS REPORTED BUT NOT TRANSCRIBED.)

14           THE COURT:   ALL RIGHT.   THANK YOU.   YOU MAY BE

15:44:04 15  EXCUSED.   AND I GUESS YOU CAN GO HOME.   OKAY.   NEXT WITNESS?

16           MR. KAUFMAN:   YOUR HONOR, WE'D LIKE TO BRING BACK

17   MR. VALENTINI TO DO OUR DIRECT.

18           THE COURT:   THAT'S FINE.

19           THE CLERK:   JUST REMIND YOU YOU ARE STILL UNDER

20   OATH.

21                        CROSS-EXAMINATION

22   BY MR. KAUFMAN:

23   Q.   GOOD AFTERNOON, MR. VALENTINI.   I'M GOING TO TRY TO CUT OUT

24   A LOT OF THIS.   I DON'T WANT TO GO OVER STUFF REPEATEDLY.

25           A FEW THINGS ABOUT MR. OLMSTED TO START.   DID YOU

15:46:02  1   RECEIVE REPORTS THAT WOULD LET YOU SEE THE AMOUNT OF LOANS THAT

2   MR. OLMSTED WAS HAVING CLOSED IN A PARTICULAR MONTH?

3   A.   YES.   I HAD ACCESS TO WEEKLY OR MONTHLY REPORTS SHOWING ME

4   THE PRODUCTION LEVELS OF HIS LOAN VOLUME, YES.

5   Q.   EARLIER WHEN YOU WERE TALKING ABOUT THE WAYS IN WHICH YOU

6   SUPERVISED THE HMC'S AND THE HMA'S, THERE WAS SOME DISCUSSION

7   ABOUT THIS SORT OF PRODUCTIVITY.   I DIDN'T REALLY FULLY

8   UNDERSTAND IT.   IF YOU WOULD JUST EXPLAIN WHAT WAS YOUR ROLE

9   WITH RESPECT TO MONITORING THE LEVEL OF PRODUCTIVITY OF THE

10   EMPLOYEES WHO REPORTED UP TO YOU.

11   A.   THERE WAS A CERTAIN STANDARD OF VOLUME IN TERMS OF UNITS

12   AND DOLLARS AND WHAT WE CALL CAPTURE RATES WITHIN THAT OFFICE

13   THAT THEY SIT IN.   SO WE MEASURE THOSE IN TERMS OF WEEKLY AND

14   MONTHLY REPORTS.   THERE ARE THOSE LOAN OPTIONS THAT DO QUITE

15:46:57  15   WELL IN THE CAPTURE RATE LEVEL OR HIGHER VOLUME LEVEL, AND

16   THOSE ARE CONSIDERED WHAT WE CALL PRESIDENT'S CLUB HMC'S, AND

17   SO WE BASICALLY TRACK THROUGH THESE MONTHLY AND WEEKLY VOLUME

18   REPORTS.

19   Q.   FROM YOUR ROLE AS THE BRANCH MANAGER, DID YOU HAVE A

20   GENERAL FAMILIARITY WITH WHAT THE EXPECTATIONS WERE IN THE JOB

21   DUTY OF HOME MORTGAGE ASSOCIATE?

22   A.   I HAVE A GENERAL IDEA, YES.

23   Q.   WHAT DID YOU EXPECT THAT THE HOME MORTGAGE ASSOCIATES WOULD

24   BE DOING FOR THE HMC'S THAT THEY SUPPORTED?

25   A.   THEY WOULD PRIMARILY HAVE A FUNCTION OF SUPPORTING THE

15:47:40  1   PAPERWORK TO PUT THOSE LOANS TOGETHER, DOCUMENTATION, REQUESTS

2   FROM LAWYERS, SOME DOCUMENTATION FOR INCOME AND ASSETS.  THEY

3   WOULD PREPARE THE FILE, AND THEY WOULD PREPARE THE FORMS THAT

4   WE NEED FROM THE LOAN CENTER, AND THEY WOULD ALSO PRIMARILY

5   HELP PULL THOSE LOANS THROUGH, COMMUNICATE WITH THE LOAN CENTER

6   SO PRIMARILY MORE OF A PROCESSING ROLE RATHER THAN ANYTHING

7   ELSE.

8   Q.  HAD YOU EVER HEARD OF THE JOB OF A HOME MORTGAGE ASSOCIATE

9   REFERRED TO AS A PROCESSOR JOB?

10   A.  YES, THAT WAS ALMOST INTERCHANGEABLE.

11   Q.  WHO REFERRED TO IT AS A PROCESSOR JOB?

12   A.  I THINK MOST AGENCIES HAVE REFERRED THEM, HAVE REFERRED TO

13   THEM AS PROCESSORS.

14   Q.  DID MR. BUCHANAN WHO TESTIFIED BEFORE -- I BELIEVE HE'S

15:48:36  15   STILL IN THE COURTROOM; HI, MR. BUCHANAN -- COMPLAIN TO YOU

16   THAT HE FELT IT WAS UNFAIR TO HAVE TO SHARE COMMISSION WITH

17   LAURA DAWSON BECAUSE THE JOB OF HMA IS JUST A PROCESSOR JOB?

18   A.  YES.

19   Q.  DID YOU DISAGREE WITH HIM AND SAY NO, THE JOB OF HMA IS

20   VERY DIFFERENT FROM THAT?

21   A.  I GENERALLY DID NOT DISAGREE WITH THAT.

22   Q.  I REALIZE YOU TESTIFIED THERE WAS SOME NUANCES OF

23   DIFFERENCE BETWEEN DIFFERENT HMA'S AND HOW THEY DIVIDED UP

24   DUTIES WITH THE HOME MORTGAGE CONSULTANTS.  DO YOU KNOW WHETHER

25   KELLY BUTLER WAS SOMEHOW UNIQUE IN TERMS OF HOW SHE DID HER JOB

15:49:28   1   AS COMPARED TO THE OTHER HMA'S WHO REPORTED UP TO YOU?

2   A.   GENERALLY, I WOULDN'T SAY SHE WAS UNIQUE TO ALL OTHER

3   HMA'S.   THERE ARE NUANCES IN REGARDS TO THEIR OWN RELATIONSHIP

4   AND WHAT AGENCIES WOULD LIKE TO HANDLE VERSUS WHAT THEY DON'T

5   WANT TO HANDLE, BUT I WOULDN'T SAY GENERALLY SPEAKING THAT IT

6   WAS MUCH DIFFERENT THAN OTHER HMA'S.

7   Q.   DO YOU KNOW WHETHER MS. BUTLER WOULD SPEND SIX HOURS A DAY

8   IN THE OFFICE JUST CHATTING AND DOING SALES ACTIVITY WITH

9   PRUDENTIAL AGENTS IN THE BUILDING?

10   A.   WOULD I KNOW THAT?

11   Q.   YEAH.

12   A.   NO.

13   Q.   WOULD YOU EXPECT THAT --

14   A.   NO.

15:50:06   15   Q.   WHY NOT?

16   A.   BECAUSE HER PRIMARY FUNCTION, AS I UNDERSTAND IT AND AS I

17   UNDERSTAND OTHER HMA'S AND HMC'S, HER ROLE REALLY WOULD BE TO

18   SUPPORT LOAN VOLUME, LOAN PRODUCTION, OF THE HMC.

19   Q.   IF THERE WAS A LOAN BLITZ WHERE THEY GO OUT TO THE OPEN

20   HOUSES, WAS IT YOUR EXPECTATION THAT WOULD BE DONE BY THE

21   EXEMPT HOME MORTGAGE CONSULTANTS OR THAT IT WOULD BE DONE BY

22   THE HOME MORTGAGE CONSULTANTS AND THE HOME MORTGAGE

23   ASSOCIATES?

24   A.   THE OPEN HOUSE BLITZ'?

25   Q.   YEAH.

15:50:40 1   A.   THOSE WOULD BE DONE BY THE HMC, THE HOME MORTGAGE

2   CONSULTANT.

3   Q.   BETWEEN 2008 AND 2010, WHAT WAS YOUR UNDERSTANDING OF WHAT

4   THE POLICY WAS FOR PAYING OVERTIME TO HOME MORTGAGE

5   ASSOCIATES?

6   A.   EMPLOYEES WOULD INPUT THEIR CARDS.   THEY WOULD INPUT THE

7   TIME THEY WORKED.   THEY WOULD SUBMIT IT THROUGH SOME ONLINE

8   PROCESS, AND THOSE WOULD BE PAID OUT THROUGH DOHERTY.   THEY

9   WERE ASKED TO GET PRIOR APPROVAL FOR ANY KIND OF OT.   BUT IF

10   THEY DID WORK OT, OVERTIME, WITHOUT ASKING FOR THE APPROVAL, I

11   NEVER DID DENY THAT, AND THEY ALWAYS GOT PAID FOR IT.

12   Q.   IF A HOME MORTGAGE ASSOCIATE WORKED AN ADDITIONAL HOUR OF

13   OVERTIME, HOW MUCH PAY WOULD THEY RECEIVE WITH IT?

14   A.   FOR THE OVERTIME?

15:51:41 15   Q.   YES, FOR ONE HOUR.

16   A.   TIME AND A HALF.

17   Q.   SO IF MS. BUTLER WAS MAKING, I BELIEVE, $33 AN HOUR --

18   $34.50 APPROXIMATELY.   SO THAT $34.50 HOW MUCH DID THAT COMPARE

19   TO YOUR OVERALL BUDGET THAT YOU WERE RESPONSIBLE FOR?   WAS IT A

20   BIG PART OF IT?

21   A.   I NEVER THOUGHT IT WAS A SIGNIFICANT PART AT ALL.

22   Q.   HOW BIG WAS YOUR OVERALL BUDGET IN TERMS OF THE TOTAL

23   EXPENSES THAT WERE OF YOUR REGION OR OF SAN DIEGO AND ORANGE

24   COUNTY?   HOW MUCH MONEY ARE WE TALKING ABOUT WAS THE

25   EXPENDITURES?

15:52:28   1   A.  I CAN'T GIVE YOU THAT EXACT NUMBER, BUT I DO KNOW THAT I

2   NEVER THOUGHT THE OT LINE ITEM FOR THAT P AND L OF MINE,

3   MONTHLY OR ANNUALLY, I NEVER LOOKED AT THAT AND MANAGED THAT OT

4   LINE.  IT WASN'T A SIGNIFICANT PART OF THE OVERALL EXPENSE, I

5   KNOW THAT.  IT WASN'T SOMETHING I FOCUSED ON.

6   Q.  CAN YOU GIVE ME AN ESTIMATE AT ALL OF HOW BIG THE OVERALL

7   BUDGET IS?

8   A.  I'D BE GIVING YOU A PRETTY ROUGH ESTIMATE.

9   Q.  GIVE ME A ROUGH ESTIMATE.

10   A.  I MEAN, OUR BUDGET WOULD BE, LET'S SEE HERE, FOR EXPENSES,

11   IT COULD BE IN THE RANGE OF A MILLION AND A HALF TO TWO MILLION

12   DOLLARS IN TERMS OF EXPENSES.

13   Q.  PER MONTH?

14   A.  NO, NO ANNUALLY.

15:53:32  15   Q.  WHY DIDN'T YOU MAKE IT A HABIT TO REVIEW THE TIME OF THE

16   HOME MORTGAGE ASSOCIATES TO MAKE SURE THAT THEY WERE RECORDING

17   ACCURATELY THE TIME THAT THEY WORKED?

18   A.  FIRST OF ALL, I TRUSTED MY EMPLOYEES.  I WOULD ASSUME

19   ALWAYS THEY DO THE RIGHT THING.  I DIDN'T HAVE ANY REASON TO

20   SUSPECT HOURS THAT WERE NOT REPORTED CORRECTLY, START TIMES.

21   LIKE I SAID, I MANAGED SOME OF THE REPORTS, DAILY

22   COMMUNICATIONS, IN REGARD TO LOAN FILES AND PROCESSES.  SO I

23   DID TRUST MY EMPLOYEES.  I JUST DIDN'T SEE THAT OVERALL NEED TO

24   BE VERY, VERY VIGILANT ON MINUTE-BY-MINUTE OVERTIME OR TIME

25   SUPERVISION.  SO I'M NOT SURE IF I ANSWERED THE QUESTION.

15:54:29  1    Q.  I THINK SO.  YOU WOULD FROM TIME TO TIME GET REQUESTS FOR

          2    OVERTIME?

          3    A.  I WOULD GET THAT, YES.

          4    Q.  AND WHAT WAS THE PHILOSOPHY, FOR LACK OF A BETTER WORD, WAS

          5    YOUR PHILOSOPHY OF DECIDING WHEN TO APPROVE OVERTIME VERSUS

          6    WHEN TO NOT APPROVE OVERTIME?

          7    A.  THE THRESHOLD WASN'T VERY, VERY DIFFICULT.  I THINK AN HMA

          8    WOULD ASK OR HMC WOULD ASK AND ONE HUNDRED PERCENT OF THE TIME

          9    I NEVER SAID NO TO AN OVERTIME REQUEST.  AS LONG AS THEY

         10    VERBALLY JUSTIFIED IT, I ASKED THEM TO SEND A QUICK E-MAIL, AND

         11    WE'LL GO AHEAD AND APPROVE IT.

         12    Q.  NOW, MR. BUCHANAN, HE TESTIFIED THAT YOU HAD MANY

         13    CONVERSATIONS WITH HIM WHERE YOU TOLD HIM ABOUT, OH, I CAN'T

         14    APPROVE HMA OVERTIME, IT'S TOO MUCH MONEY, DON'T HAVE THEM WORK

15:55:21 15    OVERTIME; IS HE TELLING THE TRUTH ABOUT THAT?

         16    A.  I DON'T RECALL THOSE KINDS OF CONVERSATIONS.

         17    Q.  WAS IT YOUR EXPERIENCE THAT HMA'S, OR HOME MORTGAGE

         18    ASSOCIATES, THAT THEY NEEDED TO WORK MORE THAN 40 HOURS IN A

         19    TYPICAL WEEK TO BE ABLE TO GET THE DUTIES DONE THAT THEY WERE

         20    HIRED TO DO?

         21    A.  NOT NECESSARILY.  AGAIN, DEPENDING ON THE UNIT VOLUME FOR

         22    THAT MONTH, THERE WOULD BE TIMES WHERE THEY HAVE A LITTLE MORE

         23    VOLUME OR CERTAIN DEADLINES TO MEET AND THAT WOULD PROBABLY

         24    JUSTIFY IT.  BUT THERE WERE MANY TIMES THAT VOLUME LEVELS MIGHT

         25    NOT BE THERE TO JUSTIFY AN OVERTIME FOR CERTAIN GROUPS OR

15:56:05   1    HMA/HMC GROUPS.

           2    Q.   IF YOU KNOW, FROM THE TIME THAT AN HMA TAKES A LOAN FILE TO

           3    THE TIME WHERE IT HAS TO BE SUBMITTED TO THE FULFILLMENT

           4    CENTER, IS THAT SOMETHING THAT HAS TO BE DONE THAT SAME DAY, OR

           5    WAS THERE A TIME PERIOD IN BETWEEN?

           6    A.   I THINK WE'D LIKE TO SEE BETWEEN THREE TO FIVE DAYS TO

           7    PREPARE A LOAN FILE TO BE READY TO SUBMIT TO OUR LOAN CENTER.

           8    Q.   AND THEN ONCE IT GOES TO THE LOAN CENTER, THERE'S A PROCESS

           9    BETWEEN THERE AND WHEN THE LOAN CLOSES, RIGHT?

          10    A.   YEAH.   ON AVERAGE, LET'S JUST SAY BETWEEN 20 TO 25 DAYS TO

          11    PULL THAT FILE OUT OF OUR LOAN CENTER AND APPROVE IT AND FUND

          12    IT.

          13    Q.   WHAT WOULD BE THE REASONS, IF THERE IS ANY, WHY A HOME

          14    MORTGAGE ASSOCIATE WOULD NOT BE ABLE TO WAIT UNTIL THE NEXT DAY

15:56:53  15    TO BE ABLE TO DO SOMETHING AND HAD TO STAY LATE THAT NIGHT TO

          16    MAKE SURE IT GOT DONE THAT SAME DAY?

          17    A.   IF THERE WAS A DEADLINE TO MEET AND THAT DOES HAPPEN.   SO

          18    THOSE ARE ABSOLUTE JUSTIFIABLE TIMES TO REQUEST FOR OVERTIME

          19    AND TO HAVE IT.

          20    Q.   DID YOU RECEIVE ANY DIRECTIVES THAT EVEN IF THERE WAS A

          21    NEED TO HAVE AN HMA WORK TO GET A LOAN CLOSED THAT NONETHELESS

          22    YOU SHOULD NOT ALLOW THEM TO WORK OVERTIME?   DID YOU EVER

          23    RECEIVE THAT DIRECTIVE FROM ABOVE?

          24    A.   NO.

          25    Q.   WHAT DIRECTIVES, IF ANY, DID YOU EVER RECEIVE ABOUT

15:57:34  1   OVERTIME DURING 2008, 2009 AND 2010 FROM PEOPLE ABOVE YOU?

2   A.   TO TRY TO GET THE PRIOR APPROVAL PROCESS IN PLACE, HAVE

3   THAT CULTURE IN PLACE.

4   Q.   CAN YOU RECALL ANY PARTICULAR SITUATION WHERE AN HMA CAME

5   TO YOU AND SAID, I NEED TO WORK OVERTIME, I LIKE TO, AND YOU

6   TOLD THEM NO?

7   A.   NO, I DON'T.

8   Q.   NOW, MS. BUTLER -- AND FOUNDATION WILL BE LAID BY OUR

9   EXPERT WHEN HE COMES IN -- BUT ASSUME FOR THE SAKE OF ARGUMENT

10  THAT MS. BUTLER CLOSED AN AVERAGE OF JUST UNDER THREE LOANS PER

11  WEEK.  DO YOU HAVE A SENSE OF, ASSUMING AN AVERAGE LOAN FILE,

12  HOW MUCH TIME IT WOULD TAKE FOR AN HMA TO WORK TO HANDLE THAT

13  KIND OF A FILE LOAD?

14  A.   THREE LOANS A WEEK.   THREE LOANS A WEEK IN TERMS OF --

15:58:33  15  DEPENDING HOW WE DEFINE THREE LOANS.   IF WE DEFINE AS FUNDING

16  THREE LOANS, THAT'S ABOUT 12 LOANS A MONTH AND THAT WOULD BE A

17  REASONABLE AMOUNT OF PIPELINE TO DEAL WITH.   IF WE'RE JUST

18  TALKING ABOUT BRAND-NEW LOANS, THREE PER WEEK, THEN THAT

19  WOULDN'T TAKE A LOT OF TIME TO DO THAT.

20  Q.   DID MS. BUTLER EVER ASK YOU ABOUT WORKING OVERTIME?

21  A.   NO.

22  Q.   DID YOU EVER HAVE ANY DISCUSSION WITH HER OF ANY SORT THAT

23  YOU CAN RECALL ABOUT WORK HOURS?

24  A.   NO.

25  Q.   MS. BUTLER CONTENDS SHE FREQUENTLY HAD PHONE CALLS WITH YOU

15:59:08  1    OUTSIDE OF NORMAL BUSINESS HOURS.  IS THAT YOUR RECOLLECTION?

        2    A.  I CAN RECOLLECT PHONE CALLS IN VARIOUS TIMES OF THE DAY OR

        3    MORNING OR EVENING, YES.

        4    Q.  IN YOUR OWN MEMORY, I REALIZE THERE'S PHONE RECORDS, AND

        5    WE'LL GO OVER THE PHONE RECORDS LATER, BUT HOW OFTEN WAS IT YOU

        6    BELIEVE THAT YOU GOT A CALL FROM KELLY BUTLER EITHER BEFORE

        7    9:00 A.M. OR AFTER 5:00 P.M.?

        8    A.  I JUST NEVER THOUGHT IT WAS THAT OFTEN.

        9    Q.  WHEN YOU SAY NOT OFTEN, WAS IT A DAILY OCCURRENCE, WEEKLY

       10    OCCURRENCE?

       11    A.  IT WASN'T A DAILY OCCURRENCE, NO.

       12    Q.  NOW, IF KELLY BUTLER SENT A TEXT MESSAGE TO YOU AT 7:00

       13    P.M., WOULD YOU THINK THAT SHE MUST BE AT WORK IF SHE IS

       14    SENDING A TEXT MESSAGE?

15:59:54 15    A.  NOT NECESSARILY.

       16    Q.  WHY NOT?

       17    A.  A TEXT MESSAGE IS REALLY USED FOR A VERY, VERY QUICK

       18    COMMUNICATION -- YES OR NO, I'LL TRY TOMORROW, I'LL CALL

       19    TOMORROW -- IT COULD BE A VERY, VERY QUICK TEN-SECOND TYPE.  SO

       20    I COULDN'T TELL YOU IF THAT WAS PART OF HER WORK OR DRIVING

       21    HOME OR AT HOME.  I COULDN'T TELL YOU.

       22    Q.  DID YOU, IN GENERAL, FEEL THAT YOUR EMPLOYEES WERE HONEST

       23    WITH YOU?

       24    A.  I ALWAYS THOUGHT THEY WERE.

       25    Q.  DID YOU -- IS IT YOUR PHILOSOPHY TO GIVE THEM THE BENEFIT

16:00:28    1   OF THE DOUBT AND ASSUME THEY'RE HONEST, OR DID YOU HAVE THEM

            2   HAVE TO PROVE TO YOU THAT THEY'RE HONEST BEFORE YOU WOULD

            3   ASSUME THAT?

            4   A.   MY NATURE IS TO ASSUME THEY'RE HONEST.

            5           MR. KAUFMAN:  I HAVE NOTHING FURTHER.  THANK YOU.

            6           THE COURT:  ALL RIGHT.

            7           MR. TEEPLE:  VERY BRIEFLY, YOUR HONOR.

            8                        REDIRECT EXAMINATION

            9   BY MR. TEEPLE:

           10   Q.   WHY WAS TODD JOHNSON SO AGAINST OVERTIME THEN IF THIS

           11   POLICY WAS SO FREE?

           12           MR. KAUFMAN:  OBJECTION.  ASSUMES FACTS NOT IN

           13   EVIDENCE, YOUR HONOR.

           14           THE COURT:  I'M SORRY?  I DIDN'T HEAR.

16:00:52   15           MR. KAUFMAN:  ASSUMES FACTS NOT IN EVIDENCE THAT TODD

           16   JOHNSON WAS SO --

           17           THE COURT:  SUSTAINED.

           18   BY MR. TEEPLE:

           19   Q.   WHAT'S YOUR OPINION ABOUT TODD JOHNSON'S ATTITUDE ABOUT

           20   OVERTIME?  WAS HE FOR IT, OR DID HE RESIST IT AND TRY TO

           21   MINIMIZE IT?

           22   A.   I DON'T THINK HE RESISTED IT AND MINIMIZED IT.

           23   Q.   THAT E-MAIL WE READ WITH YOU WHERE TODD DOESN'T WANT US

           24   ISSUING ANY MORE OVERTIME, THAT WAS JUST ABSOLUTELY ONE HUNDRED

           25   PERCENT WRONG?

16:01:17  1    A.  WHAT I SAID, IT WASN'T WHAT I MEANT TO SAY IN THAT E MAIL.

2    WHAT I MEANT TO SAY REALLY WAS TO EMPHASIZE WE NEED TO HAVE

3    PRIOR APPROVAL FOR OVERTIME, AND I SHOULD HAVE SAID THAT.

4    Q.  NOT TO LIMIT OVERTIME, RIGHT?  NOT TO LIMIT OVERTIME IN ANY

5    WAY.  YOU NEVER HEARD THAT MESSAGE?

6    A.  NO?  IF SOMEONE WORKS OVERTIME, THEY GET PAID.

7    Q.  MR. BUCHANAN IS WRONG WHEN HE SAID YOU AND HE HAD MULTIPLE

8    DISCUSSIONS ABOUT THAT, RIGHT?

9    A.  MULTIPLE DISCUSSIONS?  I DON'T KNOW THAT.

10   Q.  ANY DISCUSSION?  DID YOU HAVE ANY THAT YOU RECALL?

11   A.  NO.

12   Q.  NO?

13   A.  NO.

14   Q.  AND DO YOU KNOW WHY MR. YIP WOULD BE SCARED TO PUT HIS

16:01:53  15   OVERTIME DOWN?

16           MR. KAUFMAN:  OBJECTION, YOUR HONOR.  ASSUMES FACTS

17   NOT IN EVIDENCE.

18           THE COURT:  SUSTAINED.

19   MR. TEEPLE:

20   Q.  DO YOU KNOW WHY MR. YIP WASN'T BEING ACCURATE ON HIS TIME

21   CARD?

22   A.  I REALLY DON'T.

23   Q.  DO YOU KNOW WHY MR. YIP WOULD HAVE ANY CONCERN ABOUT HIS

24   CAREER RELATED TO OVERTIME?

25   A.  I COULDN'T IMAGINE MR. YIP BEING AFRAID OF HIS CAREER.

16:02:11   1   Q.  YOU KNOW HE TESTIFIED TO THAT, RIGHT?

           2           MR. KAUFMAN:  OBJECTION, YOUR HONOR.

           3           THE COURT:  SUSTAINED.  SUSTAINED.  IT'S OUT OF

           4   CONTEXT.

           5           MR. TEEPLE:  NOTHING FURTHER, YOUR HONOR.

           6           MR. KAUFMAN:  I HAVE ONE SERIES OF QUESTIONS.  IT

           7   WILL BE SHORT.

           8                           RECROSS-EXAMINATION

           9   BY MR. KAUFMAN:

          10   Q.  YOU'VE BEEN SHOWN SEVERAL E-MAILS FROM MS. CLARK, MRS.

          11   BUTLER MS. DAWSON -- ACTUALLY, NOT MS. BUTLER, I TAKE THAT BACK

          12   -- MS. CLARK AND MS. DAWSON.  YOU'VE BEEN SHOWN SEVERAL E-MAILS

          13   FROM HMA'S WHERE THEY PUT IN REQUESTS FOR OVERTIME TO YOU.  WAS

          14   IT YOUR UNDERSTANDING WHEN YOU WERE ANSWERING THOSE REQUESTS

16:02:42  15   THAT YOU WERE REJECTING THEIR REQUESTS, OR YOU WERE APPROVING

          16   THEM?

          17           MR. TEEPLE:  OBJECTION, YOUR HONOR.  EXCEEDS THE

          18   SCOPE OF REDIRECT.

          19           THE COURT:  SUSTAINED.  EXCEEDS THE SCOPE.

          20           MR. KAUFMAN:  OKAY.  I'M DONE, YOUR HONOR.  THANK

          21   YOU.

          22           THE COURT:  THANK YOU, SIR.  YOU'RE DONE.

          23           MR. TEEPLE:  IF EVERYBODY IS AS TIRED AS I AM, YOUR

          24   HONOR, FROM THIS DAY, WE BEAT OUR TIME, AND WE HAVE WITNESSES

          25   BUT NO MORE FOR TODAY.

16:03:08

1     THE COURT: YOU DON'T HAVE ANY HERE?

2          MR. TEEPLE: NO, BUT WE'RE DOING GREAT ON OUR TIME

3     ESTIMATE. WE'LL BE DONE TOMORROW. NO PROBLEM.

4          THE COURT: ALL RIGHT. I'M GOING TO HOLD YOU TO

5     THAT.

6          MR. TEEPLE: I'M GOING TO HOLD ME TO IT TOO. MY WIFE

7     IS HOLDING ME TO THAT.

8          THE COURT: ALL RIGHT. LADIES AND GENTLEMEN, YOU'RE

9     DONE FOR THE DAY. THANK YOU FOR YOUR ATTENTION. WE'LL SEE YOU

10    TOMORROW AT 9:00. LEAVE YOUR PADS HERE. REMEMBER MY

11    ADMONISHMENT. PLEASE DON'T DISCUSS THIS MATTER WITH ANYONE.

12          (CONCLUSION OF TRIAL-DAY TWO.)

13               C-E-R-T-I-F-I-C-A-T-I-O-N

14

15          I HEREBY CERTIFY THAT I AM A DULY APPOINTED, QUALIFIED
      AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED STATES
16    DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT
      TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE;
17    THAT SAID TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY
      STENOGRAPHIC NOTES; AND THAT THE FORMAT USED HEREIN COMPLIES
18    WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL
      CONFERENCE.

19          DATED: DECEMBER 24, 2013, AT SAN DIEGO, CALIFORNIA.

20

21               /S/ JULIET Y. EICHENLAUB
                 JULIET Y. EICHENLAUB, RPR, CSR
22               OFFICIAL COURT REPORTER
                 CERTIFIED SHORTHAND REPORTER NO. 12084
23

24

25